Termane Wood
DOC Number: 271967
Oklahoma State Penitentiary
McAlester, Oklahoma

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **Termane Wood,** | **Case No. 5:10-cv-00829-HE** |
| **Petitioner,** | |
| | **Judge Joe Heaton** |
| **vs.** | |
| **Randall Workman, Warden,** | |
| **Oklahoma State Penitentiary,** | |
| **Respondent.** | |

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY
## PURSUANT TO 28 U.S.C. § 2254

Jon M. Sands
Federal Public Defender
Robin C. Konrad (Ala. Bar No. 2194-N76K)
Kelly L. Schneider (Ohio Bar No. 0066394)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
robin_konrad@fd.org
kelly_schneider@fd.org
602.382.2816 / 602.889.3960 facsimile
Counsel for Petitioner, Termane Wood

DATE: JUNE 30, 2011

i

# TABLE OF CONTENTS

Exhibits to Habeas Petition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Statement of the Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Prior Proceedings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Principles of the Anti-terrorism and Effective Death Penalty Act. . . . . . . . . . . . . . . . 7

Claims for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Claim One: Tremane Was Denied His Sixth and Fourteenth Amendment Right to
the Effective Assistance of Counsel During the Penalty Phase of his Capital Murder
Trial Because Counsel Failed to Investigate and Present Mitigating Evidence. . . . . . . 10

I.       Procedural and Factual Background.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

         A.       Penalty Phase.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

         B.       Direct Appeal and Evidentiary Hearing.. . . . . . . . . . . . . . . . . . . . . . 15

II.      2254(d)'s Limitation on Relief is Satisfied. . . . . . . . . . . . . . . . . . . . . . . . . . . 25

         A.       The State Court Decision Was Both Contrary to and an
                  Unreasonable Application of *Strickland*, and *Lockett/Eddings*. . . . . . . . . 25

         B.       The State Court Decision Was Based on an Unreasonable Determination
                  of the Facts in Light of Evidence Presented. . . . . . . . . . . . . . . . . . . . . 31

                  1.       Exclusion of Dr. Allen's Testimony.. . . . . . . . . . . . . . . . . . . 31

                  2.       Other Unreasonable Factual Determinations. . . . . . . . . . . . . . . 33

III.     Tremane is Entitled to a New Penalty Phase Trial Because His Counsel
Was Ineffective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      A.     Trial Counsel Failed to Investigate and Present Mitigating Evidence. . . . 40

      B.     Tremane Was Deprived a Fair Trial At The Penalty Phase.. . . . . . . . . . . 47

            1.     Mitigation Evidence That Should Have Been Presented At Trial. . 49

            2.     Why This Information Would Have Made a Difference. . . . . . . . 66

Claim Two:  Prosecutorial Misconduct During his Trial Deprived Tremane of his Due Process Rights.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

I.     The Prosecutor Argued Inconsistent Theories at Tremane and Jake's Trials.. . . . 69

II.    The Prosecutor Improperly Commented on Tremane's Right to Remain Silent. . 71

III.   The OCCA's Decision is Unreasonable and Contrary to Law.. . . . . . . . . . . . . . 71

      A.     Inconsistent Theories.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

      B.     Comment on Silence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

IV.   The Cumulative Error of Prosecutorial Misconduct Warrants Relief. . . . . . . . . 75

Claim Three: Tremane Was Denied His Fourteenth Amendment Right to Counsel During His Direct Appeal Proceedings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

I.     Appellate Counsel Was Ineffective For Failing to Raise Meritorious Claims.. . . 78

      A.     The OCCA's Decision Was Based on an Unreasonable Determination of the Facts and Unreasonably Applied *Strickland*.. . . . . . . . . . . . . . . . . 78

      B.     Claims Appellate Counsel Failed to Raise. . . . . . . . . . . . . . . . . . . . . . . 80

            1.     Trial IAC for failing to object to jurors moving their vehicles. . . . 80

            2.     Trial IAC for failing to present available evidence to support defense through Bateman's presentence investigation report and to object to handwriting exemplars. . . . . . . . . . . . . . . . . . . . . . 82

3.      Trial IAC related to failure to list crucial mitigating evidence that Jake was the actual killer and failing to request *Enmund/Tison* jury instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

4.      Trial IAC for failure to object to prosecutorial misconduct. . . . . . . 85

II.     Appellate Counsel Were Ineffective at the Evidentiary Hearing. . . . . . . . . . . . . . 86

   A.    The OCCA's Decision Unreasonably Applied *Strickland*. . . . . . . . . . . . 86

   B.    Appellate Counsel's Performance Was Deficient. . . . . . . . . . . . . . . . . . . . 87

      1.      Counsel failed to obtain and use documentary evidence to rebut Raymond Gross's erroneous statements. . . . . . . . . . . . . . . . . 87

      2.      Counsel failed use information regarding Johnny Albert. . . . . . . . . 89

      3.      Counsel  failed to list all factual inaccuracies and critical issues in supplemental brief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

   C.    Tremane Was Prejudiced by Counsel's Deficient Performance. . . . . . . . . 89

Claim Four: Because of errors regarding the aggravating factors in Tremane's case, his death sentence is in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

I.      The OCCA's Decision is Unreasonable and Contrary to Law. . . . . . . . . . . . . . . . 91

   A.    Failure to Properly Instruct the Jury on Heinous, Atrocious, or Cruel Aggravating Factor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

   B.    Insufficient Evidence was Presented to Prove Capital Aggravators Beyond a Reasonable Doubt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

      1.      Murder was Especially Heinous, Atrocious, or Cruel. . . . . . . . . . . 93

      2.      Knowingly Caused a Great Risk of Death to More than One Person. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

iv

C.      The "Continuing Threat" Aggravator is Unconstitutionally Vague and
        Overly Broad. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Claim Five:  The Trial Court Violated Tremane's Sixth, Eighth, and Fourteenth
Amendment Rights by Impermissibly Coercing the Jury. . . . . . . . . . . . . . . . . . . . . . 97

Claim Six:  Tremane Was Denied His Sixth and Fourteenth Amendment Right
to the Effective Assistance of Trial Counsel Because Counsel Failed to Present
Evidence Challenging the Testimony of the State's Forensic Expert. . . . . . . . . . . . . . 100

Claim Seven:  Prosecutorial Misconduct During the State Court Proceedings
Deprived Tremane of his Due Process Rights and Rendered his State Court
Proceedings Unfair. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Claim Eight:  Tremane Was Denied His Sixth, Eighth, and Fourteenth Amendment
Right to Counsel During his Post-Conviction Proceedings. . . . . . . . . . . . . . . . . . . . . 105

Claim Nine:  The State Court 3.11 Proceedings Violated Tremane's Due
Process Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Claim Ten:  Tremane's Due Process Rights were Violated by the State
Withholding Exculpatory Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

# EXHIBITS TO HABEAS PETITION

Exhibit # 1:        Petition Citations

Exhibit # 2:        Affidavit of John Albert

Exhibit # 3:        Declaration of John Albert, dated 6/9/2011

Exhibit # 4:        Declaration of Kenneth Benedict, Ph.D.
                    Exhibit A:     Index of Records Sent to Dr. Benedict

Exhibit # 5:        Declaration of Clemens Bartollas, Ph.D.

Exhibit # 6:        Declaration of Tom Comstock

Exhibit # 7:        Declaration of Jeffrey Ware

Exhibit # 8:        Declaration of Brandy Warden

Exhibit # 9:        Declaration of Lanita Bateman

Exhibit # 10:       Declaration of Perry Hudson

Exhibit # 11:       Declaration of Jason Spanich

Exhibit # 12:       Declaration of Brenda McCray

Exhibit # 13:       Declaration of Julie Gardner

Exhibit # 14:       Declaration of Ray Hand, Ph.D.

Exhibit # 15:       Affidavit of Wayna Tyner
                    Exhibit 1:     Criminal Defense in the "Death Belt" (Oklahoma
                                   City, March 18-19, 2004)
                    Exhibit 2:     Death Penalty College (Santa Clara, CA, August
                                   5-10, 2000)

Exhibit # 16:       Declaration of Michael Colbart

Exhibit # 17:       Declaration of Candelaria Nunez

Exhibit # 18:       Report of Kate Allen, LCSW, Ph.D., and C.V.

Exhibit # 19:       Report of Jeanne Russell, Ed.D.

Exhibit # 20:       Report of Michael Iliescu, M.D., and C.V.

Exhibit # 21:       Medical Records of Linda Wood, dated 5/17/1983

Exhibit # 22:       Medical Records of Linda Wood, dated 8/5/1983

vi

Exhibit # 23:      Photograph of Tremane Wood, June 1992

Exhibit # 24:      Photograph of Tremane Wood, June 1981

Exhibit # 25:      Photograph of Tremane Wood, December 1992

Exhibit # 26:      *State v. Warden*, Case No. CF-02-46, Sentencing Transcript 4/18/2003

Exhibit # 27:      *State v. Fisher*, CF-1983-137, Testimony of Bryan Stevenson, 3/21/2008

Exhibit # 28:      *State v. Zjaiton Wood*, CF-02-46
                   Exhibit 28A:  9/20/04
                   Exhibit 28B:  2/23/05
                   Exhibit 28C:  2/24/05
                   Exhibit 28D:  2/28/05
                   Exhibit 28E:  3/1/05

Exhibit # 29:      *Bills v. State*, Case F-2009-404, Opinion, May 4, 2011

Exhibit # 30:      Raymond Gross criminal history

Exhibit # 31:      *Lawyer's absences lead to his arrest*, The Oklahoman, Mar. 2, 2006

Exhibit # 32:      *Wood v. State*, Case No. PCD-2005-143, Unpublished Order (Okla. Crim. App. June 30, 2010)

Exhibit # 33:      DVD of Arnold Kleinsasser police interview, dated 1/2/2002

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allen v. United States*, 164 U.S. 492 (1896). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Arave v. Creech*, 507 U.S. 463 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Berger v. United States*, 295 U.S. 78 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Bobby v. Van Hook*, 130 S. Ct. 13 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Bodine v. Warden of Joseph Harp Corr. Ctr.*, 217 F. App'x 811
(10th Cir. Feb. 22, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Bradshaw v. Stumpf*, 545 U.S. 175 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 73

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*Brecht v. Abrahamson*, 507 U.S. 619 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Brown v. Uphoff*, 381 F.3d 1219 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Byrd v. Workman*, ___ F.3d ___, 2011 WL 2084204 (10th Cir. May 27, 2011). . . . . . 9, 39

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . 40, 41, 66, 68

*Cartwright v. Maynard*, 822 F.2d 1477 (10th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . 91

*Coleman v. Thompson*, 501 U.S. 722 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

*Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 41

*Darden v. Wainwright*, 477 U.S. 168 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 77

*Darks v. Mullin*, 327 F.3d 1001 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). . . . . . . . . . . . . . . . . . 72, 77, 85, 103

viii

*Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Doyle v. Ohio*, 426 U.S. 610 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Eddings v. Oklahoma*, 455 U.S. 104 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Enmund v. Florida*, 458 U.S. 782 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Evitts v. Lucey*, 469 U.S. 387 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 78, 110

*Gilbert v. Mullin*, 302 F.3d 1166 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Godfrey v. Georgia*, 446 U.S. 420 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Goff v. United States*, 446 F.2d 623 (10th Cir. 1971)    . . . . . . . . . . . . . . . . . . . . . . . . 100

*Goldberg v. Kelly*, 397 U.S. 254 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Griffin v. California*, 380 U.S. 609 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . 72, 75, 85, 103

*Hamilton v. Mullin*, 436 F.3d 1181 (10th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Harrington v. Richter*, 131 S. Ct. 770 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Hooks v. Workman*, 606 F.3d 715 (10th Cir. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Jaffee v. Redmond*, 518 U.S. 1 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Jenkins v. United States*, 380 U.S. 445 (1965).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Jones v. United States*, 527 U.S. 373 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 99

*Jurek v. Texas*, 428 U.S. 262 (1976)).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Lockett v. Ohio*, 438 U.S. 586 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 84

*Lockhart v. Fretwell*, 506 U.S. 364 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lockyer v. Andrade*, 538 U.S. 63 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lowenfield v. Phelps*, 484 U.S. 231 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Maples v. Allen*, 586 F.3d 879 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . 105

*Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . 47, 49, 67

*Maynard v. Cartwright*, 486 U.S. 356 (1988). . . . . . . . . . . . . . . . . . . . . . . . 91, 92, 96

*McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429 (1988). . . . . . . . . . . . . . . . . 36

*McFarland v. Scott*, 512 U.S. 849 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Miller-El v. Cockrell*, 537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Miller v. Mullin*, 354 F.3d 1288 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . 92

*Mills v. Tinsley*, 314 F.2d 311 (10th Cir. 1963). . . . . . . . . . . . . . . . . . . . . . . . . 99

*Mitchell v. United States*, 526 U.S. 314 (1999). . . . . . . . . . . . . . . . . . . . . . . . . 75

*Murray v. Carrier*, 477 U.S. 478 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . 80

*Nguyen v. Reynolds*, 131 F.3d 1340 (10th Cir. 1997)   . . . . . . . . . . . . . . . . . . . . . 96

*Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272 (1998). . . . . . . . . . . . . . . . . . 110

*Panetti v. Quarterman*, 551 U.S. 930 (2007). . . . . . . . . . . . . . . . . . . . . . 8, 25, 30, 31

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Penry v. Lynaugh*, 492 U.S. 302 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Porter v. McCollum*, 130 S. Ct. 447 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . 41, 94

*Romano v. Oklahoma*, 512 U.S. 1 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Rompilla v. Beard*, 545 U.S. 374 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Skipper v. South Carolina*, 476 U.S. 1 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Smith v. Roberts*, 115 F.3d 818 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

*Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Taylor v. Illinois*, 484 U.S. 400 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Tennard v. Dretke*, 542 U.S. 274 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Thomas v. Gibson*, 218 F.3d 1213 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Tison v. Arizona*, 481 U.S. 137 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Trice v. Ward*, 196 F.3d 1151 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*United States v. Hill*, ____ F. 3d ___ 2011 WL 2314155 (11th Cir. June 14, 2011). . . . 73

*United States v. Lewis*, 220 F. Supp. 2d 548 (S.D. W. Va. 2002). . . . . . . . . . . . . . . . . 83

*United States v. McElhiney*, 275 F.3d 928 (10th Cir. 2001). . . . . . . . . . . . . . . . 97, 98, 99

*United States v. Oskowitz*, 294 F. Supp. 2d 379 (E.D.N.Y. 2003). . . . . . . . . . . . . . . . . 83

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978). . . . . . . . . . . . . . . . . . . . . . . 100

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

xi

*Williams v. Taylor*, 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 29, 86

*Williams v. Taylor*, 529 U.S. 420 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 92, 96

*Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 8, 110

*Wood v. Oklahoma*, 552 U.S. 999 (Mem) (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Woodson v. North Carolina*, 428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Ylst v. Nunnemaker*, 501 U.S. 797 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Zant v. Stephens*, 462 U.S. 862 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

## STATE CASES

*Fisher v. State*, 206 P.3d 607 (Okla. Crim. App. 2009). . . . . . . . . . . . . . . . . . . . . . 42

*Allen v. State*, 874 P.2d 60 (Okla. Crim. App. 1994). . . . . . . . . . . . . . . . . . . . . . . . 85

*Bayliss v. State*, 795 P.2d 1079 (Okla. Crim. App. 1990). . . . . . . . . . . . . . . . . . . . 81

*Davis v. State*, 665 P.2d 1186 (Okla. Crim. App. 1983). . . . . . . . . . . . . . . . . . . . . 98

*Garrison v. State*, 103 P.3d 590 (Okla. Crim. App. 2004). . . . . . . . . . . . . . . . . . . . 25

*Gilson v. State*, 8 P.3d 883 (Okla. Crim. App. 2000). . . . . . . . . . . . . . . . . . . . . . . . 85

*Hain v. State*, 852 P.2d 744 (Okla. Crim. App. 1993). . . . . . . . . . . . . . . . . . . . . . . 100

*Hale v. State*, 934 P.2d 1100 (Okla. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . . . 105

*Johnson v. State*, 93 P.3d 41 (Okla. Crim. App.  2004). . . . . . . . . . . . . . . . . . . . . 80, 81

*Littlejohn v. State*, 181 P.3d 736 (Okla. Crim. App. 2008). . . . . . . . . . . . . . . . . . . . 45

*Nuckols v. State*, 805 P.2d 672 (Okla. Crim. App. 1991). . . . . . . . . . . . . . . . . . . . . 93

*Pickens v. State*, 850 P.2d 328 (Okla. Crim. App. 1993).. . . . . . . . . . . . . . . . . . . . . . . 75

*Salazar v. State*, 919 P.2d 1120 (Okla. Crim. App. 1996). . . . . . . . . . . . . . . . . . . . . . 32

*Snow v. State*, 876 P.2d 291 (Okla. Crim. App. 1994.). . . . . . . . . . . . . . . . . . . . . . . . 94

*State ex rel. Oklahoma Bar Ass'n v. Albert*, 163 P.3d 527 (Okla. 2007). . . . . . . . . . . . . 46

*Wood v. State*, 158 P.3d 467 (Okla. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . 1, 7

## FEDERAL STATUTES

18 U.S.C. § 3599. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## STATE STATUTES

21 Okla. Stat. Ann. § 701.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 69, 98

22 Okla. Stat. Ann. § 857.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80-81

22 Okla. Stat. Ann. § 2002(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Okla. Admin. Code § 675:10-1-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 28, 32

Petitioner Termane Laitron Wood ("Tremane")[1] is incarcerated in the Oklahoma State Penitentiary, P.O. Box 97, McAlester, Oklahoma 74502. Tremane is confined by the State of Oklahoma under a sentence of death in violation of the laws and Constitution of the United States of America. As a result of these violations, Tremane is entitled to have the writ of habeas corpus issue on his behalf. This is Tremane's first petition for writ of habeas corpus relief pursuant to section 2254 of Title 28 of the United States Code.

## STATEMENT OF THE CASE

On Friday, April 2, 2004, after a jury heard evidence for less than three days, Tremane was convicted in the district court of Oklahoma County on three counts: (1) first-degree felony murder, (2) robbery with firearms, and (3) conspiracy to commit a felony (robbery). (OR1 at 79, 614-16.)[2] On Monday, April 5, 2004, the jury found three of the four aggravating circumstances presented by the State: (1) the defendant knowingly created a great risk of death to more than one person; (2) the murder was especially heinous, atrocious, or cruel; and (3) at the present time there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society. (OR1 at 617.)

---

[1] During the state proceeding, Petitioner's name was "spelled inconsistently throughout the record as either 'Termane' or 'Tremane.'" *Wood v. State*, 158 P.3d 467, 471 n.1 (Okla. Crim. App. 2007). His birth certificate and social security card spell his name as "Tremane." *Id.* In these proceedings, as did the Oklahoma Court of Criminal Appeals, undersigned counsel will refer to him as his correct name, Tremane.

[2] Because the state-court direct appeal and post-conviction record is voluminous, Tremane has created a chart of the abbreviations for the format of record citations in this case. *See* Exhibit 1.

1

The jury then fixed Tremane's punishment as death for count one (ORI at 618), and as life

for counts two and three (ORI at 621-22).

Tremane's attorneys missed the filing deadline for his petition in error with the

Oklahoma Court of Criminal Appeals ("OCCA"),[3] and requested permission to either file out

of time or file a new appeal out of time.  (DA1 Mot. 2/2/05.)  The OCCA denied the request

to file an untimely petition, but allowed Tremane to file an appeal out of time.  (DA1 Order

2/10/05.)  On direct appeal, Tremane filed an application pursuant to Okla. Crim. App. R.

3.11 seeking an evidentiary hearing on the issue of ineffective assistance of trial counsel.

(DA2 Application 6/28/05.)  The OCCA issued an order remanding his case to the district

court for the hearing he requested.  (DA2 Order 11/16/05.)

The district court held a three-day evidentiary hearing and heard testimony from 25

witnesses.  (Tr. 2/23/06, 2/27/06, 3/2/06.)  Following the hearing, the court issued its

fourteen-page "Finding of Fact and Conclusions of Law" denying Tremane relief.  (OR2 at

230-44.)  The OCCA affirmed Tremane's conviction and sentences.  (DA2 Op. 4/30/07.)

While his direct appeal was pending, Tremane had filed an application for post-

conviction relief.  (PC Original Appl. 12/26/06; PC Amended Appl. 4/25/07.)  The OCCA

issued an opinion denying his application without a hearing.  (PC Op. 6/30/10.)

After his state proceedings were complete, Tremane filed a request for appointment

_____

[3]Under the state rules, an appeal from a death sentence must be perfected by filing the
petition in error within six months of the date the judgment and sentence is pronounced.
Okla. Crim. App. R. 1.4(B).

of counsel in this Court. (Doc. No. 2.) Undersigned counsel was appointed. (Doc. No. 4.)

Tremane now files his timely petition for writ of habeas corpus in accordance with this

Court's page limitations. (Doc. No. 33.)[4]

## STATEMENT OF THE FACTS[5]

"Mr. Zjaiton Wood is really the worst of the two of them, considering the evidence that we know about and that *but for Mr. Zjaiton Wood, Termane would not have acted in the manner he did.*"

- Fern Smith, Prosecutor[6]

Tremane Wood is a thirty-one-year-old biracial man born in 1979, into a violent and

chaotic home in Guthrie, Oklahoma. Tremane is the youngest of three boys: Zjaiton "Jake"

Wood is two years older than him, and Andre Wood is four years older than him. Tremane

was misguided as a small child by those who should have had his best interests at heart. A

---

[4]As a capital petitioner, Tremane has a statutory right to the assistance of counsel under 18 U.S.C. § 3599(a)(2). That "right to counsel necessarily includes a right for that counsel meaningfully to research and *present* [his] habeas claims." *McFarland v. Scott*, 512 U.S. 849, 858 (1994) (emphasis added). The arbitrary constraint of a 110-page limitation in this case denied Tremane the right to present his claims in full and, in doing so, violated his constitutional right to due process. Among other things, due process assures every petitioner "a fair opportunity to obtain an adjudication on the merits of his appeal." *Evitts v. Lucey*, 469 U.S. 387, 405 (1985). Accordingly, "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). Requiring capital habeas petitioners such as Tremane to shoehorn their claims into 100- or 110-page petitions for the sake of policy concerns denies those petitioners, who labor under the gravest of circumstances, that critical opportunity.

[5]Given page restrictions, this section provides an only brief introduction to the facts related to Tremane's case. A more thorough discussion of specific facts will be presented in each individual claim.

[6]*See State v. Zjaiton Wood*, CF-02-46, Tr. 9/20/04, attached as Ex. 28A, at 25.

3

boy with great potential was born into a situation from which he had no way out.  Tremane formed an intense and unhealthy bond with his brother and protector, Jake.  It is that bond with Jake that led to Tremane's involvement in the death of Ronald Wipf ("Ronnie") on January 1, 2002.

The backdrop to Tremane's case involves many factors: trial counsel battling substance abuse who failed to conduct any investigation in preparation for trial; prosecutors who ignored their constitutional obligations in securing and maintaining a death sentence; a judge who improperly coerced the jurors to reach a verdict; and a juror who would have voted for life if she were given more information about Tremane.  A compelling story unfolds demonstrating that Tremane's conviction and death sentence do not comport with the Constitution.

The State's evidence against Tremane fails to shed light on the truth of what occurred in the early morning hours on New Year's Day—in part because of prosecutorial misconduct and in part because Tremane's trial counsel failed to present an adequate defense.  This is the brief, untold story of the crime.

On New Year's Eve 2001, Ronnie and Arnold Kleinsasser were celebrating the holiday at the Bricktown Brewery in Oklahoma City.  (Tr. 3/31/04 at 119-20.)  Tremane and Jake were also at the Brewery with Lanita Bateman, Jake's girlfriend, and Brandy Warden, Jake's ex-girlfriend.  (Tr. 4/1/04 at 142; Declaration of Lanita Bateman, attached as Ex. 9,

4

at 2.)[7]  Ronnie and Arnold started talking to Brandy and Lanita and asked the girls to leave and go to a motel, which they did after talking to Tremane and Jake. (Tr 4/1/04 at 146-47; Tr. 3/31/04 at 122; Ex. 9 at 2.)

