# EXHIBIT 1

# EXHIBIT 1

Citations to State Court Proceedings

| Court | Proceeding/Document Type | Petition Citation |
|---|---|---|
| *State of OK v. Tremane Wood*<br><br>District Court of OK County, Case No. CF-02-46 | Preliminary Hearing Exhibits | Example: PH Ex. __. |
| *State of OK v. Tremane Wood*<br><br>District Court of OK County, Case No. CF-02-46 | Trial Original Record | Original record, page number from right hand corner.<br><br>Example: OR1 at __. |
| *State of OK v. Tremane Wood*<br><br>District Court of OK County, Case No. CF-02-46 | Trial Exhibits | Example: Tr. Ex. ___. |
| *Termane Wood v. State of OK*<br><br>Court of Criminal Appeals of the State of OK, Case No. D-2004-550 | Direct Appeal I Record | Proceeding, description of document, page number if relevant, and filing date.<br><br>Example: DA1 ___ at __, ___. |
| *Termane Wood v. State of OK*<br><br>Court of Criminal Appeals of OK, Case No. D-2005-171 | Direct Appeal II Record | Proceeding, description of document, page number if relevant, and filing date.<br><br>Example: DA2 __ at __, ___. |
| *State of OK v. Tremane Laitron Wood*<br><br>District Court of OK County, Case No. CF-02-46 | Evidentiary Hearing Record | Original record, page number from right hand corner.<br><br>Example: OR2 at __. |

| | | |
|---|---|---|
| *State of OK v. Tremane Laitron Wood*<br><br>District Court of OK County, Case No. CF-02-46 | Evidentiary Hearing Exhibits | Proceeding, exhibit volume number, exhibit number, and pinpoint page[*].<br><br>Example:  EH Vol. I Ex. ___ at ___. |
| *Termane Wood v. State of OK*<br><br>Court of Criminal Appeals of the State of OK, Case No. PCD-2005-143 | Post Conviction | Proceeding, record, page number if relevant, and filing date.<br><br>Example: PC ___ at __, ___. |
| *Termane Wood v. State of OK*<br><br>Court of Criminal Appeals of the State of OK, Case No. PCD-2005-143 | Post-Conviction Application Exhibits | Example:  PCA Ex. ___ at ___. |
| *Termane Wood v. State of OK*<br><br>Court of Criminal Appeals of the State of Oklahoma, Case No. PCD-2005-143 | Documents Supporting Post-Conviction Motion to Supplement Application for Post-Conviction Petition | Example:  PC Supp. Doc. ___ at __. |
| *State of OK v. Termane Wood*<br><br>District Court of OK County, Case No. CF-02-46 | Transcripts | Tr., followed by the date, and if necessary, applicable page number.<br><br>Example: Tr. ___ at ___. |

---

[*]Because some of the exhibits contain several hundred pages, Tremane is providing with this Petition a copy of the three volumes of exhibits with bates numbers.  These bates numbers were created specifically for the federal proceedings.

# EXHIBIT 2

# EXHIBIT 2

TREMANE LAITRON WOOD,

Appellant,

vs.

THE STATE OF OKLAHOMA,

Appellee.

D-2005-171

---

EXHIBIT M
TO
RULE 3.11 APPLICATION FOR EVIDENTIARY HEARING
ON SIXTH AMENDMENT CLAIMS

---

AFFIDAVIT

OF

JOHN ALBERT

## AFFIDAVIT OF JOHN ALBERT

STATE OF OKLAHOMA         )
                              ) ss.
COUNTY OF OKLAHOMA     )

       I, John Albert, being of lawful age and being first duly sworn on oath, do depose and state the following:

            1.)      That I am providing this affidavit at the request of Jason Spanich, one of Tremane Wood's appeal attorneys.

            2.)      That I have concluded I will no longer accept appointments in death penalty cases due to the extremely busy nature of my practice, and the relative time requirements that are involved in all death penalty cases.

            3.)      That the conflict enumerated in paragraph #2 regarding my practice and death penalty appointments existed while I was representing Tremane Wood.

            4.)      That due to the time constraints enumerated in paragraph #2, I did not prepare enough of a mitigation case to effectively represent and defend Tremane Wood.

            5.)      That I relied upon Tremane Wood to properly explain and develop the mitigation portion of the defense, and in hindsight, I see that I could have achieved a better and effective result for Tremane Wood had I been more involved.

            6.)      That I relied upon Dr. Hand to take from Tremane Wood the mitigation portion of the defense and develop it into a proper second stage presentation, and in hindsight, I see that I could have achieve a better and more effective result for Tremane Wood had I been more involved.

            7.)      That I relied upon Jack Stringer, investigator for Zjaiton Wood, Tremane Wood's co-defendant, for all investigative needs that I had.

            8.)      That I did not use the investigative tools I did have to fully develop Tremane Wood's mitigation case.

            9.)      That while I did visit Tremane Wood after court hearings and while I did have a good relationship with him, in hindsight, I see that I did not spend as much time with Tremane Wood as necessary.

          10.)      That I believe I did receive all the records involved in Tremane Wood's case, but that I did not review the records properly in order to present a meaningful mitigation case, and that due to my lack of proper review, in hindsight, I see that I was not effective

in the second stage portion of Tremane Wood's trial.

11.)    That the jury did not receive all of the defense exhibits in the penalty phase of the trial and, in fact, deliberated and returned their verdicts without the benefit of those exhibits.

12.)    That Juror Burton was polled after the verdict of death was read and that she said the death verdict was not hers, that she only agreed because the other jurors were waiting on her.

13.)    That the letters I presented to Brandy Warden, while she was testifying, included letters Q-1 and Q-2.

14.)    That further, your affiant saith naught.

_____
John Albert

SUBSCRIBED and SWORN to before me this 24 day of June, 2005.

_____
NOTARY PUBLIC

My Commission, No. 03002341, expires 3-8-2007

(Seal)

# EXHIBIT 3

# EXHIBIT 3

### Declaration of John Albert

I, John Albert, declare under penalty of perjury the following to be true and accurate to the best of my information and belief:

1. I am an attorney licensed to practice law in Oklahoma. I was appointed to represent Tremane Wood as lead counsel at his trial. Lance Phillips was appointed as co-counsel. I had all responsibilities in his case.

2. At the time I was appointed to represent Tremane in October 2002, I had been practicing law for 10 years.

3. At the time that I represented Tremane, I had an excessive caseload. I would often be in court on ten cases per day. While I was representing Tremane, in addition to my non-capital clients, I represented two other capital defendants: Keary Littlejohn (starting in January 2003) and James Fisher (starting in January 2004). I was appointed to Tremane's case first of the three.

4. I had a choice whether or not to accept appointment to Tremane's case. I accepted appointment, despite my already heavy caseload. I simply did not have the time to adequately represent Tremane in his capital trial.

5. During the time that I represented Tremane, I was drinking on a regular basis. I did very little to investigate in preparation for his trial. I met with him on a very limited basis and only when we were in court.

6. I did not ask an investigator to do anything to help me on Tremane's case.

7. I hired psychologist Ray Hand, Ph.D., to evaluate Tremane and testify at the penalty phase. I did not prepare Dr. Hand for his testimony nor did I review any documents before providing them to Dr. Hand.

8. In 2004, the standard rate for a capital trial in Oklahoma County was $20,000. An attorney could get additional funds if he needed it. I only collected $10,000 as payment for Tremane's case because I did not work enough hours to make $20,000.

9. I testified at Tremane's Rule 3.11 evidentiary hearing on February 27, 2006. At the time of my testimony, I was in a very bad place in my life. I had hit rock bottom. I was drinking excessively and using drugs. A few days before his hearing, I was jumped by several men at a bar. As a result, my face looked pretty rough at the hearing. I went to rehab on March 8, 2006, only 10 days after I testified at Tremane's hearing. I have been sober ever since I entered rehab.

10. I was very defensive while on the stand at Tremane's evidentiary hearing. I had a pending bar investigation, and I was worried about the impact that being found

      ineffective would have on my license to practice law.  In April 2006, my law license was suspended for fourteen months.

11.     In representing Tremane, I know that I did not do the necessary investigation and preparation required to defend a capital client.  I had no strategic reason for failing to investigate Tremane's background, gather all necessary records, conduct all relevant interviews, and to prepare expert testimony.  I simply did not do these things.

12.     If I had done the things necessary to represent Tremane, there is a likelihood he would have received a fair trial.

13.     I previously signed an affidavit dated June 24, 2005, which was used in Tremane's direct appeal.  The information in that affidavit is true and accurate.

14.     I am providing this declaration of my own free will.

      **I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.**

_____       Date      _____
John Albert                              6/9/11

# EXHIBIT 4

# EXHIBIT 4

## DECLARATION OF KENNETH B. BENEDICT, PH.D.

I, Kenneth B. Benedict, Ph.D., declare as follows:

### Training and Experience

1.  I am a clinical psychologist licensed to practice by the State of North Carolina. Among my relevant areas of specialty are clinical and developmental neuropsychology, adult neuropsychological assessment, developmental psychopathology, child abuse, and the differential diagnosis of mental disorders.

2.  I received a Bachelor's Degree in Psychology from Dartmouth College in 1985, a Master's Degree in Clinical Psychology from the University of North Carolina at Chapel Hill (UNC) in 1990, and a Doctorate Degree in Clinical Psychology from UNC in 1992.

3.  Since becoming licensed to practice psychology in the state of Massachusetts, and later North Carolina, I have worked in primary, secondary, and tertiary care settings at the inpatient and outpatient levels. I am presently the Director of the Center for Psychology and Education, a multidisciplinary private clinic in Chapel Hill, North Carolina. Prior to holding this position I worked as a psychologist and neuropsychologist at North Carolina Neuropsychiatry for four years, at Chapel Hill Pediatric Psychology for four years, and at Massachusetts General Hospital for two years. I have been on the teaching faculties at the Harvard Medical School/Massachusetts General Hospital and the University of North Carolina at Chapel Hill.

4.  While primarily a practicing clinician, I have taught courses in psychological and neuropsychological assessment, and developmental psychopathology

Declaration of Kenneth Banks Benedict

at the undergraduate, graduate, and post-graduate levels. I have conducted research in the fields of developmental neuropsychology, child abuse, and computer-based neurocognitive assessment, among others. I am a consultant for the American Association of Medical Colleges in Washington, DC and the Educational Testing Service in New Jersey for whom I review disability documentation. Finally, I have presented at various educational conferences related to these fields of study.

5.    I have been qualified as an expert witness (in the areas of clinical psychology and neuropsychology) in state or federal criminal courts in Alabama, Georgia, Indiana, Missouri, and Pennsylvania, and in civil courts in North Carolina. Furthermore, I have performed legal evaluations or consultations that did not result in, or have not yet resulted in, deposition or testimony in the states of Arizona, California, Oklahoma, and Michigan.

**Referral Questions, Scope of Evaluation, and Evaluation Process**

6.    I was first contacted by the Office of the Federal Public Defender for the District of Arizona in November 2010 regarding the case of Tremane Wood (#271967).

7.    Mr. Wood's attorneys asked me to perform a neuropsychological and psychological evaluation including assessment of his psychosocial and developmental histories.

8.    I completed this work with Mr. Wood at the Oklahoma State Penitentiary in McAlester, Oklahoma on January 19 and January 20, 2011, spending a total of eleven contact hours with him, conducting interviews and administering performance-based tests.

Declaration of Kenneth Banks Benedict

9.    In addition to the direct assessment procedures performed above, I reviewed exhibits for purposes of record review and obtaining background and collateral information (see indices attached as Exhibit A).

### Mental Status and Behavioral Observations at the Time of Assessment

10.    Direct assessment of Mr. Wood occurred in a private room in the Oklahoma State Penitentiary that afforded adequate lighting, sound, and privacy conditions for reliable assessment.

11.    Mr. Wood was introduced to the evaluator by Case Investigator, Mr. Lamont Williams.  Mr. Wood presents as a physically able biracial man who appears his stated age.  He reports that he is in good physical health, other than the mild mid- to lower-back pain that he reported while sitting for the evaluation.  He was taking no prescription or over-the-counter medication.  There are no reported or known problems with hearing or vision functions.

12.    Mr. Wood was fully oriented and interacted in an open and candid manner with the evaluator.  He was interpersonally engaging and seemed to enjoy the social contact afforded by the evaluation process.

13.    There was no evidence of thought disorder, psychotic symptoms, or any other disturbance of mental status, nor did Mr. Wood endorse any.  His level of alertness and sustained attention were adequate in the context of this structured interview and testing context.

14.    Mr. Wood's affect was neutral to bright, with no immediate evidence of depressive or anxiety symptoms.  His responses to oral questions were well articulated and revealed no obvious problems with receptive or expressive language functions.  He

Declaration of Kenneth Banks Benedict

completed writing and drawing tasks with his left hand while utilizing a typical three-point grip.

15.    Mr. Wood clearly put forth his best effort on all presented tasks, including one specifically designed to detect malingering or symptom exaggeration, and he was forthcoming in his response to interview questions.  Hence, it is concluded that the findings from the evaluation provide a valid reflection of Mr. Wood's current neuropsychological and psychological functioning.

<u>**Summary of Neuropsychological Assessment**</u>

16.    The results of neuropsychological functioning indicate that Mr. Wood functions in at least the average range of ability.  Once taking into account his tenth grade level of education, nearly all measures of cognitive or neuropsychological functioning, as well as academic achievement, are considered to be within normal limits.  The one area of exception pertains to certain executive functions, and more specifically: complex or divided attention; and response inhibition when confronted with rapidly changing conditions (i.e., he is prone to impulsive errors when having to make decisions under novel and changing conditions).

17.    Follow-up interviewing, examination of school records and other collateral sources, along with the administration of a structured behavior rating scale, lead to the conclusion that Mr. Wood's areas of deficient executive function occur in the context of a primary attention disorder, or Attention Deficit Hyperactivity Disorder, Combined Type, as outlined in the DSM-IV-TR.

18.    Aside from what are viewed as more prominent and compelling influences on Mr. Wood's behavior throughout his development (see below), the identified

Declaration of Kenneth Banks Benedict

attention disorder had the additional impact of making it more challenging for Mr. Wood than the next child and teen of his intellect and educational exposure to sustain focus on what teachers and parents were saying to him, particularly when he had to remain seated for relatively long periods of time (e.g., in a classroom setting). Furthermore, Mr. Wood possesses fewer resources for self-regulation when confronted with provocations or interactions that invoke strong feelings, leaving him more prone to acting impulsively.

19. To the best of the evaluator's knowledge, this primary attention disorder was never formally identified and hence Mr. Wood did not have the advantage of possible medical or psychosocial interventions to help stem the negative sequela from this highly heritable psychiatric condition that two decades of research has shown is associated with high levels of morbidity when left untreated.

### Assessment of Developmental and Psychosocial Histories

20. Mr. Wood's developmental and psychosocial histories are highly remarkable for the presence of well-established "risk factors" that severely outweigh the "protective factors" identified. These factors have been empirically validated by researchers in the field of developmental psychopathology and criminal justice, and have been promulgated by various governmental and professional agencies as guidelines in prevention efforts and assessment. Much has already been written in this case about Mr. Wood's developmental circumstances, and therefore the evaluator will first present information gleaned from direct interview while organizing it based on familiar guidelines and organizing frameworks from child development. Cross-validation with relevant and previous reports will be addressed later in the declaration.

