# Exhibit 2 to
# Affidavit of Wayna Tyner

□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□

### Bryan R. Shechmeister

# DEATH PENALTY COLLEGE

□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□

**Sponsored By**
**Santa Clara University School of Law**
**California Attorneys for Criminal Justice**
**California Public Defenders Association**
**August 5 - 10 2000**



*In honor and in memory of Bryan R. Shechmeister . . .*
*who taught us about our work, our selves - and that*
*"childhood matters."*

SOUTHERN CENTER *for* HUMAN RIGHTS
83 Poplar Street, N.W., Atlanta, GA 30303-2122
(404) 688-1202 www.schr.org e-mail: sbright@schr

# PRESENTING THE THEME FOR LIFE THROUGHOUT A CAPITAL CASE

### *Developing a defense theory in mitigation and presenting it at every opportunity from voir dire through closing argument*

**Stephen B. Bright**
Director, Southern Center for Human Rights
May 19, 2000

Defense counsel in a capital case must develop and present a theme for life · a set of reasons, supported by facts, that will persuade the jury that the client will be sufficiently punished by a sentence of life imprisonment instead of the death penalty.

The reasons for life should be client specific and case specific· not stock arguments against the death penalty. The themes should focus on considerations regarding the particular client. The jury must be shown why life imprisonment is sufficient punishment in this case for this particular client, regardless of what the members of the jury think about the death penalty in general or for other offenders.

A classic example of stating a theme and supporting it with evidence is Michael's Tiger's argument in the case of Terry Nichols, who, along with Timothy McVeigh, was accused of the bombing of the federal building in Oklahoma City which left 168 people dead. Tiger told the jury that Nichols was attempting to build a life, not a bomb. Despite the horrible crime, the defense was able to persuade enough jurors to spare Nichols life that he was not sentenced to death.

This paper examines the challenges for the lawyer defending a capital case and collects a few of the many considerations which may be useful in developing a theme for a life sentence. Its purpose is limited: to help counsel brainstorm ways to develop a theme for life in planning the client-specific themes for his or her case. A case study is appended which illustrates some of the points outlined herein.

## THE DECISION TO KILL A PERSON

The decision to kill another human being is an awesome one, no matter who that person is or what he has done. As Professor Craig Haney has written, "under typical circumstances, a group of twelve law-abiding persons would not calmly, rationally and seriously discuss the killing of another, or decide that the person in question should die and then take actions to bring about that death." His article, "Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," published

in 49 *Stanford Law Review* 1447 (1997), discusses the legal and psychological mechanisms that are employed in capital trials "to bridge the fult between deep-seated inhibitions of capital jurors against hurting others and state-sanctioned violence of the most profound sort."

In the book, *On Killing* (Little Brown & Co. 1995), Lt. Col. Dave Grossman documents the reluctance of soldiers to kill even in combat situations. For example, studies reveal that in World War II, only 15 to 20 percent of combat infantrymen were willing to fire their rifles. He describes the techniques that the military has developed to overcome this instinctive aversion so that by Vietnam, the percentage of soldiers who fired their weapons was 90 percent.

Both Professor Haney's article and Lt. Col. Grossman's book are most valuable reading for a lawyer defending a capital trial. Among the factors that Prof. Haney and Lt. Col. Grossman identify that make it easier to reach a decision to kill are the following:

♦ **The dehumanization of the person to be killed.** Prof. Haney writes, "Rituals of killing, whether sanctioned by the state (as in executions or war) or at an individual level, almost always involve the systematic dehumanization of the victim – the stripping of human qualities for the target of the lethal act." *Haney* at 1452. In war, the enemy's humanity is denied by referring to them as "gooks," "Japs," or "Krauts." In the discussion of crime in the United States today and in many prosecutors's closing arguments, the humanity of the defendant is denied by referring to him as an "animal," "predator" or "subhuman."

♦ **Anonymity of the person to be killed.** Closely related to the dehumanization of the person to be killed, is preserving the anonymity of that person. Studies reveal that it is easier to kill a person who is blindfolded than one who is not; easier to kill an enemy soldier wearing a helmet than one who is bareheaded. It is easier to kill at long ranges·such as by dropping bombs from an airplane·than at close range. If the jury does not hear much about the person on trial, he remains largely anonymous, although visible.

♦ **Exploitation of racial, ethnic, class and other differences.** People are more likely to vote to kill people "whom they regard as defective, foreign, deviant, or fundamentally different from themselves." *Haney* at 1460. Grossman reports: "It is so much easier to kill someone if they look distinctly different from you." *On Killing.* at 161. Similarly, members of the upper classes who regard the poor as "inferior forms of life" find it easier to kill the poor. Thus, prosecutors characterize those accused of capital murder as "filth," "dirt," "slime," or "scum."

♦ **Denial of the enormity of killing another human being.** "Language can be used to distance people from the true nature of the activities in which they are engaged." *Haney* at 1475. Thus, "[m]ost soldiers do not `kill,' instead the enemy was knocked over, wasted, greased, taken out, and mopped up. The enemy is hosed, zapped, probed, and fired upon." *On Killing* at 92. Judges and lawyers often avoid speaking about killing the defendant, but instead talk about capital punishment, the maximum sentence allowed by law, and execution.

♦ **Group absolution and minimizing personal responsibility.** The notion that the group·not the individual·is the killer makes it easier for soldiers, and firing squads and jurors to participate in killing a person. Prosecutors often argue in capital cases that the jurors are only one "cog in the wheel" and that the entire system from the investigating officers to the judge are equally part of the decision to kill the defendant.

♦ **Following the demands of authority; routinization.** Following the directions of authority figures help people engage in violence with the feeling that the consequences are small, insignificant and distant. Studies at Yale University found that more than 65 percent of people in a controlled laboratory experiment could be directed to inflicting what they believed to be a lethal electrical charge on a total stranger, despite the victim's pleas for them to stop. The organization of activity "in such a way that there is no opportunity and seemingly no reason to consider moral issues in the course of performing it – is an especially effective technique for undermining the ethical restraints against violence." *Haney* at 1474-75. The formality and procedure of the courtroom may allow some jurors to place some psychological distance between their sentencing decision and its consequences. Equally important, many jurors misunderstand the process and particularly the death qualification of jurors as requiring the to reach death verdicts. Jurors in capital cases often report that they believed that they had no choice if they were to "follow the law" under the judge's instruction except to sentence the defendant to death. In many cases, jurors holding out for a life sentence have been accused of lying during the death qualification process because they refuse to vote for death.

♦ **An intense belief in moral superiority and vengeance.** The belief that one's cause is holy may legitimate actions that one normally would not take, such as killing. Justifications such as avenging Pearl Harbor or the crusade against communism have been used to legitimize killing in war. The murder of the victim·and the general revulsion of society to violent crime·is used in capital cases to call for killing the defendant. Victim impact evidence is used to increase the jury's sense of outrage and the need for revenge. Having had a friend or relative killed by the enemy has been strongly linked to a willingness to kill. That disposition is probably just as valid when the enemy has been the "criminal element" as an enemy soldier.

Thus, the challenge to the defense attorney is to demonstrate the humanity of the client; determine whether racial, ethnic and class biases or other differences between the client and the jurors may come into play, and determine how best to deal with them; stress the enormity of the decision to be made by the jury and the awesome responsibility of each juror; convince the jury that the law does not require death, but that it is an absolute last resort; and, finally, persuade the jury that there are other effective ways to punish the client and avenge the death of the victim than to kill the defendant. Counsel must develop a client-specific and case-specific theme or themes to respond to these challenges.

The challenge to the defense lawyer is much greater than for the prosecutor in a capital case. A death-qualified jury will usually be horrified by the crime of murder and ready to convict and sentence to death regardless of what kind of job the prosecutor does. In addition, a prosecutor's stock arguments can

3

be used quite effectively from case to case·regardless of the defendant and the circumstances of the crime · but most stock arguments will not work for defense counsel.

For example, a prosecutor can always wax eloquent about the need to get tough on crime and to use the death penalty more. A death qualified jury will usually be receptive. However, an argument *against* the death penalty will usually be disastrous for the defense. People who make up death qualified juries do not change their attitudes based on an argument from a defense lawyer. Most people will not change their opinion on the death penalty even after intense discussions with clergy, family members or friends. However, a jurors who believes in the death penalty may maintain that belief but be convinced based on evidence of individual factors about the client that death is not warranted for this particular person and that life imprisonment is sufficient punishment.

The prosecution can be expected to depict the case in stark terms·black and white; good and evil, the exercise of free will and assigning personal responsibility. Of course, the reality of life is much more complex. There are shades of gray. There is some good and some bad in everyone, and the exercise of judgement is influenced by life experiences and, for many people, by circumstances they do not completely control, such as limited intelligence, chemical imbalances in the brain or other impairments. Such a person, while responsible for their acts, is not held to the same degree of culpability as person who has not suffered such disadvantages. Thus, defense must help the jury get beyond the stark easy choices and deal with the more complex aspects of human behavior.

Some of the stock arguments frequently used by prosecutors are identified later in this paper. It is important to be prepared to answer those arguments. But counsel cannot rely on stock answers or stock arguments. The defense theme must present evidence to humanize the individual on trial, let the jury know who the client is and help the jury understand that the client, even though guilty of a very serious crime, is more than the worst thing he ever did in his life and is not so far beyond redemption that death is the appropriate punishment.

It is important for defense counsel to choose carefully the appropriate battles to fight. Abraham Lincoln was said to be a great lawyer because he knew when to concede 90 percent of the case against his client·the part that he could not successfully contest·and convince the jury that only thing that matters was the remaining 10 percent where his case was strongest and most convincing. The practice of contesting everything· even things that do not hurt the defense theory· can be counterproductive and destroy counsel's credibility with the jury.

## INTEGRATING THE THEME THROUGHOUT THE CASE

The theme should be integrated into all parts of the case·voir dire, the guilt phase, the opening statement at the penalty phase, the presentation of evidence, and the closing argument at the sentencing phase. Appended to the paper is an example from one case of developing the theme at various points in the case and presenting a guilt phase case that fits with the theme at the penalty phase.

Facts must be presented and explained in sufficient depth that the jury understands and appreciates their significance. One occasionally hears from some lawyers that evidence of abuse or neglect or mental illness will not persuade a local jury because it has not worked in other cases. However, what has often happened in the previous cases is that the evidence was not well presented or credible, or properly explained to the jury. For example, in one case superficial evidence of abuse of the defendant was dismissed by the prosecutor in closing argument by saying that he himself was whipped as a child, but he did not kill anyone. The jury had no basis to believe the evidence except testimony from the client's mother and sisters. After the case was reversed for other reasons, a second jury was presented not only with testimony from the family members, but with corroborating evidence from people outside the family (found by obtaining the father's military records), the testimony of a social worker and other experts and documentary evidence from schools and other institutions. After this, more thorough presentation of the abuse, the jury unanimously returned a sentence of life imprisonment.

No case is hopeless. Serial killers and mass murderers have been spared because of the development and effective presentation of mitigating circumstances. There is always some explanation for the client's behavior, some mercy-evoking factors which militate in favor of a sentence less than death. The death penalty is reserved for the most heinous crimes and the most incorrigible offenders. *Counsel's task is to show that the client is not one of the very few people so completely beyond hope that he can only be punished by death.*

Counsel must be prepared to answer the questions in the jury's mind about *why* the client committed the crime and why life imprisonment is sufficient punishment. The reason need not rise to a legal defense to be mitigating. It may be useful for counsel to discuss the theory of the case and arguments for a life sentence with lay persons who are not regularly exposed to crime and violence through the criminal justice system to see what questions or reactions they have. Counsel must develop a way to show how the mitigating factors can be considered in accordance with the instructions the court will give in a way that results in life for the client.

## PREPARATION: IDENTIFY THE MITIGATING FACTORS

Early in the representation of the client, begin to identify the mitigating factors and develop a theory for life. The factors may change as the investigation proceeds. However, nothing is more critical in preparing for a capital trial than identifying the mitigating factors, preparing the witnesses to testify, and weaving together a theory or theme for the case.

Some states have statutory mitigating factors. However, such factors almost never apply to those who face the death penalty: for example, did the victim participate in his/her own murder? The statutory mitigating factors, like the federal sentencing guidelines, were written by prosecutors to make it unlikely that the mitigating factors would apply to the defendants.

***Do not be limited by the statutory mitigators.*** The defendant may offer ***anything*** about his or her life and background that should be considered in mitigation of punishment. *Lockett v. Ohio*[1] enables the defense lawyer to present the real mitigating factors to the jury; it is up to the lawyer to make sure the jury understands and appreciates them and takes them into account in deciding sentence. Counsel must also make sure that the jury understands that the mitigating evidence is not being offered to excuse the crime, but that it may properly be taken into account in deciding which of two punishments to impose. A parent does not punish an eight-year old child the same way as a 16-year old for the same transgression. Individual factors must be taken into account in deciding punishment.

The investigation of mitigating factors is not covered here. This paper deals with developing those facts into a theme that will persuade the jury to impose a life sentence. Among the many mitigating factors which may be identified are:

√ Abuse and/or neglect of the client during childhood.

√ Mental impairments, disorders, or limitations of any nature. ***Any*** mental limitation can be a mitigating factor; it need not rise to the level of incompetency or insanity. Indeed, it need not even be substantial, as specified by some statutory factors, in order to be mitigating. For a mental impairment to be mitigating, it is not necessary to prove a causal relationship between the mental problem and the commission of the crime. Nor is it necessary, in most cases, for counsel to win battles over the proper diagnosis of the problem. If the client suffers from some pathology which interferes with his mental functioning, that is something that may be taken into account by the jury in deciding punishment.

√ Personal characteristics such as youth, old age, religious commitment, work history or good character.

√ Efforts at self improvement or to overcome problems, even if those efforts were unsuccessful.

√ The client's love of others, such as family, spouse, or friends.

√ Love that others have for the client.

√ Service in the military; post traumatic stress syndrome, emotional scars from military service, drug addiction from military service.

√ Addiction to drugs or alcohol if presented so that the jury understands how the client is susceptible *to addiction and how it happened that he/she became addicted*, such as resort to alcohol after a particularly traumatic loss or use of drugs to self-medicate for various reasons.

√ Cooperation with authorities such as turning oneself in or confessing to the crime. If the client waived his rights and confessed, use it to the client's advantage by arguing that it shows remorse, cooperations, realizing his mistakes, etc.

---

1. *Lockett v. Ohio*, 438 U.S. 586 (1978).

√ Lesser culpability of the client than other persons involved in the same offense.

√ Remorse.

√ Good adjustment in prison; capacity for rehabilitation.

√ The needless suffering of the client's family. Where the jury will meet the client's parents, siblings, spouse, children or friends as witnesses during the trial, it can be argued that these innocent people will be the ones who suffer if the client is put to death. See the attached excerpts for one such example in a case tried while one of the client's brothers was fighting in the Gulf War.

√ Any other characteristics of the client. The themes for life and the supporting evidence in mitigating is limited only by the scope of counsel's investigation and knowledge about the life and background of the client. Counsel must know *everything* about his or her client, his family, his life. This *does not* mean counsel present everything to the jury. But counsel must *know* everything to make intelligent decisions about how to develop and present the theme that will be most likely to convince the jury not to impose a death sentence.

√ Residual doubt. Although defense counsel frequently encounters overwhelming evidence of guilt in capital cases, in a few cases there may be a lingering doubt about the client's guilt. Even where the client's involvement is clearly established, whether he was guilty of capital murder or a lesser crime may still be a reason not to impose the death penalty. An example is contained in the attached excerpts where the defense was that the gun fired accidentally and, although the jury rejected the defense at the guilt phase, counsel argued that the closeness of the question was a reason to impose life.

The themes for life and the evidence in support will depend upon the life and background of the client as revealed by the investigation. Age and good behavior may be the starting points for one mitigation case; deprivation, abuse and neglect may be the key elements of another mitigation case. In one case, there may be a lack of a criminal record; in another it may be necessary to help the jury understand why the client was involved in crimes throughout his life. Defense counsel's task is to learn everything, develop themes, plan the presentation of evidence to support it, and integrate it into all aspects of the case from voir dire to closing argument and jury instructions at the penalty phase.

## DEVELOP A THEME FOR LIFE

The mitigating factors should be developed into a story of the client's life to be presented through witnesses, and explained by counsel and perhaps by expert witnesses. The witness-by-witness opening and closing is not an effective way to present the theory in mitigation. Counsel must paint a word picture of the client's life, describing the mitigating evidence and how it is relevant to the sentencing decision.

*Tell a story.* Explain the client's life to a jury the way one would relate facts to a neighbor or friend. The appended case examples illustrates how the themes in mitigation were related to the jury at various points in the trial, particularly in opening statement and closing argument at the penalty phase.

## PROPERLY FRAME THE ISSUES

How the issue is framed in counsel's approach to the case, in voir dire, in the presentation of evidence, in arguments and in jury instruction is critical.

A capital trial is not a 12-person referendum on whether the death penalty is a good idea. Nor is the issue in a capital case whether the client is a wonderful person. If the defendant were a wonderful person, it is very unlikely he or she would be at the sentencing stage of a capital trial. Yet many prosecutors, defense witnesses and defense lawyers frame the issues at the penalty phase along these lines. If so, a death sentence is likely to be imposed.

The real issue is a very narrow one: whether the particular individual on trial is so far beyond redemption that he or she should be killed · eliminated from the human community. The client has committed murder and usually other serious crimes and may have many faults, bad ones, but is he so beyond redemption that there is no way to punish him except to kill him? If there is any glimmer of humanity in the client, then a death sentence should not be imposed. Killing another human being is the absolute last resort. If another extreme penalty· life imprisonment [without possibility of parole, in many jurisdictions]·would be sufficient to punish this offender and protect the community, it should be imposed.

Framing the issue along these lines greatly increases the probability that the jury will properly understand that the death penalty is reserved for only the very worst crimes and most incorrigible offenders. (The first is more difficult; the jury will only hear about one murder, which will be a horrible tragedy, as all murders are, but the jury will have no perspective. However, it may be useful to mention some other notorious case as an example of the type of extremely outrageous case for which the death penalty is reserved.) The issue must be framed so that the jury understands that it is being tough on crime, but understands that our whole legal system is based on the notion of individualized punishment. There is still a place for mercy and compassion in deciding between two extremely severe punishments. The judge's instructions on mitigating factors and mercy are consistent with the Sermon on the Mount. So the law does not forbid such considerations in the jury's decision about punishment.

Other areas where clarity of the issues is critical:

♦    The issue is not forgiveness, as suggested by many prosecutors in closing argument.

*The issue is punishment:* which of the two most extreme punishments the law allows is appropriate for this crime and *this particular individual*. No one is asking the jury to forgive the client. What the client did is, in most capital cases, unforgivable. The issue is which of two (or three) severe punishments is appropriate.

♦    The issue is not whether the client will escape punishment if the jury does not give the death penalty, as suggested by many prosecutors in closing argument.

The issue is *how* the client will be punished. The issue is not life or death, but life *imprisonment* or death. Under either sentence, the client will die in prison. Under either sentence, the client will

be severely punished. The loss of freedom, association with family and friends, in a tiny cell with several other people is an extremely severe punishment. The jury must decide how to punish *this individual* for *this crime*.

♦ The issue is not whether the death penalty is wrong in all cases. The jurors have been death qualified. They do not think the death penalty is wrong and it is highly unlikely that they will change their minds after hearing the facts of a murder case.

The real issue is·assuming that the death penalty is a proper punishment for some offenders· whether it is necessary *for this client*. Is this client different from a "Ted Bundy" or others for whom the jury may all agree that the death penalty is perfectly appropriate?

♦ The issue is not whether this crime is so horrible that only death is the appropriate punishment.

That is only half of the equation. The jury should be reminded in voir dire, opening statement, closing argument, in the jury instructions and at every other opportunity that *the death penalty is never mandatory*; it is always for the jury to decide whether it is warranted for the particular person convicted of the crime. No matter how horrible the crime or crimes, the jury must consider the background of the accused to determine whether death is the appropriate punishment for this offender. Jury questions can help jurors understand this point and can help counsel assess whether the juror will be able to consider a sentence less than death for the client.

♦ The issue is not whether the mitigating evidence justifies or excuses the crime, as suggested by many prosecutors in closing.

The jury must understand that the mitigating circumstances are offered not to justify or excuse the crime, but to help the jury decide between two severe punishments, death and life imprisonment. If the crime could be justified or excused, there would be no penalty phase. Punishment, however, must always take into account considerations regarding the individual, just as no parent would punish a four-year old the same way as a teenager for the same misconduct.

## SUPPORT THE CASE FOR LIFE WITH EVIDENCE

Evidence must be presented to support the case for life. It must be presented in sufficient depth and richness that its mitigating purpose is properly understood by the jury. Obviously, to present the evidence, counsel must develop an in-depth understanding of it by studying the literature and working closely with experts who will educate counsel about the matter. This is necessary for both the investigation and discovery of all pertinent evidence and its presentation at trial.

For example, if the client was abused as a child, the attorney must learn as much as possible about child abuse. How is it identified? What are the things to look for? What are the results on the development of personality? How do families cover it up? And so forth. Similarly, if part of the case in mitigation is mental retardation, counsel must understand mental retardation·the testing, what the scores

mean, the significance of problems during the developmental period, and the meaning of the terms of art used by mental health professionals. Some prosecutors have argued that a person found to be "mildly mentally retarded" has no serious impairment in intellectual functioning. However, this term refers to a person with profound mental limitations. It is much like saying one has a "mild case of cancer." Defense counsel must be sure that his or her ignorance does not allow the prosecutor to mislead the jury in this way.

Where an expert is relied upon · particularly a mental health expert · he or she must be well prepared and, if possible, supported by lay witnesses, documents and other evidence or the expert may do more harm than good. Testimony about psychological testing is something that is easily subject to ridicule and abuse by prosecutors with a know-nothing appeal to ignorance. What testimony can be presented by lay witnesses · particularly objective ones such as teachers, employers, military personnel, etc. · about manifestations of mental problems *before* the crime was committed? Even the most severely mentally disabled person will be accused of malingering by the state's expert. Counsel must anticipate this attack and be prepared to show that the client suffered from the problem long before he had any motivation to fake it.

The usual "drive by" evaluations by hack experts who make their living doing superficial court-ordered examinations for $500 each are not sufficient for a capital case. ***Do not ask to have the client sent to the state mental hospital.*** The defense is entitled to an ***independent expert,***[2] not one who works for the prosecution. Counsel must investigate the facts and learn as much as possible about the client's mental difficulties from family, friends, records, prior evaluations and any other sources. Then, identify an expert with knowledge in that area who will do quality work and who will spend time with counsel helping him or her understand the client's disabilities. For example, if counsel finds that the client's mother abused alcohol or drugs during the pregnancy, he or she will want to consult with a specialist who can determine whether there was brain damage to the fetus that is now the client. Find out about the expert's biases *before* retaining them. Expert witnesses, like all people, have different ways of looking at the world. There are many different specialties, theories, approaches and political agendas in the mental health area. Counsel must be aware of them and choose the expert wisely.

It is also important to anticipate the prosecutor's arguments and be prepared to present *evidence* as well as argument to rebut them. The accusation of malingering has already been mentioned. Another example is the frequent tactic by prosecutors of dismissing evidence of neglect and abuse during childhood by pointing to other members of the client's family who avoided trouble or even were successful. However, investigation will often disclose reasons for these differences that should be presented to the jury. A teacher or other family members may have taken a special interest in a sister who was bright, but not in the client who was limited mentally. (See the attached case excerpts for an example of how this was done.)

---

2. See, e.g., *Smith v. McCormick*, 914 F.2d 1153 (9th Cir. 1990) (where mental state an issue, defendant has right to competent, independent mental health expert; role of defense expert may be adversarial in assisting counsel and, in certain circumstances, communications between the expert and counsel may be confidential).

## PRESENT THE THEMES THROUGHOUT THE CASE

Once the themes are developed prior to trial, counsel must integrate them into every aspect of the case·jury selection, the strategy for the guilt phase, and of course the opening statement, the evidence, the closing argument and the proposed jury instructions for the penalty phase. To help accomplish this, counsel may want, when undertaking responsibility for a capital case, to open a file or a division in the trial notebook on VOIR DIRE, OPENING and CLOSING for both phases, THEMES for both phases. As counsel works the case and thinks of ideas, he or she can put them in the files or the notebook.

Counsel must attempt to select a jury that will be responsive to the themes at the penalty phase. Even more than with the normal non-capital jury trial, it is important to identify juror biases and to educate jurors about their role in deciding punishment. For example, mitigating evidence of the client's age, abuse and neglect, mental illness, intoxication or other factors will not be well received if the jurors selected do not believe that such evidence should be considered. Some jurors in post-trial interviews have stated that they imposed the death penalty *because* the client was mentally ill, since they view such an impairment as making the client more dangerous and less subject to rehabilitation. Many citizens have a very narrow view of mitigation·that it involves a very immediate reason for committing the crime, such as stealing a loaf of bread because one is hungry. Many prospective jurors feel that evidence about a client's childhood is completely irrelevant to how the client should be punished for a murder committed as an adult. Of course, the constitutional definition of mitigating circumstances for purposes of capital sentencing is much broader. Defense counsel must be sure that jurors properly understand the purpose of the evidence to be presented. Jurors whose attitudes or opinions will substantially interfere with their ability to consider mitigating evidence should be excluded.

The strategy and themes for the penalty phase should be developed in conjunction with the guilt/innocence phase. The approaches to each phase must fit together if counsel is to have any credibility with the jurors when he or she asks them to sentence the client to life.

Counsel must assess the impact on the penalty phase of presenting certain evidence and testimony at the guilt phase. For example, counsel must assess whether presenting mental health testimony in support of an insanity defense at the guilt phase will set the stage for arguing mental factors as mitigating circumstances at the penalty phase·or will the jury's rejection of the insanity defense foreclose any serious consideration of the evidence in connection with penalty?

Counsel may make decisions regarding the approach to the guilt phase that would not be made if the case were not capital. In the appended example, the defense decided not to offer a weak misidentification defense at the guilt phase, but instead presented a defense of accident in anticipation of the penalty phase. If the case had been non-capital and the jury had not been responsible for sentencing, the misidentification case might well have been presented. Often the only credible theory at the guilt phase is to acknowledge the client's involvement in the crime, but argue for a lesser included offense or, if others are involved in the crime, that the client's involvement is less than the others'. Of course, deciding the best approach will depend upon the circumstances of each particular case.

However, counsel should avoid at all costs putting on a totally preposterous defense at the guilt phase. The "shoot at anything that moves" approach to the prosecution's case·vigorous cross-examine of even the most minor witness, challenges to chain of custody of evidence that does not link the client to the crime, contesting every factual issue no matter how overwhelmingly established or how insignificant· is not an effective way to defend a case.

Before trial, counsel must conduct sufficient investigation, develop a good relationship with the client, and work with the client so as to be able, if necessary, to persuade the client not to give some totally implausible testimony at the guilt phase which will ruin any chance for a sentence less than death at the penalty phase. (For example, testimony by the client that the victim, a stranger to him who was kidnapped and terrorized before being killed, consented to sexual intercourse with the client.) Counsel can also help clients understand that, even if their testimony is true, they may not want to be cross-examined or the jury may still not believe them due to prior convictions or other reasons that may come out.) If the client is to testify, counsel should have other lawyers cross-examine him ruthlessly in order to see whether the client maintains composure under such stress.

In presenting the themes to the jury, counsel should relate the themes to common experiences. For example, the concern that we all have for our children or the debt we owe our parents for where we are today may help jurors understand the significance of abuse or neglect of the client. This also responds to the prosecutor's arguments about free will. Yes, there is free will, but we all know that seeing violence, being around drugs, being around the "wrong people" makes a difference *because we are willing to go to considerable lengths to protect our own children from it*.

## ANTICIPATE THE JURY'S CONCERNS; DEAL WITH BAD FACTS

There is a basic human tendency to want to avoid the troublesome or difficult aspects of anything. It is critical to overcome this tendency and be thinking well in advance of trial about how to deal squarely with the loss of human life, the horror and gruesomeness of the crime, the suffering and loss of the victim's family and friends, the past criminal behavior of the client, and other facts that will not reflect favorably on the client and will have an impact on the jury. These facts will not go away. The prosector is going to emphasize them. The defense lawyer must have a response. While there may be very little that counsel can say about some of the bad facts, at the very least he or she can acknowledge them and suggest that they are only one part of the equation in deciding punishment.

While the jury can be expected to be concerned about the enormity of its decision about life or death for the client, it may be more concerned about the viciousness of the crime, the impact of the crime on the victim's family, protecting society and the possibility that the client, if spared, will kill again or commit other crimes. Counsel must deal with these concerns.

Counsel must acknowledge the crime, its wrongfulness, perhaps its senselessness. It cannot be emphasized enough to the jury that the mitigation evidence is not being offered to justify or explain away the crime, but to help the jury make its decision between two punishments.

Victims of crime do not belong to the prosecutor. Those who defend capital cases are as offended by loss of life as any one else. It is important that counsel have good rapport with the jury. Remind the jury that counsel is a member of the community who shares their values, their concern about crime, their concern about the suffering of the survivors. Acknowledge the loss and the suffering, while reminding the jury that its decision will not bring the victim back. While the loss and the suffering are certainly reasons to punish the offender and keep him away from society, those concerns do not answer the question of which of the two punishments before the jury is appropriate.

The argument about sentencing must address *punishment* of the client and protection of the community. The jury must be convinced that the client will be sufficiently punished and the society protected by a sentence of life imprisonment, particularly in those jurisdictions where the jury is instructed that the client will receive life without possibility of parole.

## DEAL WITH THE PROSECUTOR'S ARGUMENTS

As previously discussed, the prosecutor's boilerplate arguments may put before the jury very compelling reasons to sentence the client to death. Other reasons for death may be based on the particular client and the crime. Counsel can usually review the prosecutor's previous arguments in other capital cases to be prepared for the stock arguments. A transcript will exist for all cases handled by the prosecutor in which the death penalty was imposed and many in which it was not. Review the previous arguments for two reasons:

   a. To prepare a motion *in limine* seeking to bar the prosecutor from making any improper arguments both on legal grounds and lack of good faith grounds. Some arguments that may be appropriate in one case may be improper if repeated in every case regardless of the crime and the defendant. For example, if an argument by the prosecutor in every case that the defendant lacks remorse based on the same characteristic of demeanor during trial does not relate to the client it should be ruled improper.

   b. To consider a response *in both evidence and argument*.

Consider the arguments that the prosecutor makes that will resonate with the jury. Brainstorm with others what the best and most effective response to those arguments may be. An example has previously been given in the introduction of ways in which evidence and argument can be used in anticipation of prosecution arguments such as "other members of the family made it, so the defendant has no excuse."

Examples of other stock prosecution arguments which the defense may want to be prepared to deal with:

   √ The defendant is a cancer on society that must be removed.

   √ The mitigating circumstances don't justify or excuse the crime.

14

√ It's time to get tough on crime.

√ It's time to send a message that if you come to this community and commit this type of crime, you are going to pay with your life.

√ People exercise free will so any abuse, neglect, etc. is irrelevant.

√ Look at these pictures!

√ The defendant by his acts is responsible for the death sentence he should receive, not the jury.

√ Show the defendant the same mercy he showed the victim.

√ If this isn't a death penalty case, we might as well repeal the death penalty statute.

√ The defendant doesn't deserve another chance.

√ A life sentence will be forgiving the defendant.

√ A life sentence will let him get away with it.

√ The jury is just a cog in the system. The police did their job, the grand jury did its job, the prosecutors have done their job, and now it is time for the jury to do its job.

√ The defendant lacks remorse.

There are of course many more. Some of these arguments, if allowed by the court and made by the prosecutor, may require a response from defense counsel. Many of these arguments can be dealt with by properly framing the issues for the jury. The mitigation case is not about excusing or justifying the crime; it is to aid the jury in making the right sentencing decision.

## PROVIDE A STRUCTURE

Jurors are faced with the enormous task of deciding whether a fellow human being lives or dies. Jurors want structure and usually look to the judge · not the advocates · to provide it.

Obtaining good jury instructions and using them to give the jury a map of how it is to go through its deliberations can help frame the issues in a way that is helpful to the client and will be endorsed by the judge when the instructions are given. Particularly helpful are the instructions that do not require the jury to be unanimous on mitigating factors.

A verdict form which requires the jury to make findings of each mitigating factor and to indicate whether it was found unanimously or not also provides a structure. Counsel can propose such a verdict forms and argue from it.