At the motel, the men agreed to pay Lanita and Brandy $210 in exchange for sex.  (Tr 3/31/04 at 125.)  Lanita then pretended to call her mother, but actually called Jake; she thought he and Tremane would come to the motel parking lot and wait for them up after they got the money.  (Tr 3/31/04 at 169; Ex. 9 at 3.)  Instead, Jake and Tremane came to the motel room, and Jake banged on the door.  (Ex. 9 at 4; Tr. 3/31/04 at 129; Tr. 4/1/04 at 165-66.) Lanita and Brandy ran out of the room, and Jake and Tremane ran in.  (Tr. 4/1/04 at 168; Ex. 9 at 4.)

Jake approached Arnold with the gun; Tremane approached Ronnie with the knife, and Ronnie put up a fight. (Tr. 3/31/04 at 133-35.)  Ronnie grabbed the sharp end of the knife with his hand (*see* PH Ex. 23 (autopsy report noting defensive wounds on his hand)), which startled Tremane.  It was at this point that older brother Jake intervened to protect his younger brother.  (Tr. 3/31/04 at 138.)  Tremane left the knife with Jake, and went over to Arnold and hit him on the head with the sheath.  (*See* DVD of Arnold Kleinsasser police interview, dated 1/2/2002, *see* Ex. 33,[8] at 1:21:46 (stating in his initial police interview that

---

[7]Lanita did not testify at trial, but she has since provided a declaration regarding her recollection of the events that evening.

[8]Tremane has filed a separate Notice of Conventional Filing for this exhibit, as it is too large to file electronically.

when Tremane hit him, "It might not have even been a knife – I couldn't really see no blade").)  Jake stabbed Ronnie once in the chest (Tr. 4/2/04 at 94), and he died.

Tremane, Jake, Lanita, and Brandy were all charged with first-degree felony murder for Ronnie's death. (OR1 at 79.)[9]  Brandy pleaded guilty to accessory after the fact in exchange for her testimony at her codefendants' trials.[10]  Tremane, Jake, and Lanita all went to trial separately and each of them was convicted of all three counts.  Tremane, who the prosecutor even admits is less culpable than Jake, is the only person who received a sentence of death.

## PRIOR PROCEEDINGS

**A.**   **Original Conviction:**

| | | | |
|---|---|---|---|
| **Court:** | Oklahoma County District Court | **Case No.:** | CF-2002–46 |
| **Charges:** | Count I  Murder I (felony murder) | **Plea:** | Not Guilty |
| | Count II  Robbery with firearms | | |
| | Count III  Conspiracy to commit a felony (robbery) | **Verdict:** | Guilty on all counts |

**Sentencing:** By Jury

**Sentence:**  Count I - Death
Count II - Life
Count III - Life

**Counsel:**  Johnny Albert                              Lance Phillips
3001 NW Classen Blvd.                   7 South Mickey Mantle Dr. Suite 377
Oklahoma City, OK 73106             Oklahoma City, OK 73104

---

[9]The defendants were also charged with one count of robbery with firearms and one count of conspiracy to commit felony (robbery).  (OR1 at 79.)

[10]Lanita's statement calls into question the accuracy of Brandy's testimony against her codefendants.  (Ex. 9 at 4.)

**B.**   **Direct Appeal**:

| | | | |
|---|---|---|---|
| **Court:** | Oklahoma Court of Criminal Appeals | **Case No.:** | D-2005-171 |
| **Opinion:** | *Wood v. State*, 158 P.3d 467 (Okla. Crim. App. 2007) | | |
| **Counsel:** | Perry Hudson 1315 N. Shartel Ave. Oklahoma City, OK 73103 | | Jason Spanich 805 Northwest 8 Oklahoma City, OK 73106 |
| **Petition for rehearing**: | Denied: DA2 Order at 1-2, 5/31/07 | **Certiorari**: | Denied: *Wood v. Oklahoma*, 552 U.S. 999 (Mem) (2007). |

**C.**   **State Application for Post Conviction Relief**:

| | | | |
|---|---|---|---|
| **Court:** | Oklahoma Court of Criminal Appeals | **Case No.:** | PCD-05-143 |
| **Opinion**: | Denied: *Wood v. State*, Case No. PCD-2005-143, Unpublished Order (Okla. Crim. App. June 30, 2010) (Attached as Ex. 32) | | |
| **Counsel**: | Kevin H. Pate 926 West Robinson Norman, OK 73069 | | Julie Gardner 215 Dean A McGee Ave. #201 Oklahoma City, OK 73102 |
| | Brant M. Elmore 702 Wall Street Suite 200 Norman, OK 73072 | | Vicki Ruth Adams Werneke 1660 W. 2nd Street, Suite 750 Cleveland, OH 44113 |
| | Kristi Christopher P.O. Box 926 Norman, OK 73070 | | |

**Certiorari**:   None

## PRINCIPLES OF THE ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT (AEDPA)

Tremane's federal habeas proceedings are governed by 28 U.S.C. § 2254.  This Court

has the duty to review allegations that he is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). AEDPA limits a federal courts ability to grant relief where the state courts have already adjudicated his claims on the merits. 28 U.S.C. § 2254(d).[11] If, however, Tremane can meet *either* of the limitations on relief, this Court shall review his alleged constitutional violation de novo. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (noting that once § 2254(d) is satisfied, a "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires"); *Brown v. Uphoff*, 381 F.3d 1219, 1225 (10th Cir. 2004).

Under § 2254(d)(1), Tremane will have met AEDPA's limitation on relief where he can demonstrate that the state court adjudication resulted in either a decision that was contrary to or unreasonably applied Supreme Court law. *See generally Williams v. Taylor*, 529 U.S. 362 (2000); *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). In analyzing the state-court decision for reasonableness under § 2254(d)(1), this Court must only consider the record before the state court. *Pinholster*, 131 S. Ct. at 1400; *see also Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (explaining that the federal court reviewing a claim under AEDPA "must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court").

---

[11]If a claim was not adjudicated on the merits in state court, there is no state court decision to which the federal courts must defer, and Tremane does not have to meet the limitations on relief proscribed by § 2254(d). *See Wilson v. Workman*, 577 F.3d 1284, 1293 (10th Cir. 2009) (*en banc*).

The Supreme Court has explained that, under 2254(d)(1), clearly established federal law means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

Tremane can also satisfy AEDPA's limitation on relief where he can show that the state court's adjudication of his claim was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). As the Tenth Circuit has explained, "[i]t is clear that, 'where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable.'" *Byrd v. Workman*, ___ F.3d ___, 2011 WL 2084204, at *10 (10th Cir. May 27, 2011) (*quoting Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004)). Relief shall be granted when the factual determination underlying the adjudication of the claim was "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

The Supreme Court has recently emphasized that "[t]he writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Richter*, 131 S. Ct. at 780. As such, federal judges "must be vigilant and independent in reviewing petitions for the writ." *Id.* "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Miller-El*, 537 U.S. at 340. This Court

9

should review Tremane's claims with these principles of law in mind.

## CLAIMS FOR RELIEF

**Claim One**:  **Tremane Was Denied His Sixth and Fourteenth Amendment Right to the Effective Assistance of Counsel During the Penalty Phase of his Capital Murder Trial Because Counsel Failed to Investigate and Present Mitigating Evidence.**

Tremane's direct appeal counsel raised a claim that he received ineffective assistance of counsel (IAC)  because his counsel failed to investigate and present mitigating evidence at the penalty phase of his trial.  (DA2 Appl., 6/28/05; DA2 Appellant Br. at 62-64, 71-98, 6/28/05.)  After remanding for a hearing on the IAC claim, the OCCA denied relief.  (DA2 Op., 4/30/07.)  Because that decision was both contrary to and an unreasonable application of clearly established federal law, and because it was based on an unreasonable determination of facts, this Court owes no deference to the state court proceedings and can review the claim de novo.  Tremane is entitled to relief because his trial counsel's performance fell below professional norms, and as a result, his trial was fundamentally unfair and "undermined the proper functioning of the adversarial process."  *See Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also id.* at 694;  *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (noting that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective").

## I.     Procedural and Factual Background

### A.     Penalty Phase

At Tremane's penalty phase, the opening statements, the State's presentation of

10

evidence, *and* defense counsel's case for life was no more than three hours.  (Tr. 4/5/04 at 32, 103.)  In its opening statement, the State informed the jurors that it was alleging four aggravating circumstances: (1) that during the murder, the defendant knowingly created a great risk of death to more than one person; (2) that the murder was especially heinous, atrocious, or cruel; (3) that the murder was committed for purposes of preventing lawful arrest or prosecution; and (4) there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society.  (*Id.* at 3.)[12]  In his brief opening statement, Tremane's attorney Johnny Albert told the jury that it would hear from three witnesses:  a family friend who would testify that Tremane was good with his children; a psychologist who would explain that Tremane's childhood development was impacted by an absent father and a mother who shipped him around; and Tremane's mother, who would testify that his father was never in Tremane's life and that Tremane's older brother Jake became his father figure and a very bad influence.

In support of its case, the State relied in large part on the evidence presented at the guilt phase of trial.  (*Id.* at 5.)  The only additional evidence that the State presented was Tremane's prior conviction of knowingly concealing stolen property, to which defense counsel stipulated, and testimony regarding the robbery of a pizza place that occurred before Ronnie was killed.  (*Id.* at 17, 23-24.)

---

[12]The State filed its Bill of Particulars listing the aggravating factors it intended to prove on August 14, 2002, over one-and-a-half years before trial.  (OR1 at 72.)

11

Albert's presentation in defense of Tremane's life was not much longer than the State's. Andre Taylor, who was Linda's girlfriend and who knew Tremane for seven years, testified first. Tremane's attorney asked her a few cursory questions regarding Tremane's children, and whether she loved Tremane. (*Id.* at 33-36.) Her testimony in support of Tremane's life was three pages.

Dr. Ray Hand also gave very brief and cursory testimony in twenty-five pages of direct examination. Dr. Hand told the jury that Tremane had a "suspicious" attitude, and that he was "passive aggressive," "immature," and "self indulgent." (*Id.* at 42.) Dr. Hand discussed problems that were not present during Tremane's childhood. (*Id.* at 47-50 (giving overview of factors that *could* affect development); *Id.* at 50-51 (listing factors that lead to healthy development)). He only spent ten pages trying to explain Tremane's childhood to the jury. (*Id.* at 52-62.)

In describing Tremane's parents, he told the jury "there was a great deal of negativism between the parents." (*Id.* at 52.) He described a "chaotic" situation where "allegations" went "back and forth" between his parents. (*Id.* at 53.) Dr. Hand said he "wonder[ed]" (telling the jury he cannot prove it) if Tremane's parents' behavior led to Tremane's suspicion and paranoia as a young adult. (*Id.* at 53.) Dr. Hand provided very vague information to the jury about what occurred in Tremane's life—using phrases such as "it is hard to know exactly," or "it is hard to know which [allegations of abuse] were valid and which ones were invalid." (*Id.* at 54.)

Dr. Hand also said that Tremane's life had "a lot of unpredictability" and it included "drug abuse" and "gang involvement." (*Id.* at 55.)  There was no explanation of how or why Tremane ended up using drugs or being involved in a gang at such an early age because Albert did not ask the necessary questions.  Instead of asking Dr. Hand to provide details about Tremane's chaotic childhood, Albert asked if children in this type of environment – which, as far as the jury was concerned, simply involved parents who did not get along and moved around – end up doing really well. (*Id.* at 55-56.)  Dr. Hand answered, "some." (*Id.* at 56.)  In explaining the relationship between Jake and Tremane, Dr. Hand simply told the jury that Tremane got into trouble "over and over" following Jake, never expanding on the dynamics of the relationship. (*Id.* at 56-57.)

Dr. Hand provided the jury with a convoluted explanation of Tremane's psychological make-up, talking more about the characteristics that do not describe him than the ones that do. (*Id.* at 59-60.)  With little explanation, he told the jury that he believes it "highly likely" that Tremane could adapt in prison without harming anyone. (*Id.* at 62-63.)

On cross, Dr. Hand told the jury that Tremane's mother lied to the Department of Human Services about Tremane's father in some of the reports and agreed that his mother may not be a truthful person. (*Id.* at 69.)  The prosecutor questioned Dr. Hand about several of Tremane's juvenile cases that included charges of assault and battery. (*Id.* at 70-72.)  When asked if he was familiar with these charges, Dr. Hand responded that if it was "in the pile" then he reviewed it. (*Id.* at 72.)  Dr. Hand, however, was unable to respond with any

13

detail to the questions, agreeing that he would consider these crimes violent if the "specifics" indicated such. (*Id.* at 70-72.) Dr. Hand repeated his opinion that Tremane was frustrated, angry, and suspicious. (*Id.* at 80.)

Albert did nothing to rehabilitate Dr. Hand during redirect. Instead, Albert suggested that the referenced juvenile charges might have been dismissed or might have even been from his brother Jake's record. (*Id.* at 83-85.) On recross, the prosecutor showed Dr. Hand a copy of Tremane's juvenile profile. Dr. Hand confirmed that it was Tremane's record, not Jake's, and that the record included the assaults that were discussed. (*Id.* at 86-87.)

Last, Tremane's mother Linda Wood, who Dr. Hand had previously discredited, testified. In less than fifteen pages, Linda told the jury that she was abused by Tremane's father, that Tremane loved his children, that she loved Tremane, that Tremane was influenced by Jake, and that she will visit Tremane in prison if he receives life. (*Id.* at 88-100.)

During closing statements, the prosecutor stressed to the jury that there were "about" seven violent acts committed while Tremane was a juvenile in arguing that he was a continuing threat to society (*Id.* at 114), and that Dr. Hand provided "direct evidence" of those violent offenses (*Id.* at 117). The prosecutor also argued that based on Dr. Hand's testimony, Tremane had a choice and that he chose to "do these things all throughout his life." (*Id.* at 115.) Tremane, in the prosecutor's words, is "just plain mean and violent." (*Id.* at 132.) The prosecutor also spent a huge portion of the time pointing out why the seventeen mitigating circumstances listed by the defense were *not* mitigating. (*Id.* at 117-33.)

14

Albert, on the other hand, chose not to focus on mitigating circumstances in his closing statement and explain why the jury should spare Tremane's life.  Instead, Albert told the jury that the prosecutors should do their job and present evidence rather than argument (*Id.* at 142), including evidence that Albert should have presented in Tremane's defense.[13] Albert then told the jury that he is "not asking for an excuse.  Punish him."  (*Id.* at 149.) Albert ended his brief closing statement by saying, "You're a sinner.  I'm a sinner."  (*Id.* at 150.)  And then he asked the jury to let "God decide [Tremane's] ultimate fate."  (*Id.* at 150.)

The jury began deliberating at 6:23 p.m. and returned its verdict at 11:33 p.m.  (*Id.* at 163.)  In announcing the sentencing verdict, the jury foreperson indicated that the jury decided that Tremane should receive a sentence of death on count one and a sentence of life on counts two and three.  (*Id.* at 164.) When the jurors were polled,  the foreperson said, "I signed the one for death because everyone was waiting on me.  I didn't want everyone to be here."  (*Id.* at 165.)  When asked again if it was her verdict, she said yes.  (*Id.* at 165.)

**B.    Direct Appeal and Evidentiary Hearing**

On direct appeal, Tremane's attorneys filed a Rule 3.11 application for an evidentiary

---

[13] *See, e.g.*, Tr. 4/5/04 at 146 (Albert arguing that *the State* did not present testimonial evidence regarding Tremane's juvenile record); *id.* at 146 (Albert arguing that *the State* did not prove Tremane cannot live peacefully in prison).  Both of these examples have been recognized by the Supreme Court as types of evidence to present as mitigation *in defense of one's life*. *See Wiggins v. Smith*, 539 U.S. 510, 523-24 (2003) (finding deficient performance where counsel failed to investigate juvenile records); *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) (holding that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating").

hearing on the issue of trial IAC for failing to investigate and present mitigating evidence. (DA2 Appl. 6/28/05.)  In support of the application, counsel attached seven volumes of exhibits, which included seventeen affidavits and over 1200 pages of juvenile records.  (DA2 Exs. A-R, U-V; 6/28/05.)  The OCCA granted the application and remanded the case to the trial court for an evidentiary hearing.  (DA2 Order, 11/16/05.)

The trial court held an evidentiary hearing over three days.  (Tr. 2/23/06, 2/27/06, 3/2/06.)  Counsel called several witnesses who testified regarding the investigation that occurred before trial.  Johnny Albert, Tremane's lead trial counsel, testified that although he had cocounsel, he was responsible for the case.  (Tr. 2/27/06 at 241.)  While representing Tremane, Albert said that he had one hundred cases, which he recognized was "too many," and he has since "quit doing death penalties."  (*Id.* at 247.)  He further testified that he did not have an investigator in preparing for trial (*id.* at 242), but nevertheless stated that the investigator assigned to Jake's case also worked on Tremane's case (*id.* at 252-53).  This was contrary to the testimony of Jake's lead attorney and his investigator, who both stated that no investigation was done on Tremane's behalf. (Tr. 3/2/06 at 398-401; Tr. 2/27/06 at 229-30.)  While Albert claimed to have records for every school Tremane attended and all of the records from Oklahoma Department of Human Services (DHS) and Oklahoma Office of Juvenile Affairs (OJA), which he reported were about two or three hundred pages (Tr.

16

2/27/06 at 242, 244), such testimony was refuted by other witnesses[14] and the sheer volume

of records submitted as exhibits at the hearing.  It is apparent from the transcript itself that

Albert's testimony was hostile,[15] yet he *did not deny* the statements made in his affidavit.[16]

Specifically, he affirmed that he "did not prepare enough of a mitigation case to effectively

represent and defend" Tremane and that he "could have achieved a better and more effective

result for [Tremane] had [he] been more involved in the preparation at sentencing."  (*Id.* at

248.)

Lance Phillips, who served as cocounsel during Tremane's trial, testified that he did

what Albert asked him to do. (Tr. 3/2/06 at 431.)  When asked if he interviewed witnesses,

he responded that he would not use the word "interview," but he "spoke with at least three

people briefly about if they wanted to testify and what they would testify about." (*Id.* at 430-

31.)  The three people with whom he spoke were Tremane's mother, Tremane's brother, and

Tremane's mother's friend Andre. (*Id.* at 431.)   Phillips never interviewed any other

witnesses nor did he instruct an investigator to interview witnesses. (*Id.* at 431.) Phillips also

---

[14]Witnesses presented testimony to authenticate Tremane's juvenile and school
records and to demonstrate that such records had not been requested in the past.  (Tr. 2/23/06
at 7-15, 27-35, 36-43, 44-49, 65-76, 86-88; Tr. 2/27/06 at 298-326.)

[15]Since the hearing, Albert has provided a declaration explaining the reasons for his
defensive nature.  (*See* Declaration of John Albert, attached as Ex. 3, ¶¶ 9-10 ) (noting that
he was in a "very bad place," "was drinking excessively and using drugs," and "was worried
about the impact that being found ineffective would have on [his] license to practice law").

[16]Albert's affidavit was submitted as an exhibit in support of the application for an
evidentiary hearing.  (DA2 Ex. M to Appl. for Evid. Hr'g, 6/28/05.)

17

never collected any records (*Id.* at 431-32), nor did he review any of the records that were provided to Dr. Hand (*Id.* at 433).

To demonstrate that trial counsel should have presented additional testimony from witnesses during the penalty phase, Tremane's direct appeal counsel presented ten witnesses who testified regarding Tremane's childhood and his character.[17]  Tremane's mother, Linda, detailed the controlling and horrifically abusive relationship she had with Tremane's father, Raymond Gross.

Linda said that her relationship with Raymond began when he was married to another woman.  (Tr. 2/23/06 at 112.)  Once she became pregnant with her oldest child Andre, Raymond became very possessive and controlling (*id.* at 113).  Raymond controlled Linda's friends, where she could go, and even what she could wear.  (*Id.* at 113.)  Andre agreed that his father was controlling and would not allow his mother to leave the house or have any friends.  (*Id.* at 161-62.)  Jake testified that with their father, it was his way or no way; Raymond did not like their mother to go anywhere.  (*Id.* at 332.)

Raymond was also violent.  Andre, who is five years older than Tremane, testified that their father was "very, very mean" and was abusive to the boys and especially their mother.  (*Id.* at 158.)  Andre explained that it was difficult for his mother to report the abuse since their father was a police officer.  (*Id.* at 162.)  Andre said that their father would come home

---

[17]The witnesses testified that they would have provided this information to trial counsel had they been asked and testified to such information at Tremane's trial. (Tr. 2/23/06 at 23, 56, 81-81, 97, 129, 151-52, 167; Tr. 2/27/06 at 192-93, 235, 338).

from work and beat their mother "just because he had a bad day at work." (*Id.* at 158.)
Linda reported an incident where Raymond came home from work and grabbed her by the
ponytail while she was sleeping on the couch and slung her across the room into the patio
window. (*Id.* at 116.) Raymond would beat Linda with his fist, with a pipe wrench, and with
a gun. (*Id.* at 116.) Jake stated that his father hit his mother in the head with a gun. (Tr.
2/27/06 at 331.) Raymond played Russian roulette with Linda. (Tr. 2/23/06 at 116.) Linda
and Andre described Raymond tying her to a chair with extension cords, pouring alcohol on
her, and threatening to set her on fire — making the young boys watch. (*Id.* at 117, 158.)

Andre remembers his father beating his mother on numerous occasions and it was so
bad that Linda had to go to the hospital. (*Id.* at 158.) Raymond even knocked out Linda's
front teeth. (*Id.* at 119, 159.) Raymond also used the children to control Linda, and the
children were not safe from their father's violent episodes. Raymond believed Linda was
cheating on him so he would ask the boys who Linda was talking to; he would then threaten
them, and beat them, saying they were "covering" for her. (*Id.* at 118-19, 158, 160.) Andre
also testified that their father would beat him because Raymond thought Andre was
"covering" for his mother. (*Id.* at 158, 160.) When Andre told his father that his mother had
not been doing anything, his father said, "you're going to tell me or I'm going beat your ass
just like I beat hers." (*Id.* at 160.) Jake testified that their father would also beat him and his
brothers. (Tr. 2/27/06 at 332.) One time when he was a little boy, Tremane did not say grace
at the table; their father snatched Tremane and beat him with a leather strap until he had

bruises and welts.  (Tr. 2/23/06 at 161.)[18]

In addition to Raymond's violence toward his family, many witnesses testified about Tremane's substitute father figure: his brother Jake.[19]  According to Andre, "Jake is a very mean and spiteful person." (*Id.* at 163.)  Linda described Jake as a very angry young man who got involved with gang-related activities and resorted to threatening and intimidating people.  (*Id.* at 124.)

Jake and Tremane were "two peas in a pod."  (*Id.* at 163.)  According to the family, Jake had a significant influence on Tremane.  (*Id.* at 22, 123, 163.)  "If Jake wanted Tremane there, Tremane was there, because that's how they were."  (*Id.* at 164.)  "Tremane idolized his brother Jake and everything that Jake did. Tremane wanted to be just like him, whether it was good or whether it was bad."  (*Id.* at 123.)  If Jake told Tremane, "'Come on, let's go ten blocks on your knee caps,' Tremane will follow him."  (*Id.* at 22.)  Even people outside the family, such as Tremane's foster mother, knew that Tremane idolized Jake.  (*Id.* at 78.)  Tremane's juvenile probation officer said that Jake was a father figure, and Tremane "pretty

---

[18]Tremane's biological father, Raymond Gross, testified at the evidentiary hearing, but his testimony was far from credible.  His recall for important dates was poor.  He could not remember any of his sons' birth dates.  (Tr. 2/23/06 at 17.)  He also said he married Linda in 1988 (*id.* at 17), which was actually the year Linda filed for divorce (PCA Ex. 8A).  While he testified that he and Linda had a rocky relationship, he denied in large part all of the documented abuse.