21.    Based on one scheme of organizing the most essential parenting functions related to healthy child development, there are seven over-arching categories: 1) Provision of basic needs for shelter, food, and clothing; 2) Physical availability with an emphasis on early "holding" functions necessary for the establishment of self-regulation and basic trust; 3) Psychological availability as the child progresses past basic trust and stability, a factor that entails attending to a child in response to both positive and negative behaviors, and "mirroring" him all in the service of building the foundations of self-worth and identity; 4) Protection from outside influences considered to be dangerous, over-stimulating, and/or disruptive to the child's or adolescent's equilibrium.  Conversely, healthy parents who are integrated into the community work to expose their children to available broader social influences in the form of extended family or community involvement; 5) The modeling of effective problem solving and pro-social behavior, with physical modeling being generally congruent with what is verbally expressed to the child in terms of expectations for behavior; 6) The provision of gentle but firm and consistent limit setting, particularly in middle-childhood and into adolescence as the teen endeavors to separate and individuate in a healthy manner, and to expand his social sphere of interpersonal supports; and finally, 7) Tolerating the psychological loss involved in a teen's healthy separation, such that the parents can remain happily available as non-resentful resources when their children invariably return for intermittent support into their adolescent and young adult years.

22.    When viewed against the parenting functions and objectives just reviewed, the evaluator finds that aside from the basic physical needs outlined in point (1), there were substantial problems associated with each of the other six functions, setting the stage for a notably problematic developmental outcome.

23.    Without being exhaustive, what follows are representative difficulties in each of the failed areas of parental functioning:

Declaration of Kenneth Banks Benedict

(a) Physical availability: This was an issue for both parents, but more so for Mr. Wood's father who has been described as essentially "missing" from his children's upbringing. His mother often worked two jobs and attended school; hence the three children often had to fend for themselves.

(b) Psychological availability: When Mr. Wood's mother was available, there was a pattern of severe corporal punishment, particularly as the two younger boys were prone to high levels of activity and impulsivity, followed by periods of reconciliation based on her own need for companionship and approval that stemmed from the dysfunctional relationship with the boys' father. As Mr. Wood stated clearly in interview when describing whippings he received on a bear buttocks, "she would tear our ass up." Furthermore, his father, when present, and his paternal grandmother were also described as extremely rough when whipping them with belts and switches.

(c) Protection from outside influences: There were multiple layers of over-stimulating and unhealthy "outside" influences for Mr. Wood, starting at an early age, and unfortunately, some of these were witnessed in relation to other immediate family members. To name but the most salient and traumatic: Mr. Wood witnessed physical violence between his mother and father, often at a frightening level (e.g., mother handcuffed by father, punched in the face, to the point where a tooth was knocked out). Mr. Wood was exposed at the early age of six to his father's pornography collection, and he attributes this in part to his early interest in sexuality. Mr. Wood's brother Jake has been described in many sources as a particularly violent individual who while ultimately serving as parentis in locos, would nonetheless be quite harsh on Mr. Wood, with no parental intervention or oversight. Finally, both Mr. Wood and his brother Jake would frequently encounter unwanted and at times wanted violence at school and later through gang activities for which there was no parental intercession, despite the fact that Mr. Wood's father was a policeman in the community. It is of note in this context that the limitations in protection and psychological and physical availability led to social service involvement and placement in foster homes by Mr. Wood's early high school years.

(d) Modeling: Perhaps the most damaging aspect of parental functioning is the irreconcilable conflict between Mr. Wood's obvious need to look to his father as the most immediate source of how to be a young man on the one hand, and his gradual learning that his father, who represented the law and the upholding of community standards on the

7

other, was often absent, and violent when present. Mr. Wood, who possesses a healthy desire to attach and belong, naturally turned to his brother and then later a gang, for his continued needs for models and social affiliation. Hence, by virtue of what was a healthy and normal psychological process to locate attachment figures, which in his case did result in some sense of belonging, safety, and self-esteem, also had the detrimental effect of modeling violent and negative behaviors prior to and after the onset of adolescence. Furthermore, the physical violence between his parents, and more insidious, their multiple separations and reunions, left Mr. Wood with maladaptive templates for mutually gratifying adult relationships and conflict resolution, as well as guilt.

(e)    Limit setting: This function was essentially absent for Mr. Wood hence leaving him completely vulnerable to the whims of his brother, with whom he had formed his primary attachment, and other members of his gang. In other words, the assumption is that the 13-year-old Mr. Wood, in clinging to the only coherent social structure he knew, would not be in a psychological position to exercise his own judgment over any activities that he would learn in retrospect to be "wrong."

(f)    Providing a climate for healthy separation: Given the absence of earlier and foundational parenting functions, the issue of healthy separation is essentially moot in Mr. Wood's case. Because there was no primary foundation from which to separate, he entered his adolescence and young adulthood attached to dysfunctional individuals from whom there was no separating, and indeed, with respect to his involvement in a gang.

24.    Research in the area of developmental psychopathology related to resiliency (i.e., individuals who have relative good life outcomes despite problematic psychosocial histories) is clear in pointing to the importance of the presence of a consistently present individual or organization that can serve as a stabilizing source of psychological needs, influence, and point of contrast. Unfortunately, the evaluator is unable to identify such a source in Mr. Wood's case. However, his pattern of functioning when placed in foster care or juvenile detention centers is instructive. That is, he tended to respond quite well to the structure, predictability, and expectations imposed by these settings; however, the length of stays in these more supportive environments were never maintained to a

Declaration of Kenneth Banks Benedict

sufficient degree and he returned to the prevailing influences of his dysfunctional family system. In short, the evaluator is struck by what appears to be a strong element of systemic failure that adds another item to the set of already impressive risk factors.

25. Also of note in this case was that when Mr. Wood actively attempted to turn to other supports not provided by the state, such as extended family members, he was exposed to further negative role models. For example, Mr. Wood was exposed to further violence and polysubstance abuse through his paternal uncles.

26. Finally, Mr. Wood's biracial status, while not necessarily a risk factor in and of itself, has played a complicated role in his own psychological development. In that he had such a tenuous foundation for self-esteem and identity based on experiences in his family of origin, he was more challenged to locate a group with whom he immediately felt belonging, as he would be rejected, or at least anticipated rejection from both white and black peer groups when younger.

27. When examining Mr. Wood's case from the standpoint of "protective" factors, the ones this evaluator is able to identify tend be "internal" to Mr. Wood. That is, psychological evaluation reveals an individual who possesses at least average abilities, no learning disorders or brain damage, and more important, a pro-social individual eager to form attachments with others. As noted above, it was this latter personality and temperamental strength that ultimately led to his involvement in "socialized" conduct problems as a youth.

### Review of Collateral Sources

28. When reviewing available records, I am particularly struck by documents prepared by Kate Allen, Ph.D. Specifically, her "Report and Analysis of Mitigation Factors," and her "Supplemental Report Concerning Mitigation Factors," are highly consistent with the findings I have just reviewed. This consistency lends a strong

Declaration of Kenneth Banks Benedict

degree of reliability to the findings from this evaluation and hers, particularly as the evaluators utilized somewhat different methodologies and have different professional backgrounds. Indeed, there is nothing in Dr. Allen's report with which this evaluator disagrees.

29.    I have learned that Dr. Allen's testimony was not allowed at Mr. Wood's post-conviction hearing on account of the specifics of her professional training, despite having years of experience as a licensed clinical social worker. I have worked with licensed clinical social workers in numerous settings and routinely find them to be among the best diagnosticians and therapists related to psychosocial matters and family dynamics. Assuming my credentials would have been accepted by the court, I would have testified along the very same lines as reflected in her reports.

### Summary and Conclusions

30.    Tremane Wood is a 31-year-old, biracial, left-handed male who has a tenth grade education.    His attorneys requested that the evaluator assess his neuropsychological and psychological functioning.

31.    The obtained results are deemed to be reliable (as based on behavioral observation, clinical judgment, formal tests of malingering, and cross-evaluator consistency).

32.    Neurocognitive evaluation reveals normal functioning with the exception of difficulties with complex attention and impulse control that appear to be developmental as opposed to acquired in nature, and consistent with a diagnosis of Attention Deficit Hyperactivity Disorder, Combined Type.

33.    While Mr. Wood's ADHD is significant as it affects his ability to delay responding so as to critically evaluate situations when confronted with novel, intense, and/or unpredictable events, it pales in comparison to the psychosocial trauma he

Declaration of Kenneth Banks Benedict

experienced from an early age. Indeed, his is a case of a "developmental trajectory" that was highly over-determined or inevitable. To say that Mr. Wood was a victim of his circumstances may seem trite or convenient, but it is essential to consider that in being a healthy and intact individual with respect to the presence of inherently normal physical and psychological functions, he was confronted with essentially no options but to bond with the only available people available, namely: his extremely violent and mentally ill brother, to whom he continues to demonstrate an acute loyalty, and members of a gang. He internalized what has been deemed by one author as the "Code of the Streets," in the service of attachment, self-esteem, and identity, with no competing alternatives. When the State attempted to intervene, he met with more healthy choices and outcomes, only to have services discontinued, and ultimately damaging his trust in the "system" and strengthening his reliance on his counter-culture existence.

34.    There are several psychological disorders that developed in response to the extremely challenging developmental history just reviewed.    First, Mr. Wood's exposure to violence gave rise to a post-traumatic stress disorder at an early age. When children are subject to traumatic exposure it is a well-established fact that one of several limited responses are possible, and in his case it was to act out some of the behaviors he had witnessed, in addition to experiencing high levels of internal anxiety that made him even more susceptible to the alcohol and drugs to which he was exposed through his gang. It is also well documented that individuals with attention disorders are already predisposed genetically and by virtue of their conditions to anxiety disorders and drug abuse, which in Mr. Wood's case had developed in pre-adolescence, a particularly problematic risk factor. As is often the case in neuropsychiatric and psychological syndromes that are primarily influenced by psychosocial factors, Mr. Wood is no longer demonstrating clinically significant symptoms of these disorders in the structured

incarceration setting in which he now resides and demonstrates relatively good adjustment.

The foregoing is true and correct and executed under penalty of perjury under the laws of Oklahoma and the United States on June 28, 2011.

Dr. Kenneth B. Benedict

Declaration of Kenneth Banks Benedict

Exhibit A to
Declaration of Kenneth B. Benedict, Ph.D.

## _Wood- Index of Records Sent to Dr. Ken Benedict 1/18/11_

| Tab | Record | Bates Numbers |
|-----|--------|---------------|
| Records | | |
| 1. | Meadowlake records - 10-1992 | Tremane Wood 1-104 |
| 2. | Comprehensive Evaluation (COJDEC) 8-1-94 | Tremane Wood 105-126 |
| 3. | Psycho-Educational Assessment (COJC) | Tremane Wood 127-131 |
| 4. | Discharge Assessment - VisonQuest 7-8-97 | Tremane Wood 132-139 |
| 5. | Report and Analysis - Kate Allen 1-6-06 | Tremane Wood 140-146 |
| 6. | Supplemental Report - Kate Allen 12-21-06 | Tremane Wood 147-155 |

## *Wood- Index of Records Sent to Dr. Ken Benedict 6/2/11*

| Trial | | |
|---|---|---|
| 1. | T. Wood Sentencing Transcript 4-5-04 | Tremane Wood 1243-1410 |
| **Evidentiary Hearing** | | |
| 1. | Affidavits (Exhs. A-L from Rule 3.11 Application) | Tremane Wood 1411-1455 |
| 2. | Defense Hrg Exh. 1 - Stillwater School Records | Tremane Wood 1456-1464 |
| 3. | Defense Hrg Exh. 2 - Meadowlake Records | Tremane Wood 1-104 |
| 4. | Defense Hrg Exh.  3 - OJA Records<br><br>Note:<br>These records contain Discharge Assessment - VisonQuest 7-8-97 that was previously provided as Tremane Wood 132-139.  It is being provided again as Tremane Wood 1884-1891. | Tremane Wood 1465-2089 |
| 5. | Defense Hrg Exh. 4 - OJA Records<br><br>Note:<br>These records contain Comprehensive Evaluation (COJDEC) 8-1-94 that was previously provided as Tremane Wood 105-126.  It is being provided again as Tremane Wood 2170-2191.<br><br>These records contain Psycho-Educational Assessment (COJC) that was previously provided as Tremane Wood 127-131.  It is being provided again as Tremane Wood 2338-2342. | Tremane Wood 2090-2638 |
| 6. | Defense Hrg Exh.  5 - Butner School Records | Tremane Wood 2639-2646 |
| 7. | Defense Hrg Exh. 6 - DHS Records | Tremane Wood 178-187 |
| 8. | Defense Hrg Exh. 8 - Kate Allen Report | Tremane Wood 140-146 |
| 9. | Defense Hrg Exh. 8 - Kate Allen CV | Tremane Wood 2647-2651 |
| **PCR** | | |
| 1. | Exh. 7 to PCR Application - Edwin Fair Records | Tremane Wood 188-343 |
| 2. | Exh. 8A to PCR Application - Petition for Divorce | Tremane Wood 926-931 |
| 3. | Exh. 8B to PCR Application - Temporary Order | Tremane Wood 932-934 |
| 4. | Exh. 8C to PCR Application - Decree of Divorce | Tremane Wood 935-941 |

| 5. | Exh. 9A to PCR Application - Petition for Protective Order | Tremane Wood 2652-2655 |
|---|---|---|
| 6. | Exh. 9B to PCR Application - Emergency Protective Order | Tremane Wood 2656-2658 |
| 7. | Exh. 9C to PCR Application - Order of Dismissal | Tremane Wood 2659-2660 |
| 8. | Exh. 10A to PCR Application - Petition for Protective Order | Tremane Wood 2661-2664 |
| 9. | Exh. 10B to PCR Application - Emergency Protective Order | Tremane Wood 2665-2667 |
| 10. | Exh. 10C to PCR Application - Protective Order | Tremane Wood 2668-2669 |
| 11. | Exh. 10D to PCR Application - Order of Dismissal | Tremane Wood 2670-2671 |
| 12. | Exh. 11 to PCR Application - Dental Records | Tremane Wood 2672-2674 |
| 13. | Exh. 12A to PCR Application - Preliminary Information as to Linda Gross | Tremane Wood 2675-2676 |
| 14. | Exh. 12B to PCR Application - Preliminary Information as to Acie Anderson | Tremane Wood 2677-2678 |
| 15. | Exh. 12C to PCR Application - Plea and Application for Deferred Sentence | Tremane Wood 2679-2684 |
| **Other** | | |
| 1. | Dr. Jeanne Russell rpt 3-17-04 re: Jake | Tremane Wood 167-177 |
| 2. | Linda Wood medical records (from prosecutor's files) | Tremane Wood 2685-2764 |

## _Wood- Index of Records Sent to Dr. Ken Benedict 6/13/11_

| Records | | |
|---------|---|---|
| 1. | Records received from Dr. Hand 6-10-11 | Tremane Wood 2765-2862 |
| 2. | Raymond Gross evid hrg transcript 2-23-06 | Tremane Wood 759-773 |
| 3. | Linda Wood evid hrg transcript 2-23-06 | Tremane Wood 774-814 |
| 4. | Linda Wood evid hrg transcript 2-27-06 | Tremane Wood 815-823 |
| 5. | Andre Wood evid hrg transcript 2-23-06 | Tremane Wood 824-846 |
| 6. | Zjaiton (Jake) Wood evid hrg transcript 2-27-06 | Tremane Wood 847-864 |
| 7. | Matthew Netherton evid hrg transcript 2-23-06 | Tremane Wood 865-889 |
| 8. | Sandra Marshall evid hrg transcript 2-27-06 | Tremane Wood 890-910 |
| 9. | Jan Davis evid hrg transcript 2-23-06 | Tremane Wood 911-925 |
| 10. | Leslie Welch evid hrg transcript 2-23-06 | Tremane Wood 2863-2879 |
| 11. | Heather Justice evid hrg transcript 2-23-06 | Tremane Wood 2880-2890 |
| 12. | Michael Hiltzman evid hrg transcript 2-27-06 | Tremane Wood 2891-2899 |
| 13. | Dr. Kate Allen evid hrg transcript and proffer 2-27-06 | Tremane Wood 2900-2926 |

## _Wood- Index of Records Sent to Dr. Ken Benedict 6/24/11_

| Declarations | | |
|------|------------------|---------------------------|
| 1. | Jeffrey Ware | Tremane Wood 3267-3269 |
| 2. | Tom Comstock | Tremane Wood 3270-3272 |

# EXHIBIT 5

# EXHIBIT 5

**Declaration of Clemens Bartollas, Ph.D.**

I, Clemens Bartollas, declare under penalty of perjury the following to be true and accurate to the best of my information and belief:

1. I have a Ph.D. from the Ohio State University, with an emphasis in criminology. I have published 40 books and two more are in production at the present time. For the past 42 years, I have had contacts with violent offenders in various contexts (the majority have been in courtroom settings). I have been involved as an expert witness in 25 cases, of which 19 were murder cases, and 13 of which were death penalty ones.