# CONCLUSION

The defense of a capital trial is the most awesome challenge that a lawyer can undertake. The nature of the crime, the passions of the moment, the emotional response to the crime and the victim impact evidence, and even factors external to the case such as other crimes in the community or the perception that crime is "out of control" all create a momentum for death. Nevertheless, jurors, like all people, have an aversion to killing. The defense lawyer can strengthen this aversion and save the lives of clients by presenting a coherent client-specific theme that shows the humanity of the client, by impressing upon the jurors the enormity of the decision to kill, and by showing that there are other effective ways to punish the client and avenge the death of the victim than by killing the defendant.

KEYNOTE ADDRESS:  CACJ/CPDA DEATH PENALTY
DEFENSE SEMINAR
"THE CHALLENGE OF CHANGE"
Monterey, California
February 14, 1992

by
Bryan R. Shechmeister

CHILDHOOD MATTERS

Recounting the commission of a murder should be aimed at
revealing who your client was when he committed the crime and how
he came to be that way.  This always is a story of childhood and
failure.  It is eminently easy to impair a child and misshape his
spirit.  We can poison him before birth, assault, deprive, damage
him.  We can cause him to be born addicted, lethargic, angry,
bewildered, confused and retarded, even nameless.  We can nurture
him on bitterness and meanness.  We can twist his vulnerability
and need for love so profoundly as to silence his cries and
pleading and still his natural interest in the world and concern
for others altogether to the point where we mean nothing to him,
nor he to us, where our simple existence, joys and delights only
mock him.  By doing so we deaden ourselves as individuals, as
civilized society, as much as him.  We quell the enthusiasm for
life.  The inner workings of this child's imagination become a
testament to our indifference and contempt.  Where were we, where
was our concern, after all, when he was beaten and abused and
molested.  We were the adults of his world, to protect and
nourish and see him free from harm.  Childhood matters and
children have no sense of independent causation.  They are the
cause of the world and when it goes wrong it is because of
something they did or did not do.  And when the world is wrong it
is because they are wrong and foul and wanting.  As mean and
bitter as the world is.  We cannot make things right.  We cannot
undo the harm, we only can begin to tell the truth to help those
who can hear, to care, to know that childhood matters.

At the same time, his task is made more difficult because
the landscape of capital case litigation has changed in the past
decade, the pace has quickened, the focus has shifted from
concern for the individual to the efficiency of the system.
There is less time, there is less money, there is less of the
ambiguity and nuance that, curiously, careful caring thought can
reveal.  We are encouraged to move quickly, we are cajoled and
prodded to move ahead, because others are waiting.  Where is your
motion for continuance, why wasn't this done earlier, why have
you waited so long and why are you taking so long?  We are
encouraged to be half-hearted or thoughtless and neglectful by
the doctrine of "harmless" or "permissible" error, where error is
not error at all.  Just so long as you move ahead.  We are
encouraged to be careless, and inattentive and simplistic by the

disappearance of stare decisis. We have begun to lose our
connection with history and precedent. These changes of pace in
trial, appellate and habeas corpus litigation have a two-fold
effect. They diminish the respect we have for the system and
ourselves and it discourages us from vigorously endorsing the
values that hold us together. It causes us to abandon by neglect
the reason we do this work in the first place and that must not
happen. The challenge of change is to stand firm. We are again
on a crusade for social and economic justice--and common human
decency--on behalf of our clients and our children.

Just as children know they are responsible for the world's
wrongs, so we too are responsible for our children. Children
know they have caused the world to turn wrong, so we need to know
that we are responsible for childhood and when it goes wrong we
need to look to ourselves--we need to do a better job. That,
after all, is why we do this work in the first place. To take
responsibility for making it possible for all children to be
healthier and happier and freer, to have a stronger sense of self
and self-respect. So it is that we are advocates for social and
economic justice on behalf of our clients and the childhood they
never had. The challenges of changes of the past half-decade is
to hold fast to what we know to be true--love in our hearts
enriches us and thereby the world. Through your work and your
sacrifice, your love and concern, you honor us and yourselves and
all of our children to see life as valuable and the childhood of
each of us matters. You remind us of who we ought to be and can
be and want to be and who with your courage and support, will be.

DESIDERATA ON MERCY

BRYAN R. SHECHMEISTER
Santa Clara County
Public Defender's Office
December, 1988

*This wonderful piece plus Bryan's article "A Brief Constitutional History of Mercy" can be found in the 1989 CACJ/CPDA Death Penalty Defense Seminar Syllabus*

The focus of the penalty phase of a capital trial is two-fold: it is on the defendant, seen in the light not only of the crime(s) he has committed, but of all that he has done and been; it, also, is on ourselves as a civil society, for all we have done and been, and are striving to do better.

Thus, in capital cases "it is the function of the sentencing jury to 'express the conscience of the community on the ultimate question of life and death.' When carrying out this task the jury is required to focus on the defendant as a 'uniquely individual human being.'" Booth v. Maryland (1987) 482 U.S. _____; 96 L.Ed.2d 440.

As the moral decision--whether to show mercy or impose the ultimate sanction--is an "individualized determination," it must be based on "the character of the individual and the circumstances of the crime." Zant v. Stephens (1983) 462 U.S. 862, 879, 77 L.Ed.2d 235. Accordingly, in capital cases "it is constitutionally required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant... " Gregg v. Georgia (1976) 428 U.S. 153, 190 fn. 38, 49 L.Ed.2d 859.

The vice of a system that ignores the mandate of individualized sentencing was identified in Woodson v. North Carolina (1976) 428 U.S. 280, 304, 49 L.Ed.2d 944 as follows:

> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death and possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

(21)

There are no formulas for achieving favorable results, only considerations. Put simply, figure out what you want to tell the jury, supply the evidentiary grounds upon which this rests and tell them.

There is no special order of words or phrases, no particular technique of oratory or theater, no fixed rule of content or theme to employ or avoid. Give your voice to the truth as you see it to be--for so it must be for all of us. Be guided, if anything by a confidence in the humility and nobility of the human spirit and appeal to those qualities.

Remember when addressing the jurors that you are talking to the people who heard the evidence and instructions of law you heard, who heard the same words, saw the same photographs, were touched by the same feelings. Remember, also, that the exercise of mercy is a compassionate and intuitive moral judgment. It is founded neither in doctrinal formality nor in an appeal to sympathy or sentiment, but instead on reason and virtue.

Keep in mind this is not an action brought in the name of the victim to redress the prejudice he or she has suffered. This is an action brought in the name of the People to decide what we should do to redress the injury to us in pursuing our self- appointing task of living together in civil society.

The jurors are not delegates of the victim's family (no more so than of the defendant's family or who his family should have been); for obvious reasons, they cannot be, should not be and should not want to be. They are the repository of our collective experience and wisdom and sense of who we want to be.

By the workings of our laws, we have, by the determinations made to get to the penalty trial, decided to banish this person, the defendant, from society forever. Now the jurors, each with their own voice, must bring to bear their conscience and wisdom to determine whether this person must be not simply banished from society forever, but, also, executed--for being who he is, for all that he has done and been. Is that the only alternative we have to offer? Or can we do better for ourselves?



INTRODUCTION

A capital case is unlike any other case in the legal system. What a defense lawyer representing a capital defendant does or does not do can dictate whether the client lives or dies. Providing legal assistance to someone accused of a capital crime is an awesome responsibility that has become increasingly difficult in the last several years. Defense counsel must become familiar with a vast amount of death penalty law and frequently contend with difficult facts, intense political opposition to the defense effort, enthusiastic support for the death penalty, complex procedural requirements, and the singular demands of preparing for a trial at which the client's very life will be judged. While this sobering reality can be intimidating, it can also be uniquely inspiring to counsel's performance. A capital case demands and deserves from an attorney his or her most careful conscientious and committed effort: the stakes could not be higher, nor can the rewards of success be greater than in a death penalty case.

The barriers to successful and competent representation are indeed severe. Appointed lawyers must contend with ridiculously restrictive limits on compensation and funds with which to represent the client. Counsel must simultaneously prepare for two trials. The initial phase of a capital trial will determine whether your client is guilty of a capital crime and must be approached with a clear and carefully planned strategy. But before the trial even begins---no matter how strong you think your case for acquittal may be---counsel must also be prepared to

convince the jury and the judge that the client should not be
executed. This will require a complete and compelling
presentation about the client and how he or she came to be on
trial for life.

This trial manual is designed to assist defense lawyers in
meeting the awesome responsibility of providing legal assistance
when life is in the balance. It is important, however, for any
attorney who uses this resource to recognize that no form motion,
objection or pleading is a substitute for thoughtful, energetic
and passionate defense for the capitally accused. An attorney
simply cannot be effective in capital litigation without getting
to know the client well, investing a great deal of time and
effort into the unique details of the case at hand, and carefully
developing a strategy that offers the client the best chance of
success.

I.   Death is Different

At all times during a capital trial defense counsel must
make clear to the court and the prosecution that a capital case
cannot be treated as just another criminal trial. The United
States Supreme Court has repeatedly emphasized that extraordinary
measures are required to ensure the reliability of decisions
regarding both guilt and punishment in a capital trial. Woodson
v. North Carolina, 428 U.S. 280 (1976); Ford v. Wainwright, 477
U.S. 399 (1986); Caldwell v. Mississippi, 472 U.S. 320, 329
(1985); Gardner v. Florida, 430 U.S. 349, 358 (1977). See also
Ex parte Monk, 557 So.2d 832, 836-37 (Ala. 1989). Defense
counsel must make everyone involved in the process constantly

conscious of the fact that there is little room for error in a
capital proceeding.  A wrongful conviction or death sentence
cannot be corrected once implemented.  An unparalleled emphasis
on procedures that result in a reliable and fair verdict is
therefore necessary.

Every player in the capital trial process should be
constantly reminded by defense counsel that casual consideration
of defense requests and motions must be avoided.  The possibility
of death sentence dictates that everyone struggle to eliminate
anything that would increase the chance of a biased,
unconstitutional or unfair conviction or sentence.

In preparing for a capital trial, it is important to
recognize that the death penalty is as political as it is legal.
In addition to the ever-increasing indifference of state and
federal courts to fundamental errors in capital cases, there is
considerable opposition from the community, elected officials and
frequently the media to any effort that challenges violations of
your client's rights.  The fact that most societal institutions
are unsympathetic and frequently even hostile to you and your
client has a very real effect.  Public and personal support for
the death penalty can cause many judges, prosecutors, state
attorneys, witnesses, law enforcement personnel, state agencies
and other players critical to your success to be inflexible,
uncooperative and even disruptive of your endeavors.  The
importance of understanding everything that you are fighting
against -- for example, a prosecutor or judge's reelection
concerns, the prominence and influence of the victim's family, or

racial bias or discrimination -- is critical to your ability to defend your client effectively.

The defense attorney's need to conduct a thorough investigation, scrutinize the state's evidence, prepare a sentencing phase case, consult with death penalty experts, consider pending legal issues and evolving legal theories, and formulate the best trial strategy possible is critical in a capital case not only because of what is at stake, but also due to an assortment of draconian procedural regulations. Over the last ten years courts have become ever more insistent that trial counsel object contemporaneously to any constitutional error and anticipate developments in the law. State and federal courts have grown increasingly comfortable overlooking clear violations of a defendant's constitutional rights at trial by applying an ever-expanding concept of "harmless error" or relying on some procedural imperfection in the record. Trial counsel's failure to preserve error adequately with a proper objection may distinguish those death row prisoners who avoid execution and those who will die in California's gas chamber. The heavy reliance on procedural bars in capital litigation necessitates that defense counsel give enormous attention to the adequacy of the trial record and preserving important issues. In a capital trial, defense counsel simply cannot afford to put all the proverbial eggs in a small number of baskets.

II.  Working with your Client

You cannot be effective in a capital case without getting to know your client well and thoroughly investigating his or her

14

entire life.  At the penalty phase, trial counsel will be faced
with giving an account of how the defendant came to be on trial
for life.  Defense counsel cannot do this without a clear
understanding of the circumstances and influences surrounding
that life.  Because the stakes are so high in a capital case, it
will also be essential to spend a great deal of time with the
client to facilitate the kind of working relationship that can
withstand the pressures and obstacles inherent in capital
litigation.  The client who meets his attorney only a few times
before trial will not feel very comfortable or confident during
what will be a very difficult experience.  Good attorney-client
relationships are therefore key to the defense effort and must be
approached thoughtfully and carefully.

     In this manual there are client background questionnaires
and other suggestions to help you better understand your client.
However, there is simply no substitute for spending time with the
client and developing a relationship that allows you to work
effectively on his behalf.

III. Negotiating for Life

     One of the most important aspects of capital litigation is
plea bargaining.  In many cases, obtaining a sentence other than
death may be the best victory possible.  Developing a plea
strategy and enthusiastically pursuing plea settlement of the
case is therefore critical in protecting your client's interests.
Preparing for plea bargaining involves various tools and
considerations.

First, one must marshal every convincing reason as to why a sentence less than death is appropriate. A lesser role in the offense, domination by another individual or other aspects of the crime may be important. The facts of the case are often not helpful in this regard. Counsel must also find the mitigating facts -- much like those that will be presented at the sentencing phase -- that will convince others that death is not necessary here. Meetings with the client, his family, former employers, and associates will eventually produce sympathetic factors -- such as mental illness, severe limits on intelligence, abuse as a child, or infirmity -- that counsel should keep in mind as you seek to convince decision makers that a sentence less than death would be the appropriate punishment for this offender.

Second, it is important that both client and counsel realize that a plea disposition in a capital case is hardly a "cop out". The general enthusiasm for the death penalty that presently exists, the severity of the crime and a host of other factors need to be explained to the client so that he or she appreciates that in many cases a sentence other than death is a major victory.

Third, one must be aware of the various people who may play an important role in persuading the district attorney to accept a sentence less than death and must convince each of them of the appropriateness of a life sentence. Most important in this regard is the victim's family. While surviving family members are often understandably hostile, it is not uncommon for them to decide against a death trial. Making an effort to win them over

to a plea is never the easiest task of the defense lawyer, but an attempt must be made in every case. Counsel should try to develop a rapport with the family and approach them when appropriate to discuss the disposition of the case. If possible, contact a mutual friend, or persuade a sympathetic minister to act as intermediary in presenting your argument for life. Others close to the district attorney may be helpful as well. Sometimes a law enforcement officer will express hesitations over the execution of your client after becoming familiar with him over the weeks of incarceration. Another law enforcement officer, the clerk of court, or other officials may be persuaded that it is best for all concerned to dispose of the case without trial. The trial judge often plays a central role in convincing the prosecutor that a plea is preferable.

Fourth, counsel should know what will convince the district attorney to agree to a sentence less than death. No matter how bad the case, several factors that are always present may cause the prosecutor to consider a plea disposition. One is the time and expense involved. A vigorously tried death case will cost the state many times the expense of an ordinary murder trial. The strict appellate scrutiny applied to capital cases may be another important factor. Family members, too, may be dissuaded by the length of appeals and the recurrent media attention in death penalty cases.

These general considerations and others specific to your case will be key. The state's primary concern is punishment of the guilty and protection of the community. In every case your

job is to convince the prosecutor that these objectives can be met without a death sentence.

## THE PENALTY PHASE

### I.  Preparing for the Penalty Phase

The sentencing phase of a capital case involves a separate trial on the issue of punishment.  It must be approached as a major trial, not an afterthought.  It may very well be the only trial at which your client has a chance to prevail.  Defense counsel must thus work hard to turn the penalty phase into a significant event and must resist any efforts by the court or prosecution to encourage a shallow or perfunctory presentation on behalf of the person whose life is at stake.

The rules of evidence governing the sentencing phase of a capital trial are completely different from those at any other legal proceeding.  The evidence offered by the state during the penalty phase must relate to the aggravating circumstances it has alleged.  By contrast, the defendant may proffer any information about his background, character, or the crime as a basis for a sentence less than death.  Lockett v. Ohio, 438 U.S. 586 (1978); Eddings v. Oklahoma, 455 U.S. 104 (1982); Skipper v. South Carolina, 476 U.S. 1 (1986).  Trial counsel must be equipped to convince the jury that the client's life should not be taken.  Counsel must be prepared to show in a compelling manner how the client came to be at risk of losing his life.  Counsel must show why that life still has purpose and value.  Mercy will be a relevant factor.  Stanley v. Zant, 697 F.2d 955, 960 (11th Cir. 1983); see also Washington v. Watkins, 655 F.2d 1346, 1376 n.57, reh'g denied, 662 F.2d 1116 (5th Cir. 1981), cert denied, 456

U.S. 949 (1982). In sum, the penalty phase of a capital trial is unlike any other experience trial counsel is likely to have, because the stakes are extraordinary and the need for carefully planned and skillful advocacy is as great as it can ever be within the legal system.

Successful penalty phase litigation turns on proper preparation and investigation, and on knowing the client as well as anyone else in his life ever has. Ensuring that the sentencers fully consider nonstatutory mitigating evidence, being able to prevent the state from unlawfully applying aggravating circumstances, successfully limiting the state's ability to present victim impact evidence, and challenging judicial override of a life verdict from a sentencing jury are just a few critical aspects of penalty phase litigation that must be thoroughly considered and addressed.

## II. Assembling the Defense Case

Simply put, the case will have two distinct parts: If a defendant is convicted of a capital offense, a separate hearing will follow to determine whether he will be sentenced to life imprisonment without parole or death.

### A.  Investigating the Mitigation Case

Before the defense can plan its mitigation theories, every aspect of the client's life from birth until the start of trial must be investigated, as discussed above. For this reason, it is usually desirable to have one lawyer and at least one

investigator whose primary responsibilities are to prepare for the penalty phase.

The investigation for the penalty phase must start at the first client interview. The process of investigation is extremely time consuming: It cannot be done in the last few weeks before trial. It will take several months and may necessitate delay of the trial. Counsel should commence investigation into the client's background and mitigating factors immediately. An investigation will include in-depth interviews with the client and all of the people in his or her life, including parents, spouse, children, siblings, teachers, ministers, doctors, and others. Several interviews are often necessary to bring out all the relevant information, particularly when sensitive matters such as child abuse or sexual abuse are involved.

The investigation must take place wherever the client spent his or her life. If the client is from out of state, and all of his family members, schoolteachers, and friends are out of state, counsel must travel to the hometown to meet with the witnesses in person, obtain information from them, determine what they can contribute, prepare them to testify and begin making arrangements to have them brought into the jurisdiction at the state's expense.

The investigation must include obtaining all medical, mental health, school, employment and other records that relate to the client. These documents will provide the names of additional people to be interviewed who can give life to the information

summarized in the records.

Once this information is accumulated, counsel can begin developing a theory for the sentencing phase. What theory you choose will of course depend upon the circumstances of the case. If the instant crime is the accused's first, counsel may want to focus on the lack of any past criminal behavior. On the other hand, if the client has been in trouble since childhood, it may be important to identify significant causal factors that have contributed to his behavior.

For example, serious mental illness that would not rise to the level of mental incompetency or insanity may yet help explain the client's behavior. Severe impairment brought on by alcoholism or brain damage might provide insight into the defendant's actions. Physical or emotional trauma in youth or adulthood should be explored. The number and kind of mitigating factors available is limited only by the depth of counsel's investigation and creativity. Obviously, you are in a much better position at the penalty phase if you have as many mitigating circumstances to present to the jury as possible.

B.  Ensuring that the Sentencer Considers All Mitigating
    Circumstances

Many capital defense attorneys, juries and judges continue to underestimate the utility and relevance of mitigating evidence that is not defined by any one of the statutory mitigating circumstances enumerated in the California Code. The United States Supreme Court held recently in Parker v. Dugger, 498 U.S.

22

___, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991) that the failure of a
state court to consider nonstatutory mitigating evidence in
reviewing a death sentence violates Eighth and Fourteenth
Amendment guarantees.  Death sentences have also been vacated
where insufficient attention has been paid to the nonstatutory
mitigating evidence presented.  See Hadley v. State, 575 So.2d
145 (Ala.Cr.App. 1990); Magwood v. Smith, 791 F.2d 1438 (11th
Cir. 1986).

Sentencing juries and judges are obligated under the Eighth
and Fourteenth Amendments to consider any mitigation evidence
that is relevant to the circumstances of the offense or the
character of the offender, regardless of whether this evidence is
set out in California's mitigation statute.  Hitchcock v. Dugger,
481 U.S. 393 (1987) (death sentence held to be unconstitutional
where advisory jury was instructed to consider only mitigating
factors set out in state statute and sentencing judge refused to
consider nonstatutory mitigating factors); see also Lockett v.
Ohio, 438 U.S. 586 (1978); Eddings v. Oklahoma, 455 U.S. 104
(1982).  Nonetheless, many defense lawyers do not adequately
investigate or develop mitigating facts about the accused or his
background or character because such facts do not relate directly
to the mitigation defined in California's capital statute.
Similarly, many circumstances relating to the offense, such as
the lesser sentence of an accomplice, may be mitigating and
relevant to an informed sentencing determination; often, however,
they are not adequately considered because these nonstatutory
mitigating factors are not raised by defense counsel or are

23

dismissed by the sentencer as irrelevant to the punishment determination.

The case of Parker v. Dugger is instructive. There the United States Supreme Court held that the Florida Supreme Court acted arbitrarily and capriciously by failing to give proper consideration to the defendant's nonstatutory mitigating evidence. At trial Mr. Parker presented evidence that he was under the influence of large amounts of alcohol and various drugs, including LSD, during the offense. He offered evidence of a difficult childhood, an abusive and alcoholic father, and positive relationships with his adult children and neighbors. His attorney emphasized that none of Parker's accomplices received a death sentence. The Court found that the Florida Supreme Court in upholding Mr. Parker's death sentence "failed to consider this nonstatutory mitigating evidence." Parker, 112 L.Ed.2d at 824.

The Parker Court recognized that where there is no requirement that a sentencing order must detail the findings as to nonstatutory mitigating circumstances, the probability of unconstitutional treatment of this evidence is greater. Trial counsel must be particularly vigilant about directing the sentencer's attention to this evidence. There are several things that a lawyer handling a capital cases can do to make sure that everything promising about the client is given full play at sentencing.

First, defense counsel must meticulously investigate, document and present at the penalty phase all circumstances of

the offense and all facts about the client's background and
character that are mitigating.  As discussed above, a thorough
investigation is critical to an effective defense at the penalty
phase.  Lay witnesses and experts must be identified and
presented who can uncover the mitigating facts that relate to the
client's background and character.  For example, a social worker
who can talk about the effects of childhood beatings or a
neuropsychologist who can explain the consequences of brain
injury may be needed for the judge and jury to be able to begin
to understand or feel compassion for the client.

Second, counsel must make sure that both judge and jury
adequately consider and weigh nonstatutory mitigating evidence.
Instructions must be sought that expressly inform the jury of its
obligation to consider nonstatutory mitigation.  Hitchcock,
supra; Delap v. Dugger, 890 F.2d 285, 303-304 (11th Cir. 1989);
Jones v. Dugger, 867 F.2d 1277, 1279 (11th Cir. 1989); Clark v.
Dugger, 834 F.2d 1561 (11th Cir. 1987); Cunningham v. Zant, 928
F.2d 1006 (11th Cir. 1991).  Counsel should seek to identify
nonstatutory mitigating circumstances for the jury during the
penalty phase and request an instruction that enumerates the
specific mitigating factors supported by the evidence.  As the
Supreme Court observed in Parker, "[n]onstatutory evidence,
precisely because it does not fall into any predefined category,
is considerably more difficult to organize into a coherent
discussion."  Parker, 112 L.Ed.2d at 824.  Therefore,
identification and thoughtful discussion of nonstatutory
mitigating factors may be useful in guiding a sentencer as he

weighs aggravating and mitigating evidence. However, you should always make sure that by listing nonstatutory evidence, you do not dissuade sentencers from identifying other nonstatutory mitigating factors that are not expressly specified.

Finally, it is important for counsel to challenge any instance in which a sentencer imposes the death penalty where nonstatutory mitigation evidence has been improperly rejected or ignored. If the facts support the existence of a mitigating circumstance, statutory or nonstatutory, a capital defendant has a constitutional right to have that evidence fully considered and weighed against any aggravating circumstances. Magwood v. Smith, 791 F.2d 1438 (11th Cir. 1986).

Because the sentencing phase is so different from every other judicial proceeding, careful preparation of witnesses is necessary to develop mitigating factors fully during testimony. One major advantage of the penalty phase is that witnesses are not limited to general reputation about character as in other proceedings. They can relate individual incidents, such as when the client went out of his way to help someone, and give their own descriptions of the character of the accused. It is essential that counsel reveal to the jurors the unique and compelling aspects of the client's life, and convey to them the unnecessary and extraordinary consequences of condemning this person to death.

## III. Confronting the Prosecution's Case

The state bears the burden of proving beyond a reasonable

doubt the existence of one of California's aggravating circumstances before a defendant convicted of capital murder can lawfully be sentenced to death.  Defense counsel should insist upon notice from the state of the aggravating factors it will rely on and the evidence it plans to introduce in support of them.  Counsel must have adequate notice and an opportunity to investigate the aggravating factors fully in order to satisfy the Eighth Amendment's reliability requirement.  <u>See Gardner v. Florida</u>, 430 U.S. 349 (1977) (regarding need in that case to provide defense with presentence report so that defense would have opportunity to correct, explain or rebut any information therein).

Defense counsel must conduct both legal and factual investigations into the reliability and relevance of the evidence.  For example, if the state seeks to introduce prior convictions, defense counsel must determine whether the defendant had a lawyer or pled guilty without being informed of his rights.  <u>See Johnson v. Mississippi</u>, 486 U.S. 578 (1988) (Eighth Amendment requires reexamination of Mississippi death sentence where one factor considered in aggravation was prior New York conviction that was subsequently invalidated by New York Court of Appeals).  Uncounseled convictions may not be used to enhance punishment.  <u>See Burgett v. Texas</u>, 389 U.S. 109, 115 (1967).

There are a number of ways in which the state's use of aggravating circumstances can be challenged and limited.  The most fundamental requirement under the Eighth Amendment is that the evidence offered by the prosecution at the penalty phase be

reliable.  The Supreme Court has repeatedly emphasized that
"[d]eath, in its finality," is a unique penalty in our society,
"qualitative[ly] different" from all other forms of punishment.
Woodson v. North Carolina, 428 U.S. 280, 305 (1976).  "Because of
that qualitative difference, there is a corresponding difference
in the need for reliability in the determination that death is
the appropriate punishment in a specific case."  Id.' accord
Gardner v. Florida, 430 U.S. 349, 357-58 (1977); Lockett v. Ohio,
438 U.S. 586, 604 (1978); Beck v. Alabama, 447 U.S. 625, 637-38
(1980); Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor,
J., concurring).  This insistence on reliability is rooted in the
fact that

> [i]t is of vital importance to the defendant and
> to the community that any decision to impose the
> death sentence be, and appear to be, based on
> reason rather than caprice or emotion.

Gardner v. Florida, 430 U.S. at 358.  Thus in Gardner the Supreme
Court vacated the death penalty because the sentencer had relied
upon a confidential presentence report that the defendant did not
have a chance to rebut or explain.  In Proffitt v. Wainwright,
685 F.2d 1227, 1252-55 (11th Cir. 1982), modified, 706 F.2d 911,
cert denied, 428 U.S. 242 (1983), the court vacated a death
sentence because the defense lawyer was not allowed to cross-
examine a psychiatrist whose report was submitted to the
sentencing court.

These same principles apply to any evidence the state seeks
to present at your client's sentencing.  Counsel should object to

28

the introduction of any evidence that cannot be tested through cross-examination, such as reports or hearsay testimony.  Counsel should also be alert for any testimony, information or argument that encourages the jury to base its decision on "caprice and emotion," rather than on the circumstances of the crime and the character of the person on trial.

A.  General Rules about the Consideration of Aggravating Circumstances

1.  Aggravating Circumstances Perform a Narrowing Function

A capital sentence must be based on the application of statutory aggravating circumstances that <u>genuinely narrow</u> the class of individuals eligible to receive a sentence of death. <u>Godfrey v. Georgia</u>, 446 U.S. 420 (1980); <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976); In other words, there must be a "meaningful basis for distinguishing the few cases in which [the death sentence] is imposed from the many cases in which it is not." <u>Furman v. Georgia</u>, 408 U.S. 238, 313 (1972) (White, J., concurring).  A death sentence can never be imposed simply because someone has been convicted of a capital offense.

The United States Supreme Court has consistently held that the use of statutory aggravating circumstances at the sentencing phase is essential to channeling and guiding the jury's discretion.  <u>See, e.g., Gregg v. Georgia</u>, 428 U.S. at 197; <u>Zent v. Stephens</u>, 462 U.S. 862, 877 (1983); <u>McCleskey v. Kemp</u>, 481 U.S. 279, 305 (1987).  Therefore, each aggravating factor offered by the state must be unanimously found beyond a reasonable doubt

29

before it can be considered by the jury.  Whereas any single juror may consider a statutory or nonstatutory mitigating circumstance if she is convinced of its existence by a preponderance of the evidence, a juror may only consider a statutory aggravating circumstance if the entire panel has found beyond a reasonable doubt that it exists.

## I.   Getting Started

If your client is going to avoid a death sentence and you are going to be an effective advocate, you'll have to start preparing the defense effort as soon as you are brought into the case.  Capital cases are unique and require a special effort from the defense attorney.  First, counsel must establish a good relationship with the client.  It is critical that you immediately meet your client and begin to develop a working relationship that permits you to represent his or her interests fully at trial and in plea negotiations.  Second, it is also important that you organize the defense investigation and start as soon as possible the task of gathering the information and records that will be critical to both the guilt phase of the capital trail and the penalty phase.  Third, you must begin the process of sensitizing every player in the case of the fact that a person's life is at stake and that a heightened standard of care is therefore necessary throughout.  Finally, you must prepare to understand fully your client's life and circumstances and not simply the crime charged.  This chapter identifies a few devices to assist in organizing the defense effort and to help you get the case started.

Courts and commentators have recognize that a defense lawyer in a capital case cannot be effective without adequately investigating the case and preparing for both the guilt and penalty phases.  See, e.g., Armstrong v. Dugger, 833 F.2d 1430 (11th Circ. 1987); Thomas v. Kemp, 796 F.2d 1322 (11th Cir. 1986); Tyler v. Kemp, 755 F.2d 741 (11th Cir. 1985); Brown v.

Blackburn, 625 F. 2d 35 (5th Cir. 1980). Defense counsel in a capital case has

> a duty to investigate the client's life history, and
> emotional and psychological make-up, as well as the
> substantive case and defenses. There must be an inquiry
> into the client's childhood, upbringing, education,
> relationships, friendships, formative and traumatic
> experiences, personal psychology, and present feelings. The
> affirmative case for sparing the defendant's life will be
> composed in part of information uncovered in the course of
> this investigation. The importance of this investigation,
> and the thoroughness and care with which it is conducted,
> cannot be overemphasized.

Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 323-24 (1983) (footnote omitted).

A thorough investigation can be critically important. Even the most skillful lawyer's effectiveness can be undermined by inadequate knowledge about the facts of the case. A lawyer handling an inadequately investigated case is often ineffective not only at trial but also when seeking a disposition without trial, for it is not unusual for a prosecutor to agree not to seek the death penalty when confronted with the weaknesses in his own case or presented with exculpatory evidence discovered during the course of a defense investigation. Simply put, it is the obligation of every lawyer to find out as much as possible about

a case as soon as possible. Speed is essential: physical evidence disappears, memories fade, and witnesses move away or are forgotten. Thoroughness is just as crucial. Counsel can never gather too many details concerning the fact and circumstances of each case. The obscure detail or easily overlooked incident may become vital to defense strategy.

The clues to a theory of mitigation may often be found in written records -- doctor's records, hospital records (emergency room records can be especially helpful), school records, welfare department records, juvenile court or training school records, jail and prison records from prior convictions, employment records, marriage or divorce records, and any other piece of paper you think may exist. The search should also be expanded to include investigation into parents' and siblings' histories.

The goal of such a search is to discover the physical, social, psychological, and sexual problems with which your client has been forced to contend since his or her birth. The client, for example, may have been raised in a dysfunctional and/or abusive family, his mother's drinking may have caused him to be born with fetal alcohol syndrome, he may be mentally retarded or suffer from organic brain damage, or he may suffer from a mental illness such as schizophrenia.

For several reasons, the client and his or her family may not tell counsel about these matters. First, they may all be ashamed of mother's drinking, father's drug abuse, or any other family "secret." A dysfunctional family is quite adept at hiding this information. Second, they may not even be aware of the

problem. What to them was Johnny's disobedience and stubbornness may, on closer examination, be a trait characteristic of fetal alcohol syndrome. Third, counsel should bear in mind that studies show that child witnesses to abuse are often as traumatized as the abused sibling or parent. The point is this: although communication with the family is essential, counsel should never let the client or his family dictate the scope of the investigation.