[19]Jake explained that he raised Tremane "since he was a little kid."  (Tr. 2/27/06 at 335.)  He wanted to show Tremane that they live in a world of cruelty.  (*Id.* at 335.)  If Tremane did not want to go along with Jake, then Jake would beat Tremane up by kicking him or hitting him in the head.  (*Id.* at 335.)

much did what Jake was doing." (Tr. 2/27/06 at 192.)

To show the positive side of Tremane and how he did well outside his toxic home environment, several people who knew Tremane through the Oklahoma juvenile system testified. Tremane's foster mother described how well Tremane did in their home. (Tr. 2/23/06 at 79.) He was polite, always laughing, and he was the peacemaker in the group. (*Id.*) He did well in school and was involved in sports. (*Id.* at 80.) A juvenile probation officer who worked with the Wood family testified that there was not much supervision in Tremane's home, and the children took over the parenting role. (Tr. 2/27/06 at 187-90). But she reiterated that Tremane did very well when he was placed in environment outside the home. (*Id.* at 192.) Tremane's juvenile mentor who knew Tremane approximately two years described a very positive relationship. (Tr. 2/23/06 at 89-91.) He never met Tremane's father because he was never around (*id.* at 93), and although Tremane's mother loved her son, she was "more of a friend to her sons than an authority figure" (*id.* at 94). Linda was not home because she worked nights; the children had to "fend for themselves." (*Id.* at 94.)

To put all of this information from lay witnesses in perspective, including the volumes of records submitted, counsel called licensed clinical social worker (LCSW) Kate Allen,

21

Ph.D., to the stand.[20]  (Tr. 2/27/06 at 199.)[21]  Her testimony would have explained Tremane's

early childhood development and experiences, including the roles played by his mother,

father, and Jake in parenting him; the absence of positive intervention in Tremane's life;

Tremane's post-traumatic stress disorder and impaired attachment; the impact of being

biracial in a predominately white rural town; and the Department of Justice risk factors.  (*Id.*

at 204-05.)   The State objected to Dr. Allen testifying regarding "any psychological

considerations or conclusions," and termed her proposed testimony as "social commentary"

and "voodoo" that's based on "clairvoyance."  (*Id.* at 207.)  Indeed, the State went so far as

to *misrepresent the law* by telling the judge that Dr. Allen was unqualified to diagnose

Tremane.[22]  Dr. Allen, however, unequivocally stated that her Master's degree in clinical

---

[20]While Dr. Allen's report and CV were admitted as an exhibit during the hearing (Tr. 2/27/06 at 220, 224), they were not included in the three volumes of evidentiary hearing exhibits that undersigned counsel received.  As such, to ensure this Court has a copy of the exhibits for its review, counsel is attaching them as Ex. 18 to this petition.

[21]Dr. Allen reviewed Tremane's records and the affidavits submitted in support of the Rule 3.11 application, and she conducted interviews of Tremane, his mother, his brothers, his father, and juvenile probation officer Sandra Marshall.  (Tr. 2/27/06 at 201-02.)

[22]The State asserted: "[S]he clearly is not qualified to testify as to some of the factors that she has in her sociology report, all of the psychological conclusions she has drawn . . . . She may be good at social work, but . . . to talk specifically about people's psychological conditions and psychological diagnoses, I don't think she's qualified. . . ."  (Tr. 2/27/06 at 209-11.)  *But see* Okla. Admin. Code § 675:10-1-5 (a)(1) (defining clinical social work "as practice which focuses on rendering services to individuals, families, or groups of individuals that involve the *evaluation*, *diagnosis*, treatment, and prevention of *emotional disorders and mental illness* as related to the total health of the client system according to social work theory and methods, providing services of a *psychosocial nature* pertaining to personality adjustment, behavior problems, interpersonal dysfunctioning and deinstitutionalization") (emphasis added).  *See also* Declaration of Kenneth B. Benedict, Ph.D., attached as Ex. 4,

social work, along with her license, allows her to diagnose individuals. (*Id.* at 213.) Without any evidence contradicting her testimony, the court sustained the State's objection indicating that she was not qualified to provide the testimony she planned to give. (*Id.* at 219-21.) No testimony was presented to contextualize Tremane's childhood.

Finally, to demonstrate that prejudice resulted from the information that counsel failed to present at trial, juror foreperson Jera Burton testified. She reviewed affidavits prepared in support of the evidentiary hearing and testified that the information would have made a difference in her decision. (Tr. 3/2/06 at 416-17.) She explained that during the jury deliberations, she was under pressure. (*Id.* at 420.) If she knew about Tremane's life and the positive aspects of his character, she would have held her ground for a life sentence. (*Id.* at 425.)

After each side submitted proposed findings of fact and conclusions of law, the trial court issued its own. (OR2 at 202-210, 211-26.) It determined that Tremane had not demonstrated that his counsel was ineffective under *Strickland*. (*Id.* at 230-44.)[23] The OCCA

---

¶ 29.

[23]Of note, the trial court found that the testimony of Matthew Netherton, Tremane's juvenile mentor, was "inconsistent" with his notes from the time he worked with Tremane. (OR2 at 235.) The court fails to explain what inconsistencies it is referencing. The State's proposed findings of fact cited Netherton's notes; at the hearing, there was no cross-examination of his testimony using his notes. (*Id.* at 215-16.) The State's post-hearing briefing only highlights why Dr. Allen's testimony was critical. Part of her testimony would have been to explain why there would have been ups and downs in Tremane's behavior as a juvenile and examine the factors related to his behavior. (*See, e.g.*, EH Vol. II, Ex. 4 at 175 ("Tremane has kept the home free from gang wear but the activity in the house in increasing due to his brother Jake"); *id.* at 176 ("Jake is back in the home and may lead Tremane

reviewed the claim de novo, while according the district court's findings "strong deference."

(DA2 Op. at 23, 4/30/07.)  The OCCA found that trial counsel and the defense expert had

all relevant juvenile records (*id.*), and that trial counsel had access to background records in

Tremane's brother's case through the State's open file policy (*id.* at 24).[24]  The OCCA agreed

that counsel's performance did not fall below the standard of competence, noting that

counsel's strategy was to have a psychologist testify about Tremane's background, family

history, and assess his future dangerousness.  (*Id.* at 24-25.)  Because trial counsel presented

evidence regarding Tremane's troubled background, the OCCA found he did not perform

deficiently.  (*Id.* at 25-26.)  The court ultimately found that the evidence presented at the

evidentiary hearing was "nonetheless presented to the jury."  (*Id.* )  And, without discussion,

the OCCA concluded that Tremane failed to show that the outcome of his sentencing would

have been different.  (*Id.* at 27.)[25]

---

towards gang involvement in the future").).

[24]Jake's trial started almost one year after Tremane.  Under the statute, discovery must be completed ten days before trial.  22 Okla. Stat. Ann. § 2002(D).  Thus, the records that were provided to the State by Jake's counsel may not have been in turned over before Tremane's trial.

[25]The OCCA did not consider the testimony of juror Burton in making its prejudice determination because it found that she was an "incompetent witness" and impeaching her verdict was forbidden.  (DA2 Op. at 25 n.29, 4/30/07.)  Of note, Burton's testimony did not "impeach" her verdict.  She did not discuss what happened during deliberations or testify that her verdict in the case was wrong.  She merely stated that had she been given information related to Tremane's background and character, she would have likely not sentenced him to death.  Moreover, this issue was not briefed by either party.  Appellate counsel indicated that it was raised *sua sponte* by the OCCA during argument.  (*See* Declaration of Perry Hudson, attached as Ex. 10, ¶ 12.)  Because Tremane has not been able to obtain access to the

**II.    2254(d)'s Limitation on Relief is Satisfied**

In deciding this claim, the state court reached a decision that cannot withstand AEDPA deference.  As the Supreme Court has explained, "When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied."  *Panetti*, 551 U.S. at 953.  Here, in deciding whether Tremane's trial counsel was ineffective, the state court improperly excluded Dr. Kate Allen's testimony—relevant mitigating evidence that it knew or should have known was admissible in proving this claim.  This exclusion was contrary to *Lockett* and *Eddings*, and resulted in an inherently unreasonable application of *Strickland*.  The state court's error tainted the entire *Strickland* analysis making the adjudication of the claim both factually and legally objectively unreasonable.

**A.    The State Court Decision Was Both Contrary to and an Unreasonable Application of *Strickland*, and *Lockett/Eddings***

To prove his trial IAC claim under *Strickland*, Tremane had to present evidence that his trial counsel's performance was deficient and that it likely affected the outcome of his trial.  He could not do this, however, because of the antecedent error that was made during his evidentiary hearing.  By denying Tremane the ability to present the necessary and

---

recording of oral argument that the OCCA claims is work product, he has no way to confirm this information.  (*See* Doc. Nos. 26, 28.) However, in another case, the OCCA released a copy of the oral argument for purposes of allowing the state bar to review counsel's performance.  *Garrison v. State*, 103 P.3d 590, 620 n.56 (Okla. Crim. App. 2004).  To deny Tremane the same access is a violation of his due process and equal protection rights.

constitutionally relevant evidence to prove his claim, the state court corrupted the proceedings and, consequently, infected its adjudication of the claim when it consciously, and unconstitutionally, limited the record before it.  This impacted both the court's review of trial counsel's performance as well as the resulting prejudice.  As explained below, this decision was both contrary to and an unreasonable application of clearly established law.

In *Strickland*, the Court set out the instructions for reviewing claims of ineffective assistance of counsel.  First, a court "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, *in light of all the circumstances*, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690 (emphasis added).  Second, a court must determine prejudice.  In death penalty cases, "the question is whether there is a reasonable probability that, absent the errors, the sentencer. . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*,  466 U.S. at 695; *Wiggins*, 539 U.S. at 534.  In conducting its analysis, a court reviewing an IAC claim "must consider the totality of the evidence" and consider how the factual findings at trial were impacted by the errors. *Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 534.  In Tremane's direct appeal proceedings, the state court's exclusion of relevant testimony that should and could have been presented at trial made it impossible for the OCCA to comply with the *Strickland* standard.

26

For nearly thirty years, the Supreme Court has clearly established that, in death penalty cases, the constitution requires that the sentencer be permitted to consider all relevant mitigating factors. *Lockett v. Ohio*, 438 U.S. 586, 608 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982). Indeed, in *Eddings*, the Court deemed unconstitutional a case where the judge "found that *as a matter of law* he was unable even to consider the evidence" of defendants' abusive childhood. 455 U.S. at 113. Thus, the Court found that it was unconstitutional to exclude relevant mitigating evidence from the sentencer's consideration. *Eddings*, 455 U.S. at 115.[26]

In the instant case, the trial court ruled, as a matter of law, that Dr. Allen's testimony depicting Tremane's background, social history, and character could not be presented.[27] This ruling was both contrary to, and unreasonable application of, the law clearly established by

---

[26]*See also Skipper*, 476 U.S. at 7-8 (holding that death sentence was unconstitutional where defendant was precluded from presenting mitigating evidence of good behavior while in jail); *Penry v. Lynaugh*, 492 U.S. 302, 340 (1989) (finding unconstitutional capital sentencing scheme which does not allow sentencer to consider and give effect to mitigating evidence of mental retardation and childhood abuse); *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (finding it unconstitutional to require a causal-nexus between the mitigating evidence and the crime before a sentencer may consider such evidence).

[27]The trial court made a record of its ruling for appellate review. (Tr. 2/27/06 at 220.) In its denial of relief on this claim, the OCCA does not discuss the trial court's ruling on this issue. Thus, the last reasoned decision on this issue is in the trial court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (holding that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground").

*Strickland*, as well as *Lockett* and *Eddings*.[28]  Because of its ruling, the state court obstructed its ability to properly assess trial counsel's performance and consider the ultimate impact that counsel's deficiencies had on Tremane's trial.

In finding that trial counsel's performance did not fall below the standards of competency, the OCCA noted that counsel's "strategy" was to have a psychologist testify about Tremane's background and family history.  (DA2 Op. at 24-25, 4/30/07.)  The OCCA, in supporting its analysis that counsel's performance was satisfactory,[29] listed themes to which it determined Dr. Hand testified.  (*Id.*)  The state court inextricably linked its review of trial counsel's performance with the evidence counsel presented at sentencing.  Yet this was improper because the OCCA did not have before it all available evidence to make such determination.  Here, because Dr. Allen's testimony was excluded from the evidence in proving IAC, the OCCA viewed counsel's performance related to the preparation and presentation of an expert witness in a vacuum.  Such a finding was an unreasonable application of *Strickland*, where in deciding whether counsel's performance was deficient a court must consider all evidence that was available but not presented at trial.

Likewise, the determination of prejudice was also unreasonable. Examining the evidence that was *not*, but *should have been*, investigated and presented at trial is a critical

---

[28]This ruling was also in direct contravention to Oklahoma law.  Okla. Admin. Code § 675:10-1-5 (a)(1).

[29]As discussed *infra at 35-38*, this finding is also based on an unreasonable determination of the facts.

part of a reviewing court's analysis. *See Wiggins*, 539 U.S. at 538 (finding "that the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of Wiggins' moral culpability" (citation omitted)); *see also Williams*, 529 U.S. at 399 (viewing new evidence "as a whole and cumulative of mitigation evidence presented originally, raised 'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence" (citation omitted)).  Thus, in determining whether a defendant was prejudiced by his trial counsel's deficient performance, a reviewing court should not exclude evidence that would have been permissible at trial—otherwise, the reviewing court will not be complying with *Strickland* by considering the totality of "all the available evidence."  This is exactly what occurred during Tremane's evidentiary hearing.

As counsel indicated in his proffer, Dr. Allen planned to contextualize Tremane's relevant social history by explaining the impact of his abusive childhood, his lack of parental care, and growing up as a biracial child in a rural, predominately white community.  She was also going to discuss his diagnoses of post-traumatic stress disorder and the presence of impaired attachment.  (Tr. 2/27/06 at 204-05.)  All of this information is relevant mitigating evidence that a sentencer, as a matter of law, must be permitted to consider.

Indeed, in *Wiggins*, the Supreme Court determined that trial counsel was ineffective because he failed to investigate and present compelling mitigating evidence.  In reviewing the claim, the Court considered testimony of a licensed social worker who detailed Wiggins's

horrific childhood during state post-conviction proceedings. 539 U.S. at 516-17. In *Wiggins*, like this case, the social worker's testimony was crucial in proving that trial counsel failed to adequately investigate and uncover the necessary information to present a defense for life.

Just as the testimony in *Wiggins* would have provided context to the sentencer in support of the defendant's life, so too would Dr. Allen's testimony. The state court unreasonably applied the law set forth in *Strickland* by ignoring in its analysis the available and relevant mitigating evidence that should have been presented at trial. The law makes clear that the judge must consider *all available evidence* that could have been presented. Dr. Allen's testimony clearly could have been presented at trial. Indeed, if a court precluded testimony of the same nature as Dr. Allen's during the penalty phase of a capital trial, there would be no doubt reversible error under the Supreme Court jurisprudence. By committing this error during the evidentiary hearing, the state court acted contrary to *Lockett* and *Eddings* by failing to permit relevant character and background evidence in support of a sentence other than death.

As in *Panetti*, where the Supreme Court found that the "state court's failure to provide the procedures mandated" under its precedent was an unreasonable application of federal law, 551 U.S. at 948, this Court must too find that the OCCA's decision was both unreasonable application of *Strickland* and contrary to *Lockett*/*Eddings*. The state-court record in Tremane's case "cannot, under any reasonable interpretation of the controlling legal standard, support [the OCCA's] legal ruling." *Panetti*, 551 U.S. at 953. Because the state

court's adjudication of this claim was dependent on "an antecedent unreasonable application of federal law," *id.*, Tremane has met the limitation on relief as prescribed by § 2254(d)(1). This Court should afford the state-court decision no deference on this claim.[30]

**B.    The State Court Decision Was Based on an Unreasonable Determination of the Facts in Light of Evidence Presented**

**1.    Exclusion of Dr. Allen's Testimony**

In addition to being contrary to, and an unreasonable application of, clearly established law, the finding that Dr. Allen was not qualified to give testimony was also an unreasonable determination of the facts in light of the evidence presented.  The record before the state court was clear: there was uncontested evidence that Dr. Allen could offer an opinion regarding Tremane's diagnoses and all other social history evidence to which she planned to testify.  Dr. Allen has a Doctor of Philosophy degree in family sociology, and a Master's degree in clinical social work.  (Tr. 2/27/06 at 199-200.)  She has been a licensed clinical social worker, a professor, and a consultant in legal cases.  (Tr. 2/27/06 at 200; Ex. 18 at 26.)  When asked, she unambiguously stated that she can and has provided diagnoses

---

[30] If this Court finds that the state court was not unreasonable in excluding Dr. Allen's testimony, it should nevertheless find that the decision that trial counsel was effective was objectively unreasonable in light of the other evidence presented.  Moreover, by rejecting evidence to support prejudice (Burton's testimony), the Court unreasonably applied *Strickland* and *Wiggins*.  Tremane put forth evidence that if the additional mitigation evidence from lay witnesses had been presented, it would have affected at least one juror. *See Wiggins*, 539 U.S. at 537 (noting that prejudice is demonstrated where "there is a reasonable probability that *at least one juror* would have struck a different balance") (emphasis added).

and treatment; she has evaluated over 800 people.  (Tr. 2/27/06 at 213-14.)  As she explained,

she cannot prescribe medications (as can psychiatrists) and she cannot give psychometric

testing (as can psychologists), but she can "legally and professionally [] function in all the

other areas that both psychologists and psychiatrists do, which would include psychiatric

diagnosis and hospitalization and treatment."  (*Id.* at 213; *see id.* at 217.)  She is a professor

and has taught graduate sociology students, psychologists, and psychiatrists.  (*Id.* at 214.)

The State presented no evidence to rebut Dr. Allen's testimony.  Rather the prosecutor simply

expressed his opinion that Dr. Allen's work was merely "social commentary" and compared

it to "voodoo."  (*Id.* at 207.)

The state court's finding that she was "unqualified" is unreasonable.  There was no

evidence presented that Dr. Allen was unqualified to testify as to her opinion regarding

Tremane's childhood and its impact on him, and the resultant diagnoses.  And, the law itself

lends no support for the court's finding that Dr. Allen was unqualified to provide the

testimony she planned to present.  *See* Okla. Admin. Code § 675:10-1-5(a)(1); *Salazar v.*

*State*, 919 P.2d 1120, 1129 (Okla. Crim. App. 1996) ("Social workers certainly may qualify

as expert witnesses."); *see also Jaffee v. Redmond*, 518 U.S. 1, 15-17 (1996) (comparing

psychiatrists and psychologists with licensed social workers and finding that confidential-

communication privilege is applicable to social workers as they, like psychiatrists and

psychologists, provide psychotherapy and serve the same public goals).  Where a state court

"based its conclusion, in part, on a clear factual error," the "partial reliance on an erroneous

factual finding further highlights the unreasonableness of the state court's decision." *Wiggins*, 539 U.S. at 528. Because the state-court's decision regarding Dr. Allen was objectively unreasonable in light of the facts before it, it fatally undermined the fact-finding process. Because this testimony was a critical aspect to Tremane's IAC claim, the underlying decision of the OCCA was unreasonable and is owed no deference by this Court.

### 2. Other Unreasonable Factual Determinations

In addition to finding Dr. Allen unqualified to present expert testimony, the state court also based its decision on other unreasonable determinations of fact. This provides further support that this Court should not be limited by § 2254(d) in its analysis of Tremane's IAC claim at his penalty phase.

For example, the court found that Tremane's father, Raymond Gross, was credible and that his testimony was "consistent and not impeached." (OR2 at 233-34.) The court also determined that according to Gross, Tremane did not grow up in an abusive home. (OR2 at 234.) Finally, the court found that Tremane presented no evidence to corroborate Linda's testimony that she was abused by his father. (OR2 at 234.) All of these factual determinations are belied by the record.

To begin, Andre Wood, Tremane's oldest brother, testified at the evidentiary hearing that he witnessed multiple incidents of abuse, including watching his father knock out his mother's teeth and watching his father tie up his mother and threaten to burn her. The court did not discredit Andre's testimony. Instead, the court found that Andre's testimony at the

33

evidentiary hearing was "consistent with his jury trial testimony" and therefore the jury had the "benefit of any mitigating content of his testimony." (OR2 at 235.) This, too, is an unreasonable determination. Andre testified as the State's witness during the first stage of Tremane's trial. (Tr. 2/23/06 at 167.) His trial testimony only provided the jury with information regarding the events on the night of the crime. (Tr. 4/1/04 at 49-74.) During the evidentiary hearing, Andre confirmed that he did not provide any of the information to which he testified at the hearing at Tremane's trial, but stated that he would have if he had been asked. (Tr. 2/23/06 at 167.) Based on the record, it was objectively unreasonable for the state court to conclude that Andre's testimony at the evidentiary hearing was "consistent with" that at trial.[31] Thus, Andre's credible testimony at the evidentiary hearing makes the court's finding that *no* evidence corroborated Linda's claim that she was abused unreasonable.[32]

In addition to Andre's and Jake's testimony corroborating their father's abusive nature, the state court record included exhibits that called into question Raymond's

---

[31]The state court likewise found Jake's evidentiary hearing testimony "substantially the same" as it was during trial. (OR2 at 238.) At trial, Jake was a defense witness, and he testified regarding the night of the crime. (Tr. 4/2/04 at 85-136.) His testimony strictly involved the facts of the crime and no evidence regarding his father's abuse was presented. The state-court finding that the jury "had the benefit of any mitigating content" of his testimony at trial (OR2 at 238) is unreasonable and not supported by the record.

[32]Jake's testimony also corroborated Linda's testimony. While the court noted that it found "portions" of his trial testimony incredible and his evidentiary hearing testimony "no more credible," there is no factual basis for this conclusion nor any explanation of what "portions" are credible and which are not. (OR2 at 238.)

testimony.  For example, the State admitted a two-page DHS report to demonstrate that Linda's allegations of abuse were unfounded.  (EH Vol. III, Ex. 1 at 42-43.)  Indeed, the court referenced this in its findings, noting that "DHS records provided to this Court indicate that reported abuse by Linda Wood was unfounded and vindictive." (OR2 at 233.)  What the court overlooked, however, was the first page of the report, which states: "Mr. Gross informed the worker that in the past *he had been abusive with his ex-wife* [Linda].  (EH Vol. III, Ex. 1 at 42) (emphasis added).  An exhibit specifically cited by the court confirms that Raymond admitted to abusing Linda.  It is objectively unreasonable to take one sentence from a document to credit Raymond's testimony and discredit Linda's testimony, yet ignore another sentence from that *same* document that would lend support to Linda's testimony.[33]

Relying on Johnny Albert's testimony and ignoring all other evidence, the court also made factual determinations regarding trial counsel's performance and preparation that are unreasonable.[34]  For example, the OCCA found that counsel had Tremane's school records.

---

[33] The court also ignored the record evidence from Linda and Raymond's divorce decree, in which the court ordered Raymond to be restrained from "bothering, harassing, or inflicting bodily harm" on Linda.  (EH Vol. I, Ex. 2, at 95.)

[34] The OCCA based its opinion, in part, on Albert's testimony at the evidentiary hearing.  While Tremane cannot present evidence outside the state court record for purposes of his § 2254(d)(2) analysis, he points this Court to Claim Nine, *infra*, alleging that his evidentiary hearing violated due process because of Albert's mental state at the time of his testimony.