2. I have worked for four years in a maximum security institution in Ohio, known at the time to house some of the most violent juvenile offenders in the nation. I have also run a work release program for one year at a minimum-medium security prison in North Carolina.

3. In addition, I have worked with street gangs for the past twenty-three years, both in the community and in prison settings. Furthermore, I am involved in a major project concerned with the violent mind set and also in a project of resilience in the lives of adolescents.

4. I was asked by attorneys for Tremane Wood to provide insight and understanding regarding specific issues in Tremane's background. In particular, I was asked to review his history in the juvenile justice system and his involvement with gang activity. In doing so, I was provided and reviewed the documents listed in the indices attached as Ex. A to my declaration. I also interviewed Tremane for five hours on May 17, 2011, at the prison in McAlester, Oklahoma.

5. Upon review, I offer these opinions and observations. The State of Oklahoma failed Tremane Wood, which is particularly important given the debilitating factors in his life. Tremane was an excellent candidate for therapeutic intervention which could have been a major rehabilitative factor in his life, but there was a failure to provide consistent and ongoing programs to achieve this rehabilitation. Specifically, the State of Oklahoma failed by continuously returning Tremane to his negative home environment and failed to provide proper gang intervention and drug treatment.

6. Julian Mack, one of the founders of the juvenile court, identified the purpose of the juvenile court: to "provide the salvation of such a child, if its parents or guardians be unable or unwilling to do so, by bringing it into one of the courts of the state without any process at all, for the purpose of subjecting it to the state's guardianship and protection." Mack, Julian W, 15-16 (1999). "The Juvenile Court," in *Readings in Juvenile Justice Administration.* New York: Oxford University Press. We call this the doctrine of *parens patriae,* that the juvenile court will provide for the wayward child the protection and care of a parent. The juvenile court accomplishes this by rescuing those youths from a life of trouble on the streets, providing their rehabilitation, protecting them from placement with adult criminals and correctional facilities, and saving them from a life of crime.

1

7.  The state, through its juvenile welfare and corrections system, repeatedly failed Tremane by leaving him in the home or more importantly returning him to the home, in spite of all the factors that were harmful to the child. The chaotic home life was debilitating to the child in a number of ways, the factors of which included domestic violence, lack of proper parental supervision, and extreme poverty. The specifics regarding Tremane's chaotic childhood are beyond the scope of this declaration, but are discussed in the records I reviewed, including reports by Dr. Kate Allen and Dr. Jeanne Russell. What is critical to understand is that these factors resulted in Tremane becoming involved in gang activity and he subsequently found himself in the juvenile system.

8.  From an early age, Tremane's brother Jake took over parenting Tremane. In my interview with Tremane, he explained that Jake had his back. Jake was his role model. He said that they had nothing at home, and Jake would take him to get what he needed.

9.  Jake introduced Tremane to gang involvement when he was only around eleven years old. When Tremane would attempt occasionally to stand up to his brother, he would be beaten up by Jake. Tremane noted that Jake had no control over his anger, much like the father; he would just blow up and be out of control. And yet Jake became Tremane's lifeline. Jake was one of the leaders, the OG (Original Gangster) of the gang, and this gave him more power over his brother.

10. Tremane would wear gang colors, including coming home with them. Jake seemed much older than his years and was accepted by the Hoover Crips as the OG by the time he was in his twenties, which is particularly young.

11. When I interviewed Tremane, he was quite informed on the philosophy and background of gangs. He knew, for example, who Larry Hoover is, the legendary Chicago leader of the Gangster Disciples (currently serving life imprisonment in a federal supermax prison in Colorado (Florence)). We talked about Hoover (whom I have talked with on a number of occasions while he was in prison), and this report writer was impressed with how much he knew about gangs in general as well as his particular gang, the Hoover Crips. Interestingly, Tremane made an interesting fatalistic comment: "If you live to be 25, you have earned your stripes."   In larger, urban gangs, gang members would receive formal education regarding gang history and culture. Tremane did not belong to such a gang, and education would have been less formal. Given the nature of the gang, I found Tremane's familiarity significant because it demonstrated how truly enmeshed he was in the gang culture.

12. There is indication that Tremane wanted to withdraw from the gang but the pressure of being in the community was too difficult for a young adolescent to overcome. For example, at one point, he wanted his gang tattoos removed. At other times, he attempted to stay away from gang involvement, but it would not be long due to Jake's influence that he would be back with the gang.

13. Significantly, there is no evidence that any attempt was made to provide any type of gang de-escalation program to Tremane, especially in his younger years where it could have

2

made a difference.   I have been involved in developing gang de-escalation programs, and there are several of these successful, community-based programs across the country. Key components of a successful program, and what was needed to address Tremane's gang involvement, required the involvement of the entire community.  Components would include law enforcement, education, social services, recreational, job-related and even political.  All of the community stakeholders are at the table developing an approach that would address the individual needs, in this case, Tremane's.  Formal, comprehensive programming was needed, but was wholly absent.

14. Tremane also had quite a drug history as a youth.  According to him, he used ecstasy, cocaine, PCP, marijuana, and liquor.  He said that he took drugs every day and admitted that he was addicted.  He quit drinking so much when he was seventeen or eighteen. An evaluation 8/1/94 reports that Tremane had no drug problems, but part of doing "the program" is knowing what to say to get through as quickly as possible.  Drug and alcohol programming is the most common programming found in both juvenile and adult institutions.   A staff member working in this setting, interacting and counseling Tremane, should have had a sense of what really was going with Tremane's drug usage and should have been aware that drug usage was a serious issues with this youth.  That worker should have accordingly refer him to relevant programs and individual counseling.

15. There was little attention given to providing drug treatment for Tremane, and, as he now admits, drugs affect your judgment.

16. Tremane was provided with services aimed at addressing his behaviors and problems. These included out-of-home placements in detention and foster homes. Tremane typically excelled in the out-of-home placements and was rewarded with being sent home, which was always the goal.  Ironically, it was the home environment that was detrimental for Tremane. Tremane's home-life consisted of negative influences, lack of structure, and little supervision.  It was ineffective, and counter-productive, to take Tremane from the home, treat him emotionally and behaviorally, and then return him home. Even the best program, with the most intuitive staff, will not see good results when the child is returned to the community without programming and aftercare that will ensure his success. Regression was inevitable.

17. Some mentoring and in-home counseling was also provided.  Unfortunately, more intensive follow-up was needed by Tremane at a far younger age.  Tremane was already gang-involved by age 11.  By the time, for example, Matthew Netherton became involved in Tremane's life, Tremane was already 15 and there were too many negatives to overcome. When services were provided in the family home, it was well-documented that Tremane struggled to cope from day to day.  It was an environment where his older brother was a negative influence, his mother was largely absent and unable to manage him, and there was little supervision and structure.

18. If Tremane had been taken out of the home permanently and placed in foster care or a long-term institutional placement, like the foster home wherein he thrived, Jake's

3

negative influence over his younger brother would have been minimized or perhaps even eliminated. And, the foster home would have provided the nurturing and structured environment Tremane needed. There was potential in Tremane, but there were too many negatives working against him in the home for success to be achieved.

**I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.**

*Clemens Bartollas*

Clemens Bartollas

6/24/11

Date

4

# EXHIBIT 6

# EXHIBIT 6

## Declaration of Tom Comstock

**I, Tom Comstock, of lawful age and being first duly sworn upon oath, swear and state the following is true and correct:**

1.  I have been employed by the Stillwater Police Department for 16 years. My prior work experience includes child welfare and probation. I have a Bachelor's degree in Social Work.

2.  I was contacted several years ago by someone on Tremane Wood's behalf. After a brief conversation with this person, I was told that I would be contacted again for follow-up. I heard nothing else until 2011, when I was contacted by Lamont Williams with the Office of the Federal Public Defender. Had I been contacted previously as I was told I would be, I would have provided the same information that I am providing in this declaration.

3.  In the 1990s, I worked with the Wood family. I functioned as Tremane's juvenile probation worker. I worked closely with Tremane for approximately two years. I saw him regularly and spent time in the home with his family. My work with Tremane and his family is reflected in his juvenile records where I am listed as his Department of Human Services (DHS) worker in some places and Juvenile Services Unit (JSU) worker in others. At the time JSU was under DHS. JSU has since split into its own department. My goal as Tremane's probation worker was to rehabilitate Tremane by teaching him ways not to re-offend and by applying consequences as needed.

4.  I was also the worker for Tremane's brother Zjaiton (Jake). Jake was different than Tremane. Jake was a mean, nasty person. He has something mentally wrong with him; he was psychotic. I will never forget a statement Jake made to me when I was working with him. Jake told me that his goal was to contract AIDS, infect as many people as he could, and die in a gun fight with police.

5.  With Jake, it was all about power and control. He created and ran the Hoover 107 street gang. He was the "OG"—original gangster. Tremane became a part of the gang because of Jake. Tremane looked up to Jake.

*in Stillwater*
*TC*

6.  Tremane and Jake's mother, Linda, was a terrible parent. One of her problems was that she could not say no. She also did not provide discipline to her sons, even as basic as providing a bed time or a curfew. Linda could not follow through with consequences with her sons, but she would get mad and bitch to the professionals trying to help.

7.  Linda acted more as a peer than an adult to her children. Her house was a hangout for the teenagers and gangsters. She allowed partying to occur at her home. I think she enjoyed the gang lifestyle.

8.  Linda did not talk much about her own family and where she came from. I know she did not have the best background. She mentioned some abuse but gave no details. She was very closed and guarded.

9.  I referred Tremane to the foster home in Cromwell. That's when I noticed a change in Tremane's behavior. He got good grades and played football. He was a tremendous student and athlete. I remember seeing Tremane riding a tractor and watching him have a great time. He was just being a normal kid with age-appropriate behaviors.

10. I recall only one negative incident that occurred in the nine months that Tremane was in the foster home. It involved another student at the school. Tremane resolved the situation at the encouragement of his foster father by being honest and confessing to his wrongdoing.

11. Tremane thrived in the foster environment, where the parents provided stability and discipline. I recall Tremane wanting to return to the foster home following a visit home with his family. I could tell that he had a rough time at home and had been in the streets.

12. Before he left the foster home, Tremane approached me about getting his gang tattoos removed. To me, that said a lot.

13. One of the things that struck me about Tremane's experience in the foster home was the fact that the foster parents were white. Their race was not a problem for Tremane. He prospered in the home, despite the fact that his mother had perpetuated a belief that white people were out to get him.

14. During his juvenile proceedings, I recommended that the court allow Tremane to remain in that foster home. The court, however, sent Tremane home with Linda. Tremane fell back into the same negative behavior almost instantly.

15. I believe that if the system could have kept Tremane in foster care and let him age out, he would have been okay.

16. When I heard about Tremane's case for which he was sentenced to death, it threw me for a loop. I never thought Tremane would end up involved in something like this. Then, I found out Jake was involved, and that did not surprise me.

17. I know Brandy Warden. Brandy portrays nice, sweet, and innocent, but she is a master manipulator.


**I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.**

_____        _____
Tom Comstock                           Date 6/8/11

# EXHIBIT 7

# EXHIBIT 7

## Declaration by Jeffrey Ware

I, Jeffrey Ware, of lawful age and being first duly sworn upon oath, swear and state the following is true and correct:

1.  I am Tremane Wood's first generation cousin. My mother, Laverta Ware, and his father, Raymond Gross, are siblings. I have known Tremane all of his life and spent a considerable amount of time with him while we were children and young adults. I grew up in Guthrie, where Tremane spent part of his childhood. I was born in 1975, and I am 4 years/7 months older than Tremane.

2.  I was never contacted by anyone on behalf of Tremane until 2011. I have, however, been interviewed on multiple occasions by his brother, Zjaiton's, legal team, and I was listed as a testifying mitigation witness for his trial. After talking to the people on Zjaiton's case and really having to think back on Tremane and Zjaiton's childhood, I realize how bad it was.

3.  Tremane and his brothers went through life thinking their dad didn't love them. They would say how their father was not around, except when it was time for a whooping. Earlier in their youth when Raymond *was* around, it was not good. I saw no fatherly love from Raymond toward his children. He slapped them, and he talked to them forcefully.

4.  Tremane was a caring person. If anyone needed help, Tremane would be there. Tremane was a follower of his brother, Zjaiton. Zjaiton influenced Tremane and had a way of making Tremane say and do things that Tremane normally would not. If Zjaiton did something and got in trouble, Tremane was right there with him.

5.  I have about 41 first cousins, and my grandmother, Jewel Wilson, took care of most of us from time to time. My grandmother lived in a small, two-bedroom home in Guthrie. For part of my childhood, I lived with and was raised by her. Tremane also lived there for a period of time and frequented our grandmother's house as he grew older. There was always a full house. There were periods that some of my uncles and aunts stayed at my grandmother's home with us as well. The kids would sleep on the floor and let the adults have the couches.

6.  My grandmother, Jewel, sold PCP out of her home. She made and sold 'hooch' out of her home too. I remember one day playing in the front yard with my cousins when the police came to the house. I watched as the police arrested my grandmother for selling drugs and took her away in a patrol car.

7.  My grandmother had 12 children, including my mother and Tremane's father. We were constantly exposed to drugs and violence by our parents, aunts, uncles, and even our grandmother.

8.   From an early age, Tremane and his brothers saw their mom get beat by their father. Linda came to my grandmother's house to drop her kids off. She was crying and had marks on her face. Andre would tell me how his dad jumped on his mom. Andre and Jake told me that their mom dropped them off so she could get away for a minute.

9.   Growing up, Tremane and his brothers moved around from place to place, shelter to shelter.

10.  One time when Tremane was little, he got a whooping after he would not say grace. Raymond beat Tremane with his police belt.