The search for the client's family history should precede the hiring of a mental health professional. Although psychologists and psychiatrists all recognize the importance of an accurate "history" (their term for your investigative efforts), they will not take the time to perform this laborious work on the limited fee the court will pay. They will be content to evaluate your client based only on test performance, and many "bad" evaluations are the result of such a limited inquiry. In order to ensure that your client is fairly evaluated, you must take up the challenge of investigating his or her "history."

II. **Working with the Client**

Once you become involved in a capital case it is imperative that you immediately contact the client and establish a working relationship. First, someone accused of a capital crime is certain to have many questions, fears and anxieties about what kind of legal assistance he or she will receive. It is important that you be responsive to your client's questions and needs as much and as quickly as possible. Second, it is critical that the accused understand that he or she must not discuss the case,

arrest or alleged crime with anyone except defense counsel. Finally, preparation for a capital trial will be unlike anything for which the accused has ever prepared. Your success will depend on having a relationship that permits you to explore those circumstances of the client's life and background that will eventually allow you to convince a jury that his life is worth saving.

A.   Establish a Line of Communication

As soon as you make contact with the accused, it is important that he or she clearly understand how to get hold of you. Make sure the client has your name, address and phone number and understands when you can and when you can't be available to answer questions. The client should know when he or she will see you next and what to do between visits to assist in preparing the case. Too often criminal defendants are unsure about when or if they will see an attorney and incriminate themselves by making statements, or by placing ill-advised trust in law enforcement personnel or other inmates. Make sure the client understands who is on the defense team and who is not. If your investigator, co-counsel and paralegal will have direct dealings with the client, make sure that the client understands for whom they work.

B.   Assess the Client's Needs

It is important to assess the client's needs as early on in the process as possible. Anyone who has been involved in a capital offense is likely to be experiencing some kind of crisis. It is important for your to figure out what the client's

immediate problems are if you are to prepare the case effectively for trial.  Your client may be illiterate, emotionally unstable or have other special needs that you will have to identify quickly and begin to address.  A client that is mentally retarded may need special assistance in understanding fundamental issues. You may need to involve an investigator or paralegal who can constantly make sure that the client is not undermining the defense effort because of a lack of understanding about what is happening.  A mentally ill client may be incompetent to stand trial or need treatment to assist in the defense.  It is important that defense counsel spend enough time with the client that a judgment can be made about these kinds of questions early in the development of the attorney-client relationship.

Counsel must understand that an arrest for a capital offense can create an unprecedented crisis for the client and her family. It is important that counsel be sensitive to this dynamic.  A client who is overwhelmed with anxiety about what will happen to her children will need your help in understanding what will and will not happen.

C.    Begin to Gather Client Background Information

At the end of this chapter is a lengthy document that has been prepared to help guide you in gathering background information from your client.  You will need as much information as your client can provide on his life history and the circumstances surrounding his present arrest.  As discussed above, a client may need to discuss issues with you that have never been discussed with anyone.  Family conflicts, abuse, or

drug and alcohol problems may be important to understanding the crime or the circumstances of the accused's involvement in it. It is important that your client trust you as much as possible and understand that what is said to you is confidential and privileged.

D.    Educate the Client about His or Her case

It is vital that you educate your client about the situation that he or she is in.  Many capital defendants may underestimate the likelihood that they will be found guilty or sentenced to death.  Some will want to take foolish risks.  Most defendants do not think of themselves as the kind of people who should receive a death sentence.  You must make sure your client has an informed perspective on the realty of the death penalty in California and the need to work constructively to avoid a death sentence.

Counsel's duty to sensitize all players to the unparalleled stakes created by a potential death sentence and to ensure that a complete record is made of all pretrial proceedings is an initial step in preparing the capital defense.

III. Client Background Records and Information

No capital case can be adequately litigated without your having first conducted a painstakingly thorough investigation into the underlying offense, the defendant's personal background and his or her life history.  Critical to this process is the documentation of your client's entire life story.  You must utilize all existing resources that might assist you in better understanding how your client ultimately came to be faced with the possibility of a death sentence.  A primary source of

information will be client and family interviews. While the information gathered from these interviews will direct subsequent avenues of investigation, the following sources of information should be considered in every capital case, regardless of what your client may tell you.

A.    Birth and Death Certificates

Birth and death certificates are important not only for helping to establish a sequence of events but also because they may alert you to unusual occurrences in your client's history.

B.    Court Records from Prior Convictions

All state and federal court records pertaining to your client should be retrieved, regardless of whether the court sits in California or elsewhere. This will enable you to prepare to fight the state's case; to assess the validity of any alleged prior convictions (e.g., were they counselled); and to begin to amass records that may ultimately lead to mitigation. Family members' records should also be obtained.

To retrieve state circuit court records, you should contact the clerk of the particular court involved.

Counsel should also obtain records from any juvenile proceedings.

C.    Medical Records

Medical records are among the most critical documents you can obtain in preparing your case. They may contain evidence of previously undisclosed mental health problems or relevant physical infirmities. Generally, copies of these records can be obtained upon presentation of a notarized release of information

signed by your client.  For hospital records, typically you will
need to supply the approximate dates of your client's
hospitalization or treatment, and other identifying information
such as date of birth and social security number.  Be sure to
obtain records regarding your client's birth and her or his
mother's prenatal care.  A release is necessary for each hospital
and treating physician.

In addition, copies of such records should be obtained on
each member of your client's family.  Evidence of a parent's
breakdown, alcoholism, or hospitalization for abuse could also
prove essential to the case.

D.    Employment Records

Generally, former employers will supply employment records
upon presentation of a signed release of information.  Be sure to
inquire about medical and psychiatric records.

E.    Federal Bureau of Investigation Records

Federal Bureau of Investigation records can be obtained
from:

Chief

FOIA & Privacy Record Section

Record Management Division

FBI Headquarters

9th and Pennsylvania Avenue, N. W.

Washington, D.C.  205353

(202) 324-3000

For retrieval purposes, the FBI will request that you
provide the client's full name together with any aliases, his

date of birth and social security number, the dates he was tried and sentenced, the court of FBI case number (where possible), plus a notarized release of information signed by the client.

F.    Federal Bureau of Prison Files

These are maintained at the federal prison where the client was last incarcerated.  To obtain these files, you need to request the records from counsel for the Bureau of Prison ("BOP") region in which that federal prison is located.  In requesting the records, you will need to supply a notarized release of information signed by the client, the client's date of birth and his BOP registration number.

In requesting BOP records, you need to make clear that the request is made pursuant to both the Freedom of Information Act (FOIA), 5 U.S.C. §552, and the Privacy Act, 5 U.S.C. §552a.  In addition, you should expressly request all records pertaining to your client and generated during his or her stay in the federal penitentiary system including, but not limited to, all medical, psychiatric, and psychological evaluations and all institutional records.

Since some BOP officials who handle these requests have indicated that certain medical, psychiatric and psychological records will be released only to a physician (in particular, an M.D.) and only after receiving a notarized release of information signed by the client naming an M.D. to whom those records should be forwarded, you will need to discern how the BOP individual handling your request will treat those records.  Of course, if the BOP individual will release those records only to an M.D.,

40

you need to find a doctor who is willing to receive the materials and then turn them over to you.

G.    Military Records

Military records are an invaluable source of social, medical, and other information.  Post-1960 military records for all branches of the United States military may be obtained from:

National Military Personnel Record Center

Attn: (Navy, Marines, Air Force, Army)

9700 Page Boulevard

St. Louis, Missouri 63132

(314)263-7131 (Army)

(314)263-7218 (Air Force)

(314)263-7200 (Navy, Marines, Coast Guard)

Pre-1960 military records for all branches of the United States military were destroyed by fire.  However, reconstructed records may be obtained by contacting records reconstruction at (314)263-7213.

A Notarized and signed release of information must accompany your letter of request.  The release must specify the military branch in which the client served as well as the client's name while in the service.  It must also expressly state that the release is for all records maintained regarding the client, including, but not limited to, all medical, psychiatric, and psychological evaluations and all institutional records.  In addition, the letter should include the client's military identification number, his name while in the service, the relevant service branch, the dates of service, the type of

4

discharge, and the unit to which your client was assigned.

H.    Psychological/Psychiatric Records

Counsel must be sure to challenge any suggestion that a state examination can adequately substitute for expert assistance to the defense. You should also ensure that the scope of the state's examination is limited. Mental health records, notes, files and data pertaining to current and prior treatment and evaluation of your client should be obtained with a court order.

I.    Probation and Parole Records

Counsel should seek all records and files from the Board of Prison and Parole.

J.    School Records

Typically, these records are maintained by the County Board of Education. However, the individual schools and schoolteachers should be contacted for possible additional records and for interviews. General copies of these records can be obtained upon presentation of a notarized release of information signed by your client. Aside from your client's full correct name, other information helpful to retrieval includes the approximate attendance dates, your client's social security number, your client's address at the time of his attendance, and the names of your client's parents.

K.    Sheriff and Police Department Files

Often, but not always, obtaining California sheriff and police departments files requires a court order. A notarized and signed release of information may suffice. Also, often, but not always, these departments in other states will obey an order

issue by a California court.  For this reason, discovery motions should be accompanied by proposed orders directing out-of-state sheriff and police departments to permit the inspection and copying of their files.

L.    Jail and Prison Records

All jail and prison records should be obtained relating to prior convictions as well as convictions that may have taken place since your client's arrest in the pending case.  These should be obtained regardless of whether the prison is located in California or elsewhere.

Medical records generated by California prisons and their medical providers should also be obtained.

While this agenda for record-gathering may seem daunting, its payoffs for your client are inestimable.  Nor, of course, is this list exhaustive.  Creative and relentless efforts to document your client's history may prove invaluable in confronting the state's evidence at trial and presenting a mitigation case.

# CHECKLIST FOR HANDLING CAPITAL CASES

Prepared by
James McWilliams, Greg Paraskou and Christie Warren

This checklist is compiled to provide attorneys handling a death penalty case with a quick reference point to ensure that basic issues and areas are considered by counsel. It is not intended to be exhaustive. Creative and imaginative counsel will surely find other issues or avenues to explore and develop. There may also be sound legal, factual, or tactical reasons why certain steps are not pursued. The order in which the various areas are listed is also not intended to necessarily reflect a chronological progression to be followed. This is meant solely as an overall guide to allow counsel to reflect upon what has been done and what needs to be done and what yet needs to be done as the preparation of the case progresses.

I.    INTERVIEW CLIENT

    A.    Begin to establish rapport and trust; obtain his/her cooperation

    B.    Explain charges

    C.    Explain consequences

    D.    Tell client not to discuss any aspect of the case with cellmates, jail staff, or anyone else
        1. Warn him/her about snitches
        2. Warn him/her about visits and telephone calls being bugged

    E.    Explain that pre-trial conduct in jail can be used either in aggravation or mitigation at penalty phase

    F.    Explain the process involved and the time it will take

    G.    Explain the likelihood of settlement and possible consequences

    H.    Determine client's attitude toward death penalty and life without parole

    I.    Develop background
        1. Family
        2. Employment
        3. Schools
        4. Medical history
        5. Psychiatric history
        6. Drug and alcohol use and history
        7. Hospitals
        8. Doctors
        9. Social workers
        10. Juvenile records
        11. Probation and parole officers and reports
        12. CYA and prison guards, counsellors, psychologists and psychiatrists
        13. Friends
        14. Teachers
        15. Neighbors
        16. Priests, ministers, etc.
        17. Military
        18. Prior criminal history

       19. Prior incarceration records
       20. Religious activities
       21. Hobbies and other interests
       22. Affiliations or memberships
       23. Welfare and SSI records
       24. Relationship, if any, with victim

J.     Obtain releases from client to obtain necessary documents and records
       1. Obtain different types of releases: for military, school, medical, psychiatric, AIDS, employment, etc. records

K.     Explain role of co-counsel, investigator, experts, team defense approach
       1. Personally introduce each of these people to client

L.     Have client write out his own version of his social history outline

M.    Evaluate re: 1368, NGI, diminished actuality
       1. Have defendant seen immediately by psychiatrist or psychologist (mental state contemporaneous with time
          offense committed will usually become an issue)

       2. Hire "deep throat" psychiatrist who will not testify and who will evaluate all records and investigation you have
          and give advice re what to provide experts

       3. Make informed decision re what material to provide to your own and court-appointed doctors

       4. Have defendant worked up re psychiatric, psychological neuropsychiatric, neuropsychological condition

       5. Be receptive to issues of continuing competence throughout case (e.g. client may be  competent at first and
          then crack under pressure of the case

II.   <u>MANAGE CLIENT'S JAIL VISITS</u>

A.     Adjust social visitations if necessary and possible:  eliminate, limit, screen, or increase social or family visits

B.     File motion to prohibit disclosure of identity of client's social and medical/psychiatric visitors to anyone else
      (sample in syllabus)

C.     Consider obtaining "confessor" (clergy-related, mental health-oriented, or similar) to talk regularly to a client
      who persists in discussing case or needs to vent

III.  <u>SELECT TEAM</u>

A.     Co-counsel to complement your experience, strengths and weaknesses
       1. Be honest about who you are able to work with
       2. Consider tactics re same or different gender in co-counsel
           a. Divide tasks
           b. Clearly establish roles and responsibilities
           c. Establish how decisions will be made and by whom; who has final say

B.     Investigator(s)
       1. Fact phase
       2. Penalty phase

C.    Experts
1. Psychologist
2. Psychiatrist
3. Social background/history
4. Birth contamination by alcohol or drug use by mother
5. Child abuse/neglect
6. Institutional adjustment
7. Jury selection
8. Ballistics
9. Serologists
10. Scene reconstruction
11. Pathologists
12. Physical anthropologist or cultural sociologist
13. Hair/fiber
14. Forensic pathologist

D.    Be aware of available death penalty resources
1. Trial manual
2. RECAP newsletter
3. ARSNL Death Penalty Information Bank and Index
4. Annual Death Penalty Seminar
5. Experienced attorneys available for consultation:  please call and ask for help

E.    Meet regularly with members of the defense team to maintain the channels of communications and a spirit of cooperation

F.    Force yourself to talk through disagreements re tactics, issues.  Don't allow resentment to build up

IV.    <u>ORGANIZE FILE</u>

A.    Develop format and system

    1. Consider separate files and notebooks for guilt and penalty phases as well as divisions within each for each witness and/or topic

B.    Create master set of materials

C.    Designate receiver of records in cases where many records exist;  that person keeps log of records received and dates when received

D.    Keep track of what is received and when (use of date and number stamp for each page of discovery received)

E.    Record all activities and communications regarding the case

F.    Use a daily memo to summarize activities both during preparation and trial

G.    Record all important tactical decisions made and why

H.    Have client initial any instructions to you of a controversial nature (e.g. refusal to call logical witnesses, refusal to accept advice as to pleas/defenses, refusal to permit mitigation evidence or requests for death)

I.    Keep ongoing file of possible appellate issues as you progress through case

J.    As trial approaches, create witness list with columns for name, telephone number, relevant page numbers from discovery of investigation, and comments (re dates available, quality of memory events, or whatever)

V.    OBTAINING 987.9 MONEY

    A.    Review and know law.  Have points and authorities ready in case they are needed

    B.    Prepare requests, affidavits, orders

    C.    Learn about your 987.9 judge and how the county handles these requests

    D.    Create separate trust bank account for funds received

    E.    Keep accurate records of all money received and spent

    F.    Do not advance funds without serious thought, if ever

    G.    Use your imagination and discuss with other attorneys

    H.    Do not abuse it

VI.    INITIATE INVESTIGATION

    A.    Guilt Phase
        1. Go to scene immediately to see if any protective orders should be issued to preserve evidence, etc.
        2. Eyewitnesses
        3. Alibi witnesses
        4. Victim's background
        5. Mental defense issues
        6. Scientific issues
        7. Documentary evidence to support or contradict testimony
        8. Inspect all scientific and physical evidence yourself
        9. Decide whether to compel testing of physical evidence by the district attorney

    B.    Penalty Phase
        1. Family, including any family history of physical or mental illness
        2. School
        3. Friends
        4. Neighbors
        5. Church
        6. Military
        7. Medical
        8. Psychiatric
        9. Social workers
        10. Probation officers
        11. Teachers
        12. Employment
        13. Doctors
        14. Hospitals
        15. Therapists/Counselors
        16. Awards and commendations
        17. Affiliation s and memberships
        18. CYA/CDC guards, counsellors, therapists
        19. Investigate thoroughly all prior criminal history and client acts (e.g., the prior manslaughter may have had
            elements of self-defense)

VII.    OBTAIN ALL RELEVANT RECORDS CONCERNING CLIENT

    A.    Use releases (of varying types) signed by client

    B.    Send with releases letter to institutions invoking and reminding recordkeepers of all privileges held by client (sample in syllabus)

    C.    Get every record pertaining to client:
        1. Birth records
        2. All medical records from time of birth on
        3. All school records , report cards
        4. All psychiatric records
        5. All penal institution records (including confidential files)
        6. Military records
        7. Employment records
        8. Parents' birth, medical, penal and other records if these issues arise

VIII.    RECORDS CONCERNING DECEDENTS, WITNESSES

    A.    Determine whether penal, psychiatric, medical, or other records concerning non-client parties are relevant

    B.    Subpoena them to court

    C.    Undergo in-camera review
        1. File detailed, complete points and authorities and declaration re why these records must be disclosed. Include every conceivable theory.

IX.    CONTACT WITH DEFENDANT'S FAMILY

    A.    Explain charges

    B.    Explain consequences

    C.    Explain that they must not discuss case with client

    D.    Explain the process involved and the time it will take

    E.    Explain potential for assisting with factual and background investigation (i.e., locating witnesses)
        1. Explain why you need information that looks harmful to client or is potentially embarrassing to family

    F.    Develop background
        1. Consider interviewing family members separately to increase chances of eliciting helpful but embarrassing information

    G.    Gather physical evidence, memorabilia, photos, etc. they may have of client

    H.    Determine how they feel about the death penalty
        1. In general
        2. Does the defendant deserve it
        3. If they think the defendant did the crime, does he/she deserve it

    I.    Have regular meetings with family members to apprise them of case status

    J.    Send family copies of motions filed if they are interested

X.  CONTACT WITH VICTIM'S FAMILY

    A.    Develop background on deceased where there is no other source of information

    B.    Attitude regarding death penalty and defendant

    C.    Consider the timing and necessity of doing this at all; must be done very diplomatically, perhaps through intermediary

XI.  PRESS CONSIDERATIONS

    A.    Decide whether to avoid, seek, or shape press accounts of your case

        1. If avoiding press, prepare motions to exclude press (in cases where identity is an issue and you want no photographs of client, etc.). Develop ways of avoiding press without saying "no comment"·

        2. If seeking press, cultivate relationships with reporters and understand their goals and concerns. Always prepare statements before appearing in front of press. Prepare sound bites. Provide press with copies of your motions with summarized arguments to assure fair coverage

        3. If trying to (re-) shape accounts of your case, develop your theory, give it a press-appealing angle and be aggressive about promoting it at every opportunity

    B.    In high publicity cases, hire a media service to retain all TV clips. Subpoena all written articles.

    C.    Hire an expert for closing hearings, change of venue if necessary

    D.    Prepare client and client's family for press and advise them how to act, whether to talk

    E.    Read or watch press accounts of your case for possible prosecutorial misconduct or for use of prosecutor conduct at change of venue motion

    F.    Return press phone calls: Keep channels of communication open even if you are avoiding coverage of case

XII.  EVALUATE THE PROSECUTOR

    A.    What is your relationship to him/her

    B.    Get transcripts of previous penalty phase arguments, cross-examinations of experts

    C.    Talk to other opposing counsel

    D.    What is his/her reputation

    E.    His/Her opinion on the death penalty

    F.    Previous life without parole/death verdicts

    G.    Investigate possible recusal motion (Penal Code section 1424)

    H.    Learn the office's capital charging practices and decision making process on whether to seek death

    I.    Consider option of providing potentially privileged or confidential information to him/her to facilitate settlement of case

XIII.   PREPARING FOR THE PRELIMINARY EXAMINATION

   A.   Explore early disposition of case

   B.   Decide whether to put on or waive hearing to avoid filing of or increase in special circumstances

   C.   Go to scene as soon as possible

   D.   Know what trial issues and potential penalty themes will probably be before you put on the hearing

   E.   Get 987.9 fund for early investigation

   F.   Get all police reports

   G.   Get all crime scene and other photos

   H.   Get all tapes
        1. Transcribe tapes
        2. Enhance tapes if necessary
        3. Obtain all police radio dispatches

   I.   Discovery motion

   J.   Other appropriate motions (e.g., Motion to Disclose Information, Pitches Motion)

   K.   Search and seizure issues

   L.   Admissibility of confession/admission
        1. Fourth Amendment issues
        2. Fifth Amendment issues
        3. Sixth Amendment issues

   M.   Other evidentiary issues

   N.   Possible recusal motion

   O.   Motion to conditionally examine witnesses and commission to examine non-resident witnesses

   P.   Motion to close the Preliminary Hearing
        1. See "Press Considerations" (at section XI above)

   O.   Corpus delecti issues
        1. Offenses
        2. Specials

   R.   Cause of death
        1. Meet with Coroner
        2. Retain your own forensic pathologist
        3. Get autopsy photos, reports, notes, lab tests
        4. Interview paramedics, fire department and other non-police emergency personnel at crime scene

XIV.  PREPARING YOURSELF

    A.    NEVER think this is not a death case

    B.    Begin planning and preparing for the penalty phase from the very beginning without overlooking the guilt phase

    C.    Learn the law

    D.    Discuss handling death penalty cases with other attorneys

    E.    Read other penalty phase final arguments - prosecution and defense

    F.    Read Death Penalty Manual and RECAP

    G.    Follow other cases in your area.  Be aware of successful strategies, new experts, developing issues.  Follow press accounts of other trials: go watch them

    H.    Without breaking privileges, explain to your family the emotional and time strains you will be facing.  Try to obtain their understanding and support

    I.    Network:  both to become aware of issues being tried outside your area and get new ideas, and to maintain support system with people involved in same work

XV.  PRE-TRIAL MOTIONS  (CAVEAT: This is a partial list only.  The only limits are counsel's ingenuity.)

    A.    Federalize all your motions in preparation for appeal

    B.    Some types of motions:
        1. Prop. 115 - related motions
        2. 995 - offense(s)
        3. 995 - specials
        4. 995 - weapon allegations, enhancements
        5. Constitutional challenge to the death penalty
        6. Challenge of priors - (Validity:  Sumstine)
        7. Challenge of priors - (are out-of-state priors California equivalents:  Crowson)
        8. Challenge of priors - IAC issue
        9. 1538.5 motion
        10. Change of venue
        11. Discriminatory Prosecution
        12. Discovery
        13. 987.9 funds
        14. Recusal of District Attorney
        15. Severance - counts;  defendants
        16. Collateral estoppel issues
        17. Challenging jury composition
        18. For access to scene of crime

XVI.   PRE-TRIAL WRITS

    A.    When to file  (See Penal Code section 1510)

    B.    Strategic decision if you should file

    C.    What may be waived if you do not file

    D.    Become familiar with laws which limit prosecution's right to writ issues you win

    E.    Consider potential for using writ procedure as leverage to settlement

XVII.   PLEA NEGOTIATION CONSIDERATION

    A.    What information to disclose to the prosecutor
        1. Guilt phase
        2. Sanity phase
        3. Penalty phase

    B.    Evaluation of the prosecutor
        1. His/her attitude regarding the death penalty
        2. His/her reputation
            a. Regarding discovery
            b. Regarding misconduct
        3. His/her trustworthiness
        4. Learn the process used for deciding whether to charge specials, and when to seek death
        5. Learn when in the process these decisions are made and by whom
        6. Should offers be done in writing or informally?
        7. Consider written contract between you and prosecutor re what material has been provided to prosecutor, what use is to be made of it, who else communicated

XVIII.   WAIVER OF JURY TRIAL CONSIDERATIONS

    A.    Evaluate judge
        1. Is he/she sympathetic to defendant and facts of case?
        2. Is he/she open to your fact phase defense
        3. What is his/her attitude regarding the death penalty
        4. Is he/she sympathetic to your penalty phase case?
        5. Consult colleagues
        6. Check out prior rulings and cases involving this judge
        7. Will prosecutor agree to waive jury?
        8. Explain to client potential benefits and risks of jury waiver

XIX.    IN LIMINE MOTIONS (CAVEAT:  This is a partial list limited only by counsel's ingenuity)

    A.    Federalize all motions in preparation for appeal

    B.    Types of possible motions:
       1. Castro/Beagle
       2. Kelly-Frye
       3. Confessions/Admissions
           a. Fourth Amendment issues
           b. Fifth Amendment issues
           c. Sixth Amendment issues
       4. Courtroom security;  shackling of defendant, witnesses
       5. Exclude reference to gang membership (assuming such evidence is not part of your penalty phase strategy)
       6. Exclude reference to prison/parole/probation
       7. Exclude photos of deceased
           a. Crime scene photos
           b. Autopsy photos
           c. Photos prior to death
       8. Strike duplicative specials
       9. Additional peremptory challenges
       10. Admit polygraph test evidence
       11. Admit expert testimony regarding eyewitness identification
       12. Challenge jury composition
       13. Exclude various hearsay evidence
       14. Exclude reference to deceased as "victim"
       15. Exclude reference to yourself as public defender, if applicable
       16. Anticipating prosecutorial misconduct
       17. Bifurcate priors
       18. Individual sequestered *voir dire*
       19. Jury questionnaire
       20. List of proposed questions for judge-conducted *voir dire*
       21. Separate juries for fact phase and penalty phase
       22. Separate juries for co-defendants
       23. Separate phase for specials
       24. Motion for immunity for defense witnesses with Fifth Amendment problems
       25. Motion to challenge witnesses' capacity to testify
       26. Exclude snitch testimony as unreliable
       27. Be aware of People v. Jennings (1988) 251 Cal. Rptr. 278, 285, fn. 3 regarding preserving issues when
           evidence actually offered at trial

XX.    VOIR DIRE

    A.    Read Witherspoon, Witt, Hovey, Ross v. Oklahoma, Coleman, Dryer, Ghent

    B.    Learn how to death qualify a jury
       1. Observe others do it
       2. Read available transcripts
       3. Learn how to rehabilitate favorable jurors

    C.    Use of jury selecting expert

    D.    Practice on others

    E.    Prepare defense version of juror questionnaire

'53

F.    Organize information and evaluation
1. Develop model profile of ideal jurors and favorable characteristics
2. Establish a rating system
3. Identify potential leaders

G.    Prepare for "shoot out" (the use of peremptory challenges)
1. Evaluate each juror
2. Think through various jury mixes and group dynamics
3. Prepare list of jurors who must be challenged

H.    Motion for additional peremptory challenges

I.    Prepare memorandum on issue of discriminatory use of peremptory challenges by the prosecution (<u>Wheeler</u> issues)

## XXI.   <u>JURY INSTRUCTIONS</u>

A.    Obtain reference works containing instructions relevant to your case

B.    Compile list of potential instructions long before you reach the end of each phase
1. Fact phase
    a. All lesser included or related charges
    b. Tailored <u>Sears</u> instructions
    c. Amplifications or better explanations of the law

2. Penalty phase
    a. Tailor instructions to your case
        (1) Cost
        (2) Deterrence
        (3) Factors (1) and (2) do not overlap;  no dual use
        (4) <u>People v. Thompson</u>
        (5) Lingering doubt

## XXII.   <u>DEVELOPING AND PREPARING PENALTY PHASE EVIDENCE</u>

A.    Know the law regarding mitigation

B.    Know the law regarding what rebuttal evidence can come in and evaluate the dangers of certain types of mitigating evidence

C.    Prepare jury instructions based on your mitigating evidence

D.    If at all possible, go to homes of witnesses and locations of events in client's past <u>yourself</u> and conduct interviews <u>there</u>
1. Consider option of videotaping interviews of witnesses who cannot travel to court
2. Consider option of conducting conditional examinations of witnesses who cannot travel to court

E.    When interviewing witnesses:
1. Listen to what they have to say
2. Prepare them for direct-examination
3. Prepare them for cross-examination
4. Explain the process, procedures, and rules
5. Evaluate their position on the death penalty

F.    Videotape locations important to client's development and life story

G.     Take photographs for blow-up at trial

H.     Prepare and have served out-of-state subpoenas if necessary

I.     Develop your penalty phase theme(s) (see list, *infra*)
       1. Choose experts, if appropriate
       2. Prepare your experts
       3. Develop Skipper evidence

J.     Know the evidence in aggravation
       1. Evaluate the 190.3 notice
              a. Is it timely?
              b. Is it specific?

       2. What category does evidence fall into
              a. Factor (a)
              b. Factor (b)
              c. Factor (c)

       3. Evaluate out-of-state priors [see above]
              a. Can you put on evidence of facts of priors as part of mitigation evidence?

       4. Other crimes evidence
              a. Age
              b. Investigate facts, interview all witnesses
              c. Obtain all police reports and other information

XXIII.   POSSIBLE PENALTY PHASE THEMES

A.     Good guy - situational, isolated act

B.     Lingering doubt

C.     Remorse - admitted guilt early

D.     Mental condition

E.     Abuse/neglected childhood (including battered child syndrome, adult child of alcoholic, etc.)

F.     Drug/alcohol problems

G.     Birth contamination issues:  fetal alcohol syndrome, fetal narcotic syndrome

H.     Good adjustment to custody

I.     Individual juror responsibility

J.     Educational efforts in custody

K.     Potential for rehabilitation

L.     Talents that may contribute to society even while in prison

M.     Adaptability to prison

N.     Evidence mitigating the crime itself

XXIV.    PENALTY PHASE CONSIDERATIONS

       A.      In Limine motion to restrict rebuttal evidence and/or cross-examination of defendant and witnesses

       B.      Defendant always has last argument

       C.      One or two attorneys argue case

       D.      One or two arguments per side

       E.      Just prior to prosecutor's arguments make a motion regarding areas that would constitute misconduct

XXV.    POST DEATH VERDICT DUTIES

      A. Investigate possibility of juror misconduct; review jurors

      B. Motion for new trial

      C. Section 190.4(e) hearing

      D. Advise client not to discuss facts of case with anyone at San Quentin or elsewhere

      E. Assist in record preparation and correction

      F. Cooperate fully with appellate counsel

**MITIGATION**

# THE SOCIAL CONTEXT OF CAPITAL MURDER: SOCIAL HISTORIES AND THE LOGIC OF MITIGATION

### Craig Haney[*]

*The death penalty, which really neither provides an example nor assures distributive justice, simply usurps an exorbitant privilege by claiming to punish an always relative culpability by a definitive and irreparable punishment.*

—*Albert Camus*[1]

*As great as is my compassion for Robert Harris the child, I cannot excuse nor forgive the choice made by Robert Harris the man.*

—*California Governor Pete Wilson*[2]

## I. INTRODUCTION

The system of death sentencing in the United States is a model of bad faith. It is founded upon several basic myths, one concerning the reality of capital murder—the act that gives rise to the punishment, another concerning capital jurisprudence—the legal procedures by which those defendants who supposedly deserve to die are selected from those who do not, and one concerning the reality of executions—the act that culminates the lethal process. The first myth, what might be called the myth of demonic agency, serves to deny the humanity of the persons who commit capital murder, substituting the heinousness of their crimes for the reality of their personhood. The second one—the myth of "super due process"—implies that the legal procedures under which capital punishment is administered are so extraordinarily fair

---

\* Professor of Psychology, University of California, Santa Cruz; B.A. University of Pennsylvania (1969), M.A. Stanford University (1971), Ph.D. Stanford University (1978), J.D. Stanford Law School (1978).

1. Albert Camus, *Reflections on the Guillotine, in* Resistance, Rebellion, and Death 131, 161 (1960).
2. Decision, In the Matter of the Clemency Request of Robert Alton Harris, at 3 (Apr. 16, 1992).

and solicitous of the rights of capital defendants that only the truly deserving are finally executed. The last one—the myth of civilized exterminations—saves proponents of capital punishment from the psychologically difficult (for some, insurmountable) task of coming face to face with the acts they sanction. In each instance, these myths function to blur the core realities of capital punishment—the social causes of capital crime, the normative inadequacies of capital trials, and the horror of state-sanctioned executions. Thus, at one end of this lethal process we are led to believe that those whose lives will be taken are less than human, and at the other end that the actions finally taken in our name by the state are other than barbarous. In between, we are reassured that a remarkably elaborate, legally-sophisticated, costly, and time-consuming process is at work to ensure that no mistakes are made and that only the most morally blameworthy are condemned to die. By blurring the core realities of capital punishment, these myths distort the terms of the death penalty debate and undermine its authenticity. They prevent each of us from taking full responsibility for our actions when our society executes one of its citizens. Not one of these myths is true and in no case is the moral integrity of the process of death sentencing served.