Moreover, the court relied upon misrepresentations by the prosecutor regarding how many clients Albert had represented who received a death sentence.  Albert testified he only had three clients sentenced to death.  (Tr. 2/27/06 at 260.)  Appellate counsel asked the court to take judicial notice of eight cases where Albert's clients were sentenced to death.  (Tr. 3/2/06 at 409.)  The prosecutor attacked this list, avowing to the court, "I can tell you for

35

(DA2 Op. at 24, 4/30/07.)  Albert testified that he "had records for every school [Tremane]

went to." (Tr. 2/27/06 at 242).  Despite this testimony, there was uncontested evidence from

witnesses who testified that Tremane's school records had not previously been requested.

(Tr. 2/23/06 at 10; 46-47.)  For the OCCA to ignore this credible evidence which rebuts

Albert's less-than-accurate memory is unreasonable in light of the evidence before the state

court.  The trial record further highlights the unreasonableness of the OCCA.  No school

records were introduced, mentioned in Dr. Hand's report, or even referenced during his

testimony.  Had they been available, a reasonable trial attorney would have used the school

records to support Dr. Hand's conclusion that Tremane did well during his time at a foster

home in Cromwell.  (Tr. 4/5/04 at 44; EH Vol. III, Ex. 5, at 4-5.)

The OCCA also based its decision on the factual determination that Albert had all

records from OJA and DHS and that he gave the records to his expert.  (DA2 Op. at 24,

4/30/07.)  This finding, too, in unreasonable in light of the entire state-court record.  During

the trial, Dr. Hand testified that he was not "able to find any violence that involved weapons

---

sure, I tried [*State v. James Fisher*] and John Albert was not involved in that case. . . . Mr.
Albert did not represent James Fisher." (*Id.* at 410-11).  The trial court denied appellate
counsel's request relying on the State's assertion that Albert had not been the trial counsel
on at least two of the eight cases listed. (*Id.* at 411-12.)  In reality, Albert has been involved
in at least seven capital cases wherein a sentence of death was imposed, including Fisher and
Short. (PCA Ex. 14A-H, 12/26/06.)  The prosecutor's statement improperly misled the court
on the facts respecting Albert, facts directly related to Albert's credibility. *McCoy v. Court
of Appeals of Wisconsin*, 486 U.S. 429, 436 (1988) ("Neither paid nor appointed counsel may
deliberately mislead the court with respect to either the facts or the law. . . ").  Such
commentary by the prosecution rendered the proceedings fundamentally unfair.

or anything as a young child." (Tr. 4/5/04 at 58.) If he had reviewed Tremane's juvenile record from OJA (which the State used in cross-examining him), then he would not have made that statement. In fact, one of Tremane's juvenile charges in his OJA records involved assault with a dangerous weapon.[35] Moreover, Albert's testimony itself contradicts OCCA's finding that he had all OJA and DHS records. Albert reported that he had about two or three hundred pages worth of records. (Tr. 2/27/06 at 244.) The OJA records submitted as Exhibits 3 and 4 at the evidentiary hearing were over 1100 pages. (*See* EH Vol. I, Ex. 3 at 114-738; EH Vol. II, Ex. 4 at 3-549.) Based on the entire record, the finding that Albert had all OJA records was unreasonable.

The OCCA made unreasonable determinations of fact in concluding what was, in fact, presented at trial. It found that:

> Counsel presented evidence concerning Tremane's troubled background and about his childhood growing up in an abusive (both physically and *emotionally*) household *with little parental supervision or guidance*. He presented evidence that Tremane filled the void created by the absence of his parents by following in the footsteps of his older *unstable, delinquent brother, whose affection and approval he sought*.

(DA2 Op. at 25-26, 4/30/07) (emphasis added). This paragraph describes the testimony and themes that were presented at the *evidentiary hearing* rather than what was presented at trial.

---

[35] When Tremane was fifteen, he was charged with assaulting an adult with a gun. (EH Vol. I, Ex. 3 at 142.) Had Dr. Hand been provided with the records, he could have explained the circumstances around the incident. Specifically, the police reports indicate that Tremane's mother encouraged him to beat up the victim and shouted at him to shoot the victim to "show how tough he was." (*Id.* at 310.) Based on Linda's actions, she was arrested. (*Id.* at 667.)

While Tremane's mother Linda testified at trial in a few sentences that she was abused (Tr. 4/5/04 at 91), Dr. Hand never indicated that there was confirmed abuse in the home. Moreover, no one at trial testified about emotional abuse that occurred in the home. Neither Dr. Hand nor Linda testified that there was "little parental supervision or guidance." In fact, Dr. Hand simply discussed "unpredictability" and how one would not know "which parent is going to do what at what point." (*Id.* at 55.) Linda testified, "I took care of my kids as best I could." (*Id.* at 92.) Finally, counsel presented no evidence at Tremane's penalty phase that Jake was unstable or delinquent or even that Tremane sought Jake's affection and approval. The only mention of the relationship between Jake and Tremane is when Dr. Hand and Linda both indicate the Tremane got into trouble when he followed Jake. (*Id.* at 57, 98.) The court's reliance to limited references in from the trial record to support the themes that were developed and presented in support of the IAC claim is disingenuous. These findings of fact to support the rejection of Tremane's IAC claim are unreasonable.

The court also discredited the testimony of Leslie James Welch[36] and Michael Hiltzman[37]—individuals who knew Tremane growing up. Welch testified that he knew Tremane since around age twelve and that Tremane idolized Jake. (Tr. 2/23/06 at 52.) Jake was like a father figure to Tremane and had a big impact on Tremane. (*Id.* at 54.) Welch

---

[36]The trial court referred to him as Wesley Welch (OR2 at 235), but the transcript has his name as Leslie James Welch (Tr. 2/23/06 at 49).

[37]The trial court referred to him as Michael Heitzman (OR2 at 236), but the transcript has his name as Michael Hiltzman, which is even spelled out (Tr. 2/27/06 at 231).

38

saw Jake get mad at Tremane and hit Tremane because he would not beat someone up.  (*Id.* at 54-55.)  Hiltzman testified that he went to school with Tremane for seven years, and Tremane was like a big brother to him.  (Tr. 2/27/06 at 232.)  He also went to the same foster home with Tremane; at the home, Tremane tried to keep the peace and keep everyone in line. (Tr. 2/27/06 at 234.)

The court found both of these witnesses were not credible.  There was no explanation for the court's conclusion, but the court remarked that both witnesses were convicted felons. (OR2 at 236.)  This was an unreasonable determination without further explanation because the presiding trial judge, Raymond Elliott, had previously praised codefendant Brandy Warden, who is also a convicted felon, for her testimony in Bateman's case.  (*See State v. Warden*, No. CF-2-46, Tr. 4/18/03, attached as Ex. 26.)  Judge Elliott noted that "it was very powerful testimony" and he thought "it was very truthful testimony."  (*Id.*)  To simply discredit the testimony of two witnesses for no reason other than a felony conviction is unreasonable.

The state court "plainly misapprehend[ed]" the entire record in this case.  *Byrd*, 2011 WL 2084204, at *10.  These misapprehensions go to a material factual issue central to Tremane's claims—whether trial counsel conducted an adequate investigation and whether Tremane has proven prejudice from counsel's failures.  Because these errors "fatally undermine[d] the fact-finding process," they "render[ed] the resulting factual finding unreasonable."  *Id.*  For these reasons, along with the reasons already stated, the state court's

adjudication of Tremane's trial IAC claim is owed no deference.

## III. Tremane is Entitled to a New Penalty Phase Trial Because His Counsel Was Ineffective

Because Tremane has overcome the limitations on relief, this Court must now determine whether: (1) counsel's performance was deficient (i.e., counsel committed serious errors); and (2) the errors were so "serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. For the reasons below, Tremane's trial counsel failed to conduct a constitutionally adequate investigation, which in turn, resulted in Tremane being deprived of a fair and reliable sentencing hearing. This Court should grant Tremane a writ of habeas corpus on the record before it. In the alternative, this Court should both expand the record and grant Tremane a hearing so that he may present the evidence that he was improperly denied the opportunity to present in state court.[38]

### A. Trial Counsel Failed to Investigate and Present Mitigating Evidence

Because the penalty phase is critical in a capital case, "[a]ny competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." *Cargle v.*

---

[38] This Court may consider evidence that was not presented in state court because Tremane was diligent in his attempt to develop this claim in state court. *See* 28 U.S.C. § 2254(e)(2) (noting that evidentiary hearing not available where petitioner failed to develop facts in state court); *Williams v. Taylor*, 529 U.S. 420, 437 (2000) (noting that diligence requires that "prisoner, at a minimum, seek an evidentiary hearing"). "[C]omity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent effort." *Taylor*, 529 U.S. at 437 (*quoting* 28 U.S.C. § 2254(e)(2)). "In that circumstance, an evidentiary hearing is not barred by § 2254(e)(2)." *Id.*

*Mullin*, 317 F.3d 1196, 1221 (10th Cir. 2003) (*quoting Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir. 2001)).  "Dereliction of this duty is constitutionally impermissible." *Cargle*, 317 F.3d at 1221 (citations omitted).  "[C]ounsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690.  In determining whether counsel acted competently in representing a capital defendant, the court should "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable."  *Wiggins*, 539 U.S. at 523 (emphasis omitted).  Indeed, "[s]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.  In assessing the reasonableness of counsel's performance, this Court should look to guides, such as the American Bar Association (ABA) standards, *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009), as well as standards of practice in the defense community in Oklahoma, *Pinholster*, 131 S. Ct. at 1407.  In doing so, this Court must find that trial counsel's performance here fell below all standards of competency.

Bryan Stevenson, who was accepted as a standard-of-care expert in Oklahoma County in another case, opines that it is "impossible for one lawyer working alone to adequately represent capital defendants without a lot of time and resources."  (*See State v. Fisher*, CF-1983-137 (Okla. Cty. Dist. Ct.), Testimony of Bryan Stevenson, 3/21/08, attached as Ex. 27,

at 326.)[39]   As he notes, the "investigation preparation is the absolute core of effective assistance." (*Id.* at 336.)  And, to create a theory of defense, the attorney must "understand what all the information is." (*Id.* at 344.)  An attorney cannot make informed decisions on the case until he "ha[s] all that information in front of [him] and [he] . . . think[s] through it." (*Id.* at 344.)  "[N]o one is going to presume that [the defendant's life] has value or meaning unless you present that, and that's an incredibly challenging responsibility but absolutely critical in death penalty cases." (*Id.* at 328.)

Likewise, capital defense attorney Wayna Tyner (who represented Tremane's brother and codefendant Jake at trial) describes the standard of care for defending a capital client in Oklahoma: establishing and maintaining rapport with the client; meeting the client's family and establishing a relationship with them; conducting background information investigation by gathering all available records for the client and the client's family; having a mental health professional conduct a screening and, based on the findings, hiring additional experts; and interviewing all potential mitigation witnesses gathered from record review.  (*See* Affidavit of Wayna Tyner, attached as Ex. 15, ¶¶ 4-10, 13.)  Like Stevenson, Tyner also stated that capital defense teams typically had at least one investigator, and, in Jake's case, there was a first stage investigator and a mitigation investigator.  (*Id.* ¶ 3.)[40]

---

[39] In *Fisher v. State*, the defendant was also represented by Albert and was granted relief on his claim of ineffective assistance of counsel at both the guilt and penalty phases of trial.  206 P.3d 607 (Okla. Crim. App. 2009).

[40] Attached to Ms. Tyner's affidavit are materials from capital defense training seminars she attended in 2000 (national seminar) and in March 2004 (Oklahoma seminar).

The record before this Court is clear: an objectively reasonable mitigation investigation was not conducted by defense counsel in this case.  Albert did not have an investigator complete *any* work in preparation for Tremane's trial.  (*See* Ex. 3 ¶ 6; Affidavit of John Albert, attached as Ex. 2, ¶ 2; Tr. 2/27/06 at 229-30.)[41]  Albert also did "very little" himself to investigate in preparation for trial.  (Ex. 3 ¶ 5.)  Instead, he relied on Tremane to "properly explain and develop the mitigation" in the case.  (Ex. 2 ¶ 5.)  But even that was insufficient because he only met with Tremane "on a very limited basis and only when [they] were in court."  (Ex. 3 ¶ 5; Ex. 2 ¶ 9)

Moreover, Albert did not review any of the documents that he provided to Dr. Hand, nor did he prepare Dr. Hand's testimony.  (Ex. 3 ¶ 7; Ex. 2 ¶ 6; Declaration of Ray Hand, Ph.D., attached as Ex. 14, ¶ 6.)[42]  As discussed *supra* at 36-37, the record indicates that Dr. Hand was not provided all available juvenile records in this case.  Nonetheless, even if he

_____

(Ex. 15, Exs. 1 & 2.)  Of note, the Oklahoma seminar references the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines).  (*See* Ex. 15, Ex. 1.)  The ABA Guidelines suggest that there be "at least one mitigation specialist and one fact investigator" in death penalty cases.  (ABA Guideline 10.4 § C.2.a.)

[41]Cocounsel Lance Phillips never interviewed witnesses and never collected or reviewed any records.  (Tr. 3/2/06 at 431-33.)

[42]Dr. Hand states that, in his experience, attorneys were "unable to provide sufficient funding to complete a thorough review of a client's background, which should include at minimum many hours of interviews with the client to gain his trust, interviews with family members to develop a social history, and detailed review of all available records."  (Ex. 14 ¶ 2.)  In Tremane's case, Dr. Hand only spent twenty-three hours on the case, including his time in court, and was therefore unable to gather any multi-generational information from Tremane's parents' families.  (*Id.* ¶ 3.)

had some of the available records, Albert failed to work with him to formulate a theory of defense and story regarding Tremane's life. (Ex. 14 ¶ 5.) In fact, the only instruction that Albert gave Dr. Hand was to keep his testimony "to about an hour." *(Id.* ¶ 6.) These facts, in and of themselves, are sufficient to show deficient performance under *Strickland*.

However, the circumstances surrounding Albert's life during his representation of Tremane warrant additional consideration by this Court in reviewing the IAC claim. At the time of Tremane's trial, Albert's caseload was "excessive." (Ex. 3 ¶ 3; Ex. 2 ¶ 3.) He would often have to make appearance in court on ten cases per day. (Ex. 3 ¶ 3.) In addition to Tremane's case and all of his non-capital clients, Albert took appointment to defend two other capital defendants—Littlejohn and Fisher—during his representation of Tremane. *(Id.* 3 ¶ 3.) Albert could have refused to take on so many cases, but he did not. *(Id.* ¶ 4.) As a result, Albert did not have the time or the resources necessary to effectively represent Tremane.

In addition to, and perhaps in part because of, being overloaded with work, Albert's reputation began to decline as he battled a substance abuse problem. Albert "loved beer" and admitted that was his problem. (PC Supp. Doc. 14 at 17.) Albert took more cases "than he could possibly handle. There's no way he could handle them effectively." *(Id.* at 35.) Albert was "abusing alcohol and drugs and also attempting to deal with the loss of his father" (PC Supp. Doc. 11 at 19), who he called his hero (PC Supp. Doc. 14 at 38-39). Albert explained, "When he passed away, there was no one that I trusted to talk to and that's part of where I

44

let alcohol and other things comfort me."  (*Id.* at 119.)

Albert's alcohol abuse was ongoing while he represented Tremane, whose trial was March 29 through April 5, 2004.  Testimony from capital defendant Keary Littlejohn's evidentiary hearing revealed that, "[b]eginning in 2004, toward the end of the first quarter," Albert was "consuming beer during business hours in his office on a daily basis." (PC Notice of Suppl. Authority at 4, 11/19/07.)[43]  Albert himself admitted that he was "drinking on a regular basis" at the time of Tremane's trial.  (Ex. 3 ¶ 5.)

After Tremane's trial and leading up to his state evidentiary hearing, Albert's substance abuse continued to increase and the legal community became concerned.  During his testimony at Tremane's hearing on February 27, 2006, Albert was in a "very bad place" in his life; he had "hit rock bottom."  (Ex. 3 ¶ 9.)  He was "drinking excessively and using drugs."  (*Id.* ¶ 9.)  In fact, Albert's face looked "pretty rough" at the hearing because, only days before, he had been jumped by several men at a bar.  (*Id.* ¶ 9.)  Then, on March 1, 2006, Albert appeared in court on another case sweating profusely and apparently under the influence of drugs or alcohol.  At that time, Albert admitted having a substance-abuse problem and agreed to receive treatment.  (PC Supp. Doc. 13, Ex. A at 9.)  But, he then failed to show up for court and a bench warrant was issued for his arrest.  (*See Lawyer's absences lead to his arrest*, The Oklahoman, 3/10/06, attached as Ex. 31; PCA Ex. 4 at 3.)  His

---

[43]Like Fisher, *see supra* n. 39, Littlejohn was represented by Albert and has been granted relief on the claim that trial counsel was ineffective. *Littlejohn v. State*, 181 P.3d 736 (Okla. Crim. App. 2008).

substance abuse problem ultimately resulted in him entering a rehabilitation center in March 8, 2006—ten days after Tremane's evidentiary hearing—and having his law license suspended for fourteen months.  *See State ex rel. Oklahoma Bar Ass'n v. Albert*, 163 P.3d 527, 529-32(Okla. 2007); Ex. 3 ¶ 9.

Albert has been clean ever since he entered rehab (Ex. 3 ¶ 9), and his license has since been reinstated.  A sober Albert now admits that his testimony during Tremane's evidentiary hearing was "very defensive."  (*Id.*  ¶ 10.)  He explained that during Tremane's hearing, he had a pending bar investigation and was "worried about the impact that being found ineffective would have on [his] license to practice law."  (*Id.*  ¶ 10.)  In describing his representation of Tremane, Albert affirmatively states:

> I did not do the necessary investigation and preparation required to defend a capital client.  I had no strategic reason for failing to investigate Tremane's background, gather all necessary records, conduct all relevant interviews, and to prepare expert testimony.  I simply did not do these things.

(*Id.* ¶ 11.)

It is clear that from the evidence presented that Albert failed to investigate and present mitigating evidence.  Albert's reasons for falling substantially below the standard of care necessary in representing a capital defendant are not strategic.  Rather, Albert simply did not do the job he was required to do under prevailing professional norms in Oklahoma. *See, e.g.*, *Porter v. McCollum*, 130 S. Ct. 447, 452 (2009) (finding that "counsel had an 'obligation to conduct a thorough investigation of the defendant's background'") (citation omitted).  The explanation for his deficient performance includes his heavy case load and his substance

abuse problem.  But neither of those purport to be a strategy in failing to conduct the investigation necessary to present an adequate case in defense of Tremane's life.  In fact, in this case, Albert's duty to investigate and present a defense was even more significant where the State had alleged *four* aggravating factors well over a year in advance of the trial.  (OR1 at 72.)  Albert had sufficient time to prepare a mitigation case to rebut the aggravators, particularly the State's use of Tremane's juvenile record to support his being a continuing threat.  *Cf. Rompilla v. Beard*, 545 U.S. 374, 383, 385 (2005) (noting that counsel knew that state was going to use "significant history of felony convictions indicating the use or threat of violence" as an aggravator, but counsel failed to look into the prior conviction file and thereby "seriously compromis[ed] their opportunity to respond to a case for aggravation"). This Court, in "scrutiniz[ing] carefully any decision by counsel which deprives a capital defendant of all mitigation evidence," *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000), should find that Albert's performance in investigating and presenting Tremane's penalty phase case was deficient.

## B.    Tremane Was Deprived a Fair Trial At The Penalty Phase

If this Court finds that Albert performed deficiently, it must also consider whether Tremane was prejudiced from counsel's deficiencies.  Given all of the evidence presented at the evidentiary hearing, in state post-conviction proceedings, and now to this Court, this Court should find that the "fundamental fairness" of Tremane's penalty phase was compromised.  *Strickland*, 466 U.S. at 696.

47

As discussed in detail, *supra* at 17-21, the testimony from the lay witnesses at Tremane's evidentiary hearing provided part of a "powerful mitigating narrative." *Wiggins*, 539 U.S. at 537.  Tremane was born into a very violent household and witnessed horrible events that no child should have to experience.  As he grew older, his parents were not around, and Tremane was cared for and influenced by his older brother, Jake, who was a very angry and aggressive boy.  Tremane began to get in trouble by following his brother as a preteen, and he became involved in gang-related activities. Tremane, however, did very well when placed in structured settings outside his home environment.  It was only when the State "rewarded" Tremane for his good behavior by returning him home that he began to act out. None of this information was presented at Tremane's penalty phase.  As Juror Burton admitted during the hearing, had she known this information at trial, she would have held her ground for a life sentence.  (Tr. 3/2/06 at 425.)  This is sufficient to show prejudice, *see Wiggins*, 539 U.S. at 537 (noting that prejudice is demonstrated where "there is a reasonable probability that *at least one juror* would have struck a different balance") (emphasis added), in particular because Oklahoma law required imposition of a life sentence where the jury cannot reach a verdict regarding the sentence.  21 Okla. Stat. Ann. § 701.11 (2004).

What is more, this Court can and should consider the type of expert information that should have been, but was not, presented at Tremane's evidentiary hearing in his attempt to prove this claim.  Through no fault of his own, Tremane was unable to develop his mitigation story told through the lens of a mental health expert.  At trial, Dr. Hand's testimony fell short

of providing any real insight into Tremane's character and background because Albert failed in his investigation and preparation. Consequently, Dr. Hand's cursory description of limited information failed to "equip[] the jury with the 'fullest information possible concerning [Tremane's] life and characteristics.'" *Mayes*, 210 F.3d at 1288 (citations omitted). A properly prepared expert would have provided context for Tremane's life experiences and his character development and would have explained how he ultimately ended up involved in a crime that resulted in capital charges.

### 1.      Mitigation Evidence That Should Have Been Presented At Trial

In the 1970s in rural Oklahoma, two people with very different backgrounds intersected—Linda Wood, a sixteen-year-old white girl who grew up in a racist family in central Florida; and Raymond Gross, an uneducated, illiterate, violent, black man whose family lived in rural Guthrie. When Linda met Raymond, she was only sixteen and had recently been displaced from Florida to Guthrie, Oklahoma, with the Job Corps program. Raymond was twenty-eight and was married with children. Linda became pregnant with her first son, Andre, shortly after they met. (*See* Ex. 18 at 2.; EH Vol. II, Ex. 4 at 89.)

Because of her pregnancy with Andre, Linda was forced to leave Job Corps. A long way from where she grew up in Florida, Linda had no family support. And, when an unmarried teenage Linda became not only pregnant but by a black man, she was even more isolated from her family. Linda and Raymond had their second child, Zjaiton (Jake), two years after Andre. Raymond and Linda were not married or even living together when the

first two sons were born.  Raymond moved in together with Linda before their youngest child, Tremane Laitron Wood, was born in 1979.  (*See* Ex. 18 at 2; EH Vol. II, Ex. 4 at 89.) They were married in 1985, and were divorced in 1989.  (EH Vol. I, Ex. 2 at 95.)

Tremane was the youngest born into a home environment ruled by the fear and intimidation of Raymond.  Violence, turmoil, and chaos were the norm.  Tremane's father was physically, sexually, and verbally abusive to Linda.  (EH Vol. II, Ex. 4 at 89; Ex. 18 at 3; Tr. 2/23/06 at 114-17,157-59; Tr. 2/27/06 at 331; EH Vol. I, Ex. 2 at 22; EH Vol. I, Ex. 3 at 537; Declaration of Jeffrey Ware, attached as Ex. 7, ¶ 8.)  When Tremane was not quite four, Linda was admitted to the hospital from the emergency room after being beaten by Raymond. (Linda Wood, Logan County Health Center Record 5/17/83, attached as Ex. 21,[44] Ex. 18 at 2-3; Tr. 2/23/06 at 158.)  Linda's medical records reflect that she suffered multiple contusions about the face and extremities, and she had a broken tooth.  (Ex.21 at 2; Tr. 2/23/06 at 159, 119-20.)  The nurse noted that Linda was crying and seemed nervous.  (Ex. 21 at 20.)  Linda reported that she had been living in California in the months prior (Ex. 21 at 5), and that she planned to return to California upon discharge (Ex. 21 at 2.).