11.  Following Raymond and Linda's divorce, Raymond's family turned on Linda and the boys. Linda left Tremane and his brothers in a shelter. No one in the family wanted to take them in and help. Our grandmother eventually relented and picked them up from the shelter.

12.  Tremane and I saw a lot of drug addiction and violence in our family growing up. Several of Tremane's aunts and uncles were drug addicts. We also saw people selling and using drugs regularly. It was typical to see my uncles sit around all day in the yard drinking and smoking. Our uncles were aggressive. Uncle Sam was ruthless. I saw him in many fights. My Uncle Vincent was the hustler of the bunch. Sam and Vincent were violent, including with each other. Once, Sam and Vincent pulled their guns out on each other during a fight. I, along with other children, were playing in the yard. It was nothing for Sam and Vincent to draw their guns and threaten someone. When I was a boy, I watched from the car as one of my uncles beat a man with a carjack over drugs.

13.  Tremane and I heard our aunts say negative things about Tremane's mother. He and his brother were treated like outcasts by my aunts, who whooped Tremane and Zjaiton for any little thing.

14.  Nearly all of the men in our family, uncles and cousins included, have been incarcerated. These are the role-models we had. I have also spent time in the penitentiary for unauthorized use of a motor vehicle. This occurred when I was a young adult.

15.  Most of the male cousins, who did not have parents around, were in gangs. We found love being in the gangs because we didn't get love at home. Then we learned the hard way that there is a bad side to gangs.

16.  Of the cousins in my generation, only one graduated from high school.

17.  It was rough being black in Stillwater, but it was even worse being bi-racial. In Stillwater, if you were not a student at Oklahoma State University or did not have a good job, you were considered an outcast. Because my Aunt Linda was a single mother without a good job, Tremane was even more of an outcast.

18.    I am providing all of the information in this declaration of my own free will.  All of the information is true and accurate to the best of my knowledge.  If anyone from Tremane's legal team had contacted me sooner, I would have been willing to speak with them and would have provided the same information.  I would have been willing to testify on Tremane's behalf.

**I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.**

_____          _6-10-11_____
Jeffrey Ware                                                          Date

Page 3 of  3

# EXHIBIT 8

# EXHIBIT 8

I, Brandy Warden, of lawful age and being first duly sworn upon oath, swear and state the following is true and correct:

I was a codefendant with Tremane Wood, Zjaiton Wood and Lanita Bateman.

I met Tremane and Zjaiton when I was approximately 13 years of age, around 1994.

I recall a time when Zjaiton put a gun to my head and in my mouth because he had told me and Susie not to leave the house. We left anyway to go to the store, and when we got back Zjaiton and Tremane were there. Zjaiton started hitting and kicking Susie and took her into the bathroom. Zjaiton called me into the bathroom, took the gun from Susie's mouth, and put the gun on me and threatened me. He told me if I did that again, he would kill me.

There was a time Zjaiton threatened me with a knife. He put the knife to my stomach.

Zjaiton has made sexual gestures towards me despite the fact that I was his brother's girlfriend.

Ever since I have known Zjaiton, he has been a violent and controlling person. He is an evil person and has no respect for people.

I think that because Tremane was younger, he looked up to Zjaiton. Tremane placed his hands on me for the first time because his brother told him that was the only way he was going to keep me.

The way I viewed it, Zjaiton was more like Tremane's hero. Whatever Zjaiton did, he wanted to do. Zjaiton was more like that father figure, since their dad was not around.

Knowing Tremane for as long as I have, I would not think it was his idea to do something that resulted in a death. He may have a criminal history, but I can never picture him as saying "lets kill somebody."

I have never seen Tremane do any drugs besides marijuana and alcohol. On the day of the crime, prior to arriving at the brewery, I saw Tremane snort a white powdery substance.

I believe Tremane loves his son. I would like our son to have the chance to know his father, if that is what our son wants.

Tremane was close and loved my daughter even though she was not biologically his.

I feel like Tremane lived his life for his brother in following him rather than living his own life. He really never gave himself a chance.

I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.

Brandy Warden

6-9-11

_____        6-9-2011
WITNESS                      DATE

# EXHIBIT 9

# EXHIBIT 9

I Lauten Botevan of lawful & being first duly sworn upon oath, swear & state the following is true & correct.

I was convicted of first-degree murder, conspiracy to commit a felony, & robbery with a firearm. I am serving a life sentence, as well as a 101 year sentence & a 10 year sentence.

I was a co-defendant with Brandy Warden, Tremane Wood & Zjaiton Wood. We were all charged with the murder of Ronnie Wipf, which occured on January 1, 2002.

At the time of the crime I been dating Zjaiton for approximately 2 months. I met thru his cousin shortly after he was released from prison. I met Brandy once before the night of the crime.

I knew Tremane Wood for approximately 2 ~~Months~~ years before the crime occured. I met Tremane because he had family who lived in the same apartment complex ~~the~~ where I lived.

Tremane is a good-hearted guy, he was not mean spirited. I had never seen Tremane angry. When I hung out with him in the 2 month that I dated Zjaiton, Tremane was a proud new father. He liked to have fun.

Zjaiton's M.O. was to rob people. Zjaiton would say he need to go "hit a lick" which he later explained to me meant robbing people.

His intention was to rob people for drug money. At one time Zjaiton took $500.00 & a check from me in order to buy drugs. I did not know Termane to rob people.

In early October 200?, I witnessed a fight outside of my apartment complex. One of the people fighting dropped his keys & wanted them so he could leave. I handed him his keys. & he came back shortly thereafter with a gun & started shooting. Several people were shot, & one person died. I witnessed this happen. After this, I became very depressed & began drinking a lot. I believed that life did not matter. It was at this time that I started dating Zjaiton.

On the night of December 31, 2001, Zjaiton, Termane, Brandy, & I went to the Bricktown Brewery to celebrate New Years Eve.

While we were at the brewery, Brandy & I met 2 guys, Arnold & Ronnie. We were talking with the guys; they were both drunk.

Arnold & Ronnie approached Brandy & I & asked us what we were doing after we left the brewery. There was a conversation with Arnold & Ronnie, Brandy & I. Arnold & Ronnie asked us if we wanted to go party at a hotel room with them & their friends. Brandy & I didn't feel comfortable with that.

I went to the restroom. Brandy approached me & said Zjaiton & Termane want us to go back & talk to Ronnie & Arnold. Brandy & I went over to Zjaiton & Termane. They told Brandy & I to go back to Arnold & Ronnie to leave to the hotel & to take their money. Zjaiton told me to page him when we got the money.

Brandy & I left the brewery with Ronnie & Arnold. There was not a plan in place as to what exactly would happen. I was concerned that Brandy & I would leave with Ronnie & Arnold & get left. I was not certain that Zjaiton & Termane would even come to get us after we left with the guys.

I was scared to death. I never intended to have sex with anyone & was simply planning to walk away.

After we got to the motel I paged Zjaiton & told him where we chose staying & our room number. I believed that Zjaiton & Termane would come to the hotel parking lot & wait for Brandy & me. I wasn't sure they would pick us up, so I had picked a hotel close to my moms in case I had to walk.

When Brandy & I were in the bathroom fixing our hair, I told Brandy that we should tell Ronnie & Arnold that we wanted to get ice or pop, & we could just walk away.

I had no idea that Zjaiton & Termaye would come to the door Zjaiton never told me he intended to go to the door.

Brand & I left the bathroom, I left my coat behind, & telling Ronnie & Arnold the we were going to get pop Brandy & I walked to the door.

Just before we got to the door someone pounded on the door from the other side. I recognized Zjaiton's voice, saying "Brandy Lonita it's your Mama."

Things happened very fast. Brandy & I ran out the door, as Zjaiton & Termaye came in to the room. I did not see a knife in Termaye's hand, nor did I see a gun in Zjaiton's hand.

When Brandy & I left the room, Brandy started running towards the front of the hotel. I didn't think Zjaiton & Termaye would park up front, so I told Brandy to try another way. We found the car in the parking lot, the doors were unlocked the keys were in the ignition with the car running. This was not planned.

While I was being interviewed by the police, they kept telling me there was nothing they could do to help me. I was never offered a deal.

I did not testify at trial because I did not want to be responsible for helping put someone to death. Had I known it would have been helpful to Termaye to testify, after I was sentenced, I would have testified.

Brand testified at my trial. Her testimony regarding the night of December 31, 2001, was incorrect. It was Brandy who talked to me about having sex with Ronnie & Arnold in exchange for money. Brandy lied & said it was me. Brandy also lied when she said I was stalling in the hotel bathroom. I told Brandy I didn't want the money because I knew Zjaitar or Termane would just take it, I just wanted to leave.

I was contacted in May of 2011, on Termane's behalf by two defense investigators with the office of the Federal Public Defender.

I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.

Lanita Bateman                    6-8-2011

_____          6.8.2011
WITNESS                          DATE

# EXHIBIT 10

# EXHIBIT 10

### Declaration of Perry Hudson

I, Perry Hudson, declare under penalty of perjury the following to be true and accurate to the best of my information and belief:

1. I am an attorney licensed to practice law in Oklahoma. I was appointed to represent Tremane Wood as lead counsel in his direct appeal proceedings. Jason Spanich served as my cocounsel.

2. I was solely responsible for drafting the appeal brief and the supplemental brief filed after the evidentiary hearing. Jason drafted the Rule 3.11 application and I edited it prior to filing. Jason and I split responsibilities for the evidentiary hearing.

3. When I was appointed to represent Tremane in 2004, I had been practicing law for seven (7) years. I had served as both lead counsel and cocounsel in numerous death penalty direct appeals in Oklahoma. To the best of my memory, I had not participated in a prior evidentiary hearing in a death penalty direct appeal.

4. At the time that I was appointed, I thought that I would have sufficient time to devote to Tremane's appeal. Before Tremane's brief was filed, however, I obtained a criminal defense contract, and my practice became very busy. As a result, I was unable to devote adequate time in preparing Tremane's opening brief. In fact, in my opinion, it is the worst direct appeal brief that I have ever written.

5. In selecting which issues to raise, I had no strategic reason for not raising the claim of trial counsel's failure to ask for jury instructions pursuant to *Enmund/Tison* nor did I have a strategic reason for failing to raise a claim that the trial court erred in failing to give the instruction *sua sponte*. I had no strategic reason for not raising the claim that trial counsel failed to challenge the aggravating circumstance that Tremane knowingly created a great risk of death to more than one person. I had no strategic reason for not raising the claim that trial counsel failed to object when the jury was not properly sequestered at the end of each trial phase nor did I have a strategic reason for not raising the underlying substantive claim on direct appeal.

6. In preparing for the evidentiary hearing, I relied upon investigator Brenda McCray to do most of the records gathering. I did not ask her to get releases signed from the family members, nor did I ask her to obtain Linda Wood's medical records. There was no strategic reason for doing this; I simply believed that the records we gathered were sufficient.

7. We submitted over 1300 pages of exhibits at Tremane's evidentiary hearing, the bulk of which were Tremane's juvenile records. I was familiar with the records, but did not use the records to effectively rebut the State's allegations during the hearing or to impeach witnesses, including Raymond Gross.

8. I was responsible for handling the examination of Johnny Albert at Tremane's evidentiary hearing. I had no strategic reason for not introducing his affidavit during his

testimony at the hearing. In fact, there was no strategic reason for not introducing the affidavits submitted with the Rule 3.11 application during the evidentiary hearing.

9.  At the hearing, the court precluded Dr. Kate Allen from testifying. This was a very harmful ruling because Dr. Allen was going to testify in detail regarding the impact that Tremane's childhood had on him. She would have testified that she diagnosed Tremane with post-traumatic stress disorder as a result of the domestic abuse he witnessed as a small child. Because she had reviewed his juvenile records, she would have been able to put the records in context. She could have also explained the impact of abuse on Tremane. Dr. Allen's expert testimony was a large part of our proof that trial counsel's failure to investigate and prepare Dr. Hand during trial resulted in prejudice. Without her testimony, Tremane's life story and the supporting records went unexplained.

10. I had sole responsibility in drafting and filing our supplemental brief after the evidentiary hearing. I had no strategic reason for not challenging the trial court's failure to allow Dr. Kate Allen's testimony.

11. Johnny Albert had his law license suspended shortly after Tremane's evidentiary hearing. I was aware of this. During oral argument, I did not inform the judges of this fact. I had no strategic reason for this.

12. To the best of my recollection, during oral argument the court *sua sponte* raised the issue of whether juror Jera Burton's testimony could be considered in support of prejudice under *Strickland*. The State had not objected to Burton's testimony at the hearing, nor had this issue been raised in the supplemental briefs.

13. Had I been asked, I would have provided a declaration with this same information to Tremane's post-conviction counsel.

**I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.**

Perry Hudson
**Perry Hudson**

6/23/11
**Date**

# EXHIBIT 11

# EXHIBIT 11

## Declaration of Jason Spanich

I, Jason Spanich, declare under penalty of perjury the following to be true and accurate to the best of my information and belief:

1.  I am an attorney licensed to practice law in Oklahoma. I was appointed to represent Tremane Wood as cocounsel in his direct appeal proceedings. Perry Hudson was appointed as lead counsel.

2.  At the time I was appointed in 2004, I had been practicing law for seven years. Tremane's case was the first capital direct appeal to which I was appointed.

3.  Perry had sole responsibility in drafting the direct appeal brief and the post-evidentiary hearing supplemental brief. I drafted the Rule 3.11 application for an evidentiary hearing. Perry and I shared responsibilities in preparing for the evidentiary hearing.

4.  I reviewed the District Attorney's file, and I did not see any of Tremane's mother's medical records in the file.

5.  I conducted the direct examination of Raymond Gross. It was so obvious to me that he was being dishonest regarding his past abusive behavior that I did not believe it was necessary to challenge his testimony with specific records.

6.  Perry and I had a difference of opinion regarding the approach for Tremane's trial counsel, Johnny Albert. While the case was pending, it was common knowledge in the legal community that Johnny was undergoing investigation by the Oklahoma bar. I stressed to Perry that he should raise Johnny's bar investigation as part of the proceedings. Perry did not want to do that; I am not aware of any strategic reason for his decision.

7.  Had I been asked, I would have provided a declaration with this same information to Tremane's post-conviction counsel.

I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.

_____          6.27.11
Jason Spanich                                    Date

# EXHIBIT 12

# EXHIBIT 12

### Affidavit of Brenda McCray

State of Oklahoma          )
                           )          ss:
County of Oklahoma         )

I, Brenda McCray, being of lawful age, do hereby state under penalty of perjury the following is true and correct to the best of my knowledge:

1. I am an investigator in Oklahoma. I was assigned as the investigator for Tremane Wood's direct appeal proceedings.

2. I reviewed a draft of the direct appeal brief in Tremane Wood's case on the day it was due. After reading it, I was concerned that appellate counsel had not properly raised a claim regarding the ineffective of assistance of trial counsel. I spoke with an attorney in my office, who indicated that the allegation of ineffective assistance of counsel needed to be raised in the brief, even if a separate application under Rule 3.11 was filed.

3. I brought this to the attention of appellate counsel Perry Hudson, who was unaware of this.

4. On the day that the brief was due, Perry cut and pasted the claim written for the Rule 3.11 application into the appeal brief.

5. The brief was filed at the very last minute on the day that it was due.

FURTHER AFFIANT SAYETH NOT.