This article will concentrate on the first myth, the notion that people who commit capital crimes are less than human.

## II. ONLY DEMONS DESERVE TO DIE: THE SOCIAL CONSTRUCTION OF THE CAPITAL DEFENDANT

At the outset it is worth underscoring the way in which demonizing the perpetrators of violence facilitates their extermination at the hands of the state. Long before they enter a courtroom or a voting booth, American citizens have been bombarded with misleading stereotypes, partial truths that distort the painful realities that plague the lives of capital defendants. Rather than encouraging the public to contemplate what Judge David Bazelon once termed the relationship of crime to "accidents of birth,"[3] or what historian Peter Linebaugh more recently has called the connection of capital pun-

---

3. David Bazelon, *The Morality of the Criminal Law*, 49 S. CAL. L. REV. 385, 405 (1976).

ishment to the punishment of capital,[4] our system of death sentencing instead leads us to view capital defendants as genetic misfits, as unfeeling psychopaths who kill for the sheer pleasure of it, or as dark, anonymous figures who are something less than human. The public is given access—in some cases, an amazing amount of access—to only superficial and schematic details of the lives of capital defendants, typically only those "facts" that underscore their deviance and that facilitate their dehumanization. Since we can tolerate eliminating from the human social order only those who by their very nature stand outside its boundaries, the long-term viability of the system of death sentencing *requires* that capital defendants be depicted in this fashion.

The sources and dimensions of these demonized images warrant some discussion. With increasing intensity over the last several decades, politically-inspired media images have systematically misinformed the voting public and the pools of citizens from which criminal juries are drawn. Evidence from a variety of sources supports the notion that the public's fear of crime, its views of the nature of criminality, and corresponding demands for harsh punishment are the products of state and media manipulation. This manipulation involves highly politicized constructions rather than honest reactions to incidence and victimization.[5] The so-called "agenda setting" function of the state and the media have catapulted the death penalty to the forefront of public concern. At the core of this new concern has been a transformation in the media's depiction of criminality. In fact, the mood of the public began to shift from ambivalence about the death penalty to its present strong support at roughly the same time significant changes were taking place in the nature of television crime drama: "In the seventies, the easily understood and clearly identified mobsters and crime czars of the past had been replaced in the public's mind by more amorphous, but equally

---

4. PETER LINEBAUGH, THE LONDON HANGED: CRIME AND CIVIL SOCIETY IN THE EIGHTEENTH CENTURY, at xv (1992).

5. *See, e.g.*, Katherine Beckett, *Setting the Public Agenda: "Street Crime" and Drug Use in American Politics*, 41 SOC. PROBS. 425 (1994); William J. Chambliss, *Policing the Ghetto Underclass: The Politics of Law and Law Enforcement*, 41 SOC. PROBS. 177 (1994); George Gerbner, *Violence and Terror in and by the Media*, in MEDIA CRISIS AND DEMOCRACY: MASS COMMUNICATIONS AND THE DISRUPTION OF THE SOCIAL ORDER 94 (Raboy & B. Dagenais, eds., 1992); Mark Fishman, *Crime Waves as Ideology*, 25 SOC. PROBS. 531 (1978).

frightening forces. Criminals were often violent madmen and urban delinquents with no stake in society."[6]

Indeed, when a colleague and I systematically analyzed the misinformation that was being disseminated by television crime drama during this period, we found that there was something more to the way these violent madmen and urban delinquents were shown: television criminals were depicted uniformly without context, life connections, social relationships, basic human needs, wants, or hardships. They were, in short, non-people.[7] Instead, television criminals were represented or emblemized by the dastardly deeds they were shown committing (and whatever other incidental but odious traits could be shown in the first few minutes of the drama). Because they had no personal history, no human relationships, and no social context, there was no explanation for what they did except for their own personal evil. As one television historian observed, television drama "rarely invited the viewer to look for problems within himself. Problems came from the evil of other people, and were solved . . . by confining or killing them."[8]

Internal tensions created within the story lines themselves pushed audiences to demand a decisive triumph of good over the evil, one for which they had been prepared to react emotionally. A "just" and satisfying ending permitted nothing less than the clear-cut elimination of the wicked:

> And there is no ending more uncompromising than the death of one's antagonist. In the police story, justice is indefinitely suspended, the decisive combat postponed, until that final, cathartic scene in which the hero's previous inability to "speak" the definitive reply to the criminal violence is suddenly cured . . . . In this moment of purifying violence, all the frustrations of the hero's plot are fo-

---

6. HARRY CASTLEMAN & WALTER PODRAZIK, WATCHING TV: FOUR DECADES OF AMERICAN TELEVISION 246 (1982).

7. Craig Haney & John Manzolati, Television Criminology: Network Illusions of Criminal Justice Realities, in READINGS ABOUT THE SOCIAL ANIMAL 125 (E. Aronson ed.,1977).

8. ERIK BARNOUW, TUBE OF PLENTY: THE EVOLUTION OF AMERICAN TELEVISION 214 (1975). Indeed, just as with the terrorists about which Gerbner wrote, domestic criminals are depicted by the media as "isolated from their historical and social context, denied legitimacy of conditions or cause, and portrayed as unpredictable and irrational, if not insane" so that they come to "symbolize a menace that rational and humane means cannot reach or control." Gerbner, supra note 5.

---

cused into a gun barrel, all the delays of justice exploded by a single righteous bullet into the body of the criminal.[9]

Conditioned by repeated exposure to these manipulative morality plays, the mass audience has come to regard anything less than these "moments of purifying violence" as a denial of justice. The violence of the death penalty gives cathartic voice to a public frustrated by the real world's inability to deliver the "definitive reply" they have been led by the media to expect.

Newspaper reporting about crime introduces a different but equally problematic bias into the public's "knowledge" about who commits crime and why. Here, crime is important news when it happens—and until, typically, someone has been found upon whom it can be blamed—but rarely thereafter. Thus, because the background of the perpetrators and the social contextual forces that may have contributed to the criminal acts in question are unknown at the time most reporting occurs, newspaper coverage typically omits any analysis of them. Even after persons have been apprehended and charged with a crime, the press typically has little or no direct access to them and rarely shows any significant interest in their background and social history.

Indeed, the broad sociological forces that constitute the larger context of the crime, the background and history of the defendant, and even the deeper psychological issues that help to account for why a particular crime was committed by a specific defendant, are complex questions that often elude even those charged with the responsibility of investigating and prosecuting the crime.[10] By the time most of this information is gathered and becomes publicly accessible in a criminal trial, most cases are no longer "news" and—again, except for the most highly publicized cases—are no longer of interest to the press. Even in the rare case where such information is reported, most members of the public have already well-for-

---

9. Dennis Giles, A Structural Analysis of the Police Story, in AMERICAN TELEVISION GENRES 67, 81 (Stuart M. Kaminsky & Jeffrey H. Mahan eds., 1985).

10. A number of studies have documented the way in which social and economic contexts are ignored in crime reporting. See e.g., Melissa Barlow et al., Mobilizing Support for Social Control in a Declining Economy: Exploring Ideologies of Crime Within Crime News, 41 CRIME & DELINQ. 191 (1995); Drew Humphries, Serious Crime, News Coverage, and Ideology: A Content Analysis of Crime Coverage in a Metropolitan Paper, 27 CRIME & DELINQ. 191 (1981).

mulated views of the defendant, based upon whatever super-ficial and stereotypical information has been reported about him or her and the negative inferences they could draw from the nature of the crime.[11] Again, meaningful history, context, and explanation are lacking.

Film provides one of the few mediums through which any in-depth study of criminal behavior is even attempted for public consumption. Yet, almost invariably, such films sensationalize the nature of criminality, pander to the worst conceivable popular stereotypes, and are similarly uninformed by any realistic analysis of social context and personal history. Indeed, the American public has learned many of its "deepest" lessons about crime and criminality primarily through watching mythically frightening cinematic figures, figures like Hannibal Lecther—"Hannibal the Cannibal" (the sadistically mad killer, played with Oscar-winning skill by Anthony Hopkins in "Silence of the Lambs"[12])—they are tricked into believing that people who have committed capital murder relish their deadly work, plot brilliantly, diabolically, and joyfully to perform it, would just as easily polish off a meal of their victim's liver with a little Chianti as give you the time of day.[13]

---

11. For example, one study analyzed newspaper crime reporting in a major city during a one year period and found that over two-thirds of the articles related to only the beginning stages of criminal justice system processing (crime incidents, arrests, charges being lodged against suspects). In addition, the study found that that the commission of the crime itself accounted for the major details contained in the articles, and that post-arrest stages of criminal justice processing were seldom mentioned. Stanford Sherizen, *Social Creation of Crime News: All the News Fitted to Print*, in DEVIANCE AND MASS MEDIA 203 (Winick, C. ed., 1978). It also found that "[s]urprisingly, suspects were seldom described in detail. The typical information given about them was their name, age, and address." *Id.* at 218.

12. Thomas Harris' book, *Silence of the Lambs*, was made into a film by Orion Pictures in 1991. THOMAS HARRIS, SILENCE OF THE LAMBS (1988).

13. *Id.* There was, of course, another "bad guy" in this movie. Here is how one literary critic described him:

Buffalo Bill is dirty, inarticulate, artisanal (as opposed to artistic), vulgar, faggy, misogynistic, violent, perverted, tattooed, and mutilated; he listens to heavy metal, he drives a van, he lives in the suburbs, he owns a toy poodle named Precious, he is a Vietnam veteran. In short, he is an unformed, shadowy, vaguely working-class, gay composite non-character, a study in suburban Gothic, an appalling stereotype of class and erotic loathsomeness.

Adrienne Donald, *Working for Oneself: Labor and Love in The Silence of the Lambs*, 31 MICH. Q. REV. 346, 354 (1992).

---

Almost as soon as the lessons of a movie like "Silence of the Lambs" have been lost or forgotten, Hollywood delivers another dose of this abominably bad media criminology. Last year, for example, Oliver Stone taught vast audiences that most capital murderers are "natural born killers."[14] Mickey and Mallory—Stone's gratuitously, mindlessly, unbelievably violent couple—were violent for the sheer aesthetic joy of it, violent as an act self-expression while they carved up bodies and dispensed flesh-tearing gunshots much as an artist might decorate a canvas. For lack of any better, more serviceable lessons, the public was encouraged to believe that *this* is what capital punishment is about: People whose evil is so profound that it defies any attempt at rational explanation. Stone was forced at one point to stencil the word "DEMON" across his psychopathic protagonist's chest to make sure he got the point across.

Indeed, these were people whose frenetic addiction to violence was so inhuman that the film maker was forced numerous times to resort to animated cartoon figures because no real human being could adequately capture the extraordinary and grotesque distortions of body and soul he wished to convey. Yet, the reason a film like this fails as satire is because its distortions fall far too close to the dominant view. Audiences must have an alternative, competing vision of the truth against which to measure Stone's exaggerations. Too few of them did, in large part because of the extensive media miseducation they had received in the past.

The bizarre criminal caricatures of television and film are sometimes supplemented by written works of fiction. Yet, nowadays such writing not only reaches a dramatically smaller audience but does very little more than extend the same distorted mass media images that pander to an identical set of popular stereotypes. For example, one recent novel opened with its main character—a veteran prosecutor—referring to criminal defendants as "vermin" and describing repeat offenders as "rotten pieces of meat viler than when first

---

14. NATURAL BORN KILLERS (Warner Brothers Films 1994). The screenplay was adapted from an original story by Quentin Tarantino, whom one reviewer dubbed "the new guru of gore." Stanley Kauffmann, *Natural Born Killers*, NEW REPUBLIC, Oct. 3, 1994, at 26. In the increasingly politicized atmosphere of conservative criminology, scholarship comes to imitate art. *Cf.* Paul McNulty, *Natural Born Killers: Preventing the Coming Explosion of Teenage Crime*, 71 POL. REV. 84 (1995).

digested."[15] Not surprisingly, when she speculated about how to handle the crime problem, the death penalty came immediately to mind: "She thought of the guillotine, wondering if it had really been barbaric. They certainly didn't reoffend."[16] The book ended with the calming reassurance of a seasoned police officer telling the main character that her personal act of vengeance—the shotgun murder of a man she believed to have victimized her daughter (the essence of the "mitigating circumstances" from the book's title)—was entirely justified because: "The world doesn't need [them], the Bobby Hernandezes. You stepped on a cockroach. There are thousands more. They're in all the cabinets, under the sinks, crawling under every stinking toilet."[17] So why not kill them?

Other news outlets, including otherwise respectable journals of information and opinion, add another layer of misinformation to the mix. In recent years, for example, *Newsweek* magazine has carried numerous sensationalistic articles about violent crime fashioned from little more than random anecdotes and base stereotypes, virtually all ignoring the backgrounds and social histories of those involved.[18] These

15. NANCY ROSENBERG, MITIGATING CIRCUMSTANCES 3 (1993). The title provides an interesting twist on a badly misunderstood topic. Indeed, my graduate students and I have learned that, despite its absolute centrality to any attempt at fairly implementating the modern death penalty, "mitigation" is probably the least understood concept in current capital sentencing formulas. *See* Craig Haney & Mona Lynch, *Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions*, 18 L. & HUM. BEHAV. 411 (1994); Craig Haney et al., *Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death*, 50 J. SOC. ISSUES 149 (1994).

16. ROSENBERG, *supra* note 13, at 15.

17. *Id.* at 405.

18. For example, one several page spread, complete with dramatic, color mug shots, was entitled: *The Incorrigibles: They Rape and Molest. The Defy Treatment. How Can Society Protect Itself?* NEWSWEEK, Jan. 18, 1993, at 48-50. A later cover story showed a teenager running with a rifle, headlined: *Teen Violence: Wild in the Streets*, with an article that began: *Murder and Mayhem, Guns and Gangs: A Teenage Generation Grows Up Dangerous—and Scared.* NEWSWEEK, Aug. 2, 1993, at 40. Another article addressed *The Genetics of Bad Behavior*, its subtitle proclaiming *Science: A Study Links Violence to Heredity.* NEWSWEEK, Nov. 1, 1993, at 57. Another cover story blamed violence on rap music, with the cover itself featuring the picture of an African American rapper, looking much like a mug shot, and asking *When is Rap 2 Violent?* NEWSWEEK, Nov. 29, 1993. These stories are typical of those that appear in other magazines (e.g., a NEW AGE JOURNAL cover story, *Children Without a Conscience: An Inside Look at a Hidden Epidemic and Its Controversial Cure*, Feb. 1993.) They are interspersed in the public's consciousness with sensational headlines about the overwhelming threat that violent crime represents in our society. During just one month last year, the covers of all three national news magazines carried

narrowly misleading messages are not restricted to the glossy magazines that thrive on mass circulation.[19] One recent issue of a respected journal of book reviews carried this offhanded observation, feeding the mystique that the roots of capital violence are simply impossible to fathom:

> A problem with psychopathic killers, both for the law and for their biographers, is that they take their baggage with them. They profess innocence or create new excuses right up to the very end so that evidence of their deeds and even the basic facts of their lives are a confusing mass of contradictions. We know them only by the damage they leave behind, as though we were pursuing someone who had left the ransacked room just a moment before we arrived.[20]

frightening crime-related messages: Newsweek's January 10, 1994 cover reported on *Growing Up Scared: How Our Kids Are Robbed of Their Childhood* (because the fear of violent crime had become so pervasive in our society); the February 7, 1994 cover of Time ran a dramatic rendering of a criminal in a pillory made out of an American flag, under the words *Lock'Em Up And Throw Away the Key, Outrage Over Crime Has America Talking Tough;* and U.S. News & World Report ran its January 17, 1994 cover over what appeared to be three bullet holes that had pierced a glass window, surrounding the words *The Truth About Violent Crime, What You Really Have to Fear.*

19. Because sensationalizing violent crime has become an American industry, there are even glossier outlets than newsmagazines that are more dependent on mass circulation, and their messages are even more sensationalistic and misleading. For example, Time-Life Books used a national mailing to advertise their series on mass and serial murderers. The envelope that hundreds of thousands of potential buyers received depicted a pair of deep set eyes above the red letters: "Have You Ever Looked Into the Eyes of a Killer?" Recipients were further enticed—before they had even opened the envelope—with the promise: "Inside: a unique chance to probe the twisted minds and deeds of America's most violent criminals!" Not to be outdone, Columbia House Video Library's mailer promised recipients that they could "own this one-of-a-kind glimpse into the darkest side of the 20th century" by purchasing "one extraordinary video series [that] explores the shocking true stories of America's most notorious criminals," a series that among other things would answer the question: "What goes on inside the twisted mind of a serial killer?" Suffice it to say that not one of these source materials even begins to grapple honestly or accurately with the social causes of violent crime, concentrating instead only on the sordid and salacious.

20. Thomas Maeder, *Chicago's Jack the Ripper*, N.Y. TIMES BOOK REV. 25 (Nov. 27, 1994) (reviewing HAROLD SCHECHTER, DEPRAVED: THE SHOCKING TRUE STORY OF AMERICA'S FIRST SERIAL KILLER (1994)). Even sympathetic and thoughtful reviewers who have some measure of experience with these issues can fall prey to the confounding of free choice, legal responsibility, and just punishment that the media seems to insist upon with respect to serious cases. Thus, just two pages later in the same journal, Wendy Kaminer noted that although "none of us choose our temperaments or the conditions of birth and childhood," that the point "at which we decide that people assume responsibility for their behavior is arbitrary" (albeit necessary to draw), and that "good judg-

Despite the authoritative tone, it is hard to conceive of a more normatively incorrect account of the lives of capital defendants. The truth is that many of them admit to their wrongdoing and, as a group, they leave remarkably detailed documentary histories as well as numerous percipient witnesses who typically can testify to early traumatic experiences and mistreatment, often ill-fated attempts to overcome these legacies and, in many cases, what can only be interpreted as fairly desperate cries for help. But I get ahead of myself.

As the mood of the public has swung—and been coaxed, nudged, and shoved—to the right on the issue of violent crime, a conservative criminology has grown up to support mindlessly punitive strategies of control. This pseudo-scientific literature feeds the public's already increasing levels of fear. Indeed, one author claimed that serial murder—easily the very rarest form of homicide—was a disease "that had to be identified and diagnosed before it engulfed all of our social institutions."[21] As one commentator noted, "scholars who continue to investigate social explanations [for crime] are currently on the defensive against new voices calling for a return to a consideration of biology and psychology as the sources of criminal behavior."[22] Academics are still living in

the political wake of James Q. Wilson's assertion that "[w]icked people exist. Nothing avails except to set them apart from innocent people."[23] Increasingly, the "innocent" members of our society have taken to setting their "wicked" brothers and sisters apart from them by attempting to execute them.

The media's obsession with demonizing the causes of crime is not difficult to explain and tells us a great deal about the underlying dynamic that supports the death penalty itself. The slant in coverage is both economic and psychological in nature. For one, the economic mandate of television broadcasting seems to dictate a false clarity in depictions of crime and punishment. Only story lines in which pure good triumphs over pure evil leave audiences comfortably reassured: "[P]olice dramas offered a sense of security to their audiences. In theory that made them better consumers, which from a sponsor's view is the real purpose of all programming. Consequently, the new crime shows and commercial television were a perfect match."[24] In addition to the economic incentive, demonizing the perpetrators of certain kinds of crimes gets the

---

ment requires understanding (which is partly why defendants have lawyers who try to elucidate their sufferings and motivations)," she then criticized the use of such understanding in criminal sentencing because certain defendants are, in her eyes, "beyond the capabilities of the legal system" to heal. Wendy Kaminer, *They Told Him to Kill,* N.Y. TIMES BOOK REV. 27 (Nov. 27, 1994)(reviewing KEITH R. ABLOW, THE STRANGE CASE OF DR. KAPLER: THE DOCTOR WHO BECAME A KILLER (1994)). More popular treatments of courtroom attempts to elucidate the sufferings and motivations of criminal defendants categorically belittle them, dramatically overstate and inflate the instances in which this is done successfully, and badly garble the nature of the legal issues to which such testimony typically can be deemed relevant. This is true even when they are written by persons who should (and certainly do) know better. *Cf.* ALAN DERSHOWITZ, THE ABUSE EXCUSE AND OTHER COP-OUTS, SOB STORIES, AND EVASIONS OF RESPONSIBILITY (1994); J. Taylor, *Irresistible Impulses, Why America Has Lost Its Capacity to Convict the Guilty,* 121 ESQUIRE 96 (Apr. 1994).

21. J. NORRIS, SERIAL KILLERS: THE GROWING MENACE 4 (1988).

22. MERCER L. SULLIVAN, "GETTING PAID": YOUTH CRIME AND WORK IN THE INNER CITY 3 (1989). Indeed, these new voices "tend to see criminals as fundamentally different from other people—less bound by culture and less rational in the behavior" and to explain high crime rates in certain areas in terms of "the movement of already deviant individuals and families into those localities rather than as the result of economic and social disadvantages affecting particular groups and areas." *Id.* at 2. In fact, although the voices may be new, their message is quite old and familiar. *Cf.* Craig Haney, *Criminal Justice & the Nineteenth-Century Paradigm,* 6 L. & HUM. BEHAV. 191 (1982). The anachro-

nistic nature of the message has not prevented it from being vehemently promoted by the media and taken quite seriously by policymakers.

23. JAMES Q. WILSON, THINKING ABOUT CRIME 235 (1975). For example, one serious and highly touted book, Jack Katz's SEDUCTIONS OF CRIME: MORAL AND SENSUAL ATTRACTIONS IN DOING EVIL (1988), argued that crime represents an attempt on the part of most criminals to "transcend" their environment. I agree and, indeed, much of what I will say about the social histories of capital defendants is consistent with this basic proposition. However, because the author neglects to grapple meaningfully with the causal role of historical and material conditions in producing criminality—by failing to look seriously at the nature of the environment that the perpetrators of crime seek to transcend—the book associates crime with simple hedonism, a "sensual magic" whose primary function seems to be to give perpetrators much personal pleasure. As one reviewer described it, the book "insists that we take seriously the satisfactions that disreputable and depraved acts of predation can bring to those who commit them." John Hagan, *The Pleasures of Predation and Disrepute,* 24 LAW & SOC'Y REV. 165, 165 (1990). Yet, grappling seriously with the social histories of violent offenders—something this book did not pretend to do—leads one less in the direction of this romantic albeit selfish vision and more towards mundane issues of physical, psychological, and social survival in a decidedly hostile world.

24. Steven D. Stark, *Perry Mason Meets Sonny Crockett: The History of Lawyers and the Police as Television Heroes,* 42 U. MIAMI L. REV. 229, 246 (1987). For the related thesis that the economic structure of the media constrains the messages it disseminates and subverts its editorial content to reflect only a homogenized view of reality that is most comforting and attractive to affluent readers and viewers, see C. EDWIN BAKER, ADVERTISING AND A DEMOCRATIC PRESS (1994). *See also* Gerbner, *supra* note 5.

rest of society off the hook for attitudes and practices that are widespread but which implicitly promote and condone violence. For example, as one theorist has argued, "in myriad ways, the culture regularly doublethinks a distance between itself and sexual violence, denying the fundamental normalcy of that violence in a male supremacist culture and trying to paint it as the domain of psychopaths and 'monsters' only."[25] And, because the media presents us with the most distorted and extreme possible versions of violence—individual grotesques that bear so little relationship to the rest of us that no one in the audience can identify with them—we are saved the unpleasant task of confronting the potential for violence that we all share.[26]

In addition, it becomes justifiable "to kill those who are monsters or inhuman because of their abominable acts or traits, or those who are 'mere animals' (coons, pigs, rats, lice, etc.) . . . ." because they have been excluded "from the universe of morally protected entities."[27] But locating the causes of capital crime exclusively within the offender—whose evil must be distorted, exaggerated, and mythologized—not only makes it easier to kill them but also to distance ourselves from any sense of responsibility for the roots of the problem itself.[28] If violent crime is the product of monstrous offenders, then our only responsibility is to find and eliminate them. On the other hand, social histories—because they connect individual violent behavior to the violence of social conditions—implicate us all in the crime problem.

Yet, as somebody who has studied capital murder for the last 19 years, and extensively examined the backgrounds and

25. Jane Caputi, *The Sexual Politics of Murder*, 3 GENDER & SOC'Y 437, 444 (1989).

26. For an especially thoughtful discussion of this issue, especially in the context of social histories and capital mitigation, *see* George Watson, *Responsibility and the Limits of Evil: Variations on a Strawsonian Theme*, *in* RESPONSIBILITY, CHARACTER, AND THE EMOTIONS: NEW ESSAYS IN MORAL PSYCHOLOGY 256 (Schoeman, F. ed., 1987).

27. Robin M. Williams, Jr., *Legitimate and Illegitimate Uses of Violence: A Review of Ideas and Evidence*, *in* VIOLENCE AND THE POLITICS OF RESEARCH 23, 34 (Willard Gaylin, et al. eds., 1981).

28. As one media critic has put it: "For the most part, the media present myths and symbolic narratives which distort and obscure the realities of social violence, taking agency and responsibility away from that kind of social structure that actually benefits from it and projecting it onto other kinds of symbolic beings— monsters, demons, cabals of futuristic conspirators." Elayne Rapping, *The Uses of Violence*, THE PROGRESSIVE, August 1991, at 36. *See also supra* note 10.

social histories of people accused or convicted of capital crimes, I have a secret to reveal. People like Hannibal Lecther and Mickey and Mallory do not exist. To the extent to which there are persons who manifest even the *slightest* resemblance to these terrifying figures—and even then only because of what they have done, not who they are—they exist in numbers so utterly insignificant as to be literally irrelevant to any meaningful discussion of the death penalty. To be sure, these sensationalized, demonic images have become so much a part of the public's "knowledge" about crime and punishment that, despite their fictional, socially constructed quality, they wield significant power in actual legal decisions. They have garnered an important hold on matters of life and death. Indeed, these are the images that American citizens bring into many courtrooms and voting booths across the country. Unless they are effectively debunked, there is little hope that we will ever develop an effective strategy of crime control in the United States or that any significant measure of fairness and justice will be brought to capital case decisionmaking.

## III. SOCIAL HISTORIES AS CONTEXT

Now I have come to the heart of my thesis. Despite these widespread media mystifications about "natural born killers" and epidemics of the "disease" of murder, any meaningful explanation for capital violence must begin with an examination of the structure of the lives of those who commit it. This examination leads us to conclusions about the causes of crime and the culpability of capital offenders that are very much at odds with the stereotypes created and nourished by the system of capital punishment that prevails in our society. Ironically, capital trials are one of the very few forums available in which to directly confront these stereotypes. Indeed, since the mid-1970s constitutional law has *required* that capital juries—those who in the overwhelming majority of states, including California are charged with the responsibility of choosing between life and death—must consider, among other things, the background and character of the defendant. The social history of the defendant has become the primary

vehicle with which to correct the misinformed and badly skewed vision of the capital jury.[29]

It is important to emphasize that mitigating evidence—including what I will say about the structure of capital defendants' lives and the nature of their social histories—is *not* intended to excuse, justify, or diminish the significance of what they have done, but to help explain it, and explain it in a way that has some relevance to the decision capital jurors must make about sentencing. Thus, nothing that I will say in the following pages is intended to in any way diminish or otherwise lose sight of the significance and human tragedy of capital violence. Quite the contrary, I do not believe we pay fitting tribute to the victims of these crimes by continuing to ignore their causes. Only if we look honestly at the lives of those who commit capital crimes—and cease to be blinded by the fictionalized, demonized caricatures the media feeds us—can we learn the lessons by which future victims can be spared.[30]

Social histories, in this context, then, are not excuses, they are explanations. An explanation does not necessarily dictate an outcome, not even a penalty trial outcome. Some

---

29. *E.g.*, Dennis Balske, *New Strategies for the Defense of Capital Cases*, 13 AKRON L. REV. 331 (1979); Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299 (1983); Roy Herron, *Defending Life in Tennessee Death Penalty Cases*, 51 TENN. L. REV. 681 (1984). One commentator has summarized the complexity of the "complete background investigation of the inmate's life" that must be performed by investigators and experts in the construction of a social history:

> This typically requires counseling with members of the prisoner's family, loved ones, and friends in order to uncover intimate information which could be critical to the litigation. The investigation must cover the inmate's childhood, family life, education, relationships, important experiences, and overall psychological make-up. Crucial witnesses such as childhood friends, teachers, employers, religious advisors, and neighbors may be 'scattered like a diaspora of leaves along the tracks of the defendant's travels'; nevertheless, they must be located and interviewed in order to determine whether they can provide favorable evidence.

Michael Mello, *On Metaphors, Mirrors, and Murders: Theodore Bundy and the Rule of Law*, 18 N.Y.U. REV. L. & SOC. CHANGE 887, 895 (1990-91)(footnotes omitted).

30. *Cf.* Robin West, *Narrative, Responsibility and Death: A Comment on the Death Penalty Cases from the 1989 Term*, 1 CONTEMP. LEGAL ISSUES 161 (1990). West argues that we must learn about the life circumstances of capital defendants, as well as the social realities that created those circumstances, "because the victims of crime deserve it, the communities that fear crime need it, and the intractable problem of violent crime demands it." *Id.* at 176.

---

explanations lead to life verdicts, and some do not. But no jury can render justice in the absence of an explanation. In each case, the goal is to place the defendant's life in a larger social context and, in the final analysis, to reach conclusions about how someone who has had certain life experiences, been treated in particular ways, and experienced certain kinds of psychologically-important events has been shaped and influenced by them.[31]

When I began to study the backgrounds and social histories of capital defendants almost 20 years ago, very little was known about the social and psychological forces that helped to shape and influence their life course. It quickly became clear that many capital defendants shared a pattern of early childhood trauma and maltreatment. What was lacking was a theoretical framework with which to understand how the effects of that shared history could be manifested years later. But we now have developed much of that theoretical framework. In part, it reflects a turning away from a century-old bias that located the causes of violent criminality exclusively inside the individuals who engaged in it.[32] There is increased recognition that the roots of violent behavior extend beyond the personality or character structure of those people who perform it, and connect historically to the brutalizing experiences they have commonly shared as well as the immediately precipitating situations in which violence transpires. Capital penalty trials, then, have become unique legal forums in which it is possible to tell the truth about the lives of capital defendants. These are stories that are being told almost nowhere else in the United States. Yet these stories—and what they tell us about the roots of violence—can assist in

---

31. Although they were talking about the "context" of the persons who judge—and I am talking about the context of those who are judged as it is taken into account by those who judge them—Minow and Spelman's definition of the term captures much of the way in which a social history provides an essential context for capital decisionmaking:

> Context, in this sense, represents the acknowledgment of the situatedness of human beings who know, argue, justify, judge, and act. Rather than a weakness or a departure from the ideal of distance and impersonality, acknowledging the human situation and the location of a problem in the midst of communities of actual people with views about it is a precondition to honesty in human judgments.

Martha Minow & Elizabeth Spelman, *Symposium on the Renaissance of Pragmatism in American Legal Thought: In Context*, 63 S. CAL. L. REV. 1597, 1649 (1990).

32. *Cf.* Haney, *supra* note 22.

our understanding of capital murder, provide a framework for comprehending a single, violent social history, and serve as the basis for the development of a responsible social policy of violence prevention in lieu of the mindless punitiveness with which our society has become recently enamored.

Unfortunately, I must also acknowledge that although capital juries, perhaps more than any other decisionmaking body in the legal system, deserve to get the truth about the persons whose fates they decide, and are, in theory, afforded an opportunity to hear the truth that few others in our society ever get, they still too rarely do. In the case that began the modern history of executions in the United States, Gary Gilmore's jury never knew the truth about his life.[33] Although we have come a long, long way in perfecting our analysis and understanding of the social histories that stand behind capital crimes, I also know that Robert Harris was executed in California 15 years *after* Gilmore without his jury— or any other legal decisionmaker for that matter—ever knowing the truth about him. David Mason, the second and most recently executed person in California since the state resumed the business of killing, was also sentenced to death by a jury that never heard the truth about him, and executed before anyone could remedy the fact.

What, then, *is* the truth? Who commits capital murder? If not Hannibal Lechter, then who?

## A. *"Family Values" and Capital Mitigation*

Amidst the current topical discussion of family values, there is increasing recognition across disciplinary and ideological spectrums that "[d]uring their years of growth and development, children need dependable attachment, protection, guidance, stimulation, nurturance, and ways of coping with adversity."[34] But most capital defendants have lived a lifetime without any of these things. Indeed, we know now that persons accused and convicted of capital murder are very

33. For a description of Gilmore's trial, *see* NORMAN MAILER, THE EXECUTIONER'S SONG (1979). For a powerful rendering of what was, in essence, the penalty trial that Gilmore never got, see his brother's historical account of their family. MIKAL GILMORE, SHOT IN THE HEART (1994).