Only a few months later, Tremane's mother was again treated at the emergency room after being assaulted in her chest and stomach by Tremane's father.  (Linda Wood, Logan County Health Center Record 8/5/83, attached as Ex. 22, at 1).  When Tremane was six,

---

[44]Tremane's undersigned counsel obtained Linda's medical records from the prosecutor's file.  *See, e.g.*, Doc. No. 18; *see also supra*, Claim Seven.

Linda filed for a protective order describing that Raymond hit her four times in the face with his fist.  (PCA Ex. 6 at 3; PCA Ex. 9A.)  When Tremane was eight, Linda filed for another protective order describing that Raymond threatened to kill her and hit her in the back of head.  She also said that Raymond forced her to have sex and sodomized her.  (PCA Ex. 6 at 3; PCA Ex. 10A.)  Linda has described Raymond as "the most vicious and violent person" she ever met.  (EH Vol. II, Ex. 4 at 90.)  When Tremane was eight, Raymond was charged with, and pleaded no contest to, feloniously pointing a 0.44 caliber gun at Linda for the purpose of threatening and intimidating her.  (PCA Exs. 12A, 12C.)

Raymond would also force his children to watch the abuse, and "if they refused to watch, [he] would 'beat [their] ass.'"  (*See* Tr. 2/23/06 at 160, 162; EH Vol. I, Ex. 3 at 538; Report of Jeanne Russell, Ed.D, 3/17/04, attached as Ex. 19, at 4).   He beat them with his police holster or whatever was around.  (Tr. 2/27/06 at 332.)  Moreover, when Tremane and his brothers would try to protect their mother, Raymond would turn on them and beat them. (Tr. 2/23/06 at 160.)  Raymond even went so far as to tell his young boys that their mother was dead.  (*See* Ex. 19 at 4.)  Linda was ill-equipped to protect herself or her children from Raymond's violent episodes.  (Ex. 18 at 2-3; EH Vol. II, Ex. 4 at 89-90.)  Not surprisingly, as a teenager Tremane reported that he "got tired of seeing [his father] beat on [his] mom all the time and [he] got tired of [his father] beating on [him] all the time."  (EH Vol. II, Ex. 4 at 91.)

Despite this turmoil, Linda possessed an unconditional, albeit often detrimental, love

51

for her children.  (Tr. 2/23/06 at 94, 121, 126.)  She worked at times two jobs for minimum

wage to support the children.  (Ex. 18 at 3; Tr. 2/23/06 at 121-22; PCA Ex. 6 at 3; EH Vol.

III, Ex. 6 at 18.)[45]  She also put herself through college.  (Tr. 2/23/06 at 121.)  But Linda's

job and school kept her away from the home and unable to monitor the behavior of her young

boys.  (*See* Ex. 18 at 2-3; EH Vol. II, Ex. 4 at 89-91; Tr. 2/23/06 at 168.)  Linda, who was

only a child herself when she became a mother, was unable to effectively parent Tremane;

she failed to teach him personal responsibility by imposing appropriate punishment, failed

to maintain functional and appropriate boundaries, and failed to supervise or discipline him.

(PCA Ex. 6 at 2; Declaration of Tom Comstock, attached as Ex. 6, ¶¶ 6-7.)  She "acted more

as a peer than an adult to her children," and "she could not say no."  (Ex. 6 ¶¶ 6-7.)  In fact,

Linda often "held on when letting go would have better protected Tremane."  (PCA Ex. 6 at

2.)

When Tremane was only nine and Jake eleven, Stillwater police investigated a

complaint related to the boys being unsupervised and trying to "sic" a dog on someone they

were calling a "honky."  (EH Vol. III, Ex. 6 at 13.)  Tremane and Jake reported that they

were home alone with their thirteen year old brother.  (*Id.*)  Linda arrived at home while the

officer was investigating and immediately said that she did not think her children were at

fault, even though Jake had admitted so much before Linda arrived.  (*Id.* at 13-14.)  Linda

---

[45]*See also* EH Vol. I, Ex. 3 at 183 (Linda reported as working at McDonald's in 1994);
EH Vol. I, Ex. 3 at 515 (Linda reported as working at Taco Beuno in 1995); EH Vol. II, Ex.
4 at 179 (Linda reported as working two jobs and never home).

claimed the allegations were "racial just because [her] kids are black." (*Id.* at 14.)   The officer reported that Linda was "unwilling to listen to anything anyone had to say and quickly came to [her sons'] defense." (*Id.*) The police officer also reported that witnesses said Linda "is hardly ever at home," (*Id.* at 15) and noted that Tremane and Jake "could become a problem, due to the lack of supervision" (*Id*).   Linda had difficulties accepting that her children may have been in the wrong.   But what is an even more extreme concern related to her parenting is that Linda was reported to have encouraged Tremane to commit violence on several occasions.   (Ex. 18 at 3.)[46]

When Linda and Raymond got divorced, Raymond had temporary custody of the children.   (Ex. 19 at 3; EH Vol. II, Ex. 4 at 89.)   Living with his father was not a better situation for nine-year-old Tremane.   As his paternal cousin stated, "I saw no fatherly love from Raymond toward his children." (Ex. 7 ¶ 3.)   In fact, it was around this time that charges were filed against Raymond for "point[ing] a certain deadly weapon" at Tremane, his brothers, and Linda.   (Raymond Gross Criminal History, attached as Ex. 30, at 14.)   Raymond, who was a police officer, also sold drugs.   (EH Vol. I, Ex. 3 at 536.)   While in the

---

[46]Police reports indicate an incident that occurred in an apartment parking lot involving thirteen-year-old Tremane, his brother Andre, and their mother.   (EH Vol. I, Ex. 3 at 454-64.)   According to one version of the police reports, Linda came after an adult male with a broken beer bottle.   (*Id.* at 457, 461-64.)   Andre and Tremane stopped her, and Linda encouraged Tremane to fight the man and "let" the man hit Tremane because he was an adult and Tremane was a minor, therefore he would go to jail.   (*Id.* at 457, 461-64.)   Andre, Linda, and Tremane all reported that the male was calling Linda names, such as a "n*gger loving, n*gger f*cking b*tch" and that Tremane threw a punch at the man.   (*Id.* at 458-60.)   *See also supra* n.35.

care of Raymond, the children spent a lot of time staying at their paternal grandmother's house.  (Ex. 7 ¶ 5.)  Their grandmother sold "hooch" and PCP out of her home and was arrested for selling drugs.  (*Id.* ¶ 6.)  Tremane's paternal aunts and uncles were drug addicts and also very violent; the children would see "people selling and using drugs regularly" and watch their uncles in gun fights.  (Ex. 7 ¶ 12; EH Vol. I, Ex. 2 at 43.)  Tremane's paternal relatives were also active in gangs and nearly all of the men in the family have been incarcerated.  (Ex. 7 ¶ 14.)[47]  Tremane returned to his mother's custody after a few months.

While Tremane lived with his mother, she was away from the home frequently working or at school.  Jake took over as the person acting as Tremane's parent.  (Ex. 18 at 4; EH Vol. I, Ex. 3 at 538; Tr. 2/27/06 at 335.)  Jake is mentally unstable and extremely violent.  (Declaration of Brandy Warden, attached as Ex. 8, at 1.)[48]  One juvenile worker described Jake as "mean, nasty" and "psychotic."  (Ex. 6 ¶ 4.)  Another juvenile worker was "scared to death" of Jake.  (Tr. 2/23/06 at 95.)  Jake himself admitted that he would beat Tremane if Tremane did not go along with what he wanted to do.  (Tr. 2/27/06 at 335.)

Tremane was introduced to gang life by Jake when he was only eleven and in the sixth grade.  (Ex. 18 at 1; EH Vol. II, Ex. 4 at 90; Ex. 6 ¶ 5; Declaration of Clemens Bartollas, Ph.D., attached as Ex. 5, ¶ 9.)  Tremane began getting into trouble when he followed in

---

[47]On one of Tremane's DHS "needs assessment" documents, the juvenile worker labeled his family as "criminogenic."  (EH Vol. II, Ex. 4 at 193.)

[48]Jake told a juvenile probation officer that "his goal was to contract AIDS, infect as many people as he could, and die in a gun fight with police."  (Ex. 6 ¶ 4.)

Jake's footsteps.  (Tr. 2/23/06 at 124.)  The first reported arrest from Tremane's juvenile records occurred with Jake.  He and Jake were arrested for attempted burglary when they tried to kick open metal doors on city property.  (EH Vol. I, Ex. 3 at 478-81.)

In sixth grade, Tremane began to have juvenile petitions filed against him for defacing property and for unlawfully entering a building.  (EH Vol. I, Ex. 3 at 205, 211.)[49]  Notably, Tremane was absent all or part of 86 days out of 175 school days in the 1991-92 school year.  (EH Vol. II, Ex. 4 at 71.)  He also began to get referrals for various acts of misconduct in school (*Id.* at 142-46), and was suspended from school (*Id.* at 141).  During this time, a report to DHS was made; the neighbors complained about Tremane's and Jake's behavior due to their "lack of supervision."  (EH Vol. III, Ex. 6 at 18.)[50]  At the end of the school year, Tremane had failed all subjects except for music and physical education.  (EH Vol. I, Ex. 2 at 108.)[51]

In 1992, during the summer, Tremane moved from Stillwater with his mother to live

_____

[49]Each of these incidents involved another juvenile.  One petition alleges that Tremane was acting with "Tremane Laitron Wood," which is clearly a typographical error and most likely involved Jake.  The State dismissed the case after nine months because Tremane was "no longer in need of Court related services."  (EH Vol.I, Ex. 3 at 203.)  This was the first incident where the system failed Tremane because he was, in fact, in dire need of services from the juvenile court.

[50]The DHS report notes that "removal" (of the children from the home) is probable.  (EH Vol. III, Ex. 6 at 18.)

[51]Tremane was twelve years old at the end of the school year.  In this picture, he is wearing beads as a display of his gang colors.  (Photograph of Tremane Wood, June 1992, attached as Ex. 23.)

with his father and attend school in Guthrie. (*Id.* at 40, 108-10.)  In October 1992, right after his thirteenth birthday, his father admitted Tremane to Meadowlake Hospital based on "violent and out-of-control" behavior. (*Id.* at 22.)  During the intake examination, Tremane admitted to having a history of alcohol use drinking multiple beers per day. (*Id.* at 22.)  Tremane also reported having a "family history of alcohol and drug abuse." (*Id.* at 40.)[52] While Tremane stated that he did not use any other drugs, the doctor indicated that he "appeared to be minimizing regarding his psychoactive substance abuse." (*Id.* at 22.)  The treatment goal was to "help Tremane explore sources of his anger and rebelliousness" and provide family, group, and individual therapy. (*Id.* at 43.)  The estimated length of stay was between 30 to 45 days. (*Id.* at 23.)

However, only two days after Tremane was admitted, his mother removed him from the hospital against medical advice and despite the doctor's concern regarding his at-risk behaviors. (*Id.* at 48.)  After leaving the hospital, Tremane returned back to his mother's home and continued to act out; he was adjudicated delinquent at age thirteen. (EH Vol. II, Ex. 4 at 82).  During this time, Tremane was not attending school.  A petition was filed with the juvenile court alleging "in need of supervision truancy." (EH Vol. I, Ex. 3 at 196.)  The petition notes that "mother has been uncooperative in the school's efforts to secure his attendance." (*Id.* at 196.)  Tremane's mother shipped him back to live with his father. (*Id.*

---

[52]Raymond reported alcohol abuse by maternal grandfather, drug and alcohol abuse by Linda, and drug use by four of Raymond's siblings.  (EH Vol. I, Ex. 2 at 43.)

at 182.)  Tremane had a "falling out" with his father, and went to live with Jake and his girlfriend.  (*Id.* at 182.)  The juvenile officer indicated that once Tremane was back around Jake, he "seemed to go on a spree of assaults and was involved in gang activity."  (*Id.* at 182.)[53]  In February 1994, Tremane was made a ward of the Court (*Id.* at 119), but his mother still had custody of him (*Id.* at 350 (releasing Tremane to Linda after he was arrested in April 1994)).

It was not until the end of June 1994, when Tremane was fourteen, that the court ultimately granted DHS custody of Tremane.  (*Id.* at 117.)  The court determined that " the continuation of the child in his home is contrary to the welfare of the child," but nonetheless indicated that reunification was the goal.  (*Id.* at 117.)  In this case, setting the goal of sending Tremane back into his toxic home environment with his brother was contrary to his best interests.  (Ex. 5. ¶¶ 5, 18.)

Under the custody of DHS, Tremane now had the complete evaluation that was needed, but never completed, at Meadowlake (EH Vol. I, Ex. 2 at 41) because his mother removed him from the hospital.  Tremane was evaluated by the Central Oklahoma Juvenile Diagnostic & Evaluation Center (COJDEC).  Tremane "fully complied with all aspects of the testing and evaluation process," and he "maintained consistent and positive interactions with both peers and staff."  (EH Vol. II, Ex. 4 at 82.)  Tremane was described as "a bright

---

[53]This was early 1994, and three or four petitions involving Tremane were filed within a month's time.

young man" (*Id.* at 82), whose math reasoning ability was on the 10th grade level (*Id.* at 83).

He "maintained a positive outlook" and he was "polite and friendly." (*Id.* at 83.) He also

was able to "follow directions and accept responsibility for his actions." (*Id.*)

At the time of his COJDEC evaluation, Tremane recognized that Jake was "going

nowhere," and indicated that his mother had only one "really good kid," his brother Andre.

(*Id.* at 92.) As his mother told the social worker: "Tremane became involved with the gang,

long after Jake became involved . . . . Tremane will do anything that Jake does. . . . Jake is

Tremane's idol, he would die for Jake." (*Id.* at 90.) Tremane also explained to the COJDEC

social worker: "when you grew up having a life like me, the gang was fun." (*Id.* at 92.) But

after seeing a friend killed by gang violence, Tremane expressed "a strong desire to remain

dissociated from the gang." (*Id.*) At one point, Tremane even told the juvenile probation

officer that he wanted to have his gang tattoos removed, but that never happened. (Ex. 6 ¶

12.)

The COJDEC stated: "Tremane's needs would best be met if he was placed outside

the home and in a setting which will provide [him] with opportunities to learn to comply with

expected standards of behavior and a setting which will provide him opportunities for

positive personal growth." (EH Vol. II, Ex. 4 at 83.)[54] Within weeks of the evaluation,

Tremane was removed from his home and placed in a therapeutic foster home in Cromwell,

---

[54]The treatment plan however, recommended that if Tremane succeeded outside the
home, then he should be returned to his mother's home. (EH Vol. II, Ex. 4 at 84.)

Oklahoma.  At this placement over an hour away from his home, he did very well.  (Tr. 2/27/06 at 192; Ex. 5 ¶ 16.)  He was involved in sports and received A's and B's in school. (Tr. 2/23/06 at 80; EH Vol. III, Ex. 5 at 4-5; Ex. 6 ¶ 9.)  His juvenile probation officer reflected that in the foster home, Tremane could just "be[] a normal kid with age-appropriate behaviors."  (Ex. 6 ¶ 9.)

Tremane, however, was returned home in December after spending only four months in the foster home; he had just turned fifteen.  Juvenile worker Sandy Marshall's summary report of Tremane's first two weeks back home indicated: "Tremane wants to please Jake and still seems to be under his influence."  (EH Vol. II, Ex. 4 at 180.)  Marshall also noted that Tremane was back in gang activity with his brother and has been photographed by police wearing "gang attire."  (*Id.*)  What is more, she reported that "Linda's responses vary from day to day – is not consistent with support of Tremane."  (*Id.*)  The following month, the social worker reported that Tremane is doing "a lot better" because "Jake has been out of the home," but when Jake is at home, he "tries to get Tremane in trouble."  (*Id.* at 179.)  Notably, it is reported that Linda "is never at home."  (*Id.*)

From these notes, it was apparent within the first few days of Tremane being returned home that he would not be able to succeed while exposed to Jake and without any parental supervision.  Before Tremane was returned home, Juvenile Probation Officer Tom Comstock had "recommended that the court allow Tremane to remain that foster home."  (Ex. 6 ¶ 14.)  Comstock recognized Tremane's sincere desire to stay out of trouble, remove himself from

gang lifestyle (including removing his tattoos), and not "end up like his brother."  (EH Vol.
II, Ex. 4 at 157, 305; Ex. 6 ¶ 12.)  Indeed, one report clearly stated: "Tremane has a lot of
potential and always does well while he is out of the community.  He does not have enough
self esteem and self control to maintain once he is back in the community and always goes
back to his gang lifestyle."  (EH Vol. II, Ex. 4 at 193.)[55]

In Comstock's opinion, "if the system could have kept Tremane in foster care and let
him age out, he would have been okay."  (Ex. 6 ¶ 15.)  The purpose of the juvenile court is
to "provide the salvation of a such a child, if its parents or guardians be unable or unwilling
to do so."  (Ex. 5 ¶ 6.)  Here, the juvenile system failed Tremane "by continuously returning
Tremane to his negative home environment" in the face of clear evidence it was not in his
best interest.  (*Id.* ¶ 5.)

The fact of the matter was that Tremane was simply unable to escape the influence of
Jake and his ties to the gang without serious intervention.  Jake was the O.G. (Original
Gangster) of the gang in Stillwater.  (EH Vol. II, Ex. 4 at 193; Ex. 5 ¶ 9; Ex. 6 ¶ 5.)  As Jake
explained, "the gang [was] his family and [he] adopted the rules of the gang as his own.
These were the only consistent rules present in his life and the only group with whom he felt
totally accepted."  (Ex. 19 at 5.)  Jake joined the gang because he was "looking for a father

---

[55]Even Tremane recognized the need to be out of the community.  In a progress report,
Tremane stated that "he wants to get out of Stillwater in order to remain trouble free."  (PCA
Ex. 7, 10/31/96.)  The response, however, was that Tremane "needs to realize that his actions
are what keep him trouble free & not his placement or location."  (*Id.*)  (Note to Court: the
records in Exhibit 7 from the post-conviction application are in reverse chronological order.)

figure." (Tr. 2/27/06 at 335.)  Tremane's cousin reiterated the same message: "We found love being in the gangs because we didn't get love at home." (Ex. 7 ¶ 15.)  Dr. Clemens Bartollas, who has a background in studying street gangs, stressed that Tremane needed to be in a "gang de-escalation program," especially in his younger years.  (Ex. 5 ¶ 13.)  These community-based programs have been successful across the country.  (*Id.*)  The state merely listed as a goal for Tremane to "process the events of gang membership" (EH Vol. I, Ex. 3 at 145) and "resist" gang activity (EH Vol. II, Ex. 4 at 180).  Yet the juvenile system failed to provide the resources, support, and removal from home to ensure that these goals were met.  Tremane, still just a child, would not be able to resist the strong influence of his brother.

In addition to gang activity, Tremane also experienced racial tension in the small, predominately white rural town of Stillwater.  Tremane's fighting was often instigated by racial comments that focused on the fact that his mother is white and his father is black.  (EH Vol. II, Ex. 4 at 92.)  Being biracial was difficult for Tremane; he was not white enough to fit in the white community, but he was also rejected in the black community as being too light.  (Ex. 18 at 6; *see also* Photograph of Tremane Wood, June 1981, attached as Ex. 24; Photograph of Tremane Wood, December 1992, attached as Ex. 25.)  "[B]oth the maternal and paternal grandparents rejected [the Wood children] due to their own racial prejudices." (Ex. 19 at 11.)  His paternal grandmother gave Tremane and his brothers less food, she withheld medication, and she gave new clothes provided by Linda to the other grandchildren.

(*Id.* at 4-5.)  His paternal cousin noted that the aunts treated Tremane and his brothers like "outcasts." (Ex. 7 ¶ 13.)  One juvenile worker noted that Linda had "perpetuated a belief that white people were out to get [Tremane]," yet Tremane excelled in the foster home, which was run by white parents.  (Ex. 6 ¶ 13.)   Race was clearly a "fundamental stressor in [Tremane's] life, and one for which he was never responsible and could not overcome on his own." (Ex. 18 at 7.)

During Tremane's later teenage years, the system continued to place Tremane in his mother's home despite knowing how bad the environment was for his well being and success. Tremane spent part of his sixteenth year in Central Oklahoma Juvenile Center (COJC). (EH Vol. II, Ex. 4 at 260.)  In COJC's assessment, the State noted that Tremane is "in need of a very structured, consistent educational environment." (*Id.* at 253.)  The COJC treatment plan also recognized Tremane's need for a "stable social environment with much structure." (*Id.* at 269.)

During his six-month stay at COJC away from his mother's home, not surprisingly Tremane did well.  He "responded to the structure without any major violations." (*Id.* at 260.)  In fact, while at COJC he attended school daily and achieved a 3.8 GPA.  (*Id.* at 248, 261.)  His school reports indicate that he is a good student, "he works well in class and always attempts to do his best." (*Id.* at 247.)  School reports indicate he "gets along well with both staff and peers" and that he "has a good personality and a good sense of humor." (*Id.*)  Tremane also had a job and received "excellent" reports regarding performance and

attitude by his supervisor.  (*Id.* at 261.)

Once again, however, Tremane's good behavior in a structured environment was rewarded by sending him back home.  (*Id.* at 193, 260-61.)[56]  While Tremane expressed his "commitment to a crime free future," it was impossible for him to act accordingly without limits and structure.  (*Id.* at 260.)  Recognizing Jake's influence over Tremane, the juvenile probation officer noted, "Tremane has deteriorated rapidly in his home," and "will deteriorate further now that his brother is home."  (*Id.* at 193.)  Well aware of Jake's violent behavior, the officer opined that "now that Jake is back in the community someone will get hurt or killed."  (*Id.*)

When Tremane was returned home, within a few months, Tremane reported that he was using drugs.  (PCA Ex. 7, 11/13/96.)  Tremane continued to get in trouble and, in spring 1997, Tremane tested positive for THC.  (EH Vol. II, Ex. 4 at 119.)[57]  At age seventeen, after being released from COJC for approximately six months, Tremane was placed in another

---

[56]Upon being returned home, Tremane was provided a mentor, Matthew "Boone" Netherton, who was to provide counseling and support.  (EH Vol. I, Ex. 3, at 624; PCA Ex. 7, 8/28/96.)  Netherton's efforts should have occurred much sooner in Tremane's life.  (Ex. 5 ¶ 17.)  Moreover, as indicated *supra*, n. 55, Netherton's approach ignored the need for Tremane's removal from the home.

[57]Tremane's drug addiction and history is underreported in his juvenile records.  He was addicted to drugs and alcohol and used drugs every day.  (Ex. 5 ¶ 14;  EH Vol. I, Ex. 3 at 536.)  His earliest report of alcohol use was at age thirteen at Meadowlake. (EH Vol. I, Ex. 2 at 22.)  When he was evaluated by the State at age fourteen, he reported that he seldom used alcohol and never used any other drugs.  (EH Vol. II, Ex. 4 at 100.)  A trained staff member should have been aware that drug use was a serious issue with Tremane.  (Ex. 5 ¶ 14.)

program called Vision Quest, which lasted three months.  (EH Vol. II, Ex. 4 at 194; EH Vol. I, Ex. 3 at 533).  Like all the other structured environments in which he was placed, Tremane "immediately displayed adherence to the program's boundaries, rules and expectations." (EH Vol. I, Ex. 3 at 534.)  While there, "Tremane honestly focused on his substance abuse, his family relationships and his past criminal behaviors." (*Id.*)  His attitude toward school was positive, and he excelled in science and math.  (*Id.* at 538.)  After succeeding in yet another structured environment, Tremane was discharged to his mother's care.  (*Id.* at 534.)  Three months later, Tremane "aged out" of the juvenile system.  (*Id.* at 593.)[58]

As an expert could explain, Tremane's childhood "took place amid consist[e]nt poverty, recurring moves, normalized violence and criminality both inside and outside the home, abject emotional and physical neglect, and ongoing experiences of racial hostility." (Ex. 18 at 1.)  "From the earliest stage of human attachment. . . , [Tremane's] most basic needs went unmet."  (Ex. 18 at 1.)  And instead, his childhood was plagued with regular occurrences of severe domestic violence.  When this occurs, it "conveys to the child that not only is their home not safe, but that adults are inadequate in the world—there are no models of how to 'make it' in the world." (Ex. 18 at 2-3.)  As a result of growing up in this violent

_____

[58]The following year, in August 1998, Tremane became a father to Brendon Treyvon. (Tr. 4/5/04 at 20.)  By January 1999, Tremane had pleaded guilty to charges of possession of marijuana and knowingly concealing stolen property.  He spent two years in prison, being released in February 2001.  (*See* Tr. 4/5/04 at 98.)  He was doing well and staying out of trouble until Jake was released from prison in October 2001.  (Tr. 4/5/04 at 99-100.)  The crime for which Tremane is on death row occurred January 1, 2002.

home, Tremane has been diagnosed with Post-Traumatic Stress Disorder (PTSD) and Generalized Anxiety Disorder (Ex. 18 at 1; Ex. 4 ¶ 34), as well as Attention Deficit Hyperactivity Disorder (ADHD) (Ex. 4, ¶ 17).