_Brenda McCray_
Brenda McCray

Subscribed and sworn to me this ⟵ day of June, 2011, by the person known to me to be Brenda McCray.

Notary Public
My Commission number: 00009610
My Commission expires: June 7, 2012

Page **1** of **1**

# EXHIBIT 13

# EXHIBIT 13

**Declaration of Julie Gardner**

I, Julie Gardner, declare under penalty of perjury the following to be true and accurate to the best of my information and belief:

1.  I am an attorney licensed to practice law in Oklahoma, although I am not currently practicing law. I work as an investigator with the Office of the Federal Public Defender in Oklahoma City. I was appointed to represent Tremane Wood in his post-conviction proceedings in September 2005.

2.  At the time I was appointed, I had been practicing law for a little over nine-and-a-half years. I spent eight-and-a-half of those years working first in the Capital Post-Conviction Division, and then the Capital Direct Appeals Division of the Oklahoma Indigent Defense System (OIDS). I have represented numerous clients on their capital appeals.

3.  I have prepared this declaration based on my memory of the events and my review of the post-conviction petition that was filed in his case. I did not review my case file.

4.  I was a sole practitioner when I represented Tremane. OIDS was initially appointed to represent Tremane, but due to their caseload, I took over his case in September 2005. At the same time, I was also appointed to represent another capital defendant in his post-conviction proceedings.

5.  When I inherited Tremane's case from OIDS, no work had been done on the case. I had approximately three months from the time I entered the case to review Tremane's file, conduct investigation, gather records, and file a post-conviction petition. This was not enough time to adequately investigate his case; however the Court of Criminal Appeals had made it clear additional time was not going to be granted.

6.  When representing Tremane, I was aware that to prove his direct appeal attorneys failed to provide effective assistance during the appeal that I would have to show that the attorneys' performance was deficient and that Tremane was prejudiced by their performance.

7.  Perry Hudson and Jason Spanich represented Tremane during his direct appeal proceedings. I did not ask them to provide a declaration.

7.  I never obtained any hospital or emergency room records on Tremane's mother Linda Wood. I did not conduct any background investigation on Tremane's parents' families. I had no strategic reason for not conducting this investigation.

8.  I did not interview Tremane's trial attorney Johnny Albert. I did not interview Dr. Ray Hand. I had no strategic reason for not conducting this investigation.

9.  I raised claims related to the trial court's failure to allow Dr. Kate Allen's testimony. I hired Dr. Allen to prepare a supplemental report after she reviewed additional records I gathered.

I did not submit any documentary evidence, such as a declaration from another expert, or citation to the Oklahoma Administrative Code (§ 675:10-1-5) to support these claims. I had no strategic reason for not including this information in support of Tremane's petition.

10.    I did not conduct any juror interviews.

11.    I did not send a formal request to the Oklahoma County District Attorney's Office to review their file on Tremane's case. I never reviewed the DA's file in Tremane's case, and I never received any discovery materials from the DA in Tremane's case.

12.    I was unaware that the great risk of death aggravator had been challenged and dismissed before trial against Tremane's co-defendant Zjaiton Wood.

I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.

_____          _____
Julie Gardner                     6/24/11
                                  Date

# EXHIBIT 14

# EXHIBIT 14

### Declaration of Ray Hand, Ph.D.

I, Ray Hand, of lawful age and being first duly sworn upon oath, swear and state the following is true and correct:

1.  I am a licensed psychologist in Oklahoma. I was retained by attorney John Albert to testify at Tremane Wood's capital trial. I was paid $2500 for my services.

2.  I have been a testifying expert in numerous capital cases in Oklahoma. In my experience, the attorneys with whom I worked were unable to provide sufficient funding to complete a thorough review of a client's background, which should include at minimum many hours of interviews with the client to gain his trust, interviews with family members to develop a social history, and detailed review of all available records. Generally, the expert contract amounts that I received were in the $2500 range.

3.  In Tremane's case, I spent 23 hours total on the case. This includes meeting with Tremane, administering tests, talking to his mother and brother, reviewing records, and testifying. Because of the time and resources, I was unable to gather multi-generational information from either of Tremane's parents' family.

4.  When Mr. Albert retained me, he asked me to evaluate Tremane and to provide about an hour of testimony about Tremane's background. Mr. Albert also expected me to review records he provided to me.

5.  Mr. Albert and I did not discuss Tremane's records nor did we discuss or the themes to present in Tremane's case.

6.  I did not meet with Mr. Albert to prepare my testimony for Tremane's case. Mr. Albert advised me to keep my testimony to about an hour.

7.  When I took the stand, I presented the best explanation I could regarding Tremane's life history given the limited time and resources that I was provided.

8.  I was contacted by the Office of the Federal Public Defender in 2011. Had I

been asked to do so before now, I would have provided the same information I am providing in this declaration. I would have also been willing to testify regarding this information.

I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.

_____                    6-10-11
Ray Hand, Ph.D.                                      Date

# EXHIBIT 15

# EXHIBIT 15

Affidavit of Wayna Tyner

| | |
|---|---|
| State of Oklahoma | ) |
| | )  ss: |
| County of Cleveland | ) |

I, Wayna Tyner, being of lawful age, do hereby state under penalty of perjury the following is true and correct to the best of my knowledge:

1.    My name is Wayna Tyner. I was previously contacted by Ms. Kelly Schneider, Mr. Tremane Wood's federal public defender, concerning his federal habeas corpus case. I represented his brother and co-defendant, Mr. Zjaiton "Jake" Wood, in Oklahoma County District Court Case Number CF-2002-46. I was asked to draft an affidavit describing the tasks I normally conducted when preparing for a capital trial at the time the Wood brothers' capital case was pending in the district court. In my opinion, the following consisted of the standard of care in capital cases at the time of the Woods' brothers capital cases. I have attached and labeled as Exhibits 1 and 2, materials from two (2) death penalty seminars I attended prior to Mr. Zjaiton Wood's jury trial.

2.    I am currently a staff appellate attorney in the Capital Post-Conviction Division of the Oklahoma Indigent Defense System (OIDS). Prior to becoming an appellate attorney in 2009, I was an OIDS capital trial attorney for approximately nine and one half (9 ½) years. It was during that time that I represented Mr. Zjaiton Wood.

3.    At that time, our capital defense teams consisted of at least two (2) and possibly three (3) attorneys and at least one (1) investigator. Mr. Zjaiton Wood's capital defense team consisted of three (3) attorneys; one (1) first stage investigator; and one (1) mitigation investigator.

4.    Normally, once assigned to a capital case, I would make arrangements to meet with the client in order to introduce myself and the rest of the defense team. At that time, I would attempt to begin establishing rapport with the client.

5.    I also made arrangements to meet with the client's family. Again, this was to introduce the family to the defense team, and begin to establish rapport with the client's family. In Mr. Zjaiton Wood's case, some of his family members were also potential first stage witnesses for the State.

6.    At that time, the defense team would regularly request and attempt to obtain the following records pertaining to the client: school records; medical records; mental health records; law enforcement records; child welfare records; prison records; jail

records; military records; court records; juvenile records; employment records; and social security records.

7. The defense team would also regularly request and attempt to obtain those same records pertaining to the client's family, if they existed.

8. A staff mental health professional would review relevant material and records; visit the client and administer psychological and intelligence screenings to the client; and later advise counsel as to his or her findings. Based upon those screenings and consultation with that staff mental health professional, additional mental health professionals would be retained, if necessary. Even if I was not an OIDS staff attorney at the time, I would have retained a mental health professional to assist me in determining whether there was a mental health issue in the case.

9. Interviews with the client's family members and anyone who lived in the same household as the client were attempted. Additional interviews were attempted with potential mitigation witnesses that are discovered from the initial interviews and gathered records. During these interviews we asked to obtain copies of: photographs of the client, client's art work, client's certificates of achievements, etc.

10. Interviews with potential mitigation witnesses that are identified from the gathered records are attempted.

11. Interviews are attempted with first stage witnesses.

12. Interviews are attempted with the prosecution's second stage witnesses.

13. Throughout the above process, the client was visited by someone on the defense team on a regular basis keeping the client informed of the status of his or her case and continuing to establish and maintain rapport with the client.

14. Throughout the process, plea negotiations are attempted.

15. In my opinion, two of the goals for a capital trial attorney is to attempt to present through first and second stages of trial that your client is a human being with all of the frailties of a human being and that society inside and outside of prison will be sufficiently protected with your client incarcerated for the rest of his life.

16. In Mr. Zjaiton Wood's case, since some of his family members and mitigation witnesses were also potential first stage government witnesses, I provided the witnesses' prior statements given to law enforcement to the witness for their review and preparation for trial testimony. I also prepared the mitigation witnesses for their

second stage testimony.

FURTHER AFFIANT SAYETH NOT.

Wayna Tyner

Subscribed and sworn to me this 20th day of June, 2011, by the person known to me to be Wayna Tyner.

Notary Public

My Commission number: 01011011
My Commission expires: 7-2-2013

# Exhibit 1 to
# Affidavit of Wayna Tyner

# CRIMINAL DEFENSE IN THE "DEATH BELT"

PRESENTED BY

## OKLAHOMA CRIMINAL DEFENSE LAWYERS ASSOCIATION

and

## OKLAHOMA CITY UNIVERSITY SCHOOL OF LAW

### March 18 and 19, 2004

Where:  Oklahoma City University School of Law

2501 N. Blackwelder, Oklahoma City, OK

CLE: 17 hours

### Thursday, March 18

| | |
|---|---|
| 7:30 – 8:00 | Registration/ Continental Breakfast |
| 8:00 – 8:30 | Welcome and Introductory Remarks: |

Lawrence Hellman, Dean, OCU School of Law

Douglas Parr, President, OCDLA

8:30 – 9:30   Keynote:
**GOVERNOR GEORGE RYAN**
*My Decision & Why*

9:30 – 10:20   GARY JAMES: *Voir Dire/ Theories of Jury Selection*

10:20 – 10:30  Break

10:30 – 11:20 JAMES ROWAN: *Closing Arguments in Homicide and Death Cases*

11:20 – 12:10 PAT EHLERS: *Ethics*

12:10 – 1:30  Lunch on your own

1:30 – 2:20    MONICA FOSTER:  *Ineffective Assistance of Counsel – Coping With the Allegation*

2:20 – 3:10   DAVID DOERFLER: *Reconciliation: Bridging the   Concentric Healing Journeys of Victims and Accused*

3:10- 3:20    Break

3:20 – 4:10   MARK HENRICKSEN:*Emerging Daubert Issues*

4:10 – 5:10    MARK FUHRMAN: *Reflections on Death Belt Justice*

### Reception and Book Signing Following Afternoon Sessions

Reception and book signing by
Mark Fuhrman
One N. Hudson
Sponsored by OCDLA, Ron Wallace and John Hunsucker

*Constitutionalized in Wiggins (US Sup Ct 2003)*

# Excerpts from the American Bar Association

# Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases

*Available at* http://www.hofstra.edu/pdf/law_aba_DPGuidelines.pdf *Copyright © 2003 American Bar Association.* All rights reserved. The materials herein may be reproduced, in whole or in part, provided that such use is for informational, non-commercial purposes only and any copy of the materials or portion thereof acknowledges original publication by the American Bar Association and includes the title of the publication, the name of the author, and the legend "Copyright 2003 American Bar Association. Reprinted by permission."

## GUIDELINE 1.1—OBJECTIVE AND SCOPE OF GUIDELINES

A. The objective of these Guidelines is to set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any jurisdiction.

B. These Guidelines apply from the moment the client is taken into custody and extend to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, postconviction review, clemency proceedings and any connected litigation.

### *History of Guideline*

The commentary to the original edition of this Guideline stated that it was designed to express existing practice norms and constitutional requirements." This thought has been moved to the black letter in order to emphasize that these Guidelines are not aspirational. Instead, they embody the current consensus about what is required to provide effective defense representation in capital cases.

The first edition of this Guideline stated that the objective in providing counsel in death penalty cases should be to ensure the provision of "quality legal representation." The language has been amended to call for "high quality legal representation" to emphasize that, because of the extraordinary complexity and demands of capital cases, a significantly greater degree of skill and experience on the part of defense counsel is required than in a noncapital case. The Guidelines formerly covered only "defendants eligible for appointment of counsel." Their scope has been revised for this edition to cover "all persons facing the possible imposition or execution of a death sentence." The purpose of the change is to make clear that the obligations of these Guidelines are applicable in all capital cases, including those in which counsel is retained or representation is provided on a pro bono basis. The definition of "counsel" reflects this change.

The use of the term "jurisdiction" as now defined has the effect of broadening the range of proceedings covered. In accordance with current ABA policy, the Guidelines now apply to military proceedings, whether by way of court martial, military commission or tribunal, or otherwise. In accordance with the same policy, the words "from the moment the client is taken into custody" have been added to make explicit that these Guidelines also apply to circumstances in which an uncharged prisoner who might face the death penalty is denied access to counsel seeking to act on his or her behalf (e.g., by the federal government invoking national security, or by state authorities exceeding constitutional limitations). This language replaces phraseology in the former Guidelines which made them applicable to "cases in which the death penalty is sought." The period between an arrest or detention and the prosecutor's declaration of intent to seek the death penalty is often critically important. In addition to enabling counsel to counsel his or her client and to obtain information regarding guilt that may later become unavailable, effective advocacy by defense counsel during this period may persuade the prosecution not to seek the death penalty. Thus, it is imperative that counsel

begin investigating mitigating evidence and assembling the defense team as early as possible—well before the prosecution has actually determined that the death penalty will be sought.

These Guidelines, therefore, apply in any circumstance in which a detainee of the government may face a possible death sentence, regardless of whether formal legal proceedings have been commenced or the prosecution has affirmatively indicated that the death penalty will be sought. The case remains subject to these Guidelines until the imposition of the death penalty is no longer a legal possibility. In addition, as more fully described in the commentary, these Guidelines also recognize that capital defense counsel may be required to pursue related litigation on the client's behalf.

***Commentary***

***Introduction***

In 1932, Mr. Justice Sutherland, writing for the United States Supreme Court in *Powell v. Alabama*, 1 a death penalty case, acknowledged that a person facing criminal charges "requires the guiding hand of counsel at every step in the proceedings against him." (footnote omitted).

More than seventy years later, death penalty cases have become so specialized that defense counsel have duties and functions definably different from those of counsel in ordinary criminal cases. The quality of counsel's "guiding hand" in modern capital cases is crucial to ensuring a reliable determination of guilt and the imposition of an appropriate sentence. Today, it is universally accepted that the responsibilities of defense counsel in a death penalty case are uniquely demanding, both in the knowledge that counsel must possess and in the skills he or she must master. At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles, scientific developments, and psychological concerns. Counsel must be able to develop and implement advocacy strategies applying existing rules in the pressure-filled environment of high-stakes, complex litigation, as well as anticipate changes in the law that might eventually result in the appellate reversal of an unfavorable judgment.
As one writer has explained:

> Every task ordinarily performed in the representation of a criminal defendant is more difficult and time-consuming when the defendant is facing execution. The responsibilities thrust upon defense counsel in a capital case carry with them psychological and emotional pressures unknown elsewhere in the law. In addition, defending a capital case is an intellectually rigorous enterprise, requiring command of the rules unique to capital litigation and constant vigilance in keeping abreast of new developments in a volatile and highly nuanced area of the law.