34. David Hamburg, *The American Family Transformed*, Soc'Y, Jan.-Feb. 1993, at 60.

often the victims of poverty, and they have frequently been physically abused and chronically neglected as children.[35]

### 1. *The Effects of Poverty on the Lives of Capital Defendants*

Some capital defendants are the children of profound poverty and deprivation, creations of a society that has, over the last 20 years, systematically turned its back on its poor and on its children. We have been content to let government programs trickle down, when a raging torrent of assistance was needed. We have bought enhanced material wealth for those at the top of the economic order, at the price of desperation, damage, and rage for those at the bottom. We are a society that has learned to "just say no" to its poor and to their young, and some of those young have grown up, still hurting from the victimization inflicted upon them as children, the absence of self-worth, lacking in any sense of their own value, and some of them are still angry, and some are damaged and, yes, some are destructive.

Although we are just beginning to assess the long-term consequences of childhood poverty, researchers have documented the persistent despair that profound economic deprivation can inflict so that, not surprisingly, children who grow up in deprived households are less likely to be hopeful, self-directed, and confident about their future than those who grow up under better economic conditions.[36] One national survey found that welfare status or perceived financial stress was significantly related to children's emotional and behavioral problems—specifically, to higher levels of depression, antisocial behavior, and impulsivity.[37] Unemployment and employment in poor quality jobs are systematically related to

35. The widespread poverty of capital defendants is generally accepted and has escaped much academic commentary. However, see Bob Egelko, *One Thing Constant on Death Row: Inmates are Poor*, San Jose Mercury News, Aug. 14, 1994, at 3B; see generally, Marilyn Feldman et al., *Filicial Abuse in the Histories of 15 Condemned Murderers*, 14 BULL. AM. ACAD. PSYCHIATRY & L. 345 (1986); Dorothy O. Lewis et al., *Intrinsic and Environmental Characteristics of Juvenile Murderers*, 27 J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 582 (1988).

36. *See generally*, Greg J. Duncan, et al., *Economic Deprivation and Early Childhood Development*, 65 CHILD DEV. 296 (1994).

37. David Takeuchi et al., *Economic Distress in the Family and Children's Emotional and Behavioral Problems*, 53 J. MARRIAGE & THE FAM. 1031 (1991).

the arrest rates among juveniles and young adults.[38] And, in the United States, poverty and unemployment are inextricably interrelated to race.[39] African American children, particularly, are more likely to live under conditions of *chronic* poverty.[40]

In recent years, the mechanisms by which the structural variable of poverty translates into significant psychological consequences for children who experience it have received increased attention. We know that poverty forces family members to adapt to scarcity in ways that affect interpersonal relationships and, in turn, child development. One ethnographer studying children growing up in a poor urban neighborhood acknowledged their resourcefulness in dealing with poverty, but then concluded:

> Kids' resourcefulness, however, has been no match for the physical toll of poverty and its constant frustrations and humiliations. A number of the children I know came into the world already victimized by prenatal undernourishment and, as a result, by premature birth or a low birthweight. Since the, inconsistent mealtimes, punctuated by feasts on hunger-numbing junk food bought with proceeds from odd jobs or the leftovers from welfare checks, have left many kids alternately drained, hyperactive, and irritable. Frustration at their parents inability to provide and memories of those adults' defensive responses to requests for food and clothes inevitably help engender . . . mistrust and manipulative behavior . . . . Poverty also often engenders a deep sense of personal failure and humiliation.[41]

Among other things, poverty pushes children too rapidly toward adult status and roles and, because interpersonal resources within the family must be devoted more to survival

---

38. Emilie Anderson Allan & Darrell J. Steffensmeier, *Youth, Underemployment, and Property Crime: Differential Effects of Job Availability and Job Quality on Juvenile and Young Adult Arrest Rates*, 54 AM. SOC. REV. 107 (1989).

39. *E.g.*, one study found that although single year poverty rose among both Black and White children between 1970 and the mid-1980s, the absolute differences remained quite large. The average percentage of poor rose from 10.5% to 12.9% during this period among White children, and a staggering 42.5% to 45.1% among Black children. Greg J. Duncan & Willard Rodgers, *Has Children's Poverty Become More Persistent?*, 56 AM. SOC. REV. 538 (1991).

40. *E.g.*, Mary Jo Bane & David T. Ellwood, *Slipping In and Out of Poverty: The Dynamics of Spells*, 21 J. HUM. RESOURCES 1 (1986).

41. CARL H. NIGHTINGALE, ON THE EDGE: A HISTORY OF POOR BLACK CHILDREN AND THEIR AMERICAN DREAMS 55 (1993).

---

than to childrearing, younger children tend to grow up "undersocialized."[42] Other researchers have documented the ways in which economic hardship produces psychological distress for both parents and children. This distress undermines parents' ability to provide nurturant care and increases tendencies toward inconsistent discipline which are, correspondingly, associated with increased depression, drug use, and delinquency among their adolescent children.[43]

The linkages from childhood poverty to adult violence are complex but not difficult to comprehend. In addition to the role that poverty plays in increasing despair and undermining self-esteem, in forcing the undersocialization of children, and in interfering with consistent and nurturant parenting—all of which put children at greater risk of delinquent behavior—we know that poverty results in increased levels of frustration, and that chronic poverty can result in chronic frustration. Depending upon the circumstances—particularly, the reasons a person perceives his or her desired goals are blocked—such frustration can produce reliably greater levels of "angry aggression."[44] We also know about the way in which persistent poverty is predictive of severe and recurrent child abuse. That is, "[v]iolence does occur at all income levels but it is more often repeated among the persistently poor."[45]

---

42. *E.g.*, Glen H. Elder & Avshalom Caspi, *Economic Stress in Lives: Developmental Perspectives*, 44 J. SOC. ISSUES 25 (1988).

43. Jacques D. Lempers et al., *Economic Hardship, Parenting, and Distress in Adolescence*, 60 CHILD DEV. 25 (1989). Proposals to criminalize poor parenting underscore the degree to which parental behavior affects subsequent juvenile behavior but also shortsightedly ignores the extent to which poor parenting is often shaped by structural variables over which parents themselves have little control. *Cf.* S. Randall Humm, *Criminalizing Poor Parenting Skills as a Means to Contain Violence by and against Children*, 139 U. PA. L. REV. 1123 (1991). Like most exclusively criminal justice oriented approaches to social problems, these proposals not only fail to offer much of a solution but also are subject to discriminatory application. *E.g.*, Kathryn Ann Farr, *Fetal Abuse and the Criminalization of Behavior During Pregnancy*, 41 CRIME & DELINQ. 235 (1995).

44. *E.g.*, Leonard Berkowitz, *Frustration-Aggression hypothesis: Examination and Reinterpretation*, 106 PSYCHOL. BULL. 59 (1989) (frustration leads to aggression to the extent to which it produces negative affect); Lin Huff-Corzine, et al., *Deadly Connections: Culture, Poverty, and the Direction of Lethal Violence*, 69 SOC. FORCES 715 (1991)(severe poverty is associated with high rates of lethal violence); Kirk R. Williams, *Economic Sources of Homicide: Reestimating the Effects of Poverty and Inequality*, 49 AM. SOC. REV. 283 (1984)(poverty provides fertile soil for lethal violence).

45. Candace Kruttschnitt et al., *The Economic Environment of Child Abuse*, 41 SOC. PROB. 299, 310 (1994). This fact may help to explain the comparatively

Many of the capital defendants whose social histories I have compiled—and I have chosen randomly from a handful of the hundreds of similar stories that could be told[46]—speak directly about the scars of poverty. One of these defendants lived homeless on the freezing streets of Kansas City, 9 years old with no food, save what he could beg or steal, no one to clothe let alone comfort him. When the bitter cold of a midwestern winter became unbearable, he took refuge on the top of an office building, where he lived for months inside a heating vent that protruded from the roof, the steam providing the only warmth he could find. Another capital defendant and his brothers and sisters were turned in to police by neighbors who saw them scrounging around in garbage cans, looking for food. They were, in the words of the social worker who eventually brought them in, "alone, dirty, hungry, in ragged clothing" and routing in trash cans looking for scraps of food. Another capital defendant and his siblings also foraged for food in garbage cans and when they were finally brought in off the streets they suffered from severe malnutrition and had distended bellies; it took the foster mother who received them the better part of a day to wash the lice and matting out of their hair. One Native American defendant whose life I studied was found crying and starving and abandoned on the reservation by a mother who simply was too poor to care for him. He was so malnourished that doctors did not expect him to live. When we searched for the mother

---

higher rates of child maltreatment reported in African American families. For example:

> Black children suffer disproportionately from virtually every form of stress affecting full and healthy development. Too many black children live in conditions of poverty that deprive them of necessary medical care, adequate housing, food, and clothing. Yet none of these stressors is more threatening to the healthy development of black children and to the stability of their families than intrafamilial child abuse.

Ruby F. Lassiter, *Child Rearing in Black Families: Child-Abusing Discipline?*, in VIOLENCE IN BLACK FAMILIES 39 (Robert L. Hampton ed., 1987). *See also*, Jessica H. Daniel, et al., *Child Abuse and Accidents in Black Families: A Controlled Comparative Study*, 53 AM. J. ORTHOPSYCHIATRY 645 (1983); Vonnie C. McLoyd, *The Impact of Economic Hardship on Black Families and Children: Psychological Distress, Parenting, and Socioeconomic Development*, 61 CHILD DEV. 311 (1990).

46. In this and remaining sections of this article, I have included descriptions and direct quotes taken from a small but what I believe to be representative sample of the extensive number of documents I have reviewed and interviews I have conducted in the course of compiling the social histories of numerous capital defendants.

---

of another capital defendant, to talk to her about her son's early childhood development, we were directed to the park in San Francisco where she lived, where she had always lived, while her son was trying to grow up and become a responsible adult.[47]

Of course, there is more. Developmental psychologists tell us that children need love and stability in order to prosper. It is a cliché, but it is true. Yet, capital defendants have usually had neither of these things. The structure of their social histories is pervaded by chaos and instability. Their families move, their parents separate and divorce, there are new adults in their lives (sometimes so many that they can't keep them straight or remember their names), they move because of poverty, they move because of their parents chronic instability and interpersonal conflicts, they move because of the restlessness and whimsy of those adults who are in charge of them, and they move because their families have such a tenuous grasp on harsh labor markets that they are buffeted around from job to job at the slightest economic shift. One capital defendant whose life I studied grew up all over South Central Los Angeles. Literally. He moved 41 separate times before he had graduated from high school, all within a fairly narrow corridor of Los Angeles, but just far enough away each time to enter unfamiliar territory, and usually to change schools. Each chaotic move represents a life uprooted, friendships broken, relationships that can not be pursued or cemented, schoolmates and teachers left behind, classes that will never be finished, school lessons never completely learned.

Indeed, for many of these defendants there was nothing in their lives that was stable, nothing that lasted long enough for them to become invested in, nothing in the world around them that stood still long enough to help them structure their lives or identities from it. One recent review of a book about child development used an African proverb for its title: "it

---

47. Homelessness, we now know, is more than a tragic social problem; it has profound psychological consequences for those children who chronically endure it. Janice M. Molnar et al., *Constantly Compromised: The Impact of Homelessness on Children*, 46 J. SOC. ISSUES 109 (1990). Many of these children grow up feeling that they will never fit in, they are insecure and deeply frightened by what they perceive as an unpredictable and hostile world around them. *Id.*

takes an entire village to raise a child,"[48] underscoring the degree to which children are dependent upon the broader context in which they grow up or, as the reviewers put it, "children must be seen in relation to their family, and families must be seen in relation to their community."[49] But many of the children whose social histories end in capital violence either do not live long enough in a single community to establish anything approaching familial ties, or they grow up in communities where social disorganization and the press of poverty precludes the other villagers from taking any role in their upbringing.

### 2. *Childhood Abandonment and Neglect*

Who else commits capital murder? If not Hannibal Lechter, then who? In addition to abject poverty and deprivation and instability, there are other predictable components and patterns to the social histories that define these lives. Many of them are the children of abandonment and neglect. Again, my subjects' lives tell a story about the origins of violent crime that anyone who wants to understand this social problem must know about. For example, one capital defendant's mother was a prostitute and a junkie who regularly got arrested, leaving her 5 children—all under the age of 9—alone for days at a time, sometimes weeks at a time, to fend for themselves. Neighbors often complained that the kids cried and screamed at night, but they had learned to hide in a backroom closet when the police came looking for them. When the authorities finally did catch up with the defendant and his siblings and came to split the family into different foster care placements, his oldest sister protested to the social workers, "you can't do this to *my* children." She was 9 years old. Another capital defendant's 9 year old sister was also so accustomed to taking care of her 2 and 1/2 year old brother that she referred to him as "my baby" to the welfare workers who interviewed her. Another defendant's mother abandoned him as a 13 year old to the streets of small city, where he lived for a year or so, mostly on the sidewalks and out of the back of a car. When authorities finally contacted his father—a man from whom the boy had earlier escaped when he

---

48. Richard M. Lerner & Marvin H. McKinney, *It Takes an Entire Village to Raise a Child*, 38 CONTEMP. PSYCHOL. 783, 783 (1993).

49. *Id.*

tried to sexually abuse him—he told them that he never believed the child was actually his and didn't want to have anything to do with him anyway. In the case of the man whose death marked the resumption of executions in California after a 25 year hiatus, Robert Harris's mother drove off with the rest of his family leaving 14 year-old Robert all alone in the field where they had been working. She continued driving halfway across the country and Robert didn't see her or his father again for 5 years. When he was incarcerated a year later, federal authorities described him, simply, as a "homeless waif." Indeed, Robert Harris' long life of incarceration began simply because his mother refused to take him back; the others who were arrested with him for car theft were all released to the custody of their parents.

### 3. *Child Abuse and Maltreatment in the Lives of Capital Defendants*

As profoundly as neglect has permeated the early lives of capital defendants, for some neglect alone would be more benign than the treatment many received at the hands of their parents.[50] Child abuse or maltreatment has been defined variously as "the degree to which a parent uses negative, inappropriate control strategies with his or her child,"[51] or "acts of omission or commission by a parent or guardian that are judged by a mixture of community values and professional expertise to be inappropriate and damaging."[52] Whichever definition is employed, we know that abuse can be destructive of character and, depending upon its nature and severity, can produce profoundly disabling long-term effects in those who are its victims.[53] Indeed, we know that: "Inappropriate parental behavior may produce physical, emotional, or sexual

---

50. I do not mean to imply that child neglect does not have its own independently and profoundly harmful consequences. It does. *E.g.*, *see* Julie L. Crouch & Joel S. Milner, *Effects of Child Neglect on Children*, 20 CRIM. JUST. & BEHAV. 49 (1993). Unfortunately, child neglect also occurs in conjunction with physical abuse in a high percentage of cases, and both co-occur with unusual frequency in the lives of capital defendants.

51. DAVID A. WOLFE, CHILD ABUSE: IMPLICATIONS FOR CHILD DEVELOPMENT AND PSYCHOPATHOLOGY 25 (1987).

52. James Garbarino, *The Incidence of and Prevalence of Child Maltreatment*, in 11 CRIME & JUSTICE: A REVIEW OF RESEARCH 219, 220 (Lloyd Ohlin & Michael Tonry, eds., 1989).

53. *E.g.*, LEONARD SHENGOLD, SOUL MURDER: THE EFFECTS OF CHILDHOOD ABUSE AND DEPRIVATION (1989).

damage. Although we cannot always accurately predict what effects maltreatment will produce, victims most often suffer multiple damage, and individual susceptibilities to harm differ."[54]

Although it is difficult to predict precisely which of the harmful effects of maltreatment any particular child will manifest, studies show that juveniles who have become involved in delinquency "have endured child abuse and neglect at far greater rates than estimates for the population as a whole and for the low-income groups in particular."[55] We certainly know that abused children are much more likely to engage in violence as adults, giving rise to what some have called a "cycle of violence."[56] Early efforts to uncover the mechanisms by which this pattern was psychologically encoded focused on "identification with aggressor." That is, at least some abused children were found to exhibit poor impulse control and more readily express aggressive impulses in large part because they had learned to model the behavior of the powerful parent who mistreated them. Others have emphasized the developmental role of aggression in protecting the self against a hostile, seemingly psychologically life-threatening environment of the sort that is created by an abusive parent. As one study documenting the neurological, cognitive and socio-emotional consequences of physical abuse noted:

> Parental maltreatment of children is essentially an interpersonal phenomenon and, as such, it would be expected to have major effects on children's social behavior and their understanding of social relationships. Given the child's exposure to parental violence as a legitimate means of interacting with other people, it is not surprising to find that the behavioral effect most well documented by both direct observation and parent and teacher ratings is that abused children are more aggressive, showing more

---

54. Garbarino, *supra* note 52, at 221.

55. *Id.* at 251.

56. Kenneth A. Dodge et al., *Mechanisms in the Cycle of Violence*, 250 Sci. 1678 (1990); Cathy S. Widom, *Child Abuse, Neglect, and Adult Behavior: Research Design and Findings on Criminality, Violence, and Child Abuse*, 59 Am. J. Orthopsychiatry 355 (1989); Cathy S. Widom, *The Cycle of Violence*, 244 Sci. 160 (1989).

---

hostile, externalizing and negative social behavior with other people than nonabused children.[57]

These mechanisms help to explain the intergenerational transmission of violence and abuse that characterizes the lives of so many capital defendants—poor parenting and poor psychosocial functioning tends to replicate itself in the adults who were once its childhood victims.[58]

Again, I choose several examples from the many stories that could be told. Robert Harris was physically abused even before he was born—his drunken father's kicks to his pregnant mother's stomach precipitated his birth. This trauma was simply a prelude to the years of abuse he would endure as a young child. Another capital defendant whose social history I compiled was beaten so badly by his parents that, like many abused children, he refused to change his clothes for gym class so that the other students would not see the bruises that covered his body. One of his teachers told us, some forty years after having him in her class, that she was

---

57. Suzanne Salzinger et al., *Risk for Physical Child Abuse and the Personal Consequences for its Victims*, 18 Crim. Just. & Behav. 64, 74 (1991)(citations omitted).

58. *E.g.*, Joan McCord, *Aggression in Two Generations*, in Aggressive Behavior: Current Perspectives 241 (L. Rowell Huesmann, ed., 1994) (aggression is transmitted intergenerationally in part because aggressive fathers create the social environments conducive to aggressive behavior). *See also*, Joan McCord, *The Cycle of Crime and Socialization Practices*, 82 J. Crim. L. & Criminology 211 (1991); Beverly Rivera & Cathy S. Widom, *Childhood Victimization and Violent Offending*, 5 Viol. & Victims 19 (1992) (neglected and abused African American male children have a higher likelihood of arrests for delinquency, adult criminality, and violent criminal behavior); Michael Rutter et al., *Parenting in Two Generations: Looking Backwards and Looking Forwards*, in Families at Risk 60 (Nicola Madge, ed., 1983). *See also*, Pamela Lattimore et al., *Predicting Rearrest for Violence Among Serious Youthful Offenders*, 32 J. Res. Crime & Delinq. 54 (1995) (finding that "[e]ven among a relatively homogeneous group of youthful offenders, the majority of whom had substantial criminal records, evidence of family violence, parental criminality, and parental neglect or poor supervision significantly increased parolees' risk of rearrest for violent crimes."); Richard M. Tolman & Larry W. Bennett, *A Review of Quantitative Research on Men Who Batter*, 5 J. Interpersonal Violence 87 (1990); Derek Truscott, *Intergenerational Transmission of Violent Behavior in Adolescent Males*, 18 Aggressive Behav. 327 (1992). Truscott concluded:

> The present findings support the hypothesis that violence is transmitted intergenerationally from parents to their adolescent offspring and that psychological mechanisms are, at least in part, a feature of this transmission. In the present all-male sample, violent adolescent behavior was found to be associated with being physically and verbally aggressed against by the father.

*Id.* at 332.

still haunted by the look of terror and fear in his eyes. Another defendant was beaten nearly every day of his young life with a switch from a tree or with a belt, was regularly locked in his room, where his parents had removed the handles from the door and installed several locks on the outside of the door and boarded up all the windows. They would leave him in there for days at a time, forcing him to urinate and defecate on the bedroom floor, something for which he would then be punished. He cried and begged to be let out and would become so claustrophobic that he almost asphyxiated several times from the panic attacks that he experienced. The punishment only escalated. As he got older his parents made him do push ups while they held a hunting knife under his chest, as motivation to keep him from faltering. Another defendant's father used to bind his children by the wrists and hang them on a hook, sometimes naked, repeatedly whip them and, if he was really angry, pour alcohol in their wounds, while they were still hanging, like slaughtered cattle, in the basement of their house.

Research by developmental psychologists has indicated that witnessing abuse can sometimes be as psychologically damaging as direct victimization itself.[59] Indeed, many capital defendants come from chronically abusive homes in which their mothers and other siblings have been physically attacked in their presence, sometimes despite their childish attempts at intervention. Their social histories reflect this trauma as well. One defendant's father broke his stepmother's neck by jumping up and down on her with heavy

59. *Eg.*, Mindy Rosenberg, *Children of Battered Women: The Effects of Witnessing Violence on Their Social Problem-Solving Abilities*, 10 BEH. THERAPIST 85 (1987); Mindy Rosenberg & R. Giberson, *The Child Witness to Family Violence*, in CASE STUDIES IN FAMILY VIOLENCE 231 (Robert Ammerman & Michel Hersen, eds., 1991). *See also*, Marsha Klienman, *Children—Witnesses to, and Victims of, Domestic Violence*, N.J. PSYCHOL. 13 (Fall 1987). See also, David Wolfe et al., *A Multivariate Investigation of Children's Adjustment to Family Violence*, in FAMILY ABUSE AND ITS CONSEQUENCES 228 (Gerald Hotaling et at. 1988), who found that boys appeared to be more vulnerable to the effects of marital discord and, although the researchers could draw no simple causal connections between witnessing abuse and subsequent adjustment problems, they concluded that "[b]esides inappropriate modeling of conflict resolution, these children are affected by their mothers' diminished effectiveness as a parent, negative changes in family status, and related factors that result from family violence." *Id.* at 239. *See also*, McCord, *supra* note 58 (finding that exposure to parental conflict and aggression was one of the "instigating conditions" to adult criminality).

steel tipped workboots; another time he struck a glancing blow to her head with an axe, a blow that was intended to split her head down the middle but missed its mark when she turned away at the last moment. The father of another defendant beat his stepmother so badly and so regularly that she had a permanent bald spot on the back of her head from receiving so many blows. These painful traumas, and the twisted lessons they implied, were not lost on the psyches of the children who witnessed them.

*These* are the deep roots of violence in our society, the sins of the parents being visited not only on the child but, with uncanny regularity, on the future victims of that child grown up. As I said earlier, when many of us began doing this work 15 or more years ago, looking carefully at the social histories of capital defendants, we were struck, all of us, by the frequency with which our clients were brutalized as children. The patterns were striking, but it took years to carefully document them. Now, there is little question about the causal connections. Study after study has confirmed the cycle of violence, a cycle in which many, many capital defendants have become enmeshed. We know that there is sometimes a tragic symmetry to the social dynamics of violence—sometimes the abuse is reenacted at more or less the same stage in life as it was experienced. More often there is what researchers call an "isomorphism" to the relationship between childhood abuse and adult behavior. That is, the form of violence that is manifested when the child turns from victim to victimizer is the same kind that was inflicted by the original abuser, so that persons who were physically abused as children are most likely to be physically violent as adults, those who were sexually abused are most likely to be sexually violent, and so on.[60] Sometimes the lives of capital defendants provide chilling illustrations of these patterns. One defendant whose social history was filled with such maltreatment went into a semi-psychotic state in the course of his trial when he heard his 9 year old stepdaughter testify about how he—the defend-

60. Donald G. Dutton & Stephen D. Hart, *Evidence for Long-term, Specific Effects of Childhood Abuse and Neglect on Criminal Behavior in Men*, 36 INT'L J. OFFENDER THERAPY & COMP. CRIMINOLOGY, 129 (1992). *Cf.* Arlene McCormack et al., *An Exploration of Incest in the Childhood Development of Serial Rapists*, 7 J. FAM. VIOLENCE 219, 226 (1992)("The data suggest that early sexual abuse is responded to by reenactment behavior as an attempt to manage the confusion and stress generated by the sexual activities.")

ant—had sexually abused her, and he realized that she was being questioned by the very same prosecutor who, in the very same courtroom, had questioned *him* some 12 years earlier about how his own father had done the same things to him as a 9 year old boy.

## B. *Violence and the Costs of Institutional Failure*

Childhood victimization has begun to receive a considerable amount of concerned attention in professional circles as well as from the media and many segments of the American public.[61] However, little such concern is extended to children once they have gotten "in trouble," despite the fact that they are often the very same children. Indeed, there is evidence that American society cares so little about the plight of wards inside our juvenile justice institutions that we fail to adequately count them, let alone to adequately provide for their needs.[62]

Studies continue to document the absence of adequate and appropriate services for children who suffer from serious emotional problems.[63] Many such children have been inadequately or badly treated by juvenile justice institutions that lack the resources, time, and expertise with which to reverse years of pre-existing trauma and set a life gone astray back on course.[64] Indeed, one such study of California juvenile institutions reached the "specific and urgent" recommendation that "our present system for dealing with youthful offenders needs drastic overhauling," in large part because of the extent to which it "return[s] to freedom young men and women who have been brutalized by their institutional experience."[65]

---

61. *E.g.*, David Finkelhor & Jennifer Dziuba-Leatherman, *Victimization of Children*, 49 AM. PSYCHOLOGIST 173 (1994).

62. Paul Lerman, *Counting Youth in Trouble in Institutions: Bringing the United States Up to Date*, 37 CRIME & DELINQ. 465 (1991).

63. *See, e.g.*, Robert Cohen et al., *Relinquishing Custody as a Requisite for Receiving Services for Children with Serious Emotional Disorders: A Review*, 17 L. & HUM. BEHAV. 121 (1993).

64. *See, e.g.*, Michael B. Greene, *Chronic Exposure to Violence and Poverty: Interventions That Work for Youth*, 39 CRIME & DELINQ. 106 (1993); Edward Zigler et al., *Early Childhood Intervention: A Promising Preventative for Juvenile Delinquency*, 47 AM. PSYCHOLOGIST 997 (1992).

65. MICHAEL LERNER, BODILY HARM: THE PATTERN OF FEAR AND VIOLENCE AT THE CALIFORNIA YOUTH AUTHORITY 47 (1988). *See also*, DWIGHT E. ABBOTT, I CRIED, YOU DIDN'T LISTEN: A SURVIVOR'S EXPOSE OF THE CALIFORNIA YOUTH AUTHORITY (1991); BARRY KRISBERG & JAMES AUSTIN, REINVENTING JUVENILE JUSTICE (1993).

The fact led to the conclusion that such institutions actually "promote crime rather than deter it, and increase the criminal population at great expense to the rest of us."[66]

One of the greatest expenses we incur is through the human and economic price we pay for capital crime, many of whose perpetrators bear the scars of early, ineffective, brutalizing institutionalization at the hands of one or another of these facilities. Indeed, institutional failure is another theme that is prominent in the lives of capital defendants—ranging from the lack of desperately needed intervention to intervention that is ill-conceived, poorly and inadequately funded and staffed, to intervention that is terribly destructive of the human spirit. The literature on the failure of our adult prison system is clear; the impact of this failure on the problem of worsening violence in our society has yet to be adequately told.[67] However, nowhere is the damage of institutional failure clearer and more painful to contemplate than in the case of children who are confined by agencies of social control, only to have that experience worsen, sometimes irreparably, the very problems their incarceration was designed to remedy. The rhetoric of an increasingly fashionable conservative criminology likes to conceptualize all criminal behavior as the product of "free choice." However inadequate this rhetoric proves for understanding adult criminality, it does not even begin to explain most juvenile crime. And here is where the costs of destructive juvenile incarceration seem most consistent—in the way in which it seems to force children to commit to a value system, a way of being that is angry and rejecting and which places individualistic survival above all else. Too often in the lives of capital

---

66. LERNER, *supra* note 62, at 47; NIGHTINGALE, *supra* note 41, at 95. Nightingale has written about the way in which institutions of social control have begun to play increasingly larger roles in the lives of inner-city children, their harshness reinforcing the lessons of what he euphemistically refers to as the "forceful parenting" many have already received at home. *Id.* Further: "[B]y equating child punishment with jails and being prepared to employ the police, parents demonstrated just how closely their philosophies resonated with those of mainstream institutions of law and order." *Id.* The potentially destructive effects of normatively ineffective, stigmatizing juvenile justice system processing has been recognized for some time. *Cf.* EDWIN SCHUR, RADICAL NON-INTERVENTION: RETHINKING THE DELINQUENCY PROBLEM (1973).

67. *See, e.g.*, NILS CHRISTIE, CRIME CONTROL AS INDUSTRY: TOWARDS GULAGS, WESTERN STYLE? (1993); Craig Haney, *Confronting the Crisis in the Eighth Amendment: Conditions of Confinement and the Psychology of Imprisonment*, 2 PSYCH., L., & PUBLIC POL'Y (forthcoming).

defendants juvenile institutionalization provides a kind of "turning point," an experience that helps them resolve the internal struggle over who to be—indeed, over who they can be—in a profoundly negative way.

The individual stories are so many in number and so consistent in pattern that, again, I will pick only a few examples. One capital defendant whose social history I compiled then went to Napa State Hospital at age 11 for a psychiatric evaluation. Over the next 5 years he lived in 14 separate juvenile institutions and groups homes, ostensibly because he needed treatment, but receiving none. At the end of the next 5 year period, still never having received treatment, he was on trial for capital murder. Another defendant spent time in a juvenile psychiatric unit in which children were beaten, electroshocked, and chained to their beds and other furniture—conditions so terrible that they were scandalized in a national magazine. From there he went to the Preston School of Industry, along with recommendations that he receive treatment for his psychiatric problems. Unfortunately, there was not a single person on staff at Preston at the time he was there who could have provided treatment and, perforce, no one who attempted to do so. He got to work long hours in this "school of industry," got to march in its quasi-military regime, and even got to be sexually assaulted, but he did not get treated for problems that everyone agreed were the direct causes of his juvenile crimes. Eventually he got into a lot more trouble. An awful lot more. When Robert Harris was incarcerated as a juvenile in the federal prison system, doing 5 years for car theft, I counted some 17 separate psychological evaluations done of him over just a two year period, yet no evidence that staff did anything to provide the in-depth and continuous treatment that their own evaluations indicated he needed. A parole classification study done when Robert was 17 years old described him as "a totally inadequate, institutionalized, emotionally disturbed individual" who would need "community-based psychotherapy if he hopes to remain in the free community." He never got it. Finally, at age 19, the Federal Bureau of Prisons noted: "This young man's future is indeed gloomy. In all probability he will spend most of his life in institutions. His life is without direction, and he has no definite plans for the future." And then they released him. Just released him.

I should note, if only in passing, that institutional failure extends with a vengeance to adult correctional institutions. Thus, another pattern is as clear and consistent in the lives of capital defendants as the failure of juvenile justice institutions to provide the help these clients, as children, were identified as needing—the ever escalating level of violence that tends to accompany their stays in adult correctional institutions. This observation has led in some circles to the claim that, over the long run, increasingly high levels of imprisonment will worsen rather than reduce the problem of violent crime. In addition to the direct effects of institutionalization on persons who will subsequently be released, high levels of incarceration in some communities have disastrous effects on family formation, maintenance, and survival, intensifying many of the problems of poverty and instability I described earlier, and indirectly contributing to increases in criminality.[68] Moreover, the causes of escalating violence following incarceration are all the more apparent for those defendants whose prison sentences are accompanied by an acknowledgment of pre-existing psychiatric disorders and recommendations for treatment.[69]

One capital defendant whose life I studied had the psychological roots of his juvenile crimes identified early and clearly in his young life. In the wake of his first serious adult offense, numerous expert psychological and psychiatric reports assembled for a federal presentencing report (including those prepared by the prosecution and prison system) were unanimous in concluding that the defendant's crime stemmed from deep-seated psychological problems rather than anti-social tendencies. Indeed, the presentence report itself urged a reduced sentence and placement in some kind of mental

---

68. *Cf.* Robert J. Sampson, *Urban Black Violence: The Effect of Male Joblessness and Family Disruption,* 93 AM. J. Soc. 348 (1987) (high crime rates in urban African American communities stem from structural linkages between unemployment, economic deprivation, and family disruption).