In understanding what this means, an expert would have told a jury: "When children are subject to traumatic exposure it is a well-established fact that one of several limited responses are possible, and in his case it was to act out some of the behaviors he had witnessed, in addition to experiencing high levels of internal anxiety that made him even more susceptible to the alcohol and drugs to which he was exposed through his gang." (Ex. 4, ¶ 34.) Moreover, children with ADHD are more genetically predisposed to anxiety disorders and drug abuse. (*Id.*) And while ADHD is significant because it affects Tremane's "ability to delay responding so as to critically evaluate situations when confronted with novel, intense, and/or unpredictable events, it pales in comparison to the psychosocial trauma he experienced from an early age." (*Id.* ¶ 33.) "To say that [Tremane] was a victim of his circumstances may seem trite or convenient, but it is essential to consider that in being a healthy and intact individual with respect to the presence of inherently normal physical and psychological functions, he was confronted with essentially no options but to bond with the only available people available." (*Id.*) At the top of that list was his extremely violent, mentally ill brother, and in turn members of the gang. (*Id.*) And when the State attempted to intervene providing more healthy choices and outcomes yet then discontinued services, that ultimately resulted in damaging his "trust in the 'system' and strengthening his reliance

65

on his counter-culture existence." (*Id.*)  In considering all these factors, even as a small

child, Tremane's "developmental trajectory" was highly over-determined or inevitable . (*Id.*)

### 2.     Why This Information Would Have Made a Difference

In assessing prejudice during the penalty phase, this Court must "evaluate the

mitigation evidence counsel failed to present relative to what was presented; the aggravating

factors found by the jury; and the overall strength of the State's case." *Cargle*, 317 F.3d at

1221.  In considering these factors, a decision to "grant relief on ineffectiveness grounds is

a function of the prejudice flowing from all of counsel's deficient performance–as *Strickland*

directs it to be." *Id.* at 1212.[59]  "The benchmark for judging any claim of ineffectiveness

must be whether counsel's conduct so undermined the proper functioning of the adversarial

process that the trial cannot be relied on as having produced a just result." *Strickland*, 466

U.S. at 686.  Here, the Court cannot and should not rely on the penalty-phase of Tremane's

trial as being just.  Therefore, this Court should grant him relief.

Over a year before Tremane's trial, the State gave notice to Albert that it was alleging

four aggravating circumstances.  (*Id.* at 72.)  The jury found that the State only proved

beyond a reasonable doubt three: that the crime was heinous, atrocious, or cruel; that

Tremane was a continuing threat to society; and that Tremane knowingly created a great risk

---

[59]Because this Court must review all of counsel's errors cumulatively, Tremane notes
that any other deficiencies in counsel's performance (discussed elsewhere in this petition)
should also be considered part of this Court's prejudice analysis.

of death to more than one person.  (OR1 at 617.)[60]  Because the two main aggravating factors involved Tremane's behavior and actions, it was even more critical to furnish the jury with context and background regarding his life and how he ended up involved in criminal activity, once again, with his brother.

While the defense provided the jury with a list of mitigating factors (OR 634-35), these were cursory in nature and failed to even mention the severe violence that Tremane witnessed as a child.  What is more, there was little, if any, support for the few factors that would have helped the jury understand Tremane.[61]  *See, e.g.*, *Mayes*, 210 F.3d at 1288 ("The presentation of mitigation evidence affords an opportunity to humanize and explain-to individualize a defendant outside the constraints of the normal rules of evidence.").  Had the jury known the information described *supra* at 49-66, there is a likelihood that at least one juror would have voted for life.  *Wiggins*, 539 U.S. at 537.

Instead of hearing that Tremane suffers from PTSD as a result of being exposed as a small boy to severe violence, the jury heard the State emphasize that Tremane has "no mental illnesses."  (Tr. 4/5/04 at 115.)  Instead of hearing the explanation of how Tremane,  from

---

[60]As discussed in Claim Eight, *infra*, the aggravating circumstance of knowingly creating a great risk of death should have been challenged by post-conviction counsel.  If it had been, there is a likelihood that it would have been struck, as the same trial court struck that aggravator in Jake's case.  Moreover, the heinous, atrocious, and cruel aggravator could have been challenged if trial counsel retained an expert to rebut State's argument that the stab wound was five-inches deep.  *See* Claim Six *infra*.

[61]While three of the factors indicate that Tremane had no father figure, had an absent mother, and took directions from Jake, these are meaningless without the developed evidence to support them.

a very young age, was never provided proper parenting or supervision and how he was confronted with essentially no options but to bond with his brother and the gang, the jury heard the State repeatedly claim that "he made a choice to do these things all throughout his life." (*Id.* at 115; *see also id.* at 138 (noting that Tremane "had a choice" and he "decided to be a criminal").)  Instead of hearing detailed reports about Tremane excelling in a structured environment, the jury heard the State emphasize that the defense's own expert "cannot give you any guarantees about" doing well in prison. (*Id.* at 122.)  Instead of contextualizing the juvenile incidents that occurred, including explaining that reports indicated mother encouraged his violence when he was a young teenager, the jury heard the State focus on his violent behavior as a juvenile. (*Id.* at 123.)

The information that should have been presented at Tremane's penalty phase would have not only undermined the aggravating factors, but it would have also dramatically improved the very cursory mitigating evidence that was presented.  The explanation of "why [Tremane's] life was still worth saving" was never presented to the jury. *Cargle*, 317 F.3d at 1222.  In this case, given the overwhelming amount of information that was never presented to the jury, "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.[62]

---

[62]This Court also has before it the testimony of the foreperson from Tremane's trial. She stated that had she heard additional testimony (which did *not* even include an expert analysis or any diagnoses), she would have held out for a life sentence. (Tr. 3/2/06 at 425.)

**Claim Two:  Prosecutorial Misconduct During  his Trial Court Proceedings Deprived Tremane of his Due Process Rights**

**I.    The Prosecutor Argued Inconsistent Theories at Tremane and Jake's Trials**

At Tremane's trial, evidence showed that two masked men entered the motel room. (Tr. 3/31/04 at 131-32; Tr. 4/1/04 at 168.)  Witnesses indicated that Tremane, the smaller of the two brothers, was carrying a knife.  (Tr. 3/31/04 at 132; Tr. 4/1/04 at 34, 178-79.)  No witness identified which of the two men ultimately stabbed Ronnie.  Jake testified that he stabbed Ronnie.  (Tr. 4/2/04 at 94.)[63]

It was the State's position at Tremane's trial that Tremane, not Jake, inflicted the wound that killed Ronnie.  (*Id.* at 199.)  The prosecutor focused on Tremane being the person with the knife.  (*Id.* at 194, 197.)  During closing, the prosecutor argued: "I submit to you that there was blood on his [Tremane] hands and there still is and there will always be."  (*Id.* at 183.)  The prosecutor called Jake a liar and repeatedly told Tremane's jury not to believe Jake and to reject his testimony.  (*Id.* at 161-62, 194, 198-99.)  "[I]f that defendant [Jake] tells you the sun comes up in the east, in the morning every day you should get up and look out the window.  That is how much credibility that gang banging, dope dealing, confessed murderer should have in this courtroom."  (*Id.* at 161.)  Thus, the State's position at guilt phase was

---

This is critical given Oklahoma law.  *See* 21 Okla. Stat. Ann. § 701.11 ("If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life without parole or imprisonment for life.").

[63] Jake also claimed that he committed the crimes at issue with a white guy named Alex.  (Tr. 4/2/04 at 91-94.)

clear—Tremane stabbed and killed Ronnie.

That remained the State's position during the penalty phase.  In her opening, the prosecutor repeatedly reminded the jury that it was Tremane who held the knife.  (Tr. 4/5/04 at 6, 10-11.)  Again, in closing, the prosecutor flatly rejected Jake's testimony that he stabbed Ronnie.  (*Id.* at 154) ("[Tremane's] brother tried to get up there and describe some 'Oh, well, you know, kind of let the gun go.  And I picked up the knife.  And I stuck him in the chest.  And said, 'I'm God.'  Well, yeah.  People always drop guns so they can grab knives.")  And the prosecutor graphically described Tremane stabbing Ronnie.  (*Id.* at 111, 133, 155.)  The State's position at the penalty phase was clear—Jake's testimony was not to be believed—Tremane killed Ronnie.

Reversing course during Jake's trial, which occurred a year after Tremane's, the State argued that Jake stabbed Ronnie.  During Brandy Warden's direct examination, the prosecutor elicited testimony that Jake wrote a letter to her admitting "[t]hat he killed Ronnie Wipf."  (Z. Wood Tr. 2/23/05, attached as Ex. 28B, at 125.) The State even presented the testimony from a  detective who described Jake's confession during Tremane's trial.  (Ex. 28B at 205-06.)

During the guilt-phase closing statement, the prosecutor said Jake stabbed Ronnie. (Z. Wood Tr. 2/24/05, attached as Ex. 28C, at 70 (Jake admitted in a letter he wrote to Brandy Warden, "I killed Ronnie Wipf"); Ex. 28C, at 87 (Jake "took the stand and he admitted killing Ronnie Wipf just to show Ronnie Wipf he was a force to be reckoned

with.")).  This theme was continuously repeated during Jake's penalty phase.[64]

The State did not merely take inherently inconsistent positions at Tremane's and Jake's trials.  It affirmatively attacked evidence offered by Tremane that Jake was the actual killer, while making that same evidence the centerpiece of its case against Jake months later.

## II.   The Prosecutor Improperly Commented on Tremane's Right to Remain Silent

During its penalty phase closing, the prosecutor improperly argued that Tremane lacked remorse:

> Another thing when Dr. Hand testified, what is even more important is what he didn't say.  The one thing that Dr. Ray Hand didn't say about this defendant is that he is remorseful for committing this murder.  Or that he was sorry for committing this murder.  I submit to you that he is because he is not.

(Tr. 4/5/04 at 133-34.)  The prosecutor urged the jury "to deal with - - what we have today is this defendant. A man who can kill an innocent victim without mercy and without remorse."  (*Id.* at 139.)  Trial counsel failed to object to this egregious comment on Tremane's right to remain silent.

## III.   The OCCA's Decision is Unreasonable and Contrary to Law

---

[64] *See* Z. Wood Tr. 3/1/05, attached as Ex. 28E, at 118 (quoting letter, "And when I stabbed that dead punk. . ."); Z. Wood Tr. 3/1/05 Ex. 28E at 124 ("This defendant testified in his brother's trial, 'I killed him because I wanted him to know I was a force to be reckoned with'"); *Id.* at 124 ("He made choices to murder Ronnie Wipf"); *Id.* at 125 ("He murdered Ronnie Wipf with a knife"); *Id.* at 134 (noting that the jury had "evidence from this defendant's mouth that was testified to in the first stage of the trial that he did in fact murder Ronnie Wipf and "some letters where he, himself, said he murdered Ronnie Wipf"); *Id.* at 180 ("Show the letter that he enjoyed killing Ronald Wipf, continuing threat"); *Id.* at 181("this defendant in his letter said, 'I'm a force to be reckoned with' and 'Ronnie Wipf had to die because he was being a bad boy'").

71

On postconviction review, counsel raised these acts of prosecutorial misconduct as a due process violation, as well as asserting that both trial and appellate counsel were ineffective for failing to preserve this error.  (PC Appl. at 38, 39-48, 4/25/07.)  The OCCA denied relief on the substantive claim finding it was procedurally barred.[65]  (PC Op. at 18, 6/30/10.)  In rejecting the merits of Tremane's appellate ineffective assistance of counsel claim, however, the OCCA necessarily rejected the merits of Tremane's substantive claims of misconduct.  (*See id.* at 17-18.)  It made no explicit findings related to the various acts of misconduct.

To succeed on his claim of prosecutor misconduct, Tremane must demonstrate either that the prosecutor's misconduct prejudiced a substantive right, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (*citing Griffin v. California*, 380 U.S. 609 (1965) (footnote omitted)), or that the prosecutor's misconduct rendered the trial fundamentally unfair, *see Berger v. United States*, 295 U.S. 78, 88-89 (1935).  *See also Bodine v. Warden of Joseph Harp Corr. Ctr.*, 217 F. App'x 811, 814 (10th Cir. Feb. 22, 2007).  The state court's rejection of this claim was an unreasonable application of clearly established law.

## A.    Inconsistent Theories

The State's use of inconsistent theories, attacking Jake's confession at Tremane's trial then wielding it as a sword against him, was prosecutorial misconduct.  In *Bradshaw v.*

---

[65]Should this Court find this claim procedurally defaulted, cause and prejudice exist to overcome that default through IAC of trial and appellate counsel.  *See Murray v. Carrier*, 477 U.S. 478, 488-89 (1986).  *See Claim 1, 3.*

*Stumpf*, 545 U.S. 175 (2005), the defendant argued that his guilty plea was invalid based upon the state's contradictory arguments accusing him, and his co-defendant, of actually killing the victim.  The Supreme Court rejected Stumpf's claim as it related to his conviction because the identity of the triggerman was "immaterial" to Stumpf's aggravated murder conviction.  *Id.* at 187.  However, the Court remanded Stumpf's case because "[t]he prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence, however, for it is at least arguable that the sentencing panel's conclusion about Stumpf's principal role in the offense was material to its sentencing determination."  *Id.* at 187.

Tremane's case presents a more nefarious scenario than that presented in *Stumpf*.  Not only did the State use inconsistent theories in order to convict Tremane and Jake, and to obtain the death penalty against Tremane, the prosecution used "necessarily contradictory evidence" in so doing.  *See United States v. Hill*, ___ F. 3d ___ 2011 WL 2314155, *13 (11th Cir. June 14, 2011.)  The State did not merely argue that the jury should draw different inferences from the evidence.  *See id.*  ("We stressed that the prosecution in those cases did not use 'necessarily contradictory evidence,' and 'the only inconsistency was in the state's alternative arguments' about what inference the jury should draw from the same evidence." (citations omitted)).  Rather, the State affirmatively asserted that Jake's confession was false and unbelievable at Tremane's trial, but then used it as affirmative evidence of guilt at Jake's trial.  And, the state did not limit its inconsistent theories at either trial; like *Berger*, the

73

misconduct "was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." 295 U.S. at 89. The OCCA's conclusion to the contrary is an unreasonable application of *Berger* and *Stumpf*. Tremane's due process rights were violated as a result of this prosecutorial misconduct, which warrants a new trial.

Should this Court find Tremane is not entitled to a new trial, the OCCA should have found error at the penalty phase warranting a new sentencing hearing. The state urged Tremane's jury to impose the ultimate penalty because he was the man who plunged the knife five inches into Ronnie's chest. This was a powerful image that likely created strong emotions in the hearts and minds of Tremane's jurors. A matter of months later, the prosecution told the trial judge, "[b]ut we also believe that Mr. Zjaiton Wood is really the worst of the two of them, considering the evidence that we know about and that but for Mr. Zjaiton Wood, Termane Wood would not have acted in the manner he did." (Z. Wood Tr. 9/20/04, attached as Ex. 28A, at 25.) The state went much further than that, however, repeatedly telling Jake's jury that he was the man who dealt the fatal blow. Like *Stumpf*, "[t]he prosecutor's use of allegedly inconsistent theories may have a more direct effect on [Tremane's] sentence." *Stumpf*, 545 U.S. at 187. The state's use of inconsistent theories in its effort to obtain the death penalty deprived Tremane of his right to a reliable sentence and a fundamentally fair sentencing hearing. The OCCA's conclusion to the contrary violated *Donnelly, Berger,* and *Stumpf*. He is therefore entitled to a new sentencing hearing.

**B.     Comment on Silence**

While Oklahoma courts have found that a defendants' lack of remorse is relevant to the continuing threat aggravator, *see Pickens v. State*, 850 P.2d 328, 337 (Okla. Crim. App. 1993), it must be supported by the trial record.  Here, the State offered no *evidence* that Tremane lacked remorse.  *Cf. Darks v. Mullin*, 327 F.3d 1001, 1019 (10th Cir. 2003) (referencing petitioner's extreme callousness on video as demonstrating a lack of remorse).

The prosecutor's comments were directed at Tremane's failure to apologize, which would necessitate an admission of guilt.  Thus, the prosecutor's arguments were a direct, and improper, attack on Tremane's exercise of his right to remain silent.  *See Doyle v. Ohio*, 426 U.S. 610 (1976); *Mitchell v. United States*, 526 U.S. 314, 328-29 (1999) .  Those arguments improperly urged Tremane's jury to draw adverse inferences from constitutionally protected conduct.  *See Zant v. Stephens*, 462 U.S. 862, 885 (1983).  The prosecutor's arguments respecting remorse exacted a price for Tremane's exercise of his constitutional rights, a price disallowed by case law.  *See Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (punishing a person for exercising a constitutional right is a "due process violation of the most basic sort"); *see also Griffin*, 380 U.S. at 615 (finding error where comment on defendant's silence imposed a penalty for the exercise of a constitutional privilege and thus diminishes that privilege by assessing a cost for its assertion).  The OCCA's decision denying relief on this claim necessarily is an unreasonable application of *Donnelly* because the misconduct deprived Tremane of a substantive right.

**IV.    The Cumulative Error of Prosecutorial Misconduct Warrants Relief**

The Tenth Circuit Court of Appeals has rejected invitations "to parse the prosecutor's argument word by word in a vacuum." *Douglas v. Workman*, 560 F.3d 1156, 1177 (10th Cir. 2009) (citation omitted). Rather, when addressing fundamental fairness, the court must consider the "entire proceedings, including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase. Any cautionary steps—such as instructions to the jury—offered by the court to counteract improper remarks may also be considered. Counsel's failure to object to the comments, while not dispositive, is also relevant to a fundamental fairness assessment." *Douglas*, 560 F.3d at 1177 (citation and emphasis omitted).

Ultimately, the probable effect of the misconduct on the jury must be assessed. *Id.* (citations omitted). In making that assessment, the Court considers whether "the prosecutor's argument. . . manipulate[d] or misstate[d]" the evidence, "whether it impact[ed] other specific rights of the accused such as the right to counsel or the right to remain silent," whether "the objectionable content was invited by or responsive to the opening summation of the defense," and whether "[t]he weight of the evidence against petitioner was heavy." *Id.* (*citing Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986)).

The evidence during either phase of Tremane's capital trial was not strong. There is a very real question about who inflicted the single stab wound that killed Ronnie Wipf, as evidenced by the inconsistent theories offered at Tremane and Jake Wood's capital trials. Similarly, while there was far more evidence that could have been offered on Tremane's

behalf at mitigation, *see* Claim One, Section II.B.1, Tremane did offer seventeen mitigating factors for the jury's consideration.  Further, at least two of the aggravating circumstances offered against Tremane were not supported by sufficient evidence. *See* Claim Four, Section I.B.

The State's actions manipulated the evidence, and misstated the law and facts. Significantly, with respect to remorse, that misconduct unconstitutionally infringed upon Tremane's right to remain silent.  Simple review of the record demonstrates that this misconduct was not in response to comments by defense counsel; trial counsel did precious little to defend Tremane in this matter.

Viewing Tremane's allegations of misconduct in light of all the misconduct committed at trial, *Darden*, 477 U.S. at 181; *Berger*, 295 U.S. at 89, it is apparent that these acts of misconduct deprived Tremane of a fundamentally fair trial.  The many acts of misconduct, during both phases of Tremane's capital trial, "had substantial and injurious effect or influence in determining the jury's verdict[s]."  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  The misconduct of the State so infected Tremane's capital trial with unfairness as to make the resulting convictions and sentence unreliable. *See Donnelly*, 416 U.S. 637; *Darden*, 477 U.S. at 181.  Habeas relief is warranted on this ground.

**Claim Three: Tremane Was Denied His Fourteenth Amendment Right to Counsel During His Direct Appeal Proceedings**.

Tremane's post-conviction counsel raised a claim that he received ineffective assistance of direct appeal counsel, raising numerous errors.  (PC Appl. at 6-39, 4/25/07.)

77

The OCCA adjudicated this claim on the merits and reached a decision that unreasonably applied clearly established law and was based on an unreasonable determination of the facts. The claim will be discussed in two parts: (I) counsel's failure to raise meritorious claims on appeal, and (II) counsel's failure to provide effective assistance at the evidentiary hearing. Because Tremane was denied his right to effective assistance of appellate counsel, he is entitled to relief. *See Evitts*, 469 U.S. at 396 ("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.").

## I.   Appellate Counsel Was Ineffective For Failing to Raise Meritorious Claims

### A.   The OCCA's Decision Was Based on an Unreasonable Determination of the Facts and Unreasonably Applied *Strickland*

The OCCA denied the claim regarding counsel's failure to raise meritorious issues on the merits.  (DA2 Op. at 17-18, 6/30/11.)  In its brief denial of this portion of the appellate IAC claim, the OCCA found that counsel presented "those claims, he believed, in light of his professional judgment, had the best chances for success that would fit within this Court's page limitation in a capital case."  (*Id.* at 17.)  In light of the state-court record, this was both an unreasonable determination of fact and an unreasonable application of *Strickland*.

First, there was no record evidence that claims were *not raised* based on "professional judgment."[66]  In fact, the record before the state court demonstrates otherwise.  Counsel spent

---

[66]Appellate counsel who authored the brief recognized that his caseload was excessive at the time Tremane's brief was due, and he had insufficient time to devote in preparing it.

forty of his one-hundred pages raising general challenges to the death penalty.  Of that, counsel used twenty-five pages (or *one-quarter* of his allotted space) to challenge the three aggravating circumstances as being constitutionally vague or overbroad (DA2 Appellant's Br. at 27-49, 56-57, 6/28/05.)  In two of these claims, counsel specifically recognized that the OCCA "has consistently rejected attacks" on these claims.  (*Id.* at 28, 44).  Given the law was against Tremane, it was unsurprising that the OCCA dismissed the constitutional attacks on the three aggravating circumstances without discussion. (DA2 Op. at 12-13, 16, 4/30/07.) Thus a finding on post-conviction review, that counsel used the limited space to brief the claims that had "the best chances for success" (PC Op. at 17, 6/30/10) is unreasonable.

Second, the OCCA reasoned that counsel was not ineffective because he dedicated more than a quarter of the brief to the claim of ineffective assistance of counsel, which resulted in an evidentiary hearing.  (*Id.* at 18)  This is an unreasonable determination of the facts and an unreasonable application of *Strickland*.  Counsel raised the IAC claim in the opening brief, and also filed, as required by the rules, an application for an evidentiary hearing.  What was presented in the opening brief is *identical* to what was presented in the application.  (*Compare* DA2 Appellant's Br. at 71-98, 6/28/05, *with* DA2 Appl. For Evid. Hrg., 6/28/05.)  Indeed, over four pages are simply quoting the affidavits that were attached, as required under Oklahoma Rules of Criminal Procedure 3.11, to the application.  (DA2 Appellant's Br. at 88-92, 6/28/05)  While Tremane recognizes the importance of the IAC

---

(Ex. 10 ¶ 4.)  In his words: "it is the worst direct appeal brief that I have ever written."  (*Id.*)

claim and the requirement that it be raised in the brief, the OCCA's finding that it was good professional judgment to include information *not* required in the brief to the detriment of other viable claims was unreasonable. As such, this Court should review the merits of the appellate IAC claim de novo.