Douglas W. Vick, *Poorhouse Justice: Underfunded Indigent Defense Services and Arbitrary Death Sentences,* 43 Buff. L. Rev. 329, 357-58 (1995)(footnotes omitted).

# GUIDELINE 5.1—QUALIFICATIONS OF DEFENSE COUNSEL

A. The Responsible Agency should develop and publish qualification standards for defense counsel in capital cases. These standards should be construed and applied in such a way as to further the overriding goal of providing each client with high quality legal representation.

B. In formulating qualification standards, the Responsible Agency should insure:

    1.    That every attorney representing a capital defendant has:

        a.    obtained a license or permission to practice in the jurisdiction;

        b.    demonstrated a commitment to providing zealous advocacy and high quality legal representation in the defense of capital cases; and,

        c.    satisfied the training requirements set forth in Guideline 8.1.

    2.    That the pool of defense attorneys as a whole is such that each capital defendant within the jurisdiction receives high quality legal representation. Accordingly, the qualification standards should insure that the pool includes sufficient numbers of attorneys who have demonstrated:

        a.    substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing capital cases;

        b.    skill in the management and conduct of complex negotiations and litigation;

        c.    skill in legal research, analysis, and the drafting of litigation documents;

        d.    skill in oral advocacy;

        e.    skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence;

        f.    skill in the investigation, preparation, and presentation of evidence bearing upon mental status;

        g.    skill in the investigation, preparation, and presentation of mitigating evidence; and

        h.    skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements.

12

## GUIDELINE 10.5—RELATIONSHIP WITH THE CLIENT

A. Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client.

B. 1. Barring exceptional circumstances, an interview of the client should be conducted within 24 hours of initial counsel's entry into the case.

  2. Promptly upon entry into the case, initial counsel should communicate in an appropriate manner with both the client and the government regarding the protection of the client's rights against self-incrimination, to the effective assistance of counsel, and to preservation of the attorney-client privilege and similar safeguards.

  3. Counsel at all stages of the case should re-advise the client and the government regarding these matters as appropriate.

C. Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case, such as:

  1. the progress of and prospects for the factual investigation, and what assistance the client might provide to it;

  2. current or potential legal issues;

  3. the development of a defense theory;

  4. presentation of the defense case;

  5. potential agreed-upon dispositions of the case;

  6. litigation deadlines and the projected schedule of case-related events; and

  7. relevant aspects of the client's relationship with correctional, parole or other governmental agents (e.g., prison medical providers or state psychiatrists).

13

*Commentary*

*The Problem*

Immediate contact with the client is necessary not only to gain information needed to secure evidence and crucial witnesses, but also to try to prevent uncounseled confessions or admissions and to begin to establish a relationship of trust with the client.

Anyone who has just been arrested and charged with capital murder is likely to be in a state of extreme anxiety. Many capital defendants are, in addition, severely impaired in ways that make effective communication difficult: they may have mental illnesses or personality disorders that make them highly distrustful or impair their reasoning and perception of reality; they may be mentally retarded or have other cognitive impairments that affect their judgment and understanding; they may be depressed and even suicidal; or they may be in complete denial in the face of overwhelming evidence. In fact, the prevalence of mental illness and impaired reasoning is so high in the capital defendant population that "[i]t must be assumed that the client is emotionally and intellectually impaired."178 There will also often be significant cultural and/or language barriers between the client and his lawyers. In many cases, a mitigation specialist, social worker or other mental health expert can help identify and overcome these barriers, and assist counsel in establishing a rapport with the client.

**Counsel's Duty**

Although, as described *supra* in the text accompanying notes 103-07, ongoing communication by non-attorney members of the defense team is important, it does not discharge the obligation of counsel at every stage of the case to keep the client informed of developments and progress in the case, and to consult with the client on strategic and tactical matters. Some decisions require the client's knowledge and agreement;179 others, which may be made by counsel, should nonetheless be fully discussed with the client beforehand.

Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense, and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea.180 Client contact must be ongoing, and include sufficient time spent at the prison to develop a rapport between attorney and client. An occasional hurried interview with the client will not reveal to counsel all the facts needed to prepare for trial, appeal, post-conviction review, or clemency. Even if counsel manages to ask the right questions, a client will not—with good reason—trust a lawyer who visits only a few times before trial, does not send or reply to correspondence in a timely manner, or refuses to take telephone calls. It is also essential to develop a relationship of trust with the client's family or others on whom the client relies for support and advice.

14

Often, so-called "difficult" clients are the consequence of bad lawyering—either in the past or present.181 Simply treating the client with respect, listening and responding to his concerns, and keeping him informed about the case will often go a long way towards eliciting confidence and cooperation.182

Overcoming barriers to communication and establishing a rapport with the client are critical to effective representation. Even apart from the need to obtain vital information,183 the lawyer must understand the client and his life history.184 To communicate effectively on the client's behalf in negotiating a plea, addressing a jury, arguing to a postconviction court, or urging clemency, counsel must be able to humanize the defendant. That cannot be done unless the lawyer knows the inmate well enough to be able to convey a sense of truly caring what happens to him.185

178. Rick Kammen & Lee Norton, *Plea Agreements: Working with Capital Defendants*, THE ADVOCATE, Mar. 2000, at 31, *available at* http://www.dpa.state.ky.us/library/advocate/mar00/plea.html; *see also* Lewis, *supra* note 93, at 840 (finding forty percent of death row inmates to be chronically psychotic); Dorothy Otnow Lewis et al., *Neuropsychiatric, Psychoeducational, and Family Characteristics of 14 Juveniles Condemned to Death in the United States*, 145 AM. J. PSYCHIATRY 584, 586-87 (1988) (finding fifty percent of death sentenced juveniles in survey suffered from psychosis and almost all were severely abused as children).

179. *See, e.g.*, Nixon v. Singletary, 758 So. 2d 618, 624-25 (Fla. 2000) (ineffective assistance for counsel to fail to obtain client's explicit prior consent to strategy of conceding guilt to jury in opening statement in effort to preserve credibility for sentencing); People v. Hattery, 488 N.E.2d 513, 519 (Ill. 1985) (same).

180. *See* ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-5.2 & cmt., *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993); *see also* Kevin M. Doyle, *Heart of the Deal: Ten Suggestions for Plea Bargaining*, THE CHAMPION, Nov. 1999, at 68 (counsel should not expect client to accept plea bargain unless opinion is founded on experience and leg work investigating the case); White, *supra* note 3, at 371, 374 (thorough investigation and relationship of trust key to persuading client to accept appropriate plea offer).

181. *See* White, *supra* note 3, at 338 ("Often, capital defendants have had bad prior experiences with appointed attorneys, leading them to view such attorneys as 'part of the system' rather than advocates who will represent their interests. Appointed capital defense attorneys sometimes exacerbate this perception by harshly criticizing their clients's [sic] conduct or making it clear that they are reluctant to represent them. A capital defendant who experiences, or previously has experienced, these kinds of judgments understandably will be reluctant to trust his attorney.") (footnotes omitted); *infra* note 313.

15

182. A lawyer can also frequently earn a client's trust by assisting him with problems he encounters in prison, or otherwise demonstrating concern for his well being and a willingness to advocate for him. *See id.*; Lee Norton, *Mitigation Investigation, in* FLORIDA PUBLIC DEFENDER ASS'N, DEFENDING A CAPITAL CASE IN FLORIDA 25 (2001). Accordingly, such advocacy is an appropriate part of the role of defense counsel in a capital case. Indeed, a lawyer who displays a greater concern with habeas corpus doctrine than with recovering the radio that prison authorities have confiscated from the client is unlikely to develop the sort of relationship that will lead to a satisfactory legal outcome.

183. One important example is the fact that the client is mentally retarded—a fact that the client may conceal with great skill, *see, e.g.*, James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 GEO. WASH. L. REV. 414, 430-31 (1985), but one which counsel absolutely must know. *See Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (holding that mentally retarded defendants may not constitutionally be executed). The issue of mental illness presents a very similar set of challenges.

184. *See* Goodpaster, *supra* note 3, at 321.

185. *See* Norton, *supra* note 182, at 5; White, *supra* note 3, at 375 (jury will be less likely to empathize with defendant if it does "not perceive a bond between the defendant and his attorney").

### Counsel's Duties Respecting Uncooperative Clients

Some clients will initially insist that they want to be executed—as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. It is ineffective assistance for counsel to simply acquiesce to such wishes, which usually reflect the distorting effects of overwhelming feelings of guilt and despair rather than a rational decision in favor of a state-assisted suicide. Counsel should initially try to identify the source of the client's hopelessness. Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates. Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time. One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison. A client who insists on his innocence should be reminded that a waiver of mitigation will not persuade an appellate court of his innocence, and securing a life sentence may bar the state from seeking death in the event of a new trial.

Counsel in any event should be familiar enough with the client's mental condition to make a reasoned decision—fully documented, for the benefit of actors at later stages of the case—whether to assert the position that the client is not competent to waive further proceedings.

***The Temporal Scope of Counsel's Duties***

The obligations imposed on counsel by this Guideline apply to all stages of the case. Thus, post-conviction counsel, from direct appeal through clemency, must not only consult with the client but also monitor the client's personal condition for potential legal consequences. For example, actions by prison authorities (e.g., solitary confinement, administration of psychotropic medications) may impede the ability to present the client as a witness at a hearing, and changes in the client's mental state (e.g., as a result of the breakup of a close relationship or a worsening physical condition) may bear upon his capacity to assist counsel and, ultimately, to be executed. In any event, as already discussed, maintaining an ongoing relationship with the client minimizes the possibility that he will engage in counter-productive behavior (e.g., attempt to drop appeals, act out before a judge, confess to the media). Thus, the failure to maintain such a relationship is professionally irresponsible. *See* AMA Model Rules of Professional Conduct, Rule 1.4(a)(2002)("A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.")

## GUIDELINE 10.7—INVESTIGATION

A. Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

    1.     The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.

    2.     The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

B.   1.     Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel.

    2.     Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate.

## *Penalty*

Counsel's duty to investigate and present mitigating evidence is now well established.[205] The duty to investigate exists regardless of the expressed desires of a client.[206] Nor may counsel "sit idly by, thinking that investigation would be futile."[207] Counsel cannot responsibly advise a client about the

merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.208

205. *See, e.g.*, Wiggins v. Smith, 123 S. Ct. 2526 (2003) (counsel failed to uncover evidence that client never had a stable home and was repeatedly subjected to gross physical, sexual, and psychological abuse); Williams v. Taylor, 529 U.S. 362, 395-96 (2000) (counsel ineffective for failing to uncover and present evidence of defendant's "nightmarish childhood," borderline mental retardation, and good conduct in prison); Caro v. Woodford, 280 F.3d 1247, 1255 (9th Cir. 2002) (counsel ineffective for failing to investigate and present evidence of client's brain damage due to prolonged pesticide exposure and repeated head injuries, and failing to present expert testimony explaining "the effects of the severe physical, emotional, and psychological abuse to which Caro was subjected as a child"), *cert. denied*, 536 U.S. 951 (2002); Coleman v. Mitchell, 268 F.3d 417, 449-51 (6th Cir. 2001) (though counsel's duty to investigate mitigating evidence is well established, counsel failed to investigate and present evidence that defendant had been abandoned as an infant in a garbage can by his mentally ill mother, was raised in a brothel run by his grandmother where he was exposed to group sex, bestiality and pedophilia, and suffered from probable brain damage and borderline personality disorder), *cert. denied*, 535 U.S. 1031 (2002); Jermyn v. Horn, 266 F.3d 257, 307-08 (3d Cir. 2001) (counsel ineffective for failing to investigate and present evidence of defendant's abusive childhood and "psychiatric testimony explaining how Jermyn's development was thwarted by the torture and psychological abuse he suffered as a child"); *supra* note 197.

206. *See* Hardwick v. Crosby, 320 F.3d 1127, 1190 n.215 (11th Cir. 2003) ("Even if Hardwick did ask [counsel] not to present witnesses at the sentencing proceeding, . . . [counsel] had a duty to Hardwick at the sentencing phase to present available mitigating witnesses as Hardwick's defense against the death penalty."); Blanco v. Singletary, 943 F.2d 1477, 1501-03 (11th Cir. 1991) (counsel ineffective for "latch[ing] onto" client's assertions he did not want to call penalty phase witnesses and failing to conduct an investigation sufficient to allow their client to make an informed decision to waive mitigation); *see also* Karis v. Calderon, 283 F.3d 1117, 1136-41 (9th Cir. 2002), *cert. denied*, 126 S. Ct. 2637 (2003).

207. Voyles v. Watkins, 489 F. Supp. 901, 910 (N.D. Miss. 1980); *accord* Austin v. Bell, 126 F.3d 843, 849 (6th Cir. 1997) (counsel's failure to investigate and present mitigating evidence at the penalty phase of the trial "because he did not think that it would do any good" constituted ineffective assistance).

208. *See, e.g.*, Wiggins, 123 S. Ct. at 2526 (2003) (counsel's ineffectiveness lay not in failure to present evidence of client's family background, but rather in failure to conduct an investigation sufficient to support a professionally reasonable decision whether to do so); Douglas v. Woodford, 316 F.3d 1079, 1089 (9th Cir. 2003) ("It is, of course, difficult for an

attorney to advise a client of the prospects of success or the potential consequences of failing to present mitigating evidence when the attorney does not know that such evidence exists."); Silva v. Woodford, 279 F.3d 825, 838-39 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 342 (2002); *Coleman*, 268 F.3d at 447; Battenfield v. Gibson, 236 F.3d 1215, 1229 (10th Cir. 2001) ("In addition to hampering [defense counsel's] ability to make strategic decisions, [defense counsel's] failure to investigate [defendant's background] clearly affected his ability to competently advise [defendant] regarding the meaning of mitigation evidence and the availability of possible mitigation strategies."); United States v.Gray, 878 F.2d 702, 711 (3d Cir. 1989) ("[C]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."); Knighton v. Maggio, 740 F.2d 1344, 1350 (5th Cir. 1984) (petitioner entitled to relief if record shows that counsel "could not make a valid strategic choice because he had made no investigation").

## GUIDELINE 10.9.1—THE DUTY TO SEEK AN AGREED-UPON DISPOSITION

A. Counsel at every stage of the case have an obligation to take all steps that may be appropriate in the exercise of professional judgment in accordance with these Guidelines to achieve an agreed-upon disposition.