69. I do not mean to suggest that the lack of available psychological services is the only or even the most serious component to the institutional failure that plagues the lives of capital defendants. Prisons often fail by not providing meaningful vocational or educational training, so that the scars of poverty cannot be overcome. They fail because they create brutally hostile environments where the damage of earlier mistreatment worsens. They can teach criminalizing habit of mind and behavior that, along with the persistent stigma of past incarceration, may disable prisoners once they are released. The lives of capital defendants too often bear the marks of all these institutional failures.

health program where treatment could occur. The judge ignored these recommendations and sentenced him for the maximum term to a high security federal prison where there was no treatment program whatsoever available. He emerged 9 years and not one therapeutic hour later. The only contact he'd had with a mental health professional during this period was when a visiting psychiatrist briefly evaluated his suitability for parole and noted, among other things, that the defendant had been reading psychology books from the prison library in a desperate attempt to get help for his problems. Despite the psychiatric issues that had been so clearly identified when he was sentenced, no psychiatric contact or counseling of any kind was required as a condition of his parole. His next crime—committed in less than a year and more violent in nature—was followed by almost exactly the same scenario. This time however the numerous psychiatric and psychological reports were met by a sympathetic judge who, at the time of sentencing, noted on the record that the defendant did not seem criminally-oriented and was "worth the state's time and money" to help. His explicit sentencing recommendation to this effect was ignored by the Department of Corrections who sent him instead to Folsom Prison where no psychiatric services were available. The next time his psychological problems were discussed in a courtroom was in the penalty phase of his capital trial.[70]

---

70. The lack of mental health services for prisoners with psychological problems continues to plague the prison system on a widespread basis. For a recent description of the shocking inadequacies in mental health services available to psychologically troubled and psychiatrically disturbed California prisoners, *see* Coleman v. Wilson, CIV S-90-0520 (E.D. Cal. 1994), and a related discussion in Donald Specter, *Cruel and Unusual Punishment of the Mentally Ill in California's Prisons: A Case Study of a Class Action Suit*, 21 SOCIAL JUSTICE 109 (1994). The federal district court, in *Coleman*, reached the conclusion that the California Department of Corrections (CDC) does not have any of the essential components of a minimally adequate mental health treatment system. The magistrate described the CDC as running a "constitutionally inadequate system which cannot and does not meet the serious medical needs of mentally ill inmates incarcerated in California's prisons." *Id.* at 29-30. Indeed, the court concluded that this inadequacy "causes terrible suffering for thousands of inmates afflicted with severe mental illness." *Id.* at 30. What the judge could not determine—indeed, none of us can determine it with real specificity—is the effect of this inadequacy on future rates of violent crime.

## C.  *Race, Capital Crime, and Community*

Many capital defendants, far too many of them, are the children of racism and discrimination. It comes as no surprise to anyone who has studied the death penalty that an unusually high percentage of capital clients are persons of Color. Unless you are prepared to defend the notion that violence is genetically transmitted, you must accept the fact that the race-based inequalities that ravage our society take their toll on its minority citizens, and that the same institutions that help create and preserve these inequalities inflict undue punishment, including the punishment of death, disproportionately upon them. It is the double whammy of racial injustice. Persons of Color are consigned to the most crime-prone sectors of our society, and treated most harshly by our institutions of justice.

Our prisons, our lockup units, and finally, our death rows, are running the most effective affirmative action programs in the country, and the only ones where White Americans never complain that the minority occupants really aren't qualified for the positions they hold. Because they are differentially targeted for criminal justice system scrutiny, young minority men are more likely to experience the criminalizing effects of penal incarceration.[71] The racism that pervades the criminal justice system—racism that plagues the administration of the death penalty with much the same vengeance that it did in pre-*Furman* years despite elaborate reforms that the Rehnquist Court continues to assure us are working well[72]—is so transparent in the racially disproportionate numbers of

---

71. *Cf.* Chambliss, *supra* note 5, at 183 ("Young African-American and Latino men are defined [by the police] as a criminal group, arrested for minor offenses over and over again, and given criminal records which justify long prison sentences.").

72. Furman v. Georgia, 408 U.S. 238 (1972). The case found existing death penalty statutes unconstitutional as applied because of the unbridled discretion they provided capital juries which resulted, *inter alia*, in racially discriminatory patterns of death sentencing. *Compare* McCleskey v. Kemp, 481 U.S. 279 (1987) *with* David C. Baldus et al., *Equal Justice and the Death Penalty: A Legal Empirical Analysis* (1990); William J. Bowers & Glenn L. Pierce, *Arbitrariness and Discrimination under Post-Furman Capital Statutes*, 26 CRIME & DELINQ. 563 (1980); SAMUEL R. GROSS & ROBERT MAURO, DEATH & DISCRIMINATION: RACIAL DISPARITIES IN CAPITAL SENTENCING (1989); Laura T. Sweeney & Craig Haney, *The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies*, 10 BEHAV. SCI. & THE L. 179 (1992); Hans Zeisel, *Race Bias in the Administration of the Death Penalty: The Florida Experience*, 95 HARV. L. REV. 456 (1981).

minorities whose lives are ground up by this system, that I sometimes wonder whether the anti-crime obsession that has gripped our country is not simply an acceptable way to accomplish the covert ends of institutional racism without saying that's what we're doing. "Legal lynchings" is what our friends in the South call the system of capital punishment,[73] and with good reason, but it is a term that applies in some ways, to death sentencing throughout the country.

The nexus between poverty, childhood abuse and neglect, social and emotional dysfunction, alcohol and drug abuse, and crime is so tight in the lives of many capital defendants as to form a kind of social historical "profile." The social ecology of crime is shaped by the neighborhoods in which its perpetrators are raised. The demographic mix of these communities determines the nature of the class and race conflict to which participants become accustomed. Criminal opportunities and social and economic pressures to succumb vary by neighborhood and family. Indeed, recently published autobiographical and ethnographic accounts of the structural disadvantages of race and class underscore many of the difficulties capital defendants have confronted.[74] These new urban ethnographies depict the influence of sociopolitical and economic forces as they shape the choices of individual actors, choices that are often less a product of rational or conscious decision-making processes than attempts to struggle with "[f]eelings of sheer humiliation and embarrassment, disappointment and frustration, grief and loneliness, and fear and anxiety (especially concerning suspicion, rejection, and abandonment)."[75] The emphasis is on something lost sight of in most legal analyses of criminal behavior: context.

---

73. See Stephen Bright, *In Defense of Life: Enforcing the Bill of Rights on Behalf of Poor, Minority and Disadvantaged Persons Facing the Death Penalty*, 57 Mo. L. Rev. 849 (1992).

74. *E.g.*, GEOFFREY CANADA, FIST STICK KNIFE GUN: A PERSONAL HISTORY OF VIOLENCE IN AMERICA (1995); DANIEL COYLE, HARDBALL: A SEASON IN THE PROJECTS (1993); ALEX KOTLOWITZ, THERE ARE NO CHILDREN HERE (1991); DARCY FREY, THE LAST SHOT: CITY STREETS, BASKETBALL DREAMS (1994); JERROLD LADD, OUT OF THE MADNESS: FROM THE PROJECTS TO A LIFE OF HOPE (1994); NATHAN MCCALL, MAKES ME WANNA HOLLER: A YOUNG BLACK MAN IN AMERICA (1994); LUIS S. RODRIGUEZ, ALWAYS RUNNING, LA VIDA LOCA: GANG DAYS IN L.A. (1993); BRENT STAPLES, PARALLEL TIME: GROWING UP IN BLACK AND WHITE (1994); SULLIVAN, *supra* note 22.

75. NIGHTINGALE, *supra* note 41, at 40.

---

Indeed, after years of intellectual neglect, social scientists have begun to focus increased attention on the lives of young African Americans, Latinos, and the realities of surviving the mean streets that two decades of economic and political neglect have produced.[76] Indeed, one study concluded that children who grow up in urban housing projects are exposed to traumatic violence comparable to children living in "war zones" and may suffer the same kinds of psychological sequelae and need the same kinds of treatment as these children.[77] Notwithstanding progress made in quelling overt expressions of racism in this society, significant numbers of children of Color "still encounter expressions of racial hatred, live in racially segregated neighborhoods, and endure the suspicion widespread among many people in positions of authority."[78]

Race is, of course, connected to the other aspects of the social histories of capital defendants I have touched on. The racial dimension to poverty in the United States in some ways deepens the stigma, renders it more chronic.[79] In other ways, it seems to heighten the sense of injustice, the right-

---

76. *See, e.g.*, ELIJAH ANDERSON, STREETWISE: RACE, CLASS, AND SOCIAL CHANGE IN AN URBAN COMMUNITY (1990); Elijah Anderson, *The Code of the Streets: How the Inner-City Environment Fosters a Need for Respect and a Self-Image Based on Violence*, THE ATLANTIC MONTHLY, May 1994, at 81; JONATHAN KOZOL, AMAZING GRACE: THE LIVES OF CHILDREN AND THE CONSCIENCE OF A NATION (1995); NIGHTINGALE, *supra* note 41; Patricia Zavella, *Living on the Edge: Everyday Lives of Poor Chicano/Mexicano Families*, in MAPPING MULTICULTURALISM? (Avery Gordon & Christopher Newfield, eds., 1995). For a useful summary of some of this literature and a discussion of some community-based interventions that appear to reduce the harm, see Michael B. Greene, *Chronic Exposure to Violence and Poverty: Interventions that Work for Youth*, 39 CRIME & DELINQ. 106 (1993).

77. Nancy F. Dubrow & James Garbarino, *Living in the War Zone: Mothers and Young Children in a Public Housing Development*, 68 CHILD W. 3 (1989). Nothing I have said about the social and economic barriers that have been created, especially, in the inner cities of our country is intended to imply that there is an absence of talent and energy in these places that could be harnessed for positive change. For a powerful look at these possibilities, see TERRY M. WILLIAMS ET AL., THE UPTOWN KIDS: STRUGGLE AND HOPE IN THE PROJECTS (1994).

78. NIGHTINGALE, *supra* note 41, at 10. *See also* sources cited *supra* notes 74, 76.

79. *E.g.*, Sampson, *supra* note 68. *See also*, James W. Balkwell, *Ethnic Inequality and the Rate of Homicide*, 69 Soc. FORCES 53 (1990)(ethnic inequality is a strong predictor of homicide); Judith R. Blau & Peter M. Blau, *The Cost of Inequality: Metropolitan Structure and Violent Crime*, 47 AM. SOC. REV. 114 (1982)(racial and economic inequality contribute to levels of violent crime).

eous outrage that develops in what one commentator has termed a "subculture of exasperation."[80] But when you look at the role that race has played in the lives of many capital defendants, you also must confront the fact that it functions to do more than just make these other conditions worse. You must confront the fact that racism, institutional racism, exposes persons of Color to experiences that *no one else has in this society*, experiences that leave an indelible mark.

One capital defendant whose life I studied was sent to a home in Minnesota for Native American children whose parents were judged by authorities to be unfit to care for them. There, he and his siblings were beaten regularly with a radiator brush and referred to as "savages" by the staff. Another capital defendant was a 16 year old teenager when he was arrested for stealing a bicycle. Because he was African American, a juvenile court judge was able to determine—without benefit of I.Q. testing—that he was mentally defective. The judge sentenced him, absent the formality of a trial, to an *indeterminate* term in the Pennsylvania Institution for Defective Delinquents, a place whose inmate population was comprised almost entirely of African American children, some of whom had grown into *old age* awaiting their release. My client was placed among these men as a teenager, was beaten, raped, and brutalized—the fate of a young boy among many institutionalized, desperate men—and became resigned to living out the rest of his life in this nightmarish prison. A constitutional challenge to the defective delinquent statute later resulted in these men being released, and hundreds of them walked suddenly back into free society after having been incarcerated over utterly trivial offenses for 10, 20 or more years. Newspapers dubbed them the "forgotten men," but no one could doubt that they had been so completely forgotten for so long a time in large part because of the color of their skin.

Similarly, another capital defendant whose social history I compiled was just 14 years old when he was sent to the Alabama Industrial School for Negro Children, a place that was, in the opinion of the Fifth Circuit that eventually declared it unconstitutional, an almost unbelievably harsh and brutaliz-

---

ing environment.[81] Children were forced to work long hours in the agricultural fields—there was scarcely any attempt to cover up the transparent, modern-day slavery that prevailed—and the children were beaten around the head and on the back and legs with broom and mop handles, fan belts and fists. There were no social workers, no counselors, no meaningful educational programs and, to be sure, no comparison to juvenile institutions being run for the White children of Alabama. When we searched for people who had served time with the defendant in this school for Negro children, virtually *every one* who could located was in the Alabama Department of Corrections,[82] and were institutionalized shells or bitterly angry men whose lives had been irreparable damaged because of the color of their skin. And, like the defendant whose life I studied, some of them had found their way to death row.

## IV. MEDIATING THE LEGACIES OF SOCIAL HISTORY IN ADULTHOOD

The consequences of early childhood maltreatment reverberate through the life course of a capital defendant. One of the consistent patterns that emerges is the way in which early deprivation, neglect, and abuse predispose capital defendants to socioemotional problems that many must cope with as adolescents and young adults, being unable to find nurturant or sustaining relationships in which to develop their adult identities. As the victims of these early years of mistreatment mature, their adaptations become increasingly problematic and difficult to excuse. But this difficulty stems from the increasingly destructive nature of the adaptation, not its lack of connection to earlier deprivation and abuse. I know of no psychological principle that disconnects past from present within a single social history. Thus, as a child matures, both the residue of early developmental history *and* current circumstances play important roles in subsequent development. The legacy of early treatment persists, such that

---

80. William B. Harvey, *Homicide Among Black Adults: Life in the Subculture of Exasperation*, in HOMICIDE AMONG BLACK AMERICANS 153 (Darnell R. Hawkins, ed., 1986).

81. Crum v. State Training Sch. for Girls, 413 F.2d 1348 (5th Cir. 1969).
82. Most of them had been incarcerated more or less continuously in the Alabama prison system in various institutions that had been found unconstitutional in Pugh v. Locke, 406 F. Supp. 318 (M.D. Ala. 1976), Newman v. Alabama, 559 F. 2d 283 (5th Cir. 1977), Locke v. Wheat, 350 So. 2d 451 (Sup.Ct. Ala. 1977), and Newman v. Alabama, 466 F. Supp. 628 (M.D. Ala. 1979).

"children with early internal models of available care and self-worth are more responsive to positive features of the environment and more resilient to stress."[83] Not only does past experience shape present decisionmaking, but it can lead in some cases to the development of self-fulfilling interactional patterns and styles. Thus, some adolescents react to the memory of past mistreatment and rejection by becoming aggressive or emotionally distant which, in turn, leads to further mistreatment and rejection and the possibility of ever-escalating misbehavior and disconnection from others.

A.  *The Adaptation of Drug and Alcohol Abuse*

In other cases the adaptations provide short term relief from the pain of one's past or the intolerable press of immediate circumstances, but incur long-term destructive consequences later. Thus, many victims of early abuse and neglect turn to drugs and alcohol as a form of "self-medicating" to reduce their emotional pain. Indeed, often their own parents' drug and alcohol abuse provides them with their most available and salient model for resolving interpersonal conflict and reducing intolerable stress or depression.[84] We know that alcohol and drug use, especially, function as major risk factors for subsequent criminality, including violence.[85]

The connection between the drug use and crime is underscored by a substantial statistical overlap: there is a high

---

83. L. Alan Sroufe et al., *The Fate of Early Experience Following Developmental Change: Longitudinal Approaches to Individual Adaptation in Childhood*, 61 CHILD DEV. 1363, 1371 (1990).

84. There is another way in which the legacy of alcohol abuse can be transmitted across generations. Although the link between maternal alcohol abuse during pregnancy and retardation has been long established, research now suggests that heavy abuse of alcohol during pregnancy appears to be responsible for a disorder that has come to be known as "fetal alcohol syndrome." *E.g.*, Ernest Abel & Robert Sokol, *Incidence of Fetal Alcohol Syndrome and Economic Impact of FAS-Related Anomalies*, 19 DRUG & ALCOHOL DEPENDENCE 51 (1987); James Overholser, *Fetal Alcohol Syndrome: A Review of the Disorder*, 20 J. CONTEMP. PSYCHOTHERAPY 163 (1990); LeAdelle Phelps & Jo-Anne Grabowski, *Fetal Alcohol Syndrome: Diagnostic Features and Psychoeducational Risk Factors*, 7 SCHOOL PSYCH. QUARTERLY 112-128 (1992).

85. *E.g.*, Ron Langevin et al., *The Role of Alcohol, Drugs, Suicide Attempts and Situational Strains in Homicide Committed by Offenders Seen for Psychiatric Assessment*, 66 ACTA PSYCHIATRICA SCANDINAVICA 216 (1982); Ron Langevin et al., *Brain Damage, Diagnosis, and Substance Abuse among Violent Offenders*, 5 BEHAV. SCI. & THE L. 77 (1987); Robert Parker, *Bringing "Booze" Back In: The Relationship Between Alcohol and Homicide*, 32 J. RES. CRIME & DELINQ. 3 (1995).

---

level of drug use among people who commit crimes and people who use drugs also commit a large number of crimes.[86] As two researchers have recently summarized: "Although drug use does not appear to initiate a criminal career, a large volume of research clearly indicates that frequency of drug use has a strong impact on the extent, direction, and duration of that (criminal) career."[87] Street drug use places users in a subculture where criminal behavior is expected, accepted, and respected. Using drugs and engaging in criminal behavior become well-integrated within the lifestyle of the street drug user.[88] For certain drugs, the connection between use and violent crime has additional dimensions. Psychopharmacologically, cocaine use produces long periods of sleeplessness and increased paranoia, heightening the probability of aggressive behavior. Economically, cocaine use requires access to fairly large amounts of money, which some are able to obtain only through criminal, sometimes violent, activity. And the subculture of drug use itself exposes drug users to patterns of violent behavior that, because of their drug use, they are more likely to be integrated into (including the access to, familiarity with, and experience in using lethal weapons).

B.  *The Adaptation of Gang Membership*

Gang membership represents another adaptation taken in adolescence and young adulthood by some capital defendants to overcome the legacy of their early developmental problems and the pressures of the communities in which they live.[89] Early studies of urban Latino gangs noted that mem-

---

86. *E.g.*, Lana Harrison & Joseph Gfroerer, *The Intersection of Drug Use and Criminal Behavior: Results from the National Household Survey on Drug Abuse*, 38 CRIME & DELINQ. 422 (1992).

87. Duane C. McBride & Clyde B. McCoy, *The Drugs-Crime Relationship: An Analytical Framework*, 73 PRISON J. 257, 268 (1994).

88. *See, e.g.*, RICHARD C. STEPHENS, THE STREET ADDICT ROLE (1991); TERRY M. WILLIAMS, THE COCAINE KIDS: THE INSIDE STORY OF A TEENAGE DRUG RING (1989).

89. Often it occurs in conjunction with, and serves to facilitate, alcohol and drug use. *See, e.g.*, SULLIVAN, *supra* note 22 and WILLIAMS, *supra* note 88. However, research challenges the media stereotype that violent youth gangs are primarily responsible for drug distribution and sales in the inner city. *See, e.g.*, Jeffrey Fagan, *The Social Organization of Drug Use and Drug Dealing Among Urban Gangs*, 27 CRIMINOLOGY 633 (1989); Jeffrey Fagan & Ko-Lin Chin, *Initiation Into Crack and Cocaine: A Tale of Two Epidemics*, 16 CONTEMP. DRUG PROB. 579 (1989); Malcom W. Klein et al., *"Crack," Street Gangs,*

bership could be explained in part by the "absence of a secure cultural (and personal) identity," brought about by the marginality of the groups from which their members originated.[90] Luis Rodríguez, who has written eloquently about the pull of gang life, has noted that for many young people "a gang embraces who they are, gives them the initiatory community they seek and the incipient authority they need to eventually control their lives."[91] Indeed, they turn to gangs in large part because "[t]hese are things other institutions, including schools and families, often fail to provide."[92] The reliance upon gangs to fulfill needs and provide opportunities that are otherwise denied them is by no means restricted to Latinos. For example, certain Vietnamese gangs:

> started as orphaned street youth, reestablished ties with the only social network available to them, other isolated youths whom they had known on the streets of places like Cholon [a Chinese suburb of Saigon] and in the [refugee] camps. Those current gang members who were not orphaned in the camps, nevertheless, have lacked adult supervision in the United States because of the economic pressures on second wave refugee families, where each of the resident adult members of traditional extended family households must work, often moonlighting at more than one job in order to survive.[93]

---

*and Violence,* 29 CRIMINOLOGY 623 (1993). It also challenges the myth that a substantial proportion of homicides are attributable to gang involvement in narcotics trafficking. *E.g.,* Patrick Meehan & Patrick O'Carroll, *Gangs, Drugs, and Homicide in Los Angeles,* 146 AM. J. DISEASES OF CHILDREN 683 (1992).

90. James Diego Vigil, *Chicano Gangs: One Response to Mexican Urban Adaptation in the Los Angeles Area,* 12 URB. ANTHROPOLOGY 45, 47 (1983). Indeed, the multiple marginality Vigil describes applies to many capital defendants who must cope with "the effects of barrio life, low socioeconomic status, culture conflict, and impaired development of self-esteem which arise in a complex of ecological, socioeconomic, cultural, and psychological factors." *Id.* at 46.

91. Luis J. Rodríguez, *Throwaway Kids: Turning Youth Gangs Around,* 259 THE NATION, Nov. 21, 1994, at 605. *See also* Paul Cromwell et al., *Youth Gangs: A 1990s Perspective,* 43 JUV. & FAM. CT. J. 25 (1992); JOHN HAGEDORN, PEOPLE AND FOLKS: GANGS, CRIME AND THE UNDERCLASS IN RUSTBELT CITY (1988); Joan W. Moore, *Isolation and Stigmatization in the Development of an Underclass: The Case of Chicano Gangs in East Los Angeles,* 33 SOC. PROB. 1 (1985); JAMES DIEGO VIGIL, BARRIO GANGS: STREET LIFE AND IDENTITY IN SOUTHERN CALIFORNIA (1988).

92. Rodríguez, *supra* note 91, at 605.

93. Michael Smith & Bernadette Tarallo, *Who Are the "Good Guys"? The Social Construction of the Vietnamese "Other,"* in THE BUBBLING CAULDRON: RACE, ETHNICITY, AND THE URBAN CRISIS 20 (Michael Smith & Joel Feagin, eds., 1995).

---

One recent comparative study of gangs has challenged the notion that persons join gangs out of some common, pathological set of motives, and argued instead that "the vast majority of gang members of quite energetic and are eager to acquire many of the same things that most members of American society want: money, material possessions, power, and prestige."[94] Yet, virtually all gang members "come from low income neighborhoods"[95] and rely upon gangs in their quest for the good life in large part because other avenues for this quest have been foreclosed.[96] The violence in which they often engage is an extension of their prior socialization:

> ... [G]ang members grew up and live in communities in which the socioeconomic environment has produced a great deal of aggressive and violent behavior; thus a given gang member's display of aggressive traits or his involvement in violent exchanges is not necessarily pathological; rather it is appropriate behavior in an environment whose socioeconomic conditions are pathological.[97]

Although the motivation for gang membership may be perfectly reasonable under the pathological circumstances—economic, interpersonal, or otherwise—that potential mem-

---

94. MARTIN S. JANKOWSKI, ISLANDS IN THE STREET: GANGS AND AMERICAN URBAN SOCIETY 312 (1991).

95. *Id.* at 23. Another study's description of the economic situation faced by potential gang members in several Midwestern cities states:

> An economically and socially marginal youth who has dropped out of or been expelled from school, and/or is without job skills, is in deep trouble . . . . To make matters worse, the military, a traditionally available alternative career path for the poor, is increasingly inaccessible due to the higher quality of applicants generated by an economy with relatively few attractive entry-level positions for unskilled workers.

C. Ronald Huff, *Youth Gangs and Public Policy,* 35 CRIME & DELINQ. 524, 527 (1989).

96. Note that, especially "[f]or high risk youths . . . both unemployment and dropping out of the labor force because of an absence of legitimate opportunities relate to crime; illegitimate activities at this stage offer far more visible sources of income than do legitimate ones." Michelle Sviridoff & James Thompson, *Links between Employment and Crime: A Qualitative Study of Rikers Island Releasees,* 29 CRIME & DELINQ. 195, 211. *Cf.* Note, *Juvenile Curfews and Gang Violence: Exiled on Main Street,* 107 HARV. L. REV. 1693, 1693-94 (1994) ("Gangs are a product of urban decay. Many young people who grow up without economic opportunity and in struggling families and communities turn to gangs for a sense of belonging, a source of respect and support. . . . The desperation of inner-city life fosters gang membership, and the violence and crime that accompany gang activity in turn further urban decline.")

97. JANKOWSKI, *supra* note 94, at 312.

bers confront, many of those who join face increased exposure to crime and violence.[98]  In addition, the allegation of gang membership is another way in which capital defendants can be demonized in media accounts of their crimes.  Although my focus on this issue is not intended to suggest that a significant proportion of capital violence is gang-related—it is not—the way in which gang violence is handled in our society, on the one hand, and by the criminal justice system, on the other, *is* illustrative of processes that are at work in many capital cases.  Gang membership, as an adaptation to past treatment and present circumstances, may facilitate criminal behavior.  But this facilitation is situational or contextual—it can be transcended.  Yet once someone is caught within the label—seen and treated by the criminal justice system as a gang member—the characterization acquires permanence.  It is used describe who he is—for all time and for purposes of sentencing—not who he has been for what is often the brief period of time during which he was a gang member.  Indeed, as one gang researcher has noted, the media has reinforced a "folkloric myth" concerning gangs in our society, one in which gangs themselves have been given: "demonic qualities.  For gangs ultimately are depicted as not only physically threatening average, law-abiding citizens, but also as undermining the morals and values of the society as a whole.  They are carriers of moral disease within the social body."[99]

The popular stereotype of gang membership also contains "essentialist" implications that feed this demonic myth—that gang members either are somehow intrinsically different than other young people, or that once someone has "joined" a gang they are permanently transformed, as though something essential has been altered within them that cannot be changed.  This essentialism plays directly into mythologies about capital crime that are used to fuel the machinery of the death penalty, as if "gang violence" is somehow worse than other kinds, in part, because of what it implies about its perpetrators.  Yet, these notions are quite mistaken.  To the contrary, what we know about youth gangs suggests both

---

98.  *E.g.*, Finn-Aage Esbensen & David Huizinga, *Gangs, Drugs, and Delinquency in a Survey of Urban Youth*, 31 CRIMINOLOGY 565 (1993); Cheryl L. Maxson et al., *Differences Between Gang and Nongang Homicides*, 23 CRIMINOLOGY 209 (1985).

99.  JANKOWSKI, *supra* note 94, at 308.

that they "drift" in and out of criminal activity, and that young people "drift" in and out of gangs.[100]  Gang membership seems to facilitate criminality, in part, through "the normative support it provides for delinquent behavior generate[s] a context in which such behavior flourishes."[101]  But there is nothing to suggest that gang members are delinquent types beforehand, or that gang membership creates permanent transformations in persons who belong.

## V.  CHOICE, VARIATION, AND MITIGATION

I want to begin discussion of a critical issue concerning the relationship of social history to capital mitigation by quoting from the transcript of a hearing on a motion to modify a sentence of death following a lengthy California penalty trial.  The trial judge was an independent, compassionate jurist who, among other things, once had the courage to declare the mainline housing units at San Quentin prison cruel and unusual.  At the motion to modify the death sentence, she appeared to be much affected by the issues at hand.  After hearing arguments of counsel, she began her ruling by noting that this was "certainly . . . the most difficult decision that a judge, and this judge, has ever faced."  She said, "I have fleeting moments of wondering why I allowed myself to take the case.  But when I became a judge, I agreed to apply the law fairly and justly whether I agreed with the law or not.  This happens to be a law I disagree with which makes it probably a little harder for me than for other judges I'm sure.  But . . . I must follow the law.  It's my duty."

She turned to the facts of the case.  It was an aggravated case, to be sure.  A correctional officer had been killed.  Although the defendant was alleged to have played only a minor role in the actual murder, there were allegations that he

---

100.  *See, e.g.*, Esbensen & Huizinga, *supra* note 98; Terrence P. Thornberry et al., *The Role of Juvenile Gangs in Facilitating Delinquent Behavior*, 30 J. RESEARCH IN CRIME & DELINQ. 55 (1993).  *Cf.* Sullivan, *supra* note 22, who found that cliques and gangs were "quasi-familial groupings that served to protect their members from outsiders."  *Id.* at 110.  He concluded that such a group "was by no means a specialized criminal organization; it was rather a multifunctional, quasi-familial grouping in the context of which these youths discussed school, jobs, their families, and girlfriends or played handball, raced pigeons, and engaged in many other activities besides economic crimes."  *Id.* at 125.

101.  Thornberry, et al., *supra* note 100, at 79.

had been involved in its planning as well as in a previous prison murder, and his prior record included numerous robberies. But the mitigation case was exceptionally strong. Indeed, the judge said, "I don't know that anyone could have presented a more appealing case in mitigation for [the client]. You've turned [him] for me into a human being, and I'm sure for the jury. [Based on] my own knowledge of people in this background, I know few who have had a world like [your client] even with the defendants who have come before me. He was born into hell." It *was* a hell: a prostitute, drug-addicted mother, abandoned for days at a time as a 3, 4, 5 year old, exposure to violence while still a young child, then taken by the state from his family and separated from his siblings in a succession of foster homes, followed by several chronically under-staffed, largely ineffectual juvenile institutions.

The judge noted, as the attorneys had made clear in their case in mitigation, that "he did prove briefly in the proper environment at the Youth Authority that he could refrain for a while from violent behavior. But once he was on his own, he couldn't . . . . [Then] he entered a prison system which, as [the attorney] said and as the experts testified, was another hell." It, too, incidentally, was a hell—the defendant had been incarcerated in San Quentin's notorious "lockup" units from age 18 on, in what were arguably the worst conditions of confinement, in what may have been the worst prison in the California system, at the worst time in its history.[102] The judge recognized it all: born into hell, eventually taken by the state and subsequently placed into another kind of hell as a young adult. Twice doomed would surely mean once spared, would it not? She concluded: "So, I do understand to a large degree the best that one who was raised white middle-class can understand, I understand . . . what created [this client] and what turned him into a violent person. *But* [and here is the point to my story], she concluded: *fortunately everybody . . . who grew up in that miserable environment did not turn into a violent criminal.*" Motion to modify denied. Sentence of death imposed.

This example illustrates the confusion that continues to surround our understanding of the proper role of social histories in establishing capital mitigation. Specifically, it demon-

102. *See, e.g.*, Toussaint v. Rushen, 553 F. Supp. 1365, 1370-78 (N.D.Cal. 1983).

strates the way in which a simple and seemingly irrefutable assertion that "not everybody" exposed to one or another set of destructive background factors engaged in violent crime is used to trivialize and dismiss what, in virtually any other context, we would all recognize as critically important to the decision at hand. The detailed, specific connections I have labored to present in the preceding pages notwithstanding, most people recognize intuitively that background experiences can shape and influence who we are and what we are capable of becoming. Indeed, whatever effort our society now devotes to the prevention and prosecution of child abuse derives in large part out of the recognition that such early traumatic experiences can tragically alter the life course of those who are victimized by them.[103] This is true despite the fact that "not everybody" who experiences these painfully traumatic events will be affected in the *same* way.

In any general discussion of child abuse as an important social problem, acknowledging the variations in its damaging effects does not prevent us from continuing to recognize both the magnitude of this social problem and the importance of attempting to reduce as much as possible the number of children and who suffer it, whatever its long-term consequence for any one person. Neither would most people argue with the proposition that a much, much higher percentage of people who have suffered abuse or maltreatment as children, or have experienced poverty and racism, or have grown up in a domestic or urban "war zone," or were victimized by stays in uncaring or brutalizing juvenile or adult institutions will also manifest serious problems including increased rates of criminality as adults. But when we are encouraged to take these things into account in assessing blameworthiness, and especially in considering the possibility that criminal punishment should be moderated in light of these critically important past experiences, clear thinking succumbs to fear and denial. In the next few pages I address some of the psychological considerations that are typically ignored in the face of this uncritical emotional response.

103. *Cf.* Daniel J. Sonkin, Domestic Violence on Trial: Psychological and Legal Dimensions of Family Violence (1987); Humm, *supra* note 43.