**B.  Claims Appellate Counsel Failed to Raise**

"When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, [the Court] look[s] to the merits of the omitted issue." *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001) (*citing Hooks v. Ward*, 184 F.3d 1206, 1221 (10th Cir. 1999)). A petitioner alleging appellate IAC need not show that the claim would have automatically resulted in reversal. *Neill*, 278 F.3d at 1057, n.5. Rather, if there is a "reasonable probability that the omitted claim would have resulted in a reversal on appeal," a petitioner will be entitled to relief. *Id.* Here, if counsel had raised the following issues on appeal, there is a reasonably probability that the OCCA would have granted relief.

**1.  Trial IAC for failing to object to jurors moving their vehicles**

During both the trial and penalty phases of Tremane's capital trial, after the jury was charged, the trial court permitted jurors to separate and move their cars. (Tr. 4/2/04 at 209-10; Tr. 4/5/04 at 160-61.) In so allowing, the trial court violated Oklahoma Statute Title 22, § 857, which is mandatory in nature. *Johnson v. State*, 93 P.3d 41, 46 (Okla. Crim. App.

2004).[67]  Had trial counsel objected, under Oklahoma law the OCCA would have presumed

prejudice and reversal would have been warranted.  *See, e.g.*, *Bayliss v. State*, 795 P.2d 1079,

1081 (Okla. Crim. App. 1990) (reversing district court and remanding for new trial after

finding that "the lack of sequestration after the jury ha[d] been charged" violated 22 Okla.

Stat. § 857 and State failed "to rebut the automatic presumption of prejudice" arising from

violation).

For over 100 years, Oklahoma has "mandate[d] that a jury be kept together between

the time the cause is submitted and the verdict returned." *Johnson*, 93 P.3d at 47.  Once the

jury has heard the charge, under the dictates of section 857, it becomes imperative that they

remain together away from outside communications and influences." *Id.* at 48.  This rule

guards "trials by juries from improper influences, and a vigilant observance of all the

provisions of the Criminal Code tending to preserve the purity of such trials." *Id.* at 47

(internal citations omitted).

There was no strategic reason for counsel's failure to raise this claim.  (Ex. 10, ¶ 5.)

Because the law in Oklahoma is clear that Tremane would have been entitled to a new trial

due to the blatant violation of the jury sequestration statute, counsel should have raised this

---

[67]This error was compounded by the fact that the trial record is silent, during both phases, as to when, or even if, the bailiff was sworn as required by § 857.  The failure to swear the bailiff compounded the failure to properly sequester the jury. *Johnson*, 93 P.3d at 48 ("[T]he fact that the bailiff in the present case was not immediately sworn to keep the jury together after they had heard the charge does not eliminate the error but rather compounds it.").

claim.[68]   Under *Strickland*, he is therefore entitled to relief here.

> **2.   Trial IAC for failing to present available evidence to support defense through Bateman's presentence investigation report and to object to handwriting exemplars**

At trial, the defense presented only one witness.[69]  Jake testified that he, not Tremane, killed the victim by stabbing him in the chest.  (Tr. 04/02/04 at 94, 97, 131.)  Because the jury heard Jake admit to killing Ronnie, trial counsel was ineffective for not presenting readily available evidence which supported Jake's testimony that he, not Tremane, was the actual killer.

The pre-sentence investigation report ("PSI") of codefendant Lanita Bateman, which was made part of the record weeks before trial, stated that Jake was the person who stabbed the victim.  (OR1 at 501.)  Although Lanita invoked her Fifth Amendment right against self-incrimination and did not testify at Tremane's trial, her PSI could have been admitted at trial (and was admitted at the evidentiary hearing) through the testimony of the PSI report writer, Margaret Little.  (Tr. 3/2/06 at 450-52.)   Counsel had no reason not to provide support for Jake's testimony once he allowed his client to usurp his professional duty and control witness

---

[68] This claim, which if raised would have resulted in reversal of Tremane's conviction, further highlights the unreasonableness of the OCCA's decision under § 2254(d)(1).

[69] Counsel made it clear on the record that he did not want to call Jake as a witness, but he was following the wishes of Tremane. (Tr. 4/2/04 at 79.)  By allowing his client to make this critical decision, trial counsel was not acting in Tremane's best interest.  *See, e.g.*, *Taylor v. Illinois*, 484 U.S. 400, 417-18 (1988) (stating that "[a]lthough there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has–and must have–full authority to manage the conduct of the trial").

strategy.[70]

The need to support the fact that Tremane did not actually stab the victim was critical because the State introduced a letter purportedly written to Jake by Tremane. The letter was admitted through the testimony of "handwriting expert" David Parrett. (Tr. 4/1/06; Tr. Ex. 112.) Counsel neither objected nor requested a *Daubert* hearing despite the fact that Parrett's testimony linking Tremane to this letter was extremely damaging and was deftly exploited by the State in closing argument.

The National Academy of Science 2009 report, *Strengthening Forensic Scene in the United States: A Path Forward*, makes clear that the "scientific basis for handwriting comparisons needs to be strengthened." *Id.* at 166. "[T]here has been only limited research to quantify the reliability and replicability of the practices used by trained document examiners." *Id.* at 167. A proper objection by counsel, or request for a *Daubert* hearing, would have either barred Parrett's testimony entirely, *see, e.g.*, *United States v. Lewis*, 220 F. Supp. 2d 548, 554 (S.D. W. Va. 2002) (excluding handwriting expert under *Daubert*), or severely limited nature and tenor of Parrett's "expert" opinion thus excluding an opinion on the ultimate issue of who authored the disputed document, *see, e.g., United States v. Oskowitz*, 294 F. Supp. 2d 379, 384 (E.D.N.Y. 2003) (barring testimony as to authorship of questioned document but permitting testimony as to similarities between known handwriting

---

[70]Moreover, had counsel conducted any investigation before trial, he would have learned that Lanita would have been willing to provide mitigating testimony. (Ex. 9 at 4.)

83

and questioned document).

Flawed forensic evidence would have cast the State's case in a different light.  Such evidence may have led the jury to question other components of the State's case.  Certainly, it would have dramatically altered the arguments the State could make in support of its request for death.  Similarly, Lanita's PSI would have lent credibility to Jake's claim of responsibility, thus diminishing Tremane's level of responsibility.  This could have caused the jury to strike a different balance when assessing penalty.  Both claims are compelling demonstrations of trial counsel's deficient performance that cut to the heart of the State's case for guilt, as well as its case for death.  Had these issues been raised on appeal, there is a reasonable probability that relief would have been granted due to trial counsel's ineffective assistance.

 **3.** **Trial IAC related to failure to list crucial mitigating evidence that Jake was the actual killer and failing to request *Enmund/Tison* jury instruction**

At trial, Jake admitted that he killed the victim.  (Tr. 04/02/04 at 94, 97, 131.)  Trial counsel, however, failed to assert that fact as a mitigating circumstance.  *See Lockett*, 438 U.S. at 604 (holding that sentencer may not be precluded from considering "any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death").  Along those same lines, trial counsel failed to request a jury instruction under *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987).  *See* OUJI CR-4-71.  Under *Enmund/Tison*, where a defendant is not the actual killer, and did not

84

intend or attempt to kill, he cannot be sentenced to death unless the State proves that he is a major participant in the underlying felony and he exhibited a reckless indifference to human life. *See, e.g.*, *Allen v. State*, 874 P.2d 60, 65 (Okla. Crim. App. 1994). The Oklahoma jury instruction notes provide that the instruction "*shall* be used in cases where the death penalty is sought based on the felony-murder rule" and where accomplices are involved. OUJI CR-4-71 (notes) (emphasis added); *Gilson v. State*, 8 P.3d 883, 920 (Okla. Crim. App. 2000). Under state and federal law, it was error to not provide the instruction.

Counsel had no strategic reason for failing to raise this claim. (Ex. 10 ¶ 5.) Had appellate counsel raised this claim, there is a likelihood that the OCCA would have reviewed the record to determine whether "a reasonable juror [could] find beyond a reasonable doubt that he was a major participant [in the underlying felony] and that he acted with reckless indifference to human life." *Gilson*, 8 P.3d at 922 . Here, there was contradictory evidence regarding Tremane's involvement and participation in the crime. A reasonable juror could have determined that Tremane did not exhibit a reckless indifference to human life. Had this issue been raised on appeal, there is a reasonable probability that relief would have been granted.

### 4.      Trial IAC for failure to object to prosecutorial misconduct

Trial counsel was ineffective by failing to object to prosecutorial misconduct when the State commented on Tremane's exercise of his right to silence. *See Donnelly*, 416 U.S. at 644 (*citing Griffin*, 380 U.S. 609) (footnote omitted); *Berger*, 295 U.S. 78. *See* Claim Two

(incorporated here by reference).   Federal courts have consistently recognized that *Strickland*'s duties to advocate and to employ "skill and knowledge" include the necessity for trial counsel to object or otherwise preserve federal issues for review.  *See e.g., Gravley v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996); *Starr v. Lockhart*, 23 F.3d 1280, 1285 (8th Cir. 1994).  Trial counsel's failure to object was an obvious error that should have been raised by appellate counsel.  Had this issue been raised on appeal, there is a reasonable probability that relief would have been granted.

## II.   Appellate Counsel Were Ineffective at the Evidentiary Hearing

### A.   The OCCA's Decision Unreasonably Applied *Strickland*

The OCCA denied the claim regarding appellate counsel's ineffectiveness at the evidentiary hearing on merits finding generally that Tremane failed to show that the outcome of the proceedings would have been different.  (DA2 Op. at 9-16, 6/30/11.)  In reviewing this claim, the OCCA noted that it "need not determine whether counsel's performance was deficient if the claim can be disposed of on the ground of lack of prejudice." (PC Op. 6/30/10, at 8.)  While *Strickland* permits a court reviewing an IAC claim to stop its analysis once it finds that a petitioner cannot meet one of the two prongs, *Strickland*, 466 U.S. at 697, it does require courts to review the cumulative effect of counsel's errors, *id.* at 695-96.  The *Strickland* Court made clear that "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."  *Id.* at 695; *see also Williams*, 529 U.S. at 397.  "Taking the unaffected findings as a given, and taking due account of the effect of the

*errors* on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the *errors*." *Strickland*, 466 U.S. at 696 (emphasis added).

Here, the state court failed to conduct a cumulative review of the alleged errors. Instead, the state court reviewed each allegation of counsel's error piecemeal and found that the error alone would not have prejudiced Tremane. (PC Op. at 8-16, 6/30/10.) Because the state court's decision failed to review the totality of the errors, it was objectively unreasonable under *Strickland*. This Court should review the claims de novo.

**B.   Appellate Counsel's Performance Was Deficient**

**1.   Counsel failed to obtain and use documentary evidence to rebut Raymond Gross's erroneous statements**

Every witness, except for Raymond Gross, supported the fact that Linda endured severe abuse by Raymond. Raymond denied most of the reported abuse. In spite of testimonial and documentary evidence to the contrary, the trial court found Raymond credible and believed that he was not an abusive husband. Appellate counsel failed to discredit him in several ways.

Counsel failed to question him regarding his and Linda's divorce decree—an exhibit presented during the hearing. (EH, Vol. I, Ex. 2 at 95.) In the divorce decree, the court issued an order "restraining [Raymond] from bothering, harassing, or inflicting bodily harm" on Linda. (EH, Vol. I, Ex. 2 at 105.) On cross-examination, the State asked Raymond questions to imply that Linda was lying about the abuse. (Tr. 2/23/06 at 24.) Counsel should

have used this exhibit on redirect to discredit Raymond's denial of the abuse.  Appellate counsel had no strategic reason for not using records in examining Raymond; he simply "did not believe it was necessary" to challenge Raymond's testimony with documents because it was "so obvious" that Raymond was being dishonest.  (Declaration of Jason Spanich, 6/27/11, attached as Ex. 11, ¶ 5; *see also* Ex. 10 ¶ 7.))[71]

Counsel also failed to investigate and obtain relevant records supporting the abuse. They failed to obtain court records such as the divorce records (PCA Ex. 8A-8B),[72] records related to Raymond's criminal background (PCA Ex. 12A-12C),[73] and protective orders issued against Raymond (PCA Exs. 9A-9B, 10A-10C.).  Moreover, counsel failed to obtain Linda's medical records from stays in the hospital to substantiate the abuse.  (*See* Exs. 21, 22.)  These records, which were from the 1980s, detail the abuse and would have been independent evidence to discredit the testimony of Raymond.[74] Appellate counsel had no

---

[71]Tremane's other appellate attorney who did not conduct the examination of Raymond, but who nevertheless participated in the hearing, stated that he did not effectively use records to rebut the State's allegations during the hearing.  (Ex. 10 ¶ 7.)

[72]A copy of only the divorce decree was in the record as part of Tremane's file at Meadowlake Hospital.

[73]In addition to these charges, Raymond had been charged with other criminal activity, including pointing a gun at his three children.  (*See* Criminal History of Raymond Gross, attached as Ex. 30.)

[74]While Tremane has already shown that the OCCA's decision was an unreasonable application of *Strickland*, it found that protective orders are "practically meaningless here because all were later dismissed for failure to prosecute."  (PC Op. at 12, 6/30/10.)  This is unreasonable. It fails to recognize the importance of documented abuse that was credible enough to warrant the issuance of a protective order in the first place.

strategic reason in failing to obtain additional records.  (Ex. 10 ¶ 6.)

### 2.    Counsel failed use information regarding Johnny Albert

Within weeks of the evidentiary hearing, Albert was suspended from practice of law. Appellate counsel did not inform the OCCA of this during oral argument.[75] Moreover, Albert was held in contempt and appellate counsel failed to supplement the record with Albert's contempt hearing.  (PCA Ex. 4A-B.)  Appellate counsel also failed to ensure Albert's affidavit was part of the record and that he affirmed the statements in that affidavit.  There was no strategic reason for failing to do these things.  (Ex. 10 ¶ 11; Ex. 11 ¶ 6.)

### 3.    Counsel  failed to list all factual inaccuracies and critical issues in supplemental brief

There were numerous inaccuracies from the district court's findings of fact. (*See e.g.*, *supra*, Claim One, Section II.B.2.) Appellate counsel failed to raise these errors in their supplemental brief.  Moreover, counsel failed to challenge the denial of Dr. Allen's testimony in their brief.  There was no strategic reason for these failures.  (Ex. 10 ¶ 10.)

## C.    Tremane Was Prejudiced by Counsel's Deficient Performance

One of the most compelling mitigation factors presented at the evidentiary hearing, the abusive home conditions Tremane endured, was all but destroyed by counsel's failure to substantiate the abuse with available documentary evidence.  Records, including protective

---

[75]Undersigned counsel cannot effectively raise this claim because this Court and the State courts have prevented Tremane access to the recording of the oral argument. *See supra* n. 25.

orders and a divorce decree, reflect that Raymond was a threat to Linda.   Moreover,

Raymond's criminal history reflects serious acts of violence, or threats of violence.

Disinterested parties created these records and made these findings.   These records would

have bolstered Tremane's family's testimony and would have been given great  weight by

the court.   *Cf. Skipper*, 476 U.S. at 8 (noting the evidence presented by mother was the type

"that a jury naturally would tend to discount as self-serving" therefore the testimony  "more

disinterested witnesses" . . . "who would have had no particular reason to be favorably

predisposed . . . would quite naturally be given much greater weight by the jury").   These

same records would have proved what appellate counsel thought was "obvious," that

Raymond was being dishonest in his testimony.   In addition, counsel failed to provide the

court with an accurate portrait of Albert's circumstances and did not correct the numerous

factual errors made by the trial court.   The resultant prejudice is apparent—Gross and Albert

were found credible by the trial court.   Had counsel used these records to challenge

Raymond's testimony, provided supplemental information regarding Albert, and challenged

the discrepancies in the factual findings, the OCCA would have likely granted relief.

**Claim Four: Because of errors regarding the aggravating factors in Tremane's case, his death sentence is in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment Rights.**

Direct appeal counsel asserted that numerous errors during Tremane's penalty

proceedings deprived him of a sentence that comports with constitutional requirements,

including instructional errors, overly broad and/or vague aggravating factors, and insufficient

evidence of the aggravating factors for which Tremane was sentenced to death.  (DA2 Appellant's Br. at 20-61, 6/28/05.)  The OCCA denied him relief on merits.  (DA2 Op. at 10-18, 4/30/07.)  Because those decisions were both contrary to and an unreasonable application of clearly established federal law, and because it was based on an unreasonable determination of facts, this Court owes no deference to the state court proceedings and can review the claim de novo.  Relief is warranted with respect to each of these claims because the errors render Tremane's death sentence constitutionally unreliable.

I.      **The OCCA's Decision is Unreasonable and Contrary to Law**

    A.      **Failure to Properly Instruct the Jury on Heinous, Atrocious, or Cruel Aggravating Factor**

The OCCA found that the instruction given at Tremane's trial incorrectly omitted the word "physical," but reviewed this claim only for plain error because counsel failed to object.[76]  (DA2 Op. at 15, 4/30/07.)  The OCCA found that the State's evidence, in particular the photographic evidence, demonstrated that Ronnie suffered serious physical abuse prior to death.  (*Id.*)  This was an unreasonable determination of the facts because the evidence presented revealed no other serious physical injuries to Ronnie beyond the fatal stab wound that he suffered.

The instruction given to the jury contained unconstitutionally vague definitions condemned in *Cartwright v. Maynard*, 822 F.2d 1477, 1491 (10th Cir. 1987), *aff'd Maynard*

---

[76]In a footnote, the OCCA reminded trial courts to use the uniform instructions.  (DA2 Op. at 15, 4/30/07.)

*v. Cartwright*, 486 U.S. 356 (1988).  Only the limiting language in the second part of OUJI-CR 4-73 has been held to save the instruction from the constitutional defect condemned in *Cartwright*.

The Tenth Circuit Court of appeals has routinely upheld the constitutionality of the heinous, atrocious, or cruel aggravating factor, but only where it includes the "torture or serious physical abuse limitation." *Wilson v. Sirmons*, 536 F.3d 1064, 1108 (10th Cir. 2008) (internal citations omitted).  Absent that controlling language, the constitutionally required narrowing is not performed.  *Maynard,* 486 U.S. 356; *but see Miller v. Mullin*, 354 F.3d 1288, 1300 (10th Cir. 2004) (holding that instruction sufficiently narrowed and restrained sentencer despite omission of "physical" from the instruction).  Finding that omission of the very language that renders an otherwise vague aggravator constitutional cannot coexist with a finding that the jury has been properly instructed thereon.  The instruction, missing this key element fails to "furnish a sentencer with a principled means of guiding its discretion." *Wilson*, 536 F.3d at 1108 (*citing Maynard*, 486 U.S. at 361-64).  The OCCA's finding violated clearly established federal law.  28 U.S.C. § 2254(d)(2).  De novo review is thus appropriate.  Based on the plain violation of *Maynard*, a new sentencing proceeding in this case is warranted.

### B.    Insufficient Evidence was Presented to Prove Capital Aggravators Beyond a Reasonable Doubt

When reviewing the sufficiency of the evidence, this Court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." *Hamilton v. Mullin*, 436 F.3d 1181, 1194 (10th Cir. 2006) (*citing Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  This Court looks "to Oklahoma substantive law to determine the elements" of the aggravating circumstance.  *Id.* at 1194 (internal citation omitted).

This Court has not decided whether a sufficiency of the evidence finding is reviewed under § 2254(d)(1) or (d)(2).  *Thomas v. Gibson*, 218 F.3d 1213, 1227 (10th Cir. 2000) (internal citations omitted).  This Court has reviewed sufficiency of the evidence as both a fact question and a legal question.  *Id.*

### 1.    Murder was Especially Heinous, Atrocious, or Cruel

The OCCA rejected Tremane's claim on the merits.  (DA2 Op. at 14-15, 4/30/07.) To establish a murder was especially heinous, atrocious, or cruel, the jury must find death is preceeded by torture or serious physical abuse.  *Nuckols v. State*, 805 P.2d 672, 675 (Okla. Crim. App. 1991).  Only then can the jury apply the definitions to assess whether "the crime can be considered heinous, atrocious or cruel."  *Id.*  In upholding that this crime was "cruel," the OCCA cited to Ronnie's defensive wounds to show that he was "consciously resisting" by warding off blows and knife jabs with his hands.  (DA2 Op. at 14-15, 4/30/07.)  The Court noted that Ronnie struggled against both Jake and Tremane, separately and together.  (*Id.*) Resultantly, the court held that death was preceded by serious physical abuse, Ronnie was conscious, and Tremane inflicted a significant portion of it.  (*Id.*)  The OCCA's finding was contrary to or an unreasonable application of the standard set forth in *Jackson*.  Alternatively,

93

it was an unreasonable determination of the facts.

The facts do not support the OCCA's conclusion that Ronnie's death was preceded by serious physical abuse. Trial testimony reveals that Ronnie's death was the result of a single stab wound. But the record fails to reveal any additional, serious physical suffering. The coroner identified bruising to five areas of Ronnie's body, and four superficial cuts. (Tr. 4/2/04 at 8-10.) The coroner agreed that the bruising to the face could have been caused by a fall and were not lethal. (*Id.* at 18.) The only serious injury inflicted during the incident was the single, fatal stab wound. This aggravator cannot be "based merely on the brief period of conscious suffering necessarily present in virtually all murders." *Romano*, 239 F.3d at 1176 (*citing Godfrey v. Georgia*, 446 U.S. 420 (1980)).

The record does not support the OCCA's conclusion that the heinous, atrocious or cruel aggravating factor is established by serious physical abuse prior to death. Whether it is a question of fact or law, the OCCA's decision does not withstand the limitations of 28 U.S.C. § 2254(d). Based on the plain violation of *Jackson*, Tremane is entitled to relief.

### 2.   Knowingly Caused a Great Risk of Death to More than One Person

To create a great risk of death to more than one person, "the defendant's acts [must] create the risk of death to another which are in close proximity, in terms of time, location and intent to the act of killing itself." *Snow v. State*, 876 P.2d 291, 297 (Okla. Crim. App. 1994.) The OCCA found that the struggle with Ronnie occurred only a few feet from Arnold Kleinsasser in the motel room when the struggle occurred. (DA2 Op. at 18, 4/30/07.) There

was insufficient evidence to prove this aggravator.  The OCCA's finding of evidence sufficient to support the aggravator was contrary to or an unreasonable application of *Jackson*.  Alternatively, it was an unreasonable determination of the facts.

No evidence was presented that Arnold suffered any injuries.  Moreover, Arnold was never at risk from the struggle with Ronnie.[77]  Regarding the struggle between the smaller man and Ronnie, Arnold testified that they were struggling "[a]s you are coming out of the bathroom, there is a little area where the sink was at.  That is where they ended up back in that area."  (Tr. 3/31/04 at 136.)  They were struggling "in the corner just behind that little wall that comes out."  (*Id.* at 137.)  Arnold crawled "into the corner on the other side.  In the room area in front of that little wall."  (*Id.* at 138.)  Arnold did not see the shot fired because "[t]hey were just around the corner in that area by the sink area."  (*Id.* at 139.)  He only heard the shot.  (*Id.* at 138.)  It was not until after the gun was fired that "Ronnie and they [sic] guy with the gun came out into the bedroom area."  (*Id.* at 139.)