B. Counsel at every stage of the case should explore with the client the possibility and desirability of reaching an agreed-upon disposition. In so doing, counsel should fully explain the rights that would be waived, the possible collateral consequences, and the legal, factual, and contextual considerations that bear upon the decision. Specifically, counsel should know and fully explain to the client:

1. the maximum penalty that may be imposed for the charged offense(s) and any possible lesser included or alternative offenses;

2. any collateral consequences of potential penalties less than death, such as forfeiture of assets, deportation, civil liabilities, and the use of the disposition adversely to the client in penalty phase proceedings of other prosecutions of him as well as any direct consequences of potential penalties less than death, such as the possibility and likelihood of parole, place of confinement and good-time credits;

3. the general range of sentences for similar offenses committed by defendants with similar backgrounds, and the impact of any applicable sentencing guidelines or mandatory sentencing requirements;

4. the governing legal regime, including but not limited to whatever choices the client may have as to the fact finder and/or sentencer;

5. the types of pleas that may be agreed to, such as a plea of guilty, a conditional plea of guilty, or a plea of nolo contendere or other plea which does not require the client to personally acknowledge guilt, along with the advantages and disadvantages of each;

6. whether any agreement negotiated can be made binding on the court, on penal/parole authorities, and any others who may be involved;

7. the practices, policies and concerns of the particular jurisdiction, the judge and prosecuting authority, the family of the victim and any other persons or entities which may affect the content and likely results of plea negotiations;

8. concessions that the client might offer, such as:

   a. an agreement to waive trial and to plead guilty to particular charges;

   b. an agreement to permit a judge to perform functions relative to guilt or sentence that would otherwise be performed by a jury or vice versa;

   c. an agreement regarding future custodial status, such as one to be confined in a more onerous category of institution than would otherwise be the case;

   d. an agreement to forego in whole or part legal remedies such as appeals, motions for postconviction relief, and/or parole or clemency applications;

   e. an agreement to provide the prosecution with assistance in investigating or prosecuting the present case or other alleged criminal activity;

   f. an agreement to engage in or refrain from any particular conduct, as appropriate to the case;

   g. an agreement with the victim's family, which may include matters such as: a meeting between the victim's family and the client, a promise not to publicize or profit from the offense, the issuance or delivery of a public statement of remorse by the client, or restitution;

   h. agreements such as those described in Subsections 8(a)-(g) respecting actual or potential charges in another jurisdiction;

9. benefits the client might obtain from a negotiated settlement, including:

   a. a guarantee that the death penalty will not be imposed;

20

b.    an agreement that the defendant will receive a specified sentence;

c.    an agreement that the prosecutor will not advocate a certain sentence, will not present certain information to the court, or will engage in or refrain from engaging in other actions with regard to sentencing;

d.    an agreement that one or more of multiple charges will be reduced or dismissed;

e.    an agreement that the client will not be subject to further investigation or prosecution for uncharged alleged or suspected criminal conduct;

f.    an agreement that the client may enter a conditional plea to preserve the right to further contest certain legal issues;

g.    an agreement that the court or prosecutor will make specific recommendations to correctional or parole authorities regarding the terms of the client's confinement;

h.    agreements such as those described in Subsections 9(a)-(g) respecting actual or potential charges in another jurisdiction.

C. Counsel should keep the client fully informed of any negotiations for a disposition, convey to the client any offers made by the prosecution, and discuss with the client possible negotiation strategies.
D. Counsel should inform the client of any tentative negotiated agreement reached with the prosecution, and explain to the client the full content of the agreement along with the advantages, disadvantages and potential consequences of the agreement.

E. If a negotiated disposition would be in the best interest of the client, initial refusals by the prosecutor to negotiate should not prevent counsel from making further efforts to negotiate. Similarly, a client's initial opposition should not prevent counsel from engaging in an ongoing effort to persuade the client to accept an offer of resolution that is in the client's best interest.

F. Counsel should not accept any agreed-upon disposition without the client's express authorization.

G. The existence of ongoing negotiations with the prosecution does not in any way diminish the obligations of defense counsel respecting litigation.

### History of Guideline

Guideline 10.9.1 is based on aspects of Guidelines 11.6.1, 11.6.2, and 11.6.3 of the original edition. New language has been added to clarify the importance of pursuing an agreed-upon disposition at

every phase of the case, not just as a substitute for proceeding to trial initially. The current version of the Guideline also requires that counsel enter into a continuing dialogue with the client about the content of any such agreement, including advantages, disadvantages, and potential consequences.

This Guideline omits the requirement, which appeared in Guideline 11.6.1 of the original edition, of client consent to initiate plea discussions, in recognition of the possible unintended consequence of premature rejection of plea options by a suicidal or depressed client. However, Guideline 10.9.2(A) does require counsel to obtain the client's consent before accepting any agreed-upon disposition.

*Commentary*

Guidelines 10.9.1–2 both deal with the subject of agreed-upon dispositions. They and their associated commentaries should be read together.

"Death is different because avoiding execution is, in many capital cases, the best and only realistic result possible"; as a result, plea bargains in capital cases are not usually "offered" but instead must be "pursued and won."242 Agreements are often only possible after many years of effort. Accordingly, this Guideline emphasizes that the obligation of counsel to seek an agreed-upon disposition continues throughout all phases of the case. As in other sorts of protracted litigation, circumstances change over time (e.g., through replacement of a prosecutor, death of a prosecution witness, alteration in viewpoint of a key family member of the client or the victim, favorable developments in the law or the litigation, reconsideration by the client) and as they do new possibilities arise.243 Whenever they do, counsel must pursue them.

In many jurisdictions, the prosecution will consider waiving the death penalty after the defense makes a proffer of the mitigating evidence that would be presented at the penalty phase and explains why death would be legally and/or factually inappropriate. In some states and the federal government, this process is formalized and occurs before a decision is made whether to seek the death penalty.244 In other jurisdictions, the process is not formalized and may occur after the prosecution has announced its intention to seek the death penalty. In either event, the mitigation investigation is crucial to persuading the prosecution not to seek death.245

Although, for the reasons explained in the History to this Guideline, counsel does not need to have obtained client consent before entering into plea discussions, counsel does need to have thoroughly examined the quality of the prosecution's case and investigated possible first-phase defenses and mitigation, as discussed in the commentary to Guideline 10.7. Counsel must also consider the collateral consequences of entering a plea. For example, when the resulting adjudication of guilt could be used as an aggravating circumstance in another pending case, counsel should endeavor to structure an agreement that would resolve both cases without imposition of the death penalty.

In some cases, where there is a viable first-phase defense, it may be possible to negotiate a plea to a lesser charge. And if it is trial counsel's perception that the death penalty is being sought primarily

22

to allow selection of a death-qualified (and therefore conviction-prone) jury, counsel should seek to remedy the situation through litigation in accordance with Guideline 10.8 as well as through negotiation. In many capital cases, however, the prosecution's evidence of guilt is strong, and there is little or no chance of charge bargaining. In these cases, a guilty plea in exchange for life imprisonment is the best available outcome.

These considerations mean that in the area of plea negotiations, as in so many others, death penalty cases are *sui generis*. Many bases for bargaining in non-capital cases are irrelevant or have little practical significance in a capital case,246 and some uniquely restrictive legal principles apply.247 Emotional and political pressures, including ones from the victim's family or the media, are especially likely to limit the government's willingness to bargain. On the other hand, the complexity, expense, legal risks, and length of the capital trial and appellate process may make an agreement particularly desirable for the prosecution.248

A very difficult but important part of capital plea negotiation is often contact with the family of the victim.249 In some states, the prosecution is required to notify and confer with the victim's family prior to entering a plea agreement.250 Any approaches to the victim's family should be undertaken carefully and with sensitivity. Counsel should be creative in proposing resolutions that may satisfy the needs of the victim's family, including providing more immediate closure by expressly foregoing appeals or arranging an apology or meeting between the victim's family and the client if the client is willing and able to do so. [T]he defense team should consider seeking the assistance of clergy, a defense-victim liaison, or an organization of murder victims' families in the outreach effort and in crafting possible resolutions. In any event, because the victim's family can be critical to achieving a settlement,251 defense counsel should make the decision regarding contact on a fully informed and professional basis, rather than because of nervousness over entering a situation that might be emotionally stressful or in reliance on an unsupported guess as to what the response to an approach might be.

Except in unusual circumstances, all agreements that are made should be formally documented between the parties concerned (e.g., in a writing between the client and representatives of the victim). In any event, counsel has an obligation under Guideline 10.13 to maintain in his or her own files a complete written description of any agreement.

Agreements for action or nonaction by government actors in exchange for a plea of guilty are governed by Guideline 10.9.2(B)(2) and, for the client's future benefit, should be set forth as clearly as possible on the record.252

In addition to persuading the prosecution to negotiate a resolution to the case, counsel must often persuade the client as well. As discussed in the commentary to Guidelines 10.5 and 10.9.2, a relationship of trust with the client is essential to accomplishing this. The entire defense team must work from the outset of the case with the client and others close to him to lay the groundwork for acceptance of a reasonable resolution.

23

If the possibility of a negotiated disposition is rejected by either the prosecution or the client when a settlement appears to counsel to be in the client's best interest, counsel should continue efforts at persuasion while also continuing to litigate the case vigorously (Subsection G).

242. Kevin McNally, *Death Is Different: Your Approach to a Capital Case Must be Different, Too*, THE CHAMPION, Mar. 1984, at 8, 15; *see also* Doyle, *supra* note 180.

243. Examples of agreed-upon dispositions after extended litigation include the cases of Calvin Burdine, *see* Henry Weinstein, *Inmate in Texas Sleeping-Lawyer Case Pleads Guilty*, L.A. Times, June 20, 2003, at 14 (client agrees to three life sentences), Michael Wayne Williams, *see* Jamie C. Ruff, *Williams Pleads Guilty to Murders*, RICHMOND TIMES-DISPATCH, Mar. 25, 2003, at B1 (client waives parole eligibility and agrees to life term), Lloyd Schlup, *see* Tim O'Neil, *Killer Who Escaped Execution Over New "Evidence" Pleads Guilty*, ST. LOUIS POST-DISPATCH, Mar. 25, 1999, at A15 (client pleads guilty to second-degree murder after new evidence appeared), and Paris Carriger, *see* Samuel R. Gross, *Lost Lives: Miscarriages of Justice in Capital Cases*, 61 LAW & CONTEMP. PROBS. 125, 139-40 (1998) (following affirmance of federal habeas corpus relief by *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) (en banc), client pleaded guilty to lesser offense and was released). Numerous other instances are reported in LIEBMAN ET AL., *supra* note 46, Apps. C, D.; *see also* James Kimberly, *Inmate Swaps Death Sentence for 20 Years*, HOUS. CHRON., Aug. 12, 2003, at 1 (Paul Colella pleads to twenty-year term "just days before a federal judge was to hear evidence on . . . allegations of prosecutorial misconduct and ineffective assistance"); Lynn Thompson, *Life Without Parole in Massacre: Mak Sentenced Again for 13 Wah Mee Deaths in 1983*, Seattle Times, May 21, 2002, at B1 (client sentenced to 13 life terms after prosecution decides not to appeal judge's order that death penalty is unavailable).

244. *See* UNITED STATES ATTORNEYS' MANUAL, *supra* note 162, § 9-10.030. New York law gives the District Attorney a 120-day "deliberative period" to decide whether to file a notice of intent to seek the death penalty. *See* N.Y. CRIM. PROC. LAW § 250.40(2) (McKinney 2002); Francois v. Dolan, 731 N.E.2d 614, 616 (N.Y. 2000). During that time, with the assistance of the Capital Defender's Office, counsel is appointed and may attempt to persuade the prosecutor not to file a notice. *See* N.Y. JUD. LAW § 35-b (McKinney 2002). The notice may also be withdrawn at any time. *See* N.Y. CRIM. PROC. LAW § 250.40(4) (McKinney 2002). Between 1995 and mid-2003, District Attorneys in New York formally investigated seeking the death penalty against 780 defendants, but only filed notice that they were seeking the death penalty against forty-eight of these. *See* New York Capital Defender Office home page, *at* http://www.nycdo.org/caseload/answers.html (last visited June 14, 2003).

245. *See supra* text accompanying note 162; Doyle, *supra* note 180; White, *supra* note 3, at 328-29.

246. A number of concessions that the parties might exchange in the capital context appear in Subsection B.

247. *See* United States v. Jackson, 390 U.S. 570, 583 (1968) (invalidating provision of federal statute carrying capital punishment on basis that it coerced waivers of jury trial rights); Hynes v. Tomei, 706 N.E.2d 1201, 1207 (N.Y. 1998) (applying *Jackson* to invalidate portion of New York death penalty statute); Comm. On Capital Punishment, Ass'n of the Bar of the City of N.Y., *The Pataki Administration's Proposals to Expand the Death Penalty*, 55 REC. ASS'N OF THE BAR OF CITY OF N.Y. 129, 141-44 (2000) (describing mechanisms by which pleas in capital cases were being reached in light of *Hynes*).

248. Plea offers are extended prior to trial in a significant proportion of cases and also commonly occur after protracted litigation, *see supra* note 243.

249. *See* Russell Stetler, *Working with the Victim's Survivors in Death Penalty Cases*, THE CHAMPION, June 1999, at 42; *see also* Gail Gibson & Laura Willis, *Tears and Remorse Precede Life Term in Dawson Deaths*, BALTIMORE SUN, Aug. 28, 2003, at 1 as part of arrangement for life sentence, Darrell L. Brooks makes emotional apology in open court to families of seven victims of his arson).

250. *See, e.g.*, ALA. CODE § 15-23-71 (1995).

251. Text of footnote omitted.

252. *See* Ricketts v. Adamson, 483 U.S. 1, 7, 10-12 (1987) (where defendant was deemed to have breached terms of plea agreement by refusing to testify against co-defendant at a retrial, double jeopardy did not preclude state from vacating defendant's plea of guilty to second degree murder, trying him for capital murder and sentencing him to death).

# Discovering and Responding to Mental Health Issues: Mitigation Concepts from the U.S. Department of Justice

## March 19, 2004

## Oklahoma Criminal Defense Lawyers Association
## and
## Oklahoma City University School of Law

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

417 Oak Bend, Suite 260
Lewisville, Texas 75067
972 459 0658     Fax: 972 459 0958
mdc@markdcunningham.com

Mitigation Concepts, 3-19-04

## Positive Character Evidence

- Constructive relationships
  - Community
  - Family
  - Children

- Benevolent and/or heroic acts

- Positive prisoner evidence
  - ("Skipper evidence")

What is mitigation?

What is moral culpability?

## What are the Issues?

| Criminal Responsibility | Moral Culpability |
|---|---|
| **Guilt phase** | **Sentencing phase** |
| Could he control himself? | What diminished his control? |
| Did he have a choice? | What shaped the choice? |
| Did he know right from wrong? | What shaped his morality and value system? |
| What did he do? | How did we get here? |
| | How was he damaged? |

Cunningham, M.D. & Reidy, T.J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.



Mark D. Cunningham, Ph.D., ABPP

1

Mitigation Concepts, 3-19-04





**Diagnosis**
*The Label*

vs.

**Damaged Development**
*The Story*

Illustrating normal
development



Healthy Development:
Early Childhood

Secure, stable relationship with parents.
Neurologically and developmentally
healthy.

Mitigation Concepts, 3-19-04



### Healthy Development:
#### Middle Childhood

Continued security and stability across childhood.

Supportive parental involvement in expanding competencies.

Peer participation, friendships, teamwork



### Healthy Development:
#### Adolescence

Positive same sex role models.
Gradual reduction in structure tied to responsible independence.
Constructive relationships with healthy peers.



### Healthy Development:
#### Late Adolescence - Early Adulthood

Intact capabilities and available opportunities.
Adult mentoring, assistance, guidance.



### Life Bridge

#### Resilience – Load Tolerance

1. Quality of the concrete and rebar reinforcement
2. Strength and number of supports
3. Weight on the span

Mitigation Concepts, 3-19-04

1. Secure, stable relationship with parents.

2. Neurologically and developmentally healthy.

3. Genetically resilient.

4. Free from serious childhood trauma.

What about choice?





Mitigation Concepts, 3-19-04





How adverse development impacts on how values and choices are viewed



Mitigation Concepts, 3-19-04

 

 

Mitigation Concepts, 3-19-04





Isn't this just so much abuse excuse?