## A. *The Myth of Equally Autonomous "Free Choice"*

From a psychological perspective, variation in human behavior does not necessarily imply individual choice. Reacting differently from someone else to what appear to be the same set of circumstances is not the same thing as choosing freely. Someone who behaves in a more socially desirable way has not necessarily "chosen" more nobly, nor are their "choices" necessarily more praiseworthy than those of someone whose behavior falls below that standard. Apparent choices, noble or otherwise, are not made unencumbered by past history and present circumstances. As one social scientist who studied the contextual causes of crime put it:

> . . . [O]ur data reveal that many of the youths portrayed here have "chosen" unemployment, crime, prosecution, and incarceration. The choices are not those of equal competitors in an open market with equal opportunities to invest in human capital and advance in the labor market. Neither are they the choices of deranged, isolated individuals. Rather, they are the collective choices of those in similar structural situations who refuse to accept the impossible contradictions of these situations.[104]

Particularly in the case of powerful risk factors and traumatic life experiences like chronic poverty and childhood maltreatment, different kinds of behavior—behavior that "not everybody" engages in the same way—must be understood as variation in adapting, coping, and struggling to survive a set of circumstances that few if any have "chosen" to endure.

Sometimes the differences in the ways in which people adapt to these background experiences and present circumstances have an identifiable pattern to them. We know, for example, that the different paths people's lives take often reflect differences in structural opportunities that are based on status characteristics like gender or age (over which individuals also have no choice or conscious control). As one urban ethnographer wrote in illustration: "The advantage of greater avenues for psychic expression is no doubt reflected in inner-city African-American girls' much higher rates of high-school graduation and employment. But a slightly wider array of options to express pain does not by any means always reduce the power of girls' painful memories sufficiently to avoid in-

---

104. SULLIVAN, *supra* note 22, at 247.

auspicious outcomes."[105] People take whatever opportunities for survival that they perceive to be available—but the limited number of options that actually are available to them (as opposed to some hypothetical long list of possibilities that seem viable to persons who have never been snared in the maze of pain and despair with which many capital defendants have been forced to cope) is not something over which they freely choose or easily can alter and control.

## B. *Critical Variations in Experience Through Similar Social Histories*

Individual lives are a complex amalgam of experience, and the effects that certain events or different kinds of treatment have on particular children vary, among other things, as a function of when in the life of the child they occur and how they are interpreted by the child and the family.[106] For example, families themselves go through "life cycles" in which, at each stage, the family is presented with a different developmental challenges or crises.[107] These family stages interact with the developmental stages of children to produce very different experiences for children within the same family. For example, children born to young families are often more likely to experience economic hardship, those who mature during periods of marital disharmony are more likely to experience their family as unstable, and so on. Correspondingly, changes in the nature of family life interact with developmental periods or stages, such that certain kinds of exper-

---

105. NIGHTINGALE, *supra* note 41, at 46.

106. One developmental psychologist applied what has been called the "myth of developmental uniformity" to the trauma of child abuse: "[T]he 'same' type of maltreatment experienced at different points in development is not likely to produce uniform outcomes . . . . Because children at various developmental levels have qualitatively different tools for interpreting events, the 'same' event is likely to produce qualitatively distinct meanings for children at different ages." Stephen R. Shirk, *The Interpersonal Legacy of Physical Abuse of Children*, *in* ABUSE AND VICTIMIZATION ACROSS THE LIFE SPAN 57, 58-59 (Martha B. Straus, ed., 1987).

107. *E.g.*, JOAN ALDOUS, FAMILY CAREERS: DEVELOPMENTAL CHANGE IN FAMILIES (1978); EVELYN DUVALL, MARRIAGE AND FAMILY DEVELOPMENT (1977). For discussions of the way in which the life cycles of families interact with race, see Johnella Banks, *A Developmental Perspective on Black Family Violence*, *in* VIOLENCE IN THE BLACK FAMILY: CORRELATES AND CONSEQUENCES 249 (Robert L. Hampton, ed., 1987); Robert L. Hampton, *Family Life Cycle, Economic Well-Being, and Marital Disruption in Black Families*, 5 CAL. SOCIOLOGIST 16 (1982).

iences differentially impact children who are at different ages within the same family.

For example, one researcher has found that the lives of those children he studied were not only shaped by their settings but also by the timing of their encounters with economic and historical forces. Indeed, there were "noteworthy variations in developmental stage at the point of economic strain . . . and in the social timetable of age-related options or roles."[108] Moreover, the effects of economic hardship appeared to be indirect—mediated by the way in which the hardship affected the behavior of the parents—and were also a function of the age, gender and other characteristics of the children within a family.[109] Indeed, the work of developmental contextualists underscores the degree to which processes of psychological change or influence cannot be the same for all persons: "[T]he import of any set of contextual conditions for psychosocial behavior and development can only be understood by specifying the context's relations to the specific, developmental features of the organisms within it."[110]

Equally important is the fact that our *perceptions* of what options or paths are available to us are often more important than whatever, in fact, exists. Although we can only chose to pursue options that we perceive to be available, these perceptions are themselves often blurred by the very circumstances

---

108. Glen H. Elder, *Social History and Life Experience*, in PRESENT AND PAST IN MIDDLE LIFE 3 (Dorothy Eichorn et al., eds., 1981). In this case, the younger cohort of the boys Elder studied were most affected by economic deprivation: "[T]hese boys as adolescents ranked well below the nondeprived on goal orientation, self-competence, social skills, and assertiveness, a difference . . . that is linked to paternal impairment, hostile relations with father, and inconsistent discipline." *Id.* at 19. *See also*, GLEN H. ELDER, CHILDREN OF THE GREAT DEPRESSION (1974).

109. Glen H. Elder et al., *Linking Family Hardship to Children's Lives*, 56 CHILD DEV. 361 (1985).

110. Richard Lerner & Marjorie Kauffman, *The Concept of Development in Contextualism*, 5 DEVELOPMENTAL REV. 309, 325 (1985). *See also*, Richard Lerner & Jacqueline Lerner, *Organismic and Social Contextual Bases of Development: The Sample Case of Early Adolescence*, in CHILD DEVELOPMENT TODAY AND TOMORROW 69 (William Damon, ed. 1989) (emphasizing the individuality of adolescent development and its responsiveness to the demands of social context). The theoretical perspective of life-span developmental psychology acknowledges a similar point: "Depending on the life conditions and experiences of a given individual, his or her developmental course can take many forms." Paul Baltes, *Theoretical Propositions of Life-Span Developmental Psychology: On the Dynamics Between Growth and Decline*, 23 DEVELOPMENTAL PSYCH. 611, 613 (1987).

---

our actions seem to be shaped by. For example, one of the pernicious effects of poverty is the way in which it erodes its victims' perceptions of what they might achieve. Similarly, child abuse is so invidious because it attacks the sense of self, and undermines a child's perception of what is possible to create or attain in the world. Discrimination is destructive in part because it teaches some people to limit themselves, to close off alternatives in life before they are ever pursued. Because people cannot always "choose" their perceptions any more freely than they can always choose their courses of action, the ability to see a range of viable alternatives can be affected by the very same set of dire circumstances one confronts and struggles to survive or overcome. Thus, the risk factors that help to shape the lives of capital defendants also help to shape their perceptions of what might be. Bad choices, in this context, often reflect an inability to perceive options that are otherwise available.[111]

In a related vein, many survival strategies or short-term adaptations to a damaging and traumatic past, along with attempts to adjust to maladaptive situations in the present, have future long-term consequences associated with them that few people can anticipate and fewer still can be said to "choose freely" to incur. Indeed, as one group of researchers put it: "[T]he evidence suggests that there are continuities in development that stem from the opening up or closing down of further opportunities—a train of events in which there are lasting sequelae as a result of a cumulative chain of indirect effects."[112] But these patterns typically are identifiable and predictable only to those who have the luxury of viewing them outside the circumstances in which they are generated. That is, choices that feel compelled or dictated at an early age carry consequences that compel a whole different set of choices later on, but in a way that simply is not, and can not be, apparent at the time. Thus, the pathway from petty crimes and misbehavior to street gangs to extensive drug in-

---

111. Ironically, those most able to perceive avenues of opportunity and exit within the psychologically embattled states of mind I have described often are precisely those whose somewhat more favorable socialization histories—ones in which, for example, the abuse they experienced was either somewhat less profound or less seemingly sanctioned—not only gave them the ability to perceive alternatives but also the optimism and self-confidence with which to take advantage of them.

112. Rutter et al., *supra* note 58, at 94.

volvement to Youth Authority socialization to serious adult criminality to long-term Department of Corrections warehousing (to pick just one of these all-too-common patterns) is apparent in retrospect and at a safe, clear distance in a way it could not be to many persons—sometimes with their very survival seemingly at stake—when they first begin to cope with the range of risk factors I have outlined above.[113] Yet, each one of these adaptations, seemingly reasonable, perhaps the only obvious ones at the time they were made, delimit choices at later stages in one's life, and make each subsequent move towards serious criminality and violence more likely.[114]

What about those who have managed to escape these bleak situations and survive seemingly unscathed? These are the counterexamples who make the "not everybody" formulation viable. Fortunately, there usually seem to be more of them than those whose lives have taken a turn towards crime and violence. Yet, sometimes overcoming truly overwhelming disadvantages, barriers or structural handicaps is rare enough that it is the occasion for admiration and praise (and,

---

113. Many of the causal linkages identified by researchers are so complex that it is simply unrealistic to expect a child or adolescent—on the verge of one of these pathways—to anticipate where it will lead him. For example, Gerald Patterson and his colleagues have identified the causal connection between poor parenting (e.g., harsh, inconsistent discipline, little positive involvement, and inadequate monitoring and supervision) and coercive, socially unskilled behavior on the part of children. Gerald R. Patterson et al., *A Developmental Perspective on Antisocial Behavior*, 44 AM. PSYCHOLOGIST 329, 329 (1989). Yet, they have also learned that this coercive behavior—a predictable adaptation to a dysfunctional family life—leads to social rejection and school failure. *Id.* at 330. Children react to these two unexpected and undesirable outcomes by engaging in what Patterson terms "deviant peer group membership," which not only facilitates the development of subsequent delinquent acts and substance abuse but makes more likely a series of adult life outcomes, including "school dropout, uneven employment histories, substance abuse, marital difficulties, multiple offenses, incarceration, and institutionalization." *Id.* at 331. *See also*, Gerald R. Patterson & Thomas J. Dishion, *Contributions of Families and Peers to Delinquency*, 23 CRIMINOLOGY 63 (1985). Yet, Patterson needed decades of careful research to reach these conclusions, decades that the children he studied did not have.

114. In a related vein, several developmental researchers have documented the ways in which "interactional styles" can have important consequences, and exacerbate early difficulties, across an entire life course. For example, "a boy whose ill temper leads him to drop out of school may thereby limit his future career opportunities and unwittingly channel himself into frustrating life circumstances that further evoke a pattern of striking out explosively against the world." Avshalom Caspi et al., *Continuities and Consequences of Interactional Styles Across the Life Course*, 57 J. PERSONALITY 375, 377 (1989).

---

from a psychological perspective, is more salient and memorable). However, the logic of mitigation requires us to consider whether—if we praise those who have overcome such barriers despite this potentially destructive presence in their lives—we should not also adopt a more merciful and compassionate posture towards those who could not. Perhaps it is because, at least at a distance, we often are hard pressed to account for the differences between these two kinds of outcomes that our reactions are so inconsistent. (To be sure, if our society spends so little time examining the lives of those who have succumbed to these miserable and destructive conditions, it spends even less examining the lives of those who seem to have survived and overcome them.) The simplistic and satisfying explanations are usually that the survivors just tried harder, were better people, or had strong enough consciences to guide their consistently moral choices—as opposed to people like capital defendants who, we assume, were lazy and simply gave up, were bad from the start, or whose moral sense was just so defective that they consistently chose wrong. A careful look at the internal dynamics of adaptation and survival, however, tells a different story.

Indeed, it is a story that is usually clearly illustrated within a capital defendant's own family. To understand how, it is important to recognize the tendency to think in very sloppy and overly general terms about commonality of experiences and life circumstances that often leads us to premature and erroneous conclusions about people who have undergone the "same" treatment but somehow managed to behave differently. This tendency takes several forms. One is to regard life experiences as the same when, in fact, under careful inspection, events, circumstances, or conditions are experienced quite differently. Siblings whose life courses took dramatically different turns are pointed to as evidence that family poverty and child maltreatment is not dispositive of adult behavior. Yet, anyone who has grown up in a family with brothers or sisters can attest to the fact that siblings within the same family are rarely treated identically. Indeed, the "same" families are experienced very differently by children as a function of numerous differences in treatment that are obvious to all who live through them. Ironically, family members who have written about the genesis of violence within their families—violence that visited one or another but not

all of their siblings—have no trouble distinguishing their own life course from that of the person who succumbed.[115] And in some instances capital defendants themselves—either because of their age, gender, or some idiosyncratic characteristic—manage to draw a disproportionate amount of their parents rage or shoulder an undue portion of the family's burdens, thereby protecting their siblings from the worst abuse.

Sometimes differences within families follow predictable or systematic patterns, but sometimes they do not. For example, families that face similar structural disadvantages may handle them in different ways, ways that have significant consequences for the children within them. Researchers know that certain kinds of parenting can serve as "protective factors" that decrease the likelihood that otherwise "at risk" children will commit crime.[116] Yet, in many cases the systematic patterns elude us. Often the stories that are told by the survivors of the kinds of brutalizing experiences I have described are ones in which luck or chance or good fortune figure prominently at crucial life turns. Survivors tell tales of fortuitous events and critical moments of good fortune, ones that others typically cannot tell. Sadly, and in a way that shakes our sense of justice, what many times saves some people from falling prey, and dooms others to a life of predation, is chance or luck. This kind of serendipity often takes the form of someone who cared—a teacher, an uncle, friend, or counselor. Indeed, a single caring person who got involved in the life of a child or adolescent otherwise profoundly at risk can sometimes make all the difference. Survivors tell about the importance of someone who gave them a brief respite from their trauma and abuse, who extended a hand to pull them out of their despair, or whose mere interest in them served to acknowledge their personal value and worth. This is what many capital defendants have missed and what helps to account for their tragically difficult life course despite the fact that a brother or childhood friend or someone else from the same neighborhood took a different, more successful path.

115. *E.g.*, GILMORE, *supra* note 33; STAPLES, *supra* note 74; JOHN E. WIDEMAN, BROTHERS AND KEEPERS (1984); Mikal Gilmore, *Family Album*, 37 GRANTA 10 (Autumn 1991).

116. *E.g.*, McCORD, *supra* note 58. McCord found that maternal affection, nonpunitive and consistent discipline, and parental supervision were effective "protective factors" in different kinds of families. *Id.* at 223.

And we should make no mistake about it: even though not everybody who suffers such early deprivation or abuse, or endures the sting of racial mistreatment resorts to violence, *no one* emerges completely untouched and unscathed. Some of those whose social histories parallel the lives of capital defendants adapt by striking out in anger, some by turning the anguish inward and suffering psychiatric disorder, some anesthetize themselves with drugs, some do all three and more, but no one is truly unaffected. Some of the people exposed to the brutalizing experiences and conditions I have described lead lives of quiet desperation while, for some, the desperation gets very, very loud. Their adaptations tell us where to find them, and little else. Some turn the anger and hatred inward, many are found in mental hospitals, homeless shelters, or on street corners, not in capital courtrooms. Indeed, the line between internalized and externalized aggression is often blurred, especially if the brutalization is deep enough. Gary Gilmore, Robert Harris, and David Mason all made a number of very serious attempts to take their own lives before they ever took the lives of anyone else. In fact, in Gilmore's and Mason's cases, it seems obvious that their very executions were little more than state-assisted suicides.[117] Gary Gilmore's brother Mikal—a successful writer who seemed to have emerged unscathed from the history of violence that plagued his family—wrote eloquently about the way in which a destructive childhood can take a very different but nonetheless exacting toll on siblings who appear to have escaped its legacy. He wrote:

> What had gone wrong [in my life], I realized, was because of my past, something that had been set in motion long before I was born. It was what Gary and I shared, more than any blood tie: we were both heirs to a legacy of negation that was beyond our control or our understanding. Gary had ended up turning the nullification outward—on innocents, on Nichole, on his family, on the world and its ideas of justice, finally on himself. I had turned the ruin inward. Outward or inward—either way, it was a powerfully destructive legacy. . . .[118]

117. *See* Gilmore v. Utah, 429 U.S. 1012 (1976); Mason v. Vasquez, 5 F.3d 1226 (9th Cir. 1993).

118. Gilmore, *Family Album*, *supra* note 115, at 49. For another richly historical and contextual analysis of a destructively violent legacy, one that incorporates insights into the ways in which the juvenile and criminal justice sys-

D. *Discrediting the Impact of a Destructive Life History by Considering Only One Mitigating Factor at a Time*

Another form of sloppy or imprecise thinking that diminishes or discounts the significance of mitigating factors is to address only a single factor at a time, as if an individual factor somehow was registered in isolation in a single social history. It is, for example, to contend that "not everybody" succumbs to even severe child abuse, or "not everybody" among even the desperately poor commits acts of violence, and so on. Of course, in so doing, we ignore the fact that human lives are made up of numerous experiences that accumulate and interact with one another. What matters much more than the presence or absence of one or another specific damaging experience or condition of life is their additive impact and the way in which they interact with each other to compound the effect.[119] For many capital defendants, these experiences have combined with each other like a bad mix of toxic chemicals to make some lives a very bitter pill to swallow, or to swallow and survive.

It is possible to think of these mitigating variables or experiences as "risk factors" that when added up over the course of a life form a whole that is greater than its individual parts.[120] Many capital defendants have led lives that are the criminogenic equivalent of being born into hazardous

---

tem's narrowly individualistic focus on the causes of violence fail to adequately address the problem, see FOX BUTTERFIELD, ALL GOD'S CHILDREN: THE BOSKET FAMILY AND THE AMERICAN TRADITION OF VIOLENCE (1995).

119. Novelist John Wideman's eloquence on the subtlety and complexity of these combinations, and the outcomes made inevitable by their mixing, is useful to quote in this regard:

You never know exactly when something begins. The more you delve and backtrack and think, the more clear it becomes that nothing has a discrete, independent history; people and events take shape not in orderly, chronological sequence but in relation to other forces and events, tangled skeins of necessity and interdependence and chance that after all could have produced only one result: what is.

WIDEMAN, *supra* note 115, at 19.

120. This model provides a more valid and meaningful way of conceptualizing the complex interplay of social history and adult behavior. It allows us to analyze the background experiences I have described as so commonplace in the lives of capital defendants as "risk factors" and the immediate situational pressures under which they act as "stressors." Precisely this model of causation has been employed by Ann Masten & Norman Garmezy, *Risk, Vulnerability and Protective Factors in Developmental Psychopathology, in* ADVANCES IN CLINICAL CHILD PSYCHOLOGY 1 (Benjamin Lahey & Alan Kazdin, eds., 1985). Masten and Garmezy define "risk factors" as those events whose presence one's background

---

waste dumps—Love Canals of crime—being exposed to crime-producing carcinogens since birth, breathing the social and psychological equivalents of smog-infested air through most of their young lives and into adulthood. They have had risk factor dumped upon risk factor over the course of a life—impoverished, abused kids, the targets of racism, poor schools, badly botched treatment or no treatment at all in the juvenile justice system, unemployment, harsher treatment still at the hands of a warehousing adult prison system, and on and on.

We do no justice to these issues by oversimplifying them or by pulling them out, one by one, and saying that "not everybody" who experienced any one of them reacted the way a particular capital defendant did. A life is an accumulation of interacting variables and it needs to be understood in that way. For most capital defendants, the risk factors are so many and varied that the real issue is not why "not everybody" responded this way but rather how anybody could survive and why more people do not succumb.[121]

---

indicates "a higher probability for the development of a disorder; as such, these factors are statistically associated with higher incidence rates." *Id.* at 6.

This way of conceptualizing social histories allows juries to understand and appreciate the role that one or (typically) many of these risk factors—extreme poverty or exposure to serious physical and emotional child abuse, or the presence of any one of the other significant background factors that distinguishes a capital defendant's life history from others—play in accounting for his presence in the courtroom. Along with the numerous stressors that typically are present as precipitating factors, these forces constitute the psychological context of capital crime. The model also helps to account for individual variations in responding to the same or similar risk factors and stressors by acknowledging, on the one hand, the presence or absence of "protective factors" (like warn and supportive family milieus, or the presence of an extended support system) that can buffer children from otherwise damaging elements in their environment.

121. In this context, however, it is important to underscore the fact that this is not an argument that everyone who experiences poverty or racism or even severe childhood maltreatment is predisposed to a life of crime and violence. Thankfully, few lives are comprised of risk factor piled upon risk factor with a corresponding absence of social and psychological buffers. Indeed, many capital defendants are outliers on a continuum of risk factors like abuse and neglect. Their actions and adaptations should not be taken to condemn the large numbers of people who have shared some similar experiences; rather they underscore the cumulatively dire effects of many such destructive experiences and the way in which they collectively preclude meaningful chances to prevail. Although it is somewhat beyond the scope of the present article, it is important to note that there is a strongly situational component to most violent encounters that helps determine whether, when, and how aggression is manifested. *E.g.,* Michael Carlson et al., *Effects of Situational Aggression Cues: A Quantitative Review,* 58 J. PERS. SOC. PSYCH. 622 (1990); Melissa DeRosier et

Finally, the "not everybody" argument in some ways reflects a deeper confusion about the language of causality in psychology, one with especially profound consequences in capital jurisprudence. Despite its commonsense appeal, the "not everybody" argument is not only psychologically incorrect (as my preceding comments have tried to show) but legally disingenuous. To be sure, the argument provides a highly misleading and inaccurate way of conceptualizing human behavior. But, at the core of the legal disingenuity is this: virtually no psychological cause or social influence produces the same effect in everyone. Hence, no matter how powerful or potentially influential a background factor or situational influence that places a child or young adult "at risk," not everyone who has experienced it will respond to it in the same way. Thus, if uncritically accepted, use of this impossible-to-meet standard would virtually eliminate consideration of any and all social history factors and situational influences from capital sentencing inquiries.

Of course, such logic clearly violates the mandate of contemporary capital jurisprudence. If jurors are instructed to consider the background and character of capital defendants in the course of deciding their fate, then no behavioral standard can be employed that, in essence, would preclude them from doing so in every case. Stephen Gillers has reminded us that, in a capital case, "the sentencer, whatever else it does, necessarily decides whether mercy is appropriate given the crime and the history and record of the accused. The defendant is entitled to introduce evidence of his history and record to assure that mercy is not denied despite facts that would support it."[122] To succumb to the argument that a particular defendant is not entitled to mercy because not everybody who has shared his experiences has reacted similarly would render *all* forms of mitigation irrelevant and accomplish precisely the kind of categorical denial of mercy that modern capital sentencing schemes are designed to avoid.

## VI. THE CONSTITUTIONAL MANDATE TO CONSIDER SOCIAL HISTORY MITIGATION

The presentation of detailed social history testimony represents a significant challenge to the myth of demonic agency upon which the system of death penalty imposition is partially based. It also promises to infuse the capital sentencing process with a measure of integrity that is lacking from public discussions about the death penalty that take place beyond the confines of the courtroom.[123] Absent this kind of information the capital jury is thrown back upon precisely the kind of partial and misleading false stereotypes that I described earlier. Indeed, these stereotypes are usually all the jury is given until the very last stages of a capital trial:

> The past life and character of the defendant are usually irrelevant in the guilt phase. While the state has often presented the evidence in the guilt phase that arguably makes the homicide especially heinous, the penalty phase is usually the defense's first opportunity to present to the factfinder the personal aspects of the defendant's life.[124]

Despite the tension that social history evidence creates in the operation of the system of death sentencing, the opportunity to find and present such evidence is now constitutionally mandated. The principle that a sentencer's "possession

---

al., *Group Social Context and Children's Aggressive Behavior*, 65 CHILD DEV. 1068 (1994); Virginia Hiday, *The Social Context of Mental Illness and Violence*, 36 J. HEALTH & SOC. BEH. 122 (1995). Factors such as the availability of lethal weapons also play a key role in distinguishing deadly aggression from less tragic manifestations of anger and impulsivity.

122. Stephen Gillers, *The Quality of Mercy: Constitutional Accuracy at the Selection Stage of Capital Sentencing*, 18 U.C. DAVIS L. REV. 1037, 1046 (1985).

123. The silence that shrouds the lives of capital defendants is not restricted to the United States, but seems fundamental to the operation of the death penalty throughout the modern world. Historian Peter Linebaugh has observed that, in contrast to the 18th century London, where news of public hangings and the biographies of those executed were widely disseminated, nowadays "remarkably little is know about the recent victims of capital punishment . . . . The international press is strangely silent, and the national press is terse." LINEBAUGH, *supra* note 4, at xvi. Another historian has argued that it was the British Crown's inability to control the public's reaction to executions—and what that implied about their relationship to the power of the state—that led to the end of public executions in England and the creation of secrecy surrounding the ritual. Thomas W. Laqueur, *Crowds, Carnival and the State in English Executions*, in THE FIRST MODERN SOCIETY: ESSAYS IN ENGLISH HISTORY IN HONOUR OF LAWRENCE STONE 305 (A. L. Beier, et al., eds., 1989). The same process seems to be at work with the lives of capital defendants. Psychologically, today's "evolving standards of decency" require that not only executions but the lives of their victims be removed from public view in order for the state sanctioned killing process to run smoothly. Social history evidence is a strong antidote to this dehumanizing tendency.

124. Linda Carter, *Maintaining Systemic Integrity in Capital Cases: The Use of Court-Appointed Counsel to Present Mitigating Evidence When the Defendant Advocates Death*, 55 TENN. L. REV. 95, 101 (1987)(footnote omitted).

of the fullest information possible concerning the defendant's life . . ."[125] is essential to the selection of the appropriate penalty predates the modern era of capital jurisprudence and has never been restricted exclusively to death penalty cases. It was embraced and reaffirmed both before and after *Lockett*,[126] the case generally identified as having given rise to this requirement in contemporary capital litigation. Two years before, the plurality in *Jurek v. Texas* had emphasized that "[w]hat is essential is that the jury have before it all possible information about the individual defendant whose fate it must determine."[127] Similarly, the *Woodson* plurality acknowledged a belief in "the fundamental respect for humanity underlying the Eighth Amendment [that] requires consideration of the character and record of the individual offender" in a capital case.[128] Several years after *Lockett*, the Court held that refusal to consider a capital defendant's family history as mitigating evidence warranted reversal.[129] The Court later reaffirmed the principle by ruling that the state must "allow the sentencer to consider the individual circumstances of the defendant, his background, and his crime."[130] In

125. Lockett v. Ohio, 438 U.S. 586, 603 (1978)(quoting Williams v. New York, 337 U.S. 241, 247 (1949)). The Williams Court stated:

The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender . . . . [A] strong motivating force for [these] changes has been the belief that by careful study of the lives and personalities of convicted offenders many could be less severely punished and restored sooner to complete freedom and useful citizenship. This belief to a large extent has been justified.

Williams, 337 U.S. at 247-49. The Court in Williams also quoted Judge Lewis Schwellenbach to the effect that: "The knowledge of the life of a man, his background and his family, is the only proper basis for the determination as to his treatment. There is no substitute for information." Williams, 337 U.S. at 249-50 n.14.

126. Lockett v. Ohio, 438 U.S. 586 (1978). See also, Bell v. Ohio, 438 U.S. 637 (1978)(death sentence reversed because statute precluded consideration of various aspects of defendant's background).

127. Jurek v. Texas, 428 U.S. 262, 276 (1976). The legal commentators have understood the Court's mandate in equally broad terms: "While the precise contours of the Eighth Amendment requirements are not clear, it seems relatively certain that a convicted defendant is entitled to present and to have the sentencing authority consider any information of reasonably mitigating significance." George E. Dix, Psychological Abnormality and Capital Sentencing, 7 INT'L J. L. & PSYCHIATRY 249 (1984).

128. Woodson v. North Carolina, 428 U.S. 280, 304 (1976).

129. Eddings v. Oklahoma, 455 U.S. 104 (1982).

130. Spaziano v. Florida, 468 U.S. 447, 460 (1984).

*Penry*,[131] Justice O'Connor crystallized the teachings of *Lockett* and *Eddings* as "the principle that punishment should be directly related to the personal culpability of the criminal defendant," which could only be assessed if things like the defendant's history as an abused child could be given mitigating effect.[132] She noted that "[r]ather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a 'reasoned moral response to the defendant's background, character and crime.'"[133] It is the nexus between legal storytelling (in the form of a defendant's social history) and the empathy that such storytelling is capable of generating among jurors that offers the promise of individualized justice in the capital sentencing process.[134]

Despite informed commentary about the inadequacies of capital trials, particularly with respect to the investigation and presentation of social history mitigation,[135] it has been clear for some time that capital juries must be given the opportunity to hear and fully consider such testimony. Indeed, some commentators have argued that the task of compiling background and social history information is so foreign to criminal defense work generally, yet so monumentally important to the question of whether or not a capital defendant

131. Penry v. Lynaugh, 492 U.S. 302 (1989).

132. Id. at 319.

133. Id. at 328. Justice O'Connor has been consistent in her focus on blameworthiness and culpability in the capital sentencing calculus. In her dissent in Enmund she argued that "[p]roportionality requires a nexus between the punishment imposed and the defendant's blameworthiness." Enmund v. Florida, 458 U.S. 782, 825 (1982). And in Tison she wrote that "[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." Tison v. Arizona, 481 U.S. 137, 149 (1987).

134. Cf. Toni M. Massaro, Empathy, Legal Storytelling, and the Rule of Law: New Words, Old Wounds?, 87 MICH. L. REV. 2099 (1989) (discussing the connection between these concepts and questioning their value as a comprehensive model of law). Massaro concedes that the courtroom setting is "hardly intimate or otherwise conducive to 'knowing' someone" and that those who advocate the kind of empathetic understanding and contextual justice I argue is essential to capital sentencing "must favor radical restructuing of court procedures to make them more congenial" to these things. Id. at 2108. Yet, capital penalty phases, when properly conducted, lend themselves to precisely such intimate knowing.

135. E.g., Bright, supra note 73; William S. Geimer, Law and Reality in the Capital Penalty Trial, 28 N.Y.U. REV. L. & SOC. CHANGE 273 (1990-91); Goodpaster, supra note 29; Ronald J. Tabak, The Death of Fairness: The Arbitrary and Capricious Imposition of the Death Penalty in the 1980's, 14 N.Y.U. REV. L & SOC. CHANGE 797 (1986).

lives or dies, that a separate standard of ineffective assistance should be applied in death penalty cases.[136] Another commentator has observed that the prejudice prong of the *Strickland* standard[137] has been especially onerous to capital defendants: "Faced with a horrific crime and overwhelming evidence of guilt, reviewing courts are often unable to imagine that a jury would have imposed any sentence but death."[138]

But it is not just that the reviewing court must "guess, based on a cold record,"[139] what effect evidence that was not presented might have had on the jury. Estimating the effect that *mitigating* evidence would have had on a reasonable juror involves courts in personal questions of value and individualized interpretations of what should matter in assessing a life, rather than in questions of objective fact or law. Indeed, "[t]he appellate court's task is particularly complicated because the jurors are almost unguided in how they may use the evidence,"[140] as well as how much value they may attach to it and how they may compare it to other evidence in the "weighing" process they must engage in. In addition, given the fact that the appellate court reviews the penalty records of only those cases in which death verdicts were rendered, there is no reason to believe that judges have any special expertise or range of experience in reaching conclusions about how background and social history actually affect the life course of a capital defendant, or the way in which evidence about these factors can influence the decisionmaking of (especially) life-sentencing capital jurors. Appellate courts are in need of education about both, otherwise their judgments may approximate those of lay persons, threatened by stereotypes

and misconceptions, but absent any meaningful exposure to powerful penalty phase evidence designed to challenge or counterbalance them.[141] As one legal commentator has noted, the tendency of even liberal judges to avoid precisely the kind of contextualizing analysis and narrative of the defendant's life history that I have urged in this article means that their opinions typically "underscore, rather than challenge, the public tendency to view these defendants, and not just their acts, as inexplicably alien, horrendous and inhuman—and to view their lives as therefore expendable."[142] Appellate courts seem unwilling and ill-suited to make up for the absence of social history testimony at trial. Thus, "[s]ociety's interest in preventing arbitrary imposition of the death penalty can be protected most effectively at the *trial* level" through the jury's affirmative consideration of such mitigating evidence.[143]

There is another kind of societal interest at stake as well. Part of what the secrecy about the lives of capital defendants and corresponding dependence upon wildly inaccurate media stereotypes has purchased over the last several decades is the conditioned inability to make reasoned choices about competing crime control policies. The kind of public relations campaigns that have been used to whip up execution fever across the country have contributed to the public's miseducation

---

136. Ivan K. Fong, *Ineffective Assistance of Counsel at Capital Sentencing*, 39 STAN. L. REV. 461 (1987). Linda Carter has argued that the presentation of capital mitigation has become so central to the "systemic integrity" of our system of death sentencing that courts should appoint independent counsel to do so in cases where defendants instruct their attorneys not to. Carter, *supra* note 124.