The OCCA's determination that this fact was sufficient to establish that Tremane created a knowing risk of great harm to Arnold was unreasonable.  While Arnold was in the same room, there was a wall separating Arnold from the gunshot that was fired.  Arnold was not in danger.  *Cf. Trice v. Ward*, 196 F.3d 1151, 1173 (10th Cir. 1999) (finding sufficient

---

[77]Further support for Tremane's position is found in Jake Wood's trial.  There, on defense counsel's motion, the trial court dismissed this specification finding it unsupported by the law and evidence.  (Z. Wood Tr. 2/28/05, attached as Ex. 28D, at 23.)  In so doing, the court noted that Tremane's counsel had not asked the court to dismiss this same specification. (Ex. 28D, at 11.)

evidence of great risk of death coupling the nature of the attack with the fact that the second victim suffered life threatening injuries).  No reasonable trier of fact could find that Arnold was a great risk of death.  This is particularly true in light of the fact that he suffered no injuries as a result of the events that transpired in the motel room.  Based upon the plain violation of *Jackson*, the OCCA's decision was unreasonable under § 2254(d).  Tremane is entitled to relief.

### C.    The "Continuing Threat" Aggravator is Unconstitutionally Vague and Overly Broad

Relying on prior holdings, the OCCA rejected this claim on the merits.[78]  (DA2 Op. at 13, 4/30/07.)  This aggravating circumstance fails to "furnish a sentencer with a principled means of guiding its discretion."  *Wilson*, 536 F.3d at 1108 (*citing Maynard*, 486 U.S. at 361-64).  As such, the OCCA's decision rejecting this claim was an unreasonable application of clearly established Federal law.  *See* 28 U.S.C. § 2254(d)(2).

The courts, in upholding this aggravating circumstance, have principally relied upon *Jurek v. Texas*, 428 U.S. 262 (1976).  This is improper for two reasons.  First, *Jurek* did not raise the vagueness or overbreadth of the continuing threat aggravator.  Second, *Jurek* only addressed whether a similar factor was proper for selection purposes, not for eligibility purposes, which is the issue in this case.

---

[78]The Tenth Circuit Court of Appeals has upheld the constitutionality of this aggravating circumstance.  *Nguyen v. Reynolds*, 131 F.3d 1340, 1353-54 (10th Cir. 1997) (*citing Jurek v. Texas*, 428 U.S. 262, 274-75 (1976)).

Moreover, the statute's vagueness is apparent by considering its possible application. The legislature could not have intended that a murderer will commit any violent crime, misdemeanor or felony, to make such a person death-eligible. If this is the case, then the aggravator is unconstitutionally vague, since it does not adequately inform the jury what it is supposed to find. *See Arave v. Creech*, 507 U.S. 463 (1993). The OCCA's decision is inconsistent with *Tuilaepa* and *Arave.* It thus violates clearly established federal law.

## Claim Five:   The Trial Court Violated Tremane's Sixth, Eighth, and Fourteenth Amendment Rights by Impermissibly Coercing the Jury

This claim has not yet been decided by the state courts, but Tremane will raise it in his successor postconviction petition. The court impermissibly coerced the jury into delivering a dispositive decision when it informed jury that it "had to reach a unanimous decision" and that a "hung jury was not an option." (*See* Declaration of Michael Colbart, attached as Ex. 16, ¶ 2; Declaration of Candelaria Nunez, attached as Ex. 17, ¶ 2.) Such coercion was a violation of Tremane's due process rights, and his right to an impartial jury trial and a fair sentencing. *See United States v. McElhiney*, 275 F.3d 928, 937 (10th Cir. 2001); *Jones v. United States*, 527 U.S. 373, 381–82 (1999).

For more than a century, the United States Supreme Court has warned trial courts that they must be vigilant to instruct a jury in such a way as to not coerce the jury into returning a death sentence. *See, e.g.*, *Lowenfield v. Phelps*, 484 U.S. 231, 238-41 (1988) ("Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body."); *Allen v. United States*, 164 U.S. 492, 493, 501 (1896).

Instructing a jury in such a way as to eliminate the possibility of a deadlock—particularly during the penalty phase where a deadlock demands the dismissal of the jury and the imposition of life sentence[79]—impermissibly coerces the jury into returning a death sentence. *Jenkins v. United States*, 380 U.S. 445 (1965) (holding that comment, "You have got to reach a decision in this case," during supplemental charge was of itself coercive and therefore ground for reversal). Nevertheless, the court in this case did just that and, in doing so, denied Tremane the basic constitutional protections afforded every capital defendant.[80]

While it is fundamental to our jury system that a criminal case "may terminate with the failure to reach a verdict," the court in this case repeatedly denied the jurors the option of disunity and, in turn, denied Tremane the possibility of a mistrial. *McElhiney*, 275 F.3d at 935. According to Juror Colbart, the jury was also "told that if we did not reach a unanimous decision, we could not break for the weekend." (Ex. 16, ¶ 2.) Juror Nunez adds that, to the best of her recollection, she and her fellow jurors "were instructed to continue to deliberate until [they] had reached a unanimous decision."[81] (Ex. 17, ¶ 2.) Consistent with the transgressions described in the declarations of Jurors Colbart and Nunez—the trial

---

[79] 21 Okla. Stat. Ann. § 701.11 (2004); *see also Davis v. State*, 665 P.2d 1186, 1203 (Okla. Crim. App. 1983).

[80] The OCCA recently reversed a conviction where the presiding judge in Tremane's trial (Judge Elliott) made coercive comments to a jury suggesting that they had to reach a verdict. *See Bills v. State*, CF-2009-404, Opinion, May 4, 2011, attached as Ex. 29.

[81] That Juror Nunez now attests to being mislead by the court is entirely understandable given, inter alia, the court's affirmative answer to her direct question during voir dire, "when you say unanimous, do you mean all agree?" (Tr. 3/30/04 at 168, 171.)

transcript reveals that the court also instructed the jurors to return "verdicts of either guilty and not guilty" on more than a dozen occasions.[82]  A failure to agree during the penalty phase would have been a victory for Tremane and a legitimate end of the trial.  *McElhiney*, 275 F.3d at 935.

The declarations of Jurors Colbart and Nunez vividly demonstrate that the court "affirmatively misled" the jury as to its deliberative options and thereby violated Tremane's constitutional rights.  *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) (holding that a constitutional violation would result from a jury being "affirmatively misled regarding its role in the sentencing process"); *see also Mills v. Tinsley*, 314 F.2d 311, 313 (10th Cir. 1963) ("To compel a jury to agree upon a verdict is a denial of a fair and impartial jury trial, and, hence, is a denial of due process.").  Such coercion not only resulted in violations of Tremane's Sixth Amendment and due process rights; it also resulted in a violation of his Eighth Amendment right to heightened reliability in death-penalty proceedings.  *See Jones*, 527 U.S. at 381-82 (noting that "a jury cannot be 'affirmatively misled regarding its role in

---

[82]*See, e.g.*, Tr. 3/31/04 at 87- 88 ("You may be in that room, depending on how long you feel it takes to arrive at *one of the two verdicts*.") (emphasis added); Tr. 3/31/04 at 40 ("Every piece of evidence that is admitted, it will be your duty to review to decide *one of two choices, guilty or not guilty*.") (emphasis added); Tr. 3/31/04 at 16 ("It will be the duty of the jury, and you if you sit on the jury, to determine whether the defendant is guilty or not guilty.") (addressing prospective jurors); Tr. 3/30/04 at 166 ("But the verdict on the punishment must be unanimous just as your verdict of either guilty or not guilty." (addressing prospective jurors); Tr. 3/31/04 at 87. ("You stay in that room without leaving until you arrive at three verdicts of either guilty or not guilty."); Tr. 3/31/04 at 96 ("It is your responsibility . . . to reach verdicts of guilty or not guilty based on the evidence."); Tr. 4/2/04 at 201 ("You just stay up there until you arrive at three unanimous verdicts.").

the sentencing process.'" (citation omitted)); *see also Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (noting that "the penalty of death is qualitatively different from a sentence of imprisonment" and therefore "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case").

"[S]entences of death must be absolutely, unquestionably fair." *Hain v. State*, 852 P.2d 744, 753 (Okla. Crim. App. 1993). As to the context and circumstances of Tremane's trial, "the record in this case reveals an ever-rising tide of coercion ultimately resulting in [a] unanimous death sentence[]." *Hooks v. Workman*, 606 F.3d 715, 741 (10th Cir. 2010); *see also Gilbert v. Mullin*, 302 F.3d 1166, 1175 (10th Cir. 2002) ("[C]ourts should be wary of the potentially coercive effect of holding jurors late into the night and even into the early morning hours."). The taint of coercion is undeniable. *See Goff v. United States*, 446 F.2d 623, 626 (10th Cir. 1971) ("The court must avoid any indicia of coercion."). If even one juror believed trial court was insisting on a unanimous verdict, that would be one juror too many. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 462 (1978) (holding that "the Court of Appeals would have been justified in reversing the convictions solely because of the risk that the foreman believed the court was insisting on a dispositive verdict"). Here there were two. Because Tremane's constitutional rights were violated by the court's improper and coercive comments to the jury, he is entitled to relief.

**Claim Six: Tremane Was Denied His Sixth and Fourteenth Amendment Right to the Effective Assistance of Trial Counsel Because Counsel Failed to Present Evidence Challenging the Testimony of the State's Forensic Expert.**

This claim has not yet been decided by the state courts, but Tremane will raise it in his successor post-conviction petition.  In all cases, but more critically in capital cases, counsel has a duty to challenge the State's case against the defendant and, when necessary, employ experts to defend against the State's experts.  *See* ABA Guideline 10.7, Commentary (noting that counsel has a duty "to scrutinize carefully the quality of the state's case" and "aggressively re-examine all of the government's forensic evidence").  In the instant case that did not happen.  As a result, the testimony regarding the autopsy of the victim in this case went unchallenged.  In failing to challenge the forensic testimony, counsel's performance fell below the objective standard of reasonableness— that is, it was outside the "wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 690.  Had the defense presented expert testimony of a forensic pathologist, the jury would have heard evidence that could have ultimately made a difference in the guilt and/or penalty phase of Tremane's trial.

At trial, the jury heard virtually unchallenged testimony from the chief medical examiner Dr. Fred Jordan; he was not the doctor who actually performed the autopsy of the victim.  (Tr. 4/2/04 at 6.)[83]  Dr. Jordan testified that the cause of death was from a five-inch deep stab wound.  (*Id.* at 14.)  Had trial counsel retained an expert and presented such testimony the jury would have learned that Dr. Jordan's testimony was inaccurate.  A defense expert could have demonstrated that the width of the wound was not as wide as the width of

---

[83] Dr. Larry Balding, who did perform the autopsy, had passed away the previous year. (Tr. 4/2/04 at 6.)  Dr. Jordan presented testimony based on Dr. Balding's report, records, and photographs.  (Tr. 4/2/04 at 6.)

the knife.  (*See* Report of Michael Iliescu, M.D., 6/27/11, attached as Ex. 20, at 3-4.) Therefore, the entire length of the knife could not have been inserted into the victim's body.

Moreover, a defense expert could have attacked the autopsy report in several ways. First, the documentation of the stab wound was made after the body was autopsied.  This is against the common practice in forensic pathology of documenting the injuries before the autopsy examination is performed.  (Ex. 20 at 6.)  Second, the stab wound should have been documented with the approximation of the edges of the wound (with the wound being closed), which was not done in this case.  (Ex. 20 at 6-7.)  Finally, an expert would have criticized the medical examiner for not taking photographs of the body before conducting the autopsy.  (Ex. 20 at 6.)

Another problem with the State's autopsy report involved the toxicology.  (Ex.20 at 6.)  The State's report says Ronnie had no drugs or alcohol in his system at time he died.  (Tr. 4/2/04 at 11.)  Ronnie's friend Kleinsasser testified that Ronnie was drinking (Tr. 3/31/04 at 121.)  Codefendant Lanita Bateman also indicated that Ronnie was drunk.  (Declaration of Lanita Bateman, attached as Ex. 9, at 2.)  This information lends serious questions to the credibility of the autopsy.

Had this evidence been presented during the guilt phase of Tremane's trial, the State's case would have been challenged regarding the circumstances surrounding the victim's death.  The jury could have determined that the autopsy report was not accurate and that there were problems with Dr. Jordan's testimony.  Moreover, the jury could have also discredited

the State's argument that the stab wound was five inches, which was repeatedly emphasized in support of the heinous, atrocious or cruel aggravating circumstance.  (Tr. 4/5/04 at 8, 111, 112, 133, 157.)  The State told the jury that it was "shockingly evil" to stab a man with a knife and "stick it five inches into his body."  (*Id.* at 111.)  This repeated reference to the depth of the wound portrayed a more graphic image to the jury that could have been discredited.

Here, had counsel performed under prevailing professional norms, the evidence regarding the crime in this case would have been challenged and effectively undermined.  This would have impacted both the guilt and penalty phases of Tremane's trial.  In particular, the jury may not have found the aggravating circumstance of heinous, atrocious, or cruel.  Because of the other related penalty-phase errors, *see, eg.*, *supra* Claims One and Four, there is a likelihood that Tremane would not have been sentenced to death.  In this case, counsel's failures "undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at 686.

**Claim Seven:  Prosecutorial Misconduct During the State Court Proceedings Deprived Tremane of his Due Process Rights and Rendered his State Court Proceedings Unfair.**

This claim has not yet been decided by the state courts, but Tremane will raise it in his successor post-conviction petition. To succeed on a claim of prosecutor misconduct, Tremane must demonstrate either that the prosecutor's misconduct prejudiced a substantive right, *see Donnelly*, 416 U.S. at 644 (*citing Griffin*, 380 U.S. 609) (footnote omitted), or that the prosecutor's misconduct rendered the trial fundamentally unfair, *see Berger*, 295 U.S. 78.

103

Following Tremane's capital trial the OCCA ordered a hearing on Tremane's claim of ineffective assistance of trial counsel.  Familial abuse was a central issue during these proceedings with Linda, Andre, and Jake all offering testimony regarding abuse inflicted on Linda by Tremane's father, Raymond.  In cross-examining defense witnesses, the State created the impression that Linda's claims of abuse were untrue, with particular reference to an absence of medical or hospital records to support Linda's claims.  (Tr. 2/23/06 at 170-71; Tr. 2/27/06 at 341.)  At that time, the prosecutor had in its position medical records reflecting treatment Linda had received after various incidences of abuse, including contusions, abrasion and a broken tooth (Ex. 21 at 2), and for being hit in the chest and stomach (Ex. 22 at 1).

In a similar form, the State cross-examined Raymond Gross in a manner designed to suggest he was a law-abiding, non-violent man, who had not inflicted terror and abuse on his family.  (*See, e.g.* Tr. 2/23/06 at 23-26.)  The State conducted this cross-examination despite having records in its possession that painted a violent picture of Raymond, abusing and threatening his wife and children.  (*See* Ex. 30.)

The State's duty to turn over *Brady* material continued after trial.  *Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997) (*citing Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987)). Not only did the State fail to turn over these records, it created the material misrepresentation that the Wood family's testimony regarding the abuse endured by Linda was simply false because it was unsupported by records, and because Raymond denied it.  While the State did

104

not present false testimony, the cross-examination it conducted, particularly in light of its knowledge of these medical records and the criminal offenses related to Raymond, created a materially false impression. The State's suppression of this evidence allowed it to effectively neutralize what would have been compelling support for Tremane's claim of ineffective assistance of trial counsel, and to mislead the trial court (an independent act of misconduct that deprived Tremane of a fair hearing). *See Berger*, 295 U.S. 78. Considering the prosecutorial misconduct cumulatively, Tremane was deprived of his due process rights.

**Claim Eight: Tremane Was Denied His Sixth, Eighth, and Fourteenth Amendment Right to Counsel During his Post-Conviction Proceedings.**

This claim has not yet been decided by the state courts, but Tremane will raise it in his successor post-conviction petition. Oklahoma recognizes a right to effective assistance of counsel on postconviction review. *Hale v. State*, 934 P.2d 1100, 1102-03 (Okla. Crim. App. 1997) (OCCA applied *Strickland* to ineffective assistance of postconviction counsel claim).[84] *Strickland*, 466 U.S. at 686-88, sets forth the standard for assessing ineffective assistance of appellate counsel. *Hale*, 934 P.2d at 1102-03. Tremane must demonstrate deficient performance and prejudice. *See id.* To establish prejudice postconviction counsel's

---

[84] In *Coleman v. Thompson*, 501 U.S. 722 (1991), the Court left open whether there is a federal constitutional right to the effective assistance of counsel on PCR review. *Id.* at 755. A change in the legal landscape leaves the Court poised to answer that question in *Maples v. Allen*, 586 F.3d 879 (11th Cir. 2009), *cert. granted sub nom. Maples v. Thomas*, No. 10-63, 2011 WL 940889 (Mar. 21, 2011) and/or *Martinez v. Schriro*, 623 F.3d 731 (9th Cir. 2010), *cert. granted sub nom. Martinez v. Ryan*, No. 10-1001, 2011 WL 380903 (June 6, 2011).

failure to raise certain issues "undermines confidence in the appellate process." *Id.* at 1103.

Tremane's postconviction counsel was ineffective for each instance, considered separately or cumulatively, in which counsel failed to raise the following issues: (1) failure to investigate and present relevant mitigating evidence in support of trial IAC for same; (2) failure to raise a claim of ineffective assistance of direct appeal counsel for failing to raise trial IAC for not challenging death to two or more people; and (3) failure to hire a forensic pathologist to challenge the autopsy findings.

The claims counsel failed to raise were supported by the facts and the law. They were obvious errors counsel should have presented for appellate review:

(1) Postconviction counsel failed to assert appellate IAC for failing to investigate and present relevant mitigating evidence in support of ineffective assistance of trial counsel for same. *See, e.g.*, Claim One, Section III.B.1. Counsel indicates she did not collect medical records related to Tremane's mother, or conduct additional background investigation into Tremane's parents' families. She had no strategic reason for this failure. (*See* Declaration of Julie Gardner, 6/24/11, attached as Ex. 13, ¶¶ 7-8.)

(2) Postconviction counsel failed to assert appellate IAC for failing to argue trial counsel's ineffective assistance with respect to the allegation that Tremane knowingly created a knowing risk of great harm to two or more persons.[85] This aggravating factor was

---

[85] Tremane incorporates here a claim of appellate IAC in failing to raise this claim during his appeal.

not supported by the facts in evidence and was dismissed in Jake's case. Indeed, the same judge who presided over Tremane's trial dismissed this aggravator in Jake's case, finding it unsupported by the law and evidence.  (Ex. 28D at 23.)  In so doing, the court noted that Tremane's counsel had not asked the court to dismiss this same specification.  (Ex. 28D at 11.)  PCR counsel Julie Gardner indicates that she was unaware that this same aggravator was dismissed in Jake's case.  (*See* Ex. 13 ¶12.)

(3) Postconviction counsel failed to assert trial and appellate IAC failure to hire a forensic pathologist to challenge the autopsy findings.[86]  Counsel should have consulted with a neutral forensic expert, which would have led counsel to discover real problems with this forensic evidence as outlined in Claim Six (incorporated here by reference).   Tremane had a right to effective assistance of postconviction counsel.  This right was violated by counsel's omissions.

Postconviction counsel had compelling claims of IAC of both trial and appellate counsel. Trial and appellate counsel missed obvious errors—had either challenged the great risk of harm aggravator, it would have been successful.   Similarly, there were serious flaws with in Ronnie's autopsy, which led to inaccurate findings—most significantly, that the stab wound was five inches deep.   A forensic expert would have revealed these flaws, and allowed Tremane to call into question the medical examiner's testimony.  This would have

---

[86]Tremane incorporates here a claim of appellate IAC in failing to raise this claim during his appeal.

drastically altered the State's repeated cry for the death penalty due to the depth of the wound inflicted on Ronnie.

There was a powerful story to be told in mitigation, and both trial and appellate counsel failed to tell the complete story. Postconviction counsel also could have asserted deficient performance and prejudice for failing to obtain present all relevant mitigation. Linda's medical records, which would have bolstered her claims of abuse, *cf. Skipper v. South Carolina*, 476 U.S. 1, 8 (1986), and additional information available regarding the families would have demonstrated that Tremane found no solace, no help outside of his immediate family—he was met with abuse and neglect inside, and outside, of his home. The additional witnesses available, as well as records created years before the crime would have bolstered Tremane's mitigation case. Prior counsel's failure to investigate and present such evidence deprived the jury, and later the trial court, of a full understanding of the relevant, compelling mitigating factors.

With one aggravating circumstance gone, the State's graphic language now limited, Tremane's complete case in mitigation of the death penalty would have carried far more power. These failures were deficient performance that prejudiced Tremane.

**Claim Nine: The State Court 3.11 Proceedings Violated Tremane's Due Process Rights.**

This claim has not yet been decided by the state courts, but Tremane will raise it in his successor postconviction petition. Trial counsel John Albert now indicates that, at the time of Tremane's 3.11 hearing, he "was in a very bad place in his life. [He] had hit rock

bottom." (Ex. 3 ¶9.) At the time, Albert was "drinking excessively and using drugs." (*Id.*) In addition, Albert faced a pending bar investigation. (*Id.* ¶10.) Ten days later, Albert entered rehab. (*Id.* ¶9.) Because of this, Albert describes himself as "very defensive" during his testimony at Tremane's 3.11 hearing. (*Id.* ¶10.) He was "worried about the impact that being found ineffective would have on [his] license to practice law."[87] (*Id.*)

Sober since he entered rehab (*Id.* ¶ 9), Albert's declaration demonstrates he rendered deficient performance during Tremane's capital trial. Albert "simply did not have the time to adequately represent Tremane in his capital trial." (*Id.* ¶ 4.) He failed to prepare witnesses, including Dr. Hand. (*Id.* ¶ 7.) Albert candidly admits to a lack of investigation, "I did not do the necessary investigation and preparation required to defendant a capital client." (*Id.* ¶11.) And, he offers no strategic reasons for failing to investigate Tremane's background, gather records, conduct relevant interviews or prepare Dr. Hand. (*Id.* ¶11.) Moreover, Albert believes all of this would have made a difference. (*Id.* ¶12.)

Albert's defensive testimony deprived the Oklahoma courts of facts necessary to assess Tremane's claim of ineffective assistance of counsel under *Strickland*. Rule 3.11 plays an important role in the Oklahoma direct appeal process. "As a matter of policy, Rule 3.11 requires criminal defendants to bring their *Strickland* claims on direct appeal rather than in post-conviction proceedings and to lay their evidentiary cards on the table before the

---

[87] Albert's license to practice law was suspended for fourteen months in April 2006. (Ex. 3 ¶10.)

OCCA." *Wilson*, 577 F.3d at 1304 (*en banc*) (Tymkovich, J., dissenting).

Given the important role that Rule 3.11 proceedings play in Oklahoma's direct appeal process, Albert's defensive testimony created a fundamental flaw in the fact finding process, which deprived Tremane of his due process interest in those very proceedings. *Evitts*, 469 U.S. at 396. This is all the more so when the defendant's "life" interest is at stake in the proceedings. *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272 (1998) (five Justices recognized a distinct "life" interest protected by the Due Process Clause in capital cases above and beyond liberty and property interests).

**Claim Ten:  Tremane's Due Process Rights were Violated by the State Withholding Exculpatory Evidence.**

This claim has not yet been decided by the state courts, but Tremane will raise it in his successor postconviction petition. Brandy Warden was on probation in Payne County, Oklahoma, at the time these offenses were committed. (PCA Ex. 19B.) Yet she never faced charges in Payne County for violating the terms of her probation. Any deal that relieved Warden of criminal charges in exchange for her testimony was material and exculpatory. *See Brady v. Maryland*, 373 U.S. 83 (1963). The State's failure to turn over such evidence deprived Tremane of his due process rights. *Id.* Given this Court's page limitations and the State's failure to turn over regarding this claim, Tremane can only generally allege this claim.

## CONCLUSION

For the reasons set forth in this petition, Tremane respectfully requests that this Court grant him a writ of habeas corpus and any other relief deemed appropriate.

**Certificate of Service**

I hereby certify that on June 30, 2011, I electronically filed the foregoing with the

Clerk's Office by using the CM/ECF system.  I certify that all participants in the case are

registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Michelle Young
Legal Assistant
Capital Habeas Unit