---

*Risk and protective factors for serious, violent, and chronic juvenile offenders in the community*

## U.S. Department of Justice Model

➢ Prevention approaches seek to interrupt the **processes that cause** problem behavior.

➢ Research over the past 30 years has identified **risk factors** for delinquency and violence, as well as **protective factors** that buffer an individual against risk factors and inhibit the development of behavior problems.

➢ Strongest prevention:

    ↓ risk factors

    ↑ protective factors

U.S. Department of Justice (June 1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders. Juvenile Justice Bulletin: OJJDP Update on Programs. NCJ 153571. Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

---

Mark D. Cunningham, Ph.D., ABPP

Mitigation Concepts, 3-19-04

---

*U.S. Department of Justice Model*

**Risk Factors for Violence and Delinquency In the Community**

**Conception to age 6:**

✓ Perinatal difficulties

• Minor physical abnormalities

✓ Brain damage

✓ Family history of criminal behavior and substance abuse

✓ Family management problems

✓ Family conflict

✓ Parental attitudes favorable toward, and parental involvement in, crime and substance abuse

---

*U.S. Department of Justice Model*

**Risk Factors for Violence and Delinquency In the Community**

**Age 6 through adolescence:**

• Extreme economic deprivation
• Community disorganization and low neighborhood attachment
• Transitions and mobility
• Availability of firearms
• Media portrayals of violence
• Family management problems
• Family conflict
• Parental attitudes favorable toward, and parental involvement in, crime and substance abuse
• Early and persistent antisocial behavior
• Academic failure
• Lack of commitment to school
• Alienation and rebelliousness
• Association with peers who engage in delinquency and violence
• Favorable attitudes towards delinquent and violent behaviors
• Constitutional factors (e.g. low intelligence, hyperactivity, attention-deficit disorders)

---

*U.S. Department of Justice Model*

**Protective Factors that Inhibit Violence and Delinquency in the Community**

➢ **Individual characteristics:**

Female gender
Intelligence
Positive social orientation
Resilient temperament

➢ **Social bonding to positive role models:**

Family members
Teachers
Coaches
Youth leaders
Friends

➢ **Healthy beliefs and clear standards for behavior, including those that promote nonviolence and abstinence from drugs.**

➢ **Effective early interventions**

---



---

Mark D. Cunningham, Ph.D., ABPP

8

Mitigation Concepts, 3-19-04







U.S. Department of Justice Model

**Protective Factors that Inhibit Violence and Delinquency in the Community**

➢ **Individual characteristics:**
    Female gender
    Intelligence
    Positive social orientation
    Resilient temperament

➢ **Social bonding to positive role models:**
    Family members
    Teachers
    Coaches
    Youth leaders
    Friends

➢ **Healthy beliefs and clear standards for behavior, including those that promote nonviolence and abstinence from drugs.**

➢ **Effective early interventions**

Mark D. Cunningham, Ph.D., ABPP

9

Mitigation Concepts, 3-19-04

*U.S. Department of Justice Model*

**Protective Factors that Inhibit Violence and Delinquency in the Community**

➢ **Individual characteristics:**
  Female gender
  Intelligence
  Positive social orientation
  Resilient temperament

➢ **Social bonding to positive role models:**
  Family members
  Teachers
  Coaches
  Youth leaders
  Friends

➢ **Healthy beliefs and clear standards for behavior, including those that promote nonviolence and abstinence from drugs.**

➢ **Effective early interventions**

*U.S. Department of Justice Model*

**Protective Factors that Inhibit Violence and Delinquency in the Community**

➢ **Individual characteristics:**
  Female gender
  Intelligence
  Positive social orientation
  Resilient temperament

➢ **Social bonding to positive role models:**
  Family members
  Teachers
  Coaches
  Youth leaders
  Friends

➢ **Healthy beliefs and clear standards for behavior, including those that promote nonviolence and abstinence from drugs.**

➢ **Effective early interventions**

*U.S. Department of Justice (April 2000)*

**Predictors of Youth Violence in the Community**

**Cumulative impact:**

◆ The larger the number of risk factors the youth was exposed to, the greater the probability of violent behavior in the community.

U.S. Department of Justice

Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000). Predictors of youth violence. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

*U.S. Department of Justice (April 2000)*

**Individual factors**
- Hyperactivity, concentration problems, restlessness, and risk taking (x 2 - 5)
- Aggressiveness (x .5 - 6)
- Early initiation of violent behavior (x 6)
- Involvement in other forms of antisocial behavior
- Beliefs and attitudes favorable to deviant or antisocial behavior.

**Family factors**
- Parental criminality (x 0 - 3.8)
- Child maltreatment
- Poor family management practices (x 2)
- Low levels of parental involvement
- Poor family bonding and family conflict
- Residential mobility (+)
- Parental attitudes favorable to substance abuse and violence (x 2)
- Parent-child separation

Hawkins et. al. (2000)

Mark D. Cunningham, Ph.D., ABPP

10

Mitigation Concepts, 3-19-04

---

*U.S. Department of Justice (April 2000)*

**Individual factors**
- ✓ Hyperactivity, concentration problems, restlessness, and risk taking (x 2 - 5)
- ✓ Aggressiveness (x .5 - 6)
- ✓ Early initiation of violent behavior (x 6)
- ✓ Involvement in other forms of antisocial behavior
- • Beliefs and attitudes favorable to deviant or antisocial behavior.

**Family factors**
- • Parental criminality (x 0 - 3.8)
- ✓ Child maltreatment
- ✓ Poor family management practices (x 2)
- ✓ Low levels of parental involvement
- ✓ Poor family bonding and family conflict
- ✓ Residential mobility (±)
- ✓ Parental attitudes favorable to substance abuse and violence (x 2)
- ✓ Parent-child separation

Hawkins et. al. (2000)

---

*U.S. Department of Justice (April 2000)*

**School factors**
- • Academic failure
- • Low bonding to school
- • Truancy and dropping out of school
- • Frequent school transitions
- • High delinquency rate schools

**Peer-related factors**
- • Delinquent siblings
- • Delinquent peers
- • Gang membership (x 3-4)

**Community and neighborhood factors**
- • Poverty (x 2)
- • Community disorganization (crime, drug-selling, gangs, poor housing)
- • Availability of drugs and firearms
- • Neighborhood adults involved in crime
- • Exposure to violence and racial prejudice

**Situational factors**

Hawkins et. al. (2000)

---

*U.S. Department of Justice*
Childhood Risk Factors for Child Delinquency and Later Violent Juvenile Offending

**Individual factors**
- • Early antisocial behavior
- • Emotional factors such as high behavioral activation and low behavioral inhibition
- • Poor cognitive development
- • Low intelligence
- • Hyperactivity

**Family factors**
- • Parenting
- • Maltreatment
- • Family violence
- • Divorce
- • Parental psychopathology
- • Familial antisocial behaviors
- • Teenage parenthood
- • Family structure
- • Large family size

Wasserman, G.A., Keenan, K., Tremblay, R.E., Coie, J.D., Herrenkohl, T.I., Loeber, R., & Petechuk, D. (April, 2003). Risk and protective factors of child delinquency. Child Delinquency Bulletin Series. U.S. Department of Justice, NCJ 193409.

---

**Peer factors**
- • Association with deviant peers
- • Peer rejection

**School and community factors**
- • Failure to bond to school
- • Poor academic performance
- • Low academic aspirations
- • Living in a poor family
- • Neighborhood disadvantage
- • Disorganized neighborhood
- • Concentration of delinquent peer groups
- • Access to weapons

Wasserman, et al. (2003). U.S. Department of Justice.

---

Mark D. Cunningham, Ph.D., ABPP

11

Mitigation Concepts, 3-19-04



How the age affects the rate of violence in the community:

Swanson, J. W., Holzer, C. E. III, Granju, V.K., & Jono, R. T. (1990). Violence and psychiatric disorder in the community: Evidence from the epidemiologic catchment area surveys. Hospital and Community Psychiatry, 41, 761-770.

## Youthfulness = Immaturity

◆ Brain development continues to age 25, particularly in the frontal lobes.

| | |
|---|---|
| judgment | empathy |
| impulse control | responsibility |
| delay of gratification | |
| appreciation of consequences | |

◆ Characteristics of adolescence confirmed by research*:

...adolescents tend to be less mature, more impulsive, and less capable of controlling their conduct and thinking in terms of long-range consequences. Adolescence is a stage of human development in which one's character and moral judgment are incomplete and still undergoing formation.

◆ Factors that delay maturity:

| | |
|---|---|
| Low IQ | Psychological disorder |
| Developmental trauma | Substance abuse |
| Peer isolation and rejection | |
| Corruptive community or family | |

*Brief of the American Society for Adolescent Psychiatry and the American Orthopsychiatric Association filed as an *amici curiae* in *Thompson v Oklahoma* (1986) in the U.S. Supreme Court.





Mitigation Concepts, 3-19-04









Mitigation Concepts, 3-19-04

*Neuropsych eval → All Capital*
*Cases*
*→ Bd Certified in Neuropsych*



Damaged Wiring

Parental Poisoning

Community Poisoning

Toxic Behavior

## Wiring

- Prenatal alcohol exposure
- Prenatal/birth complications
- Malnutrition
- Toxic exposures
- Illness/injury
- Intellectual limitations
- Head injury
- Anoxia
- Seizures
- Learning disability
- Attention deficit disorder
- Neuropsychological deficits
- Neurological
- Psychological disorder
- Substance abuse

## Family

- Multi-generational family distress
- Genetic predisposition to alcohol and drug abuse
- Genetic predisposition to psychological disorder
- Parental alcoholism or drug dependence
- Teenage mother
- Abandoned by father
- Disrupted primary attachment
- Chaotic family structure and residence
- Observed domestic violence
- Emotional and physical maltreatment
- Corruptive family influences
- Inadequate supervision and guidance

### Potential Barriers to Self-Disclosure

**Full Self-Disclosure**

- Cultural disclosure and relationship mores
- Cultural emphasis on family loyalty
- Cross ethnic communication
- Dysfunctional family system secrecy
- Cultural stigma regarding male victimization
- Traumatic stress related responses of denial and fantasy
- Insufficient relationship duration with interviewer
- Distrust from childhood experience of parental betrayal
- Failure to understand interview purpose and objectives
- Interviewer insensitivity and inattention to clues
- Anxiety laden content
- Normal inhibition of highly personal information

**Mitigating Family History**

Mark D. Cunningham, Ph.D., ABPP

14

Mitigation Concepts, 3-19-04









Mitigation Concepts, 3-19-04



Drug dealer and criminal models —
applauded and admired by family

## Community

- Pervasive poverty
- Social disorganization
- Single parent families
- Corruptive community influences
- Observed community violence
- Epidemic peer criminal activity



Delinquency Rates of Male Teens in
Three Violent DC Neighborhoods

21.6%
No Criminal Acts
(1/3 have recent
status offenses)

31.9
Property
Offenders

19.2%
Fighters
(Assaults only)

4.7%
Drug Dealers

7%
Robbers
(Also likely to commit
other offenses)

15.5%
Property Offenders /
Drug Dealers

Chaiken, M.R. (March, 2000). Violent neighborhoods, violent kids. Office of
Juvenile Justice and Delinquency Prevention. U.S. Department of Justice.

## Mental Health Mitigation Case

| *Causal Factor* | *Demonstration* |
|---|---|
| *operating system* | |
| genetic predisposition | genogram |
| *hardware* | |
| organic issues | prenatal/birth problem |
| | malnutrition/toxic expos. |
| | illness/injury |
| | head injury |
| | learning disability |
| | attention deficit disorder |
| | substance abuse |
| | neuropsych deficits |
| | psychological disorder |

Mitigation Concepts, 3-19-04

---

## Mental Health Mitigation Case -2

*software / data*

| | |
|---|---|
| community context | social history |
| | housing grants |
| | census profile |
| | police data |
| | |
| family environment | social history |
| | family interviews |
| | community interviews |
| | mental health records |
| | education records |
| | |
| life events | social history |
| | family interviews |
| | community interviews |
| | employment record |
| | offense reports |
| | mental health records / |
| | psychological disorder |

*output*

maladaptive emotion, thought, relationships and behavior -- instant offense

---

## Emotionally Damaging Factors

- Family distress from generation to generation
- Teenage mother
- Paternal alcoholism
- Observed domestic violence
- Emotional and physical abuse
- Father abandonment
- Inadequate structure, supervision, and guidance
- Multiple concussions
- Psychological disorder
- Teenage onset alcohol and drug dependence

---

*Herman Jones:*
## An Impaired Person

**Neuropsychologically**
- Difficulty learning and processing
    - School
    - Employment
- Attention Deficit Disorder
- Cognitive rigidity

**Developmentally**
- Father alcoholic and emotionally absent
- Parent's marriage dysfunctional
- Brutalized by older brother
- Physically abusive discipline
- Perverse family sexuality

**Socially**
- Isolated and alienated from peers from childhood on
- Failed attempts to establish a marriage
- Unable to sustain employment

**Psychologically**
- Delusional Disorder
- Schizotypal Personality Disorder
- Dysthymic Disorder
- Self-medicating through poly-substance abuse

---

James Jones:
## Pervasive Developmental Poisoning

**Neurological**
- Fetal alcohol exposure
- Head injuries
- Neuropsychological deficits

**Parental**
- Inadequate attachment
- Never knew father
- Teenage mother
- Chaotic family structure and residence
- Observed mother being abused
- Heard mother shoot to death "stepfather"
- Abused and neglected by mother
- Introduction into drug dealing by mother's boyfriend
- Mother's drug addiction, prostitution, and neglect

**Family**
- Dysfunctional family scripts
- Family substance dependence and criminality
- Violent victimization of siblings

**Neighborhood**
- Corruptive values
- Community violence
- Peer drug trafficking
- Teen onset drug dependence

---

Mark D. Cunningham, Ph.D., ABPP

17

Mitigation Concepts, 3-19-04

What does this story have to do with this offense?

What does this story have to do with this offense?

What difference does it make?

What's the nexus?

Tying it up.

---

**Damaged Development:**
**Early Childhood**

- Marked poverty and chaotic household
- Mother's mental illness
- Abandoned by father
- Sexual abuse



---

**Damaged Development:**
**Middle Childhood**

- Mother's promiscuity
- Physical and psychological abuse by mother
- Frequent moves
- Corruptive family and community



Mitigation Concepts, 3-19-04



**Damaged Development:
Early Adolescence**

- Began alcohol abuse
- Profoundly disturbed family system
- Absence of functional models



**Damaged Development:
Mid-Adolescence**

- Chronic parental and family conflict
- Sister expelled from home
- School dropout



**Damaged Development:
Late Adolescence**

- Breakdown of marriage
- Realization that he was unable to continue parental role



Mitigation Concepts, 3-19-04

Intoxication offenses.

Mental disorder.



Albert Smith



- Respectful and compliant at home in spite of family dysfunction and neglect.

- Perfect attendance in Sunday School.

- Loved books and reading.

- "Team player" on football team.  Good adjustment in school.

- Protective of other students.

- Worked making pizzas during high school – respectful, dependable.

Mitigation Concepts, 3-19-04







Susceptibility to Influence

Mitigation Concepts, 3-19-04



Predisposing factors.
Build-up of stressors.
Attempts to cope.
Loss of supports.





Mark D. Cunningham, Ph.D., ABPP                                                                22