137. Strickland v. Washington, 466 U.S. 668 (1984). *Strickland*'s prejudice prong requires proof of a reasonable probability that the result of the proceeding would have been different absent the error in question.

138. Note, *The Eighth Amendment and Ineffective Assistance in Capital Trials*, 107 HARV. L. REV. 1923, 1931 (1994).

139. Id. at 1936.

140. Linda Carter, *Harmless Error in the Penalty Phase of a Capital Case: A Doctrine Misunderstood and Misapplied*, 28 GA. L. REV. 125, 156 (1993).

141. `Cf.` Carter, *supra* note 140, at 158 ("It is crucial to educate the courts to the importance of recognizing that a value judgment, and not a factfinding mission, is occurring in the penalty phase"). However, as part of its mission to streamline the capital appeals process the Supreme Court seems intent upon rendering much of that education irrelevant. In *Sawyer v. Whitely*, 112 S. Ct. 2514 (1992), the Court ruled that successive habeas corpus petitions may be brought only by petitioners who can make out a showing of "actual innocence," but defined in such a way as to preclude consideration of the possibility that a "factually inaccurate sentencing profile" was the basis of the death verdict or that constitutional errors led to the omission of mitigating evidence that would have led to a sentence less than death. Inter alia, Sawyer had claimed that medical records from his stays at two different mental institutions during his teenage years were not introduced at trial due to ineffective assistance of counsel. Although this kind of psychological evidence represents classic mitigation that, in the appropriate case, might make all the difference, the Court refused to consider the claim because it did not relate to his actual innocence or eligibility for the death penalty. *Cf.* Eric D. Scher, *Sawyer v. Whitely: Stretching the Boundaries of a Constitutional Death Penalty*, 59 BROOK. L. REV. 237 (1993).

142. West, *supra* note 30, at 175. *See also*, Joan W. Howarth, *Deciding to Kill: Revealing the Gender in the Task Handed to Capital Jurors*, 1994 WIS. L. REV. 1345.

143. Carter, *supra* note 140, at 129 (emphasis added).

about crime and punishment. One legal commentator has made the useful observation that even those who are victimized by crime have no way of appreciating the consequences of different policies of punishment on the crime rate.[144] Their claims for maximum retribution can be respected without serving as the basis for a national crime control strategy. But neither is the public at large in a position to compare alternative strategies of crime control in terms of their cost to effectiveness ratio, given the level of confusion that surrounds the issue. Advocating more and more punishment thus becomes a cost-free political panacea in the short run and an extremely expensive course of action over the long term. However, the broad lessons that emerge from capital penalty trials about the real causes of violent crime serve to balance that picture and point the way toward a very different approach to crime prevention.

## VII. CONCLUSION

These, then, are some of the elements of the social histories that produce capital violence: Family poverty and deprivation, childhood neglect, emotional and physical abuse, institutional failure and mistreatment in the juvenile and adult correctional system. There is not much glamour in these stories, not much stylized evil, not much brilliant, diabolical, deliciously twisted violence. Just a lot of mundane truths about how deprivation, abuse, neglect, institutional failure and mistreatment, and so on can all combine to twist a life badly out of shape. Indeed, as one commentator has aptly put it:

> In the end, it is the defendant whose life is in the balance. It is the defendant as a complete person, not as a composite drawing of mitigating and aggravating evidence, who will suffer the ultimate penalty. The fundamental purpose of the capital sentencing hearing is to force the sentencer to view the defendant as a person, no matter how hard some prosecutors might try to describe the defendant as an animal or an inanimate object.[145]

144. Samuel R. Gross, *The Romance of Revenge: Capital Punishment in America*, 13 STUD. LAW, POL., & SOC'Y 71 (1993).

145. Markus D. Dubber, *Regulating the Tender Heart When the Axe is Ready to Strike*, 41 BUFF. L. REV. 85, 114 (1993). *See also*, Samuel H. Pillsbury, *Emotional Justice: Moralizing the Passions of Criminal Punishment*, 74 CORNELL L. REV. 655 (1989). He acknowledged that "[t]he greatest temptation in assessing what punishment is deserved is to oversimplify—to exaggerate the good, or,

Yet, in many ways, these are stories much more about *us*, about our priorities as a society, about the bitter fact that we somehow feel more comfortable expending scarce resources on the process of killing than on the task of creating lives worth living. These social histories seem to say much more about these things than they do about individual human evil and abject depravity. Indeed, that may be exactly why such stories are so difficult to tell.

Does any of what I have said excuse what capital defendants have done? Of course not. The law typically does not even permit jurors to hear these stories until the only decision remaining before them is life without parole or death. Is there a simple one-to-one correspondence between the childhood abuse and deprivation and the crime committed as an adult? The sophisticated research notwithstanding, the answer is "rarely." Many capital defendants feel a profound desperation, with no way out of the morass they have entered. Their lives take twists and turns that no one can account for, least of all them. Desperate people do desperate things, crazy, irrational things, things that sometimes are unlike any of the things they have ever done at any other time in their lives. Confusion, emotional pressure, desperation lead basically good people to do bad, reprehensible things. We do not excuse people completely for things that they have done simply because they became desperate, confused, or even chronically enraged. But if we can identify with their struggles, if we are moved in our heart by the things that made them this way, and realize that they did not choose these formative experiences any more than they chose the emotional consequences of having to grapple with them, then we take the sum of that life, and the terrible turn that it took, into account when deciding how to punish them. The legal, psychological, and moral significance we attach to these lives of trauma, deprivation, abuse, and neglect is often all that stands between a capital defendant and the execution chamber. No, we don't excuse them for their actions, but neither do we kill them.

more commonly, to exaggerate the evil of the offender." *Id.* at 691. Yet, he also argued that "any sentence based on a judgment that the offender is 'other' must violate the basic principle of human worth upon which retribution is based." *Id.* at 699.

# MITIGATION INTRODUCTION
## Mitigation Evidence Twenty Years After *Lockett*

by Russell Stetler

*Russell Stetler is Director of Investigation and Mitigation for the New York Capital Defender Office*
and Michael N. Burt
*Michael N. Burt is a Deputy Public Defender in San Francisco*
and Jennifer Johnson
*Jennifer Johnson is in private practice in San Francisco*

In 1972. the United States Supreme Court struck down all the capital statutes then in effect in the landmark case *Furman v. Georgia*. 408 U.S. 238. which prohibited unfettered discretion in a complex opinion in which every justice wrote separately. Many states responded to *Furman* by passing new death penalty statutes which attempted to eliminate the unfettered discretion which had made past statutes cruel and unusual in their arbitrary results. In 1976. the U.S. Supreme Court reviewed five capital cases. Some new capital statutes (for example. those with mandatory death sentences) were invalidated. Statutes with "guided discretion" were upheld in *Gregg v. Georgia*. 428 U.S. 153. California reintroduced the death penalty with such a statute in 1977.

## Individualized Sentencing under Lockett and its Progeny: "The Diverse Frailties of Humankind"

In striking down mandatory sentencing schemes. the United States Supreme Court noted that the "enlightened policy" reflected in the then prevailing practice of individualizing sentencing in noncapital cases becomes a constitutional requirement when the punishment is death. In *Woodson v. North Carolina*. 428 U.S. 280. the Court began to articulate this requirement. noting,

> In *Furman*. members of the Court acknowledged what cannot fairly be denied — that death is a punishment different from all other sanctions in kind rather than degree. . . . A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings. but as members of a faceless. undifferentiated mass to be subjected to the blind infliction of the death penalty.

> . . . we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.
> This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment. however long. Death. in its finality. differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference. there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case. (*Woodson*. at 303-305)

In 1978. the U.S. Supreme Court required full consideration by the sentencer of all mitigation in *Lockett v. Ohio*. 438 U.S. 586. Lockett had challenged the constitutionality of the Ohio statute. claiming it did not allow the sentencing judge to consider as mitigating factors her character, prior record. age. lack of specific intent to cause death. and relatively minor role in the crime. The Court concluded that the Eighth and Fourteenth Amendments require that the sentencer "not be precluded from considering. **as a mitigating factor.** any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (*Lockett*. at 604)

The progeny of *Lockett* have consistently maintained that mitigation is whatever evidence is proffered as a basis for a sentence less than death. In *Eddings v. Oklahoma*. 455 U.S. 104 (1982), the Supreme Court found that the trial court had erred in refusing to consider as a matter of law Eddings's emotional disturbance and turbulent family history because these factors "did not tend to provide a legal excuse" from criminal responsibility. The Supreme Court stated:

89

1

> We find that the limitations placed by these courts upon the mitigating evidence they would consider violated the rule in *Lockett*. Just as the state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. (*Eddings*, at 113)

In *Skipper v. South Carolina*, 461 U.S. 1 (1986), the Supreme Court found that the defense should have been permitted to introduce evidence of Skipper's "good adjustment" in jail prior to his capital trial, but subsequent to the alleged capital offense, holding:

> Although it is true that any such inferences [regarding Skipper's good adjustment to jail] would not relate specifically to petitioner's culpability for the crime he committed, there is no question but that such inferences would be "mitigating" in the sense that they might serve as a basis for a sentence less than death. (*Skipper*, at 4-5)

In *Penry v. Lynaugh*, 492 U.S. 302 (1989), the Supreme Court found Penry's death sentence was obtained in violation of the Eighth Amendment because the jury was not adequately instructed to consider all the mitigating evidence and because the questions posed to Texas juries in their sentencing determinations were not defined in such a way that the jury could consider and give effect to Penry's mitigating evidence in answering them. In *Penry*, Justice O'Connor crystalized the teachings of *Lockett* and *Eddings* as "the principle that punishment should be directly related to the personal culpability of the criminal defendant," which could only be assessed if life history data could be given meaningful effect. She noted that "rather than creating a risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a 'reasoned moral response to the defendant's background, character, and crime.'"

### Client-focused investigation

Under California's death penalty statute and the *Lockett* line of cases, capital defense counsel are obliged to investigate the lives of their clients with a view to presenting to the jury at the sentencing phase of trial evidence about the client's state of mind or background which evokes empathy, compassion, and mercy.

The majority of prisoners under sentence of death in California and nationwide are people of color. Other demographic information is much less clear because confidentiality issues preclude study. But all are poor.

Many have multigenerational history of mental illness, such as schizophrenia, bipolar disorder, depression.

Many have suicidal histories, often undiagnosed, or histories of self-destructive behaviors.

Many have learning disabilities or other cognitive impairments — also often undetected and even masked by the clients' coping strategies.

Many are illiterate.

Many have organically based neurological deficits — ranging from seizure disorder to the organic consequences of Fetal Alcohol Syndrome and Fetal Alcohol Effect or intrauterine exposure to neurotoxins.

Many have physical conditions which affect cognition, such as hearing and vision impairments, or medical conditions, such as asthma (which may be stress-related or a long-term consequence of abuse) or Sickle Cell Disease (which can cause childhood strokes and organic brain damage).

Abuse and trauma histories are virtually universal. The overwhelming majority of capital clients have suffered trauma outside the realm of ordinary human experience, whether it occurred within the home, as in incest and sexual abuse, or in the wider social setting, where growing up as an inner-city person of color means witnessing violent death of peers and loved ones. Whether they have suffered violence or helplessly witnessed violence to others, they live with the intrusive memories and remain hypervigilant in the expectation that random violence may visit them again at any moment.

Polysubstance abuse and addiction are commonplace, often secondary to self-medication following trauma.

Many clients are descendants of slaves, and it is common to have ancestors who died by lynching. Among their contemporaries, siblings, cousins, aunts and uncles have died of AIDS.

Many clients have experienced abandonment, beginning with their biological parents. They have been molded and malformed by orphanages, foster care, and a host of institutions which have failed them along the way. Prior experiences in the criminal justice system may be perceived as part of a pattern of abandonment and be-

trayal from the perspective of the client — or of institutional failures, from our perspective.

## Mitigation investigation

Mitigation investigation begins with the client, but it is inevitably a multigenerational inquiry aimed at identifying the genetic predispositions and environmental influences which molded the client's life. The goal is to humanize, but not to normalize, the client. That is, the goal is to present this client to the jury as a member of their human community, worthy of their compassion, worthy of life, or worthy of protection from the ultimate sanction of capital punishment because of handicaps beyond his or her control.

Mitigation investigation is the biography of disability. It is an attempt to discover and document specific impairments, deficits, and disorders.

Neurological impairment is biological mitigation. It is an organic explanation for socially unacceptable behavior. Neurological deficits and cognitive impairments range from mental retardation to learning disabilities. Organic brain damage may result from Fetal Alcohol Syndrome. It must be established through an independently corroborated social history and neuropsychological testing. Social history investigation will involve gathering every piece of documentary evidence bearing on the client's life (including documents relating to ancestry, nuclear family, and other significant caretakers) and interviewing those who knew the client at every stage of life. In the investigation of neurological deficits, the inquiry focuses on a range of issues, including:

— Genetic predispositions, manifested in medical histories of parents and grandparents
— Prenatal development
    — in utero exposure to toxins
        — maternal substance use/abuse(drugs, alcohol)
        — environmental toxins
    — nutrition/malnutrition
    — physical insult/trauma
        — accidental
        — abuse
        — attempted abortion
— Birth
    — premature
    — low birth weight (LBW)
    — labor complications (prolonged labor, forceps delivery, Caesarian section, oxygen deprivation, etc.)
— Infancy
    — developmental milestones

— physical features (head size, wide area between eyes, short nose, flattened filtrum, epicanthal lobes on eyes, malaligned teeth, etc.)
— accidents
— illnesses (high fever)
— environmental toxins
— nutrition/malnutrition
— Childhood
    — developmental milestones
    — accidents
        — head trauma/loss of consciousness
        — bicycle/motorcycle/auto accidents
        — ingestion of toxins
        — asphyxia
— illnesses (high fever; diabetes, hypoglycemia; head aches; sleep disorders)
— exposure to toxins
    — environmental (lead paint, pesticides, industrial chemicals)
    — substance use/abuse
— school performance, intellectual functioning

Mental health issues pervade capital cases. Psychological and psychiatric disorders are no less real than biological disorders, and they are critical to uncover in death penalty cases. The key again is social history investigation, the meticulous biographical inquiry aimed at understanding who the client is and what in his or her background will help us to explain what happened in the alleged capital crime. Investigation focuses on a range of issues, including:

— Genetic predispositions, manifested in medical histories of parents and grandparents
— Family
    — mental illness/retardation of caretakers
    — abuse/maltreatment/abandonment
    — neglect: malnutrition, anemia, poor hygiene, poor medical/dental care, premature sexualization
    — instability: divorce, intermittent parents, adoption, foster placements
    — substance abuse among caretakers
    — criminal activity among caretakers
    — domestic violence — physical, sexual, psychological
    — tragedy: natural disaster, death of family members
— Personal
    — victim of violence, trauma
    — self-destructive or suicidal behaviors
    — recklessness (accidents, injury)
    — truancy, running away
    — depression
    — sexual disorders
    — sleep disorders

— substance use/abuse
— prescribed medications
— school performance/adjustment
— psychological testing, evaluations, therapy
— Social/cultural
— race
— sex/sexual orientation
— economic well-being
— institutional influences

The exploration of all these areas of potential mitigation requires an extraordinary level of trust between the capital defense team and client. Mitigation investigation invades the darkest, most shameful secrets of the client's family, exposes raw nerves, retraumatizes, scratches at the scars nearest the client's heart. It is cyclical, rather than linear, because the witnesses will often oscillate between denial and disclosure as painful truths unfold slowly.

Differences between capital defense counsel and the clients may create barriers to disclosure of sensitive life-history information. These differences typically include race, ethnicity, culture, language, class, education, age, religion, politics, social values, gender, and sexual orientation. Overcoming these barriers will often mean involving someone in the defense team with whom the client will feel more at ease.

Clients tend to be poor historians, and capital defense counsel learn to see them as poor historians, rather than uncooperative liars. Capital counsel learn to see client behaviors, including their inability to provide accurate personal history, as manifestations of their impairments and mental disorders, rather than hostility or manipulation. When we see these behaviors as signals of impairments, our observations of the clients may disclose more information about them than their verbal responses to specific questions. Counsel become observational caretakers because the client's impairments will often preclude accurate self-monitoring or self-disclosure.

The whole defense team has an opportunity to observe the client over a long period of time — from the initial contact immediately following the stressful moment of arrest and interrogation through the ordeal of trial. Between arrest and trial will be other stressful situations — ranging from case developments and conflict in the custodial environment to anniversaries which trigger powerful emotions, including the milestones of everyday life (birth, marriage, holidays, deaths of loved ones) to the anniversary of the crime and arrest. Capital counsel learn to correlate observations of behavioral changes with such stressors.

Behaviors can be anything the client does or says — from refusing a visit to accusing counsel of conspiring with the DA or laughing inappropriately.[1]

### Failure to Investigate Mitigation

The failure to investigate, develop, and present mitigation evidence remains the most common basis for claims of ineffective assistance of counsel in death penalty cases around the country. A cursory review of successful ineffectiveness claims in capital cases throughout the country suggests the range of mitigation evidence which is available:

— failure to present evidence re: poor living conditions in childhood; lack of adult supervision as a child; employment at a young age to support family; irregular school attendance because of employment; reputation as a hard worker; history of nonviolence; epileptic seizures; mental retardation and organic brain damage
— failure to obtain psychiatric examination for defendant or to present any medical evidence at trial re defendant's mental condition or to follow up on phone calls to the state mental hospital where defendant had previously been treated or to subpoena medical records
— failure to present evidence re: defendant's childhood, birth complications, oxygen depletion at birth, childhood seizures, family psychosis, cultural mitigation [Cuban prison/Mariel boat lift], organic brain damage, epileptic disorder, borderline mental retardation, major mental disorder [psychotic, paranoid with depressive features, poor contact with reality]
— failure to present evidence re: defendant's shock therapy at age ten; brain damage from head injury; fixation at dependent and infantile level of development at age eleven inhibiting impulse control; mild mental retardation at age twelve; susceptibility to influence of others; traumatic impact of mothers's death, instability of permanent home, juvenile institutionalization
— failure to present evidence re: mental retardation, minimal schooling, poverty/socioeconomic background, reputation as good father and good worker, impact of father's death in childhood failure to present lay evidence re: irrational acts or to contact family members or to obtain psychiatric evaluation or to investigate insanity defense
— failure to present evidence re: mental problems; mental state; mental impairments; schizophrenia, pathological intoxication, organic brain damage, commitment to mental institutions, history of adjustment in institutional settings; lack of treatment for episodes of dyscontrol
— failure to humanize defendant through evidence of nonviolent nature, caring personality, outstanding performance record at work, but turbulent

4

family history (long-term alcohol and amphetamine abuse, chaotic and crowded childhood home, father's abandonment of family prior to defendant's birth, defendant's psychiatric hospitalizations)
— failure to ask defendant about family background (i.e., marriages, children, employment history)
— failure to conduct any investigation — even when defendant wishes to limit, direct or restrict trial counsel's investigation for mitigating evidence
— failure to present presentence report showing incarceration in state mental facility, to present medical records showing history of mental disorders, to present evidence of suicide attempt in state prison, or to ascertain extent of possible mental impairment
— failure to investigate family, scholastic, military, or employment background or evidence of good character
— failure to present mental retardation, emotional disturbance, and defendant's severely limited capacity to think and understand what is happening around him
— failure to use social history, medical reports, military records, and family testimony; to review records of discharge from military after suicide attempt; to present medical records re alcohol abuse/intoxication at time of offense
— failure to call available character witnesses (neighbors and co-workers who were well respected citizens in their community)
— failure to obtain independent psychiatric evaluation, which resulted in absence of evidence that defendant's mother sustained paint poisoning one month before defendant's birth; family history of epilepsy; family history of dyslexia; radiation therapy of defendant as infant; family history of alcoholism; defendant's chemical and substance abuse; defendant's overall emotional disturbance; defendant's overall depression, schizophrenia, somatic delusions, disordered thinking, and paranoid ideation; and cumulative stresses, including arguments with spouse about finances, drinking, and workaholism
— failure to obtain foster home records which show constant neglect as child and early mental and emotional problems, troubled relationship with father, traumatic effect of mother's death, traumatic effect of witnessing father's sexual assault on sibling, failure to finish fifth grade, borderline retardation, organic brain damage from two head injuries, sexual assault victimization at school for boys, and multiple suicide attempts
— failure to present evidence of defendant's time in juvenile detention center which was grossly overcrowded, staffed by untrained and unnecessarily punitive officers, and rife with incidents of physical and sexual abuse
— failure to learn details of defendant's mental history until defendant's mother testified at sentencing phase concerning multiple episodes of

bizarre behavior and commitment to mental hospital following one such incident
— failure to investigate seriousness of defendant's mental disorders though defendant had been hospitalized five times within the approximately four years prior to the alleged offense; or to present evidence of prior suicide attempt
— failure to be aware of *Lockett v. Ohio* and the requirement that mitigating circumstances be considered by the sentencing jury.

## Conclusion

In hindsight, the instances of ineffective capital representation outlined here may seem obvious and elementary. But truly effective representation requires much more than a checklist of topics to investigate and a litany of now familiar themes.

To be effective, mitigation evidence must be reliable, vivid, concrete, and coherent. Reliability requires contemporaneous documentary evidence wherever possible. Vivid and concrete testimony requires family members, childhood friends, teachers, social workers, employers, correctional staff — lay witnesses of every imaginable variety — to bring the client to life before the jury's eyes. Coherence often requires an expert, such as a clinical psychologist or social worker, to narrate the biography, identifying themes and formative events and offering an interpretation that gives meaning to all that the jury is attempting to assimilate.

The presentation of this evidence, one case at a time, also serves a much broader social purpose than the outcome of the individual capital trial. We live in an era obsessed with crime, murder, and violence — yet we are tragically uninformed and misinformed as to why this epidemic of homicide afflicts our society more than any other in the twilight of the twentieth century. Each case is an opportunity to combat the mythology of the tabloids, TV and Hollywood and offer instead some intense illumination — in one specific instance — of why these tragedies really occur.

This mitigation workbook is an attempt to help capital practitioners — lawyers, investigators, mitigation specialists, social workers, clinicians, and other members of the defense team — in the task of gathering admissible evidence in the trial for life. The concepts have not changed in the twenty years since *Lockett*. The goal is still to uncover the client's frailty and to enable the jury to embrace the convicted killer as a member of our human community. We hope that this workbook is helpful in reaching that goal, and we welcome feedback and suggestions for future revisions.

When a separate mitigation volume first appeared in the 1993 edition of this manual, we noted that it is different in conception from the other volumes in the *California Death Penalty Defense Manual* — and indeed from all the predecessor manuals published by CACJ and CPDA since 1980. The mitigation volume was conceived as a resource for all members of the capital defense team — lawyers and nonlawyers alike. For lawyers, it is a primer on fact-gathering to complement the material on pure lawyering in the companion volumes. For nonlawyers, it stands on its own as a handbook for investigating mitigation evidence in capital cases.

The inspiration and organizational core of this volume was the *Mitigation Workbook* prepared by nationally recognized mitigation specialist Jeff Blum and published originally by the Capital Case Resource Center of Tennessee in 1992. Jeff Blum and the Capital Case Resource Center of Tennessee not only generously shared all their material with us, but permitted us to augment and edit the material at will to fit the needs of readers outside Tennessee.

Beginning in 1993, we adopted Jeff Blum's organization scheme, but added material from past syllabi of the CACJ/CPDA Capital Case Defense Seminars and other publications. Each year, we have added new material on cultures and subcultures, multiple mental impairments, substance dependencies, institutional adjustment, etc. We continue to include both Jeff Blum's mitigation checklist and his guide to using the volume.

We also include a succinct overview of California death penalty law (published originally by the Death Penalty Task Force of the Ninth Circuit Court of Appeals Judicial Council and reprinted with their kind permission). This updated summary is particularly valuable for nonlawyers seeking a concise explanation of the historical and procedural complexities of capital litigation in California.

Our introductory section covers general strategy in investigating capital cases, including the basics of life-history record gathering, locating and approaching life-history witnesses, and building relationships with clients and their families.

Over the years, we have substantially augmented the bibliographies in each section of this manual so that they now meticulously cross-reference all the material in recent syllabi of the CACJ/CPDA capital case defense seminars as well as various other publications.

Seventy-four prisoners were executed nationwide in 1997 — the highest number since 1955. But Texas accounted for half of the executions. A majority of the 38 death penalty jurisdictions, including California, actually carried out no executions.

Sometime in the summer of 1993, California quietly edged past Texas to become the state with the largest death row population in America, and as of December 31, 1997, there were more than 480 prisoners under California death sentences. Some 39 death sentences were imposed in the trial courts of California in 1997. But these large numbers are deceptive. They reflect merely the grandiose scale of criminal litigation in California, and the rarity of executions. Death verdicts continue to be imposed in only a small minority of capitally charged cases throughout the state.

In the first dozen years of post-*Furman* capital litigation in California, over 3,000 cases were filed as death-penalty cases, but only about one in ten ended in a death verdict. Roughly nine of ten capitally charged cases statewide had an outcome other than death. Only half went to guilt trial. Fewer than half which went to guilt trial went on to penalty trial. And fewer than half of those which went to penalty trial ended in death verdicts.

Beyond the statistics lies the reality that good, solid capital lawyering is continuing to win the overwhelming majority of death-penalty cases in California. With an understanding of the client and an explanation of why a seemingly senseless offense occurred, jurors can be empowered to follow their conscience and to vote for life. Given effective representation, no capital case is beyond hope. There is mitigation evidence to be found for every client.

It is our modest hope that this volume will help lawyers, investigators, mitigation specialists, psychologists, social workers, law students, and other members of diverse defense teams to uncover the life-saving facts which will win individual cases. We welcome comments, criticisms, suggestions, and submissions in the form of articles, declarations, transcripts, or examples of demonstrative evidence. We wish to thank all of authors — named and unnamed — for their creative contributions over the years, as well as the many colleagues around the country who have taken the time to keep us apprised of the best new work in the area of mitigation.

## For More Information Contact

**Michael N. Burt**
Deputy Public Defender
Office of the Public Defender
555 Seventh Street
San Francisco, CA 94103

**Russell Stetler**
Director of Investigation & Mitigation
Capital Defender Office
915 Broadway, Seventh Floor
New York, NY 10010

**Jennifer Johnson**
Attorney at Law
555 Seventh Street
San Francisco, CA 94103

## Endnotes

[1]Some of the kinds of behaviors which should be noted are as follows:

1. Reality confusion — hallucinations, illusions, phobias, disorientation, delusions
2. Speech and language — incoherence, neologisms, poverty of speech and thought, distractibility, tangentiality, derailment, circumstantiality, loss of goal, perseveration, pressured speech, blocking, paraphasia, slurring, monotone, stilted speech, micrographia, hypergraphia, dyslexia
3. memory and attention — amnesia, confabulation, hypermnesia, limited attention span, selective inattention
4. medical complaints — hypochondria, self-mutilation, insomnia, hypersomnia, anorexia, ringing ears, dizziness [There are also numerous medical illnesses with psychiatric symptoms and consequences, including AIDS, cerebral ischemia, diabetes, encephalitis, hypoglycemia, hypothyroidism, malaria, mononucleosis, systemic Lupus, etc.]
5. emotional tone — anxiety, suspicion, depression, hostility, irritability, excitement, flat affect, emotional lability
6. personal insight and problem solving — self-esteem (too high or too low), frustration, denial of mental problems
7. physical ability — agitation, hypervigilance, psychomotor retardation, clumsiness, tension
8. social interaction — isolation/estrangement, difficulty perceiving social cues, suggestibility, disinhibition

For a full discussion of these problems, see Deana Dorman Logan, "Learning to Observe Signs of Mental Impairment," CACJ FORUM, v. 19, n. 5-6 (1992), pp. 40-49.

# PRESENTING MITIGATION EVIDENCE
# IN THE GUILT PHASE

**Katy C. O'Donnell**
Assistant Public Defender
Maryland Bar Center
520 W. Fayette Street
Baltimore, Maryland  21201
(410) 333-1935

I.     **Mitigating Factors That May Effect Verdict**

    A.     Intoxication

    B.     Mental Disorder (NCR, Diminished Capacity, Lack of Specific Intent)

    C.     Perfect Self-Defense/Imperfect Self-Defense

    D.     Defense of Others

    E.     Accomplice Liability (Principal vs. Accessory)

    F.     Provocation

    G.     Duress/Domination

II.     **Mitigating Factors That Do Not Effect Verdict**

    A.     *Examples of mitigating factors specific to offense*

        1.     Drugs/alcohol at time of offense

        2.     Mental health issues with nexus to crime

        3.     Relationship between victim and defendant

        4.     Victim's reputation

        5.     Exposing subculture/setting scene

        6.     Relationship among co-defendants

        7.     Opportunity for further criminal activity not pursued

8. Showed some mercy or compassion during offense

9. Special circumstances surrounding the offense

10. Lingering doubt

11. Co-defendant's sentence

12. Cooperation with authorities

13. Remorse

14. Defendant's death wish

B. *Examples of mitigating factors specific to defendant*

1. Age

2. Level of education

3. Employment/lack of employment

4. Military service

5. Level of intelligence/literacy

6. Lack of criminal record

7. Physical condition/health problems

8. Mental health issues with no apparent nexus to crime

9. Religious/church-going

10. Member of organizations

11. Community involvement/activities

12. Reputation in community

13. Positive character traits

14. Special talents

15. Drug/alcohol problem

16. Sought treatment /never received treatment

17. family, friends, children    -- 97

18. provides

# MITIGATION: NO EXCUSE --
## NO JUSTIFICATION JUST AN EXPLANATION

**I.    GENERAL TYPES OF MITIGATION**

    **A.    LACK OF AGGRAVATION IS BEST MITIGATION**

    **B.    GOOD CHARACTER**

        1.    LACK OF CRIMINAL RECORD

        2.    CARING DEEDS/ACTS

        3.    GOOD JOB HISTORY

        4.    SCHOOL ACHIEVEMENTS

        5.    MILITARY HISTORY

        6.    STABLE FAMILY/MARRIAGE

        7.    RELIGIOUS ACTIVITIES

        8.    COMMUNITY ACTIVITIES

    **C.    POSITIVE PRISONER**

        1.    LACK OF PROBLEMS IN JAIL

        2.    GOOD DEEDS IN JAIL -- HELP GUARD/INMATE

        3.    POSITIVE ADJUSTMENT IN PRISON

        4.    USEFUL WORK SKILLS

        5.    CONTINUING EDUCATION

    6.     AGE – OVER 30

    7.     OTHER INSTITUTIONS – FOSTER HOMES – MILITARY

**D.**    **EMPATHY**

    1.     CHILDHOOD POVERTY

    2.     FATHERLESS/MOTHERLESS

    3.     FAMILY INSTABILITY

    4.     ABUSIVE/NEGLECTFUL FAMILY

    5.     EMOTIONAL DEPRIVATION

    6.     PARENTAL ALCOHOL/DRUGS

    7.     FAMILY DYSFUNCTION

**E.**    **MENTAL CONDITION**

    1.     MENTAL RETARDATION – STATUTE?

    2.     MENTAL DISEASE/ILLNESS

        A.    ORGANIC V. NON-ORGANIC

        B.    KNOWN V. UNKNOWN – RECOGNIZED SCHIZOPHRENIA

        C.    TREATABLE V. NOT TREATABLE – OLD YELLER

        D.    LENGTH OF ILLNESS – ACUTE/CHRONIC

        E.    PRIOR HOSPITALIZATION

F.    **ALCOHOL/DRUGS**

    1.    FAMILY HISTORY OF ALCOHOLISM ETC. — GENETIC

    2.    EVENT THAT STARTED USE

    3.    PRIOR TREATMENTS — PERIODS OF SOBRIETY

    4.    EXPERT TO EXPLAIN ADDICTION PHENOMENA


G.    **CRIME RELATED**

    1.    LINGERING DOUBT — CRIME/DEGREE

    2.    REMORSE — DEFENDANT, OTHERS, CONFESSION

    3.    LESSER ROLE IN CRIMINAL ACTS

    4.    CAPACITY TO FORM INTENTS ETC.

    5.    FAR WORSE CASES — # OF BODIES, SEX ACTS, ETC.

    6.    LIFE SENTENCE FOR EQUALLY/MORE CULPABLE

        CO-DEFENDANT


II.    **ORGANIZING MITIGATION**

    A.    **TIMELINE OF SOCIAL HISTORY**

___ | ____ | ____ | ___ | ____ | ____ | ____ | ____ | ____ | ____ | ___

        EXLPAINS AGGRAVATION EVENTS