# EXHIBIT 16

# EXHIBIT 16

### Declaration of Michael Colbart

**I declare under penalty of perjury the following to be true and accurate to the best of my information and belief:**

1.     I was selected to serve as a juror in the State of Oklahoma vs. Tremane Wood, case number CF-02-46. The case was tried during March of 2004. Sentencing followed in April of 2004.

2.     During the trial, the jurors were instructed that we had to reached a unanimous decision. We were told that a hung jury was not an option and that we had to make a decision one way or the other. We were told that if we did not reach a unanimous decision, we could not break for the weekend.

3.     I was contacted in May 2011, on Tremane's behalf by two defense investigators with the Office of the Federal Public Defender. I would have provided the same information to others that I am providing today if I had been asked.

**I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.**

_____          _____
**Michael Colbart**                                                  Date   May 5/2011

# EXHIBIT 17

# EXHIBIT 17

## Declaration of Candelaria Nunez

**I declare under penalty of perjury the following to be true and accurate to the best of my information and belief:**

1.  I was selected to serve as a juror in the State of Oklahoma vs. Tremane Wood, case number CF-02-46. The case was tried during March of 2004. Sentencing followed in April of 2004.

2.  ~~To my best recollection, CN~~ During the sentencing phase, the jurors were instructed to continue to deliberate until we had reached a unanimous decision. We were further instructed that a hung jury was not an option.

3.  I did not understand that a life without the possibility of parole sentence meant Tremane Wood would actually spend the remainder of his natural life incarcerated. I voted for the death sentence because I thought Tremane might one day be released and offend again, and I did not want that to occur.

4.  During the sentencing hearing, I recall we did not hear very much about Tremane Wood's childhood. Had I known the following information, I would have given serious consideration to a life sentence:

    a.  That Tremane's brother Andre and his brother Jake often saw their father severely beat their mother. Their father tied their mother to a chair, poured alcohol on her, and threatened to set her on fire. He also handcuffed her to his car and dragged her alongside.

    b.  That a protective order filed in the 1980s by Tremane's mother stated that Tremane's father threatened to kill her, forced her to have sex against her will, sodomized her, fractured her jaw, knocked out her teeth, threatened her with a gun, knife, and pipe wrench.

    c.  That a clinical social worker/sociologist would explain: that Tremane suffered from post-traumatic stress disorder as a result of growing up in a home where he witnessed violence as a small child; that Tremane's basic needs as a child went unmet; that Tremane felt helpless seeing his mother being abused; that Jake took over as the parent-figure; that Tremane functioned well when he had structure; and that Tremane never felt like he belonged in a racial group.

5.  I was contacted in May 2011, on Tremane's behalf by two defense investigators with the Office of the Federal Public Defender. Until now, I had never been contacted by anyone on Tremane's behalf. I would have provided the same information to others that I am providing today.

**I declare under penalty of perjury the foregoing is true and accurate to the best of my information and belief.**

_Candelaria Nuñez_                              5-5-11
**Candelaria Nunez**                              Date

# EXHIBIT 18

# EXHIBIT 18



DEFENDANT'S EXHIBIT 8

# Report and Analysis of Mitigation Factors
## In the Case of

### Tremane Wood, Appellant
### v.
### The State of Oklahoma, Appellee

Developed by Kate Allen, LCSW, Ph.D.
Forensic Consultant
Date Delivered:  1-06-06

## Purpose of This Report

Tremane Wood is a 26 year-old biracial male appealing a capital punishment decision in the Oklahoma State Court of Criminal Appeals, stemming from his capital murder trial in March, 2004.  What follows is a report and an abbreviated analysis of relevant mitigation factors to which a mitigation expert could have testified if such expert had been utilized in the original trial.  This analysis has been developed from a review of many hundreds of pages of mitigation-related records and court documents, consultation with the mitigation investigator, and my interview with the defendant on 12-29-05.  This report is designed to enable an explanation of how the defendant's childhood development, experiences in his family and community, and his neuro-psychiatric diagnoses contributed to his adult functioning capacity and his journey to the murder that occurred on 1-01-02.  As well, it will delineate the enduring positive qualities of the defendant's character and personality.  This analysis, had it been offered in this case, is critical to a jury's duty to deliberate on the role of both aggravating and mitigating factors in the penalty phase of their decisions.

## Early Childhood Development and Experiences

A number of persons and conditions influenced Mr. Wood's earliest development.  His parents, together and individually, categorically failed him from early days in their most fundamental duties.  His development took place amid consistant poverty, recurring moves, normalized violence and criminality both inside and outside the home, abject emotional and physical neglect, and ongoing experiences of racial hostility and rejection from both Caucasians and African-Americans.  Finally, his parents allowed the criminal gang—first brought to him through his mentally ill and extremely violent older brother, Jake—to take over his upbringing at around age 11.

From the earliest stage of human attachment to the reliability that adults would consistently provide for his food and shelter, Mr. Wood's most basic needs continually went unmet.  His pattern of school rejection and criminal acting out—responses to his pathological environment and being alone in the world—began at least in the years he

EXHIBIT
3

2

was 11 and 12 years old, after which a very remarkable set of counterveiling facts ensued as Tremane began to experience residential placements outside the home, starting at age 14. The strongest indicator of Tremane's capacity at that time to function as a healthy, law-abiding young man were the consistent reports of his pro-social development and notable successful rehabilitative behaviors while in residential care. However, just as remarkable were the losses in that progress as soon as he was returned to his home and community, which was overwhelmingly structured by gang violence and parental chaos. And that was to be the pattern of his life until he finally surrendered to the emotional and financial support that criminal gang activity provided him as an older teenager and adult.

**The Defendant's Parents Failed**

Tremane is the youngest of three sons born to Linda Wood and Raymond Gross. When she met her children's father, Linda, who is Caucasian, was a 16-year-old unsupported child who had made her own way from Florida to Oklahoma to find the means to support herself with Job Corps training. Raymond is African-American and was 28 years old when the two got together and began to have children. Andre was born to the couple in 1975; Jake was born in 1977; and Tremane was born in 1979. Linda Wood has no other children; Raymond Gross has a total of 6 sons by three marriages. Linda Wood has spent most of her working life in fast food restaurant jobs. Raymond Gross spent many years as a police officer, including a stint as Chief of Police in Langston, OK when Tremane was in the 1st and 2nd grades. Andre has been generally successful in life and has avoided meaningful criminal involvement. Jake, who is a co-defendant with Tremane in the current appeal, has always been extremely violent and is reportedly severely mentally ill.

The most significant force in Tremane's early life are his memories (and their corrobation by other family members) of the many incidents of extreme violence of his father toward his mother. The reports range from general domestic abuse to incidents such as these: their father tied their mother to a swing, poured gasoline on her and threatened to put a match to her; their father used his police handcuffs to tie her to the sideview mirror of a car and drag her with the car; he knocked out some of Linda Wood's teeth. Not only was extreme domestic violence a central characteristic of the parents' relationship with each other, it became a central experience of the three boys: when the boys took their mother's side and tried to protect her, their father turned his violence on them, beating them sadistically. Andre stated in his affidavit intended for mitigation that when his father thought his mother was confiding in him (Andre) about seeing other men, he beat Andre in front of the mother, thinking it was an effective way to "get at" his wife and would also dissuade them from "covering" for her.

Tremane today can easily recall the potent combination of terror, anger, and helplessness he felt as a child being forced to witness such brutality against his mother, as spilling over to himself and his brothers. Children's experience of domestic violence is well-known in the field as child abuse by proxy. It can be more pernicious in a child's development than general child abuse because it conveys to the child that not only is their home not safe, but that adults are inadequate in the world—there are no models of how to

3

"make it" in the world. It is, of course, the major source of his diagnosis of Post-Traumatic Stress Disorder and Generalized Anxiety Disorder; these are fundamental psychiatric conditions that seasoned into his criminal acting out behavior. Andre states that he remembers his mother reporting the abuse on a couple of occasions and that nothing ever came of the reports—his father was a police officer and denied the charges. He still denies the history of domestic violence.

When the parents split for good when Tremane was 8 years old, Linda was unable to earn a good enough living for her family and was not receiving child support. [On almost all of the treatment documentation from Tremane's life with his mother, his father's whereabouts are stated as unknown.] Linda Wood admits that she was away from home working or going to school all the hours of the day except for sleeping. The boys were left completely on their own and the neighborhood did not appreciate it in the least. CPS calls about the lack of supervision went by without effective responses. They were considered "outcasts" (Linda Wood's word) in the neighborhoods they lived in because of the behaviors of the youngest sons, Linda's absence, and her inclination to blame everyone else in the neighborhood but herself and her children. She taught them steadily to believe that others were to blame for their problems and that most of it was due to racial prejudice.

Tremane's mother was not successful in providing for her family or raising and protecting her sons or finding a suitable mate for herself and father for her family. However, she did find an outlet for herself in education and managed, while working as many as two jobs at a time, to complete her undergraduate degree and even a master's degree in education. Her education, however, could not pull her out of poverty because, as reported by her and Tremane, her two felony convictions kept her from obtaining better jobs. And, her many years of obtaining education for herself only served to promote more abandonment and neglect for the children. But her parenting was not just a case of neglect. There are reports that on many occasions, Linda succumbed to the criminal and violent ethic she was surrounded by, not only by virtue of committing her own felonies, but she encouraged her sons' violence to get what she wanted in altercations. They became more like mates to her than children she was raising.

Linda Wood stated in her mitigation affidavit that she, indeed, made many mistakes with her children and she stated that her children "grew up in an environment of terror, deprivation and exclusion."

**The Presence of Impaired Attachment**

Even earlier than Tremane's development of PTSD was the condition of attachment disorder that formed the main container of his development. Neither his father, nor especially his mother, were able to be available to Tremane to form the healthy attachment that every child needs to serve as the base for being effective in the world and relating with empathy to others. His brother 2 years older than Termane was the closest figure of attachment in his early life. A child's bond to their abuser is known as the most pathological survival mechanism available to a child overwhelmed with

4

needs and fear. As well, as a child ages into adolescence, that "significant other" role, designed by nature to be first held by the nurturing and protecting maternal figure, is replaced in this case with the emotional home and protection provided by the criminal gang.

### Jake Takes Over the Parenting

Tremane's mother was always loyal to her children, and her continuous loyalty and provision of refuge to Jake was a primary cause of Tremane's losses of behavioral control whenever he would be put back in the home. Linda gave up on controlling her sons, and indeed, there is indication that she used their violent behaviors to get her own needs met. She always wanted Tremane to be discharged back to her home, but she never prohibited Jake and his gang connection from taking over the control of the household. At least by the time Tremane was 11, Jake had become the defacto father and "head of the house." Jake first put a gun in Tremane's hand when he was 11 or 12, planned criminal actions with Tremane as a partner or even at the lead; when Tremane resisted or tried to avoid such behaviors, Jake would beat him up just as Jake was known to beat up anyone else who got in his way. In the only functional bond that Tremane has known in his life, his older brother became his lifeline. He would endure his bullying and beating in return for his leadership in Tremane's life. Jake could get things done. Their mother was ineffective and sadly pathetic, though they still felt strong love for her. When her boyfriends would start to be violent towards her, the sons would step in and "take care of it." Jake became the feared and loved father proxy, even till the date of the murders in 2002.

### The Results of the Safety Net

The defendant was rejecting school by age 11 and at 12 ½ the district attorney threatened Linda Wood with criminal charges if she didn't keep Tremane in school. She sent the two youngest sons to live with Raymond when she couldn't handle them. When Tremane got in trouble for threats of violence at that school, the father put him in Meadowlake Hospital in Stillwater. Tremane could not tolerate not being in control of his life and enlisted his mother to get him out. At that time, it was reported by the father that Linda was drinking heavily and using marijuana, that her current boyfriend was dealing drugs. Though Termane responded poorly to that first hospitalization, he demonstrated remarkable progress when he became incarcerated in residential treatment programs with the COJC, the Vision Quest "boot camp" program, and his two foster family placements, all starting at age 14. Each time he was put into treatment, the professionals in charge of his rehabilitation documented his progress very similarly to this particular example:

[In 1996 Tremane was incarcerated for these reasons:
1. youth is a multiple offender
2. home does not provide structure youth requires
3. lack of community tolerance would not allow for the youth's success

5

Several months later, Termane was given a 30-day pass to live with his mother. From the written report: Tremane has never exhibited significant behavior problems while at COJC. He has become a role model for his peers. He seems to have overcome blaming others, particularly the community's attitude toward him and his family. He achieved a 3.8 GPA; his average t4est score for sill modules is 99%. He received excellent job reports and attitude from his bosses. He is recommended for parole.

And later, "Tremane aced everything, with one exception: he may reintegrate with the gang."

Such positive reports of his progress in treatment were consistent during these middle adolescent years. Yet, each and every time he was returned to his mother's home, he would in fact reintegrate with the gang. The longest time he prevailed was when Boone Netherington, his Family Focus counselor and beloved mentor, was seeing him several times each week. He persisted in resisting Jake and the gang for almost 3 months. Then Mr. Netherington noted his concern that Tremane was losing ground. Tremane stated that he would have done anything to live with Boone; he know that Boone had taken in another boy and Tremane was jealous it hadn't been him. Tremane also has told me that he would have thrived in either of the foster homes he was temporarily placed in. But, for reasons unstated, each treatment program returned him to the community he could not live in unless he participated in their demands.

## Neurological and Psychiatric Issues

Tremane was probably always overfunctioning whether he was doing well in treatment or reintegrating back into the community. His documented depression, dependency, PTSD and generalized anxiety were combined with psychological evaluations reporting neurological immaturity, a very common consequence of an early violent environment and impaired attachment. It is now documented in the research literature that early environments of violence and neglect cause the brain to be underdeveloped and in fact, to stall in a flight, fight or flee mode. Tremane could function normally when he was given the supportive structure of treatment centers. When that was removed—as it always was—his vulnerable condition could not match the challenges of his environment.

Two psychological evaluations (one at age 13 and one while he was incarcerated in 2004) note the presence of paranoia. Dr. Hand's report of the MMPI results centers on paranoia and schizotypal traits. My lengthy review of this case and my 3 ½ hour interview of the defendant lead me to comment on these evaluations as follows. I see no evidence of paranoia and I note that upon questioning Tremane on who/what he most fears, he stated "while males." I am left to wonder if the race and role of the evaluators, not to mention the defendant's legally vulnerable situation, might have influenced that result. Otherwise, I cannot find anything to support a diagnosis of paranoia. I also see no evidence whatsoever of schizotypal personality traits. While I can accept the fear of rejection of the avoidant personality trait impression, and I can certainly support

6

diagnostic impressions of rebellious attitude, immaturity, self-indulgence, depression, dependency, generalized anxiety and PTSD, I cannot explain the finding of "paranoia or passive-aggressive personality," "moderately severe mental health disorder," and "schizotypal personality features." Without going into a lengthy explanation, I will briefly state that I believe that a combination of attachment disorder and race-based emotional injuries are likely to be the real underlying conditions that have promoted Dr. Hand's diagnostic picture. And, the 1992 report of antisocial behaviors is simply a description of his acting out behaviors. The diagnoses of conduct disorder in adolescence and then anti-social personality disorder in adulthood represent a collection of physically anti-social behaviors (as opposed to say, corporate-based antisocial behaviors) which are most often found to have neurological and trauma-based causations. That would most clearly apply in Tremane Wood's case.

### Race as a Consideration in Development

Last, I pinpoint the role of being a biracial male in various small Oklahoma towns during the time of Tremane's development and continuing up till the present. Coming to the fore today is a scholarly understanding of the unique situations of children who live in both the "white" world and the "black" world come to experience the expectations and rewards of dual environments. Simply put, being biracial—and light skinned—has had a significant impact on who he was and how he would respond to expectations and conditions of acceptance and rejection by others. He reports that in mostly white towns, where he would be one of 6 or 7 "black" children in the class, he tried to identify more with the white children, though they would often reject the "blackness" in him. Yet, when he lived in predominantly black areas, such as Langston, the black children rejected him because he "wasn't black enough." Although he has mostly chosen to date white women, he stated to me he is most afraid of white males. He was able to recount a number of experiences of blatant abuse by white police officers which he strongly believes happened because he was seen by them as black or biracial. One such incidence is when, at age 16, a police officer told him to put out his cigarette, he made a production of stomping it out with his foot and the officer proceeded to batter him. He states he probably experienced more than 10 episodes of "DWB" (driving while black)-type incidents. I would be inclined to believe this.

A sensitive subject here is what exactly is considered "white" and what is considered "black" behavior. Children report that if you work hard in school, try to make good grades and conform your behavior to the expectations of authorities—and your are black—you are often judged by other black students as trying to "act white." You will be rejected for it. On the other hand, if you dress in a hip-hop fashion, used that lingo, show interest in gangster-type culture and behavior, you are considered fully black, one of the group. The pressure on young people is very severe to go where they are most accepted. In this case, when Tremane was in "white" territory—the treatment center environment— he was able to "act white" and indeed, gain some of the benefits of going straight. However, when he returned to a criminal community, he would not have survived with those "white values." At the risk of being misunderstood, I present this duality as a

7

fundamental stressor in this defendant's life, and one for which he was never responsible
and could not overcome on his own.

## Department of Justice Indicators

The best collection of juvenile delinquent research in the United States today is a
result of a commission by the USDOJ in June of 1995. Over 30 years' of research was
compiled to pinpoint the risk and protective factors for a youth engaging in violence and
delinquency within the community. These factors are conditions or attributes for which
the individual child could not be held accountable. Of the 7 known risk factors present
upon birth through age 6, Tremane Wood qualified on 4-5. Of the 15 risk factors during
ages 6 through adolescence, he met all but one (and I could make a case for that
attribute); and last, of the 14 protective factors, Tremane Wood was in possession of 3.
In summary, he presents as the model of a child victimized by a pathological
environment and unable to be rescued from a criminal path through treatment that was
ultimately effective.

## Personality Strengths

Mr. Wood has a documented and consistent history of positive responses to a
caring and supported environment offering direction. He has abiding love for his mother,
brothers, and even his father whom he is attempting to forgive. He states strong love for
his two children and a desire to be the best parent he can be under the circumstances.
During my several hours with him, he cooperated fully and meaningfully with my very
intrusive questioning. He admits to a history of creating turmoil and violence. He shows
insight about the causes and the consequences. As well, he made a number of statements
of personal responsibility about his history. He understands and is saddened by the life
his mother lived and his part in her sorrow. He also understands how much both she and
Jake have failed him. When the discussion came to the night of the murders, Tremane
expressed sadness, feelings of helplessness, and certain remorse. Though he has had
periods of prison adjustment, he evidences an ability to conform to prison life in a
positive manner.

*Kate Allen, LCSW, Ph.D.*
*Expert Witness (Civil and Criminal)*
*Trainer, Consultant, Attachment Specialist*
*5576 Hartson, Kyle (Austin), TX 78640*
*Phone: 512-449-1100*
*Cell: 512-787-9565*
KateAllen@austin.rr.com

Abbreviated Resume´

Licensure/Certifications
- Licensed Master Social Worker (Advanced Clinical Practitioner in Texas since 1987) LCSW
- Licensed Clinical Social Worker in California (since 1992) LCSW
- NASW Academy of Certified Social Workers (admitted 1975)

Education
- 1980 Ph.D.      American University, Washington, D.C.
                 (Family Sociology)
- 1973 MSSW    University of Texas at Austin
                 (Clinical Social Work)
- 1970 B.A.       Texas Christian University, Fort Worth
                 (Sociology and Psychology)

Current Professional
- Professor Emerita in Social Work Graduate Program at California State University, Sacramento
- Private Practice in forensic consultation; mental health- and child welfare-related training provider in California and Texas

Previous Professional
  Academic
  Associate Professor, California State University, Division of Social Work for 10 years, (teaching clinical courses)--student evaluations consistently registered between 4.6 and 4.9 on a 5.0 scale in all teaching positions
- Temporary fulltime positions at University of Texas at Austin, Texas Tech University in Lubbock, and Baylor University in Waco

2

- <u>Policy consultations/testimony</u> delivered to California Legislative Subcommittee, California Health and Human Services Director Eloise Anderson, U.S. Senate Oversight Committee on Families, President Carter's Senior White House Staff, former Ohio Governor and Mrs. Richard Celeste, and National Institute for Mental Health; many scholarly presentations/3 publications
- Summer <u>Fulbright Fellowship</u> Recipient (to Nigeria)

<u>Clinical</u>

- Full and part-time private practice from 1987 to present
  --provided psychotherapy, clinical supervision, coaching for the oral licensing exam, family and organizational mediation, <u>forensic expert witness testimony and consultation, professional training in a wide variety of mental health areas</u>
  - ➢ known as an <u>Attachment Specialist</u> trainer, consultant, and therapist
  - ➢ training topics (repeated many times over many years) have included:
    --Attachment Disorder
    --Predicting Youth Violence
    --Understanding and Treating Sex Offenders
    --Understanding and Using the DSM-IV-TR
    --Cognitive and Behavioral Deficits of Prenatal Substance-Exposed Children
    --Borderline, Antisocial, and Narcissistic Personality Disorder
    --Posttraumatic Stress Disorder in Women and Children
    --Women and Depression, Women and Substance Abuse
    --Mediation with Highly Conflicted Couples
    --Understanding and Responding to Brain-Based Behavior
    --Therapeutic Parenting for Foster and Adoptive Children
    --Exposure to Domestic Violence (Child Abuse by Proxy)
- Clinical Social Work in Hospital Settings
  --Per Diem and Fulltime Clinical Social Worker at <u>University of California, Davis Medical Center</u>, Sacramento; Shoal Creek <u>Psychiatric Hospital</u> in Austin; <u>Scott and White Hospital</u> in Temple, TX

3

<u>Forensic</u>

- Qualified as and provided <u>expert witness trial testimony</u> in 7 criminal cases and 3 civil cases in Texas, California, Nebraska, and Georgia; (prepared for an additional case which resulted in Not Guilty)
- Ongoing death penalty cases (as of November 2005)--5;  one ongoing death penalty habeas case
- Qualified as and provided <u>expert witness deposition testimony</u> in 2 civil cases in California
- Provided <u>mitigation investigations</u> in 2 capital murder cases in Texas
- Provided <u>court affidavits</u> in 3 capital murder cases (habeas) and 2 civil cases in Texas, California, and South Carolina
- Provided <u>psychiatric consultation</u> to lawyers in these cases:
  - --sentencing and prison placement strategy for a high profile satanic murder case in California
  - --countering a psychiatric evaluation in a third-party personal injury civil suit in California
- Provided numerous <u>at-risk-for-violence</u> and <u>sex offending evaluations</u>, as well as <u>disability evaluations</u> in Texas and California

4

## Summary Description of Dr. Kate Allen's Specialties

*Areas of Expertise*

In professional training, graduate instruction, and private practice, I specialize in the following areas:

1) Adolescent development
   a) Normal development with attention given to special circumstances, such as race, gender, sexual orientation, immigration, adoption, and traumatic experiences
   b) Developmental disability due to substance-exposure in utero/brain injury (cognitive, emotional, behavioral)
   c) Developmental delay under the following conditions:
      --early and later childhood physical and sexual trauma
      --early and pernicious drug use
      --pseudo-brainwashing conditions of structured hate and fear
   d) Developmental delay-related behaviors such as:
      --"crazy lying," dissociative lying, malingering
      --emotional and behavioral dysregulation (poor impulse control and frustration tolerance)
      --faulty cause-effect thinking and inability to self-correct
      --empathy failures and childlike defenses (trauma-based)
      --stages of moral development and judgment failures

2) Trauma states and responses across the lifespan, including
      --posttraumatic stress disorder and its sequelae
      --trancing and dissociative states
      --neuropsychology of trauma and cognitive, emotional, and behavioral sequelae
      --exposure to caregiver violence (child abuse by proxy)

3) Attachment failures, including
   a) sequelae of abuse
   b) diagnosis and treatment of attachment disorder
   c) gradations of impaired attachment

5

    d) neuropsychology of attachment
    e) attachment, trauma, and personality disorders
    f) rehabilitation of attachment disorders

4) Psychiatric diagnosis: DSM-IV
    a) misuse of DSM-IV
    b) borderline, narcissistic, and anti-social personality disorders
    c) pernicious misdiagnosis, including
        --converting Axis I disorders into Axis II disorders
        --unrecognized trauma in children, adolescents, women
        --childhood diagnoses that pathologize child victims of
            violence, abuse and neglect
    d) role of psychopharmacology in habilitative development of
       children and adolescents

5) Psychology of rage and violence
    a) clinical predictors of violence
    b) FBI Indicators of Youth Violence
    c) written risk evaluations

6) Child abuse indicators and institutional responsibilities, including
    a) failure to follow procedures and failure to protect
    b) preparation and supervision of foster and adoptive parents

7) Risk assessment
    a) potential for violence and/or sexual offending
        --in adults, adolescents, and children

## Experience

Please see my resume'.

**References are available upon request.**

# EXHIBIT 19

# EXHIBIT 19

## SOCIAL HISTORY

**NAME:**                    WOOD, Zjaiton

**DATE OF BIRTH:**           ▆▆▆▆▆▆

**CASE NUMBER:**             CF 2002-46

**DATE OF REPORT:**          03/17/04

**COUNTY:**                  Oklahoma

**DEFENSE ATTORNEY:**        Wayna Tyner

**EXAMINER:**                Jeanne Russell, Ed.D.
                             Licensed Psychologist #632

**REASON FOR REFERRAL:** Mr. Zjaiton Wood was referred to me by his defense attorney, Wayna Tyner, for the purpose of completing a social and psychological history. Specifically Ms. Tyner requested an assessment of the impact historical factors have had on Mr. Wood's current behavior(s). In completing this history, I reviewed numerous records (see list below) and interviewed Mr. Wood on two separate occasions in the Oklahoma County Jail. In addition I have talked with a lifelong friend who provided confirmation of the accuracy of some of the records reviewed.

### PROCEDURES:

Interviews with the defendant (03/10/04 and 3/16/04)
Interview with Nancy Hipshire (childhood friend and later significant other)

#### *Records Reviewed*

1. Report by George Henderson, Ph.D, University of Oklahoma, Human Relations Department dated August 8, 2003
2. Stillwater Public School Records
3. Edmond Regional Medical Center Records – Admission Date 1/9/92 Psychological Report dated 1/18/92, Progress Notes
4. Drug and Alcohol Assessment completed in June 1992 by Robert McElroy of the Logan County Youth and Family Services
5. Central Oklahoma Juvenile Diagnostic and Evaluation Center – Substance Abuse Evaluation, Behavioral Evaluation, Evaluation Summary, Psychological Evaluation, Family and Social History Evaluation – Reports 8/31/92 through 9/9/92 for the Department of Human Services
6. Drug and Alcohol Residential Treatment Center – Treatment Team Recommendation dated 10/3/92

7. JSU Drug/Alcohol Residential Treatment Center Discharge Summary dated 12/30/92
8. Quarterly Report Discharge Report from Speck Homes, Inc. dated 4/14/93
9. Lloyd E. Rader New Start Psycho-Educational Evaluation dated 7/1/93, Recreational Preference and Needs Assessment dated 7/7/93, Medical Summary dated 7/27/93, Psychological Evaluation dated 7/29/93
10. Department of Corrections Progress Notes beginning 7/3/98 through 11/16/01
11. Correctional Healthcare Management Progress Notes beginning 1/9/02

## BACKGROUND INFORMATION:

*Overview of Family History:*   The information contained in this section is a compilation of reports and statements made by the defendant, his family, friends and a review of numerous records. In general, the family constellation and how it functions is considered important in establishing later relationships and behaviors. The relationship between father and mother has a significant impact on a child and often establishes the pattern for all interpersonal relationships in the family. As described in the following paragraphs, Mr. Wood had a chaotic and violent history with even his earliest memories connected to physical punishment.

*Mother:*  Ms. Linda Wood is the defendant's natural mother. She is Caucasian and reports being born and raised in Florida. Ms. Wood reports she moved to Oklahoma in 1974 at the age of 16 to attend Job Corps. It was at this time she met Raymond Gross, the defendant's father who was working as a city police officer.  One of the defendant's juvenile social workers described Ms. Wood as having severe personal and emotional instability with questionable aptitude for parenting. To support this claim Mrs. Wood was described as having a felony conviction for obtaining food stamps fraudulently.

Mr. Wood reports a loving relationship with his mother but admits he does not trust her. He remembers learning not to trust what she said when he was 9 or 10. He described her as frequently making promises that she would not keep. For example, she told him that she would not leave him but proceeded to do so on more than one occasion.  He remembers his mother placing him and his brothers in the Youth Center and saying she would be back for them but never returning. Eventually they were placed in his paternal grandmother's home. He does not recall when he reunited with his mother. Mr. Wood also saw his mother's reconciliations with Mr. Gross as a violation of his trust. He saw himself as his mother's protector against his father and often suffered abuse as a result. Mr. Wood saw her frequent returns to Mr. Gross as putting not only her safety but also that of her children at risk. Mr. Wood recalls begging his mother not to return but to no avail. He also recalls that after they reconciled, they would often go away and leave him and his brothers without saying when or if they would return. Mr. Wood recalls his paternal grandmother sending them outside for six to seven hours at a time to wait for his parents return.

WOOD, Zjaiton Tyrone
Social History
3/17/04
Page 3

The defendant reports that following his parent's divorce when he was 11, his mother
moved to Stillwater and his father was given temporary custody because (according
to the defendant) "he knew everyone in town". He was left with his paternal
grandmother for two or three months who he reports didn't like him. Eventually, Ms.
Wood gained custody and all three boys moved to Stillwater to live with her and her
new boyfriend. The defendant reports "he didn't like me either". He reported that
when money was missing, his mother would blame him (which he denies) and lock
him out of the house when she wasn't there. Mr. Wood reports that the boyfriend
didn't work and lived off of them despite the fact that he had "a lot of money". The
defendant recalls that it was around this time that his mother started comparing him to
his father.

Mr. Wood recalls the boyfriend (Acie) staying around about four years. During this
time he would "whip us but not as bad as Raymond" and also have physical fights
with his mother. Mr. Wood recalls his role in both of these relationships as protective
of his mother. Ms. Wood also recalls physical fights in this relationship. However, she
stated she often started the fights as she would start hitting and they would slap each
other with open hands. Ms. Wood's new relationship also proved to be unstable.
She went back and forth between Acie and Mr. Gross.

Juvenile records indicate that at the age of 14, the defendant reported that he stayed
away from home on evenings and weekends until his father left for work and his
mother went to sleep. He explained he often heard from his mother that she
regretted his birth and meeting his father. At the age of 14, Mr. Wood described
being angry with his mother as he felt she didn't care about him. Although currently
Mr. Wood reports being close to his mother, he continues to feel that she loves him
less than his two brothers and if given a choice would sacrifice his life for that of his
brothers.

*Father:* Mr. Raymond Gross, an African American male was born on ████45 and
according to him lived with Linda Wood for 13 years prior to their marriage in 1985. In
a 1992 interview conducted by the office of Juvenile Affairs, Mr. Gross reported to the
staff there that his marriage to Ms. Wood failed due to infidelity on her part. Mr.
Gross also reported having one felony conviction. Mr. Gross reported he was self
employed repossessing vehicles and working for bonding companies. He denied
being physically abusive toward his family despite records and reports to the contrary.

For example hospital records indicate that on 5/17/83, Mr. Gross beat Ms. Wood
severely enough to require inpatient treatment at the Logan County Health Center.
On 8/7/83, Mr. Gross broke Ms. Wood's jaw and she moved out of the house without

WOOD, Zjaiton Tyrone
Social History
3/17/04
Page 4

her children as Mr. Gross wouldn't allow her to take them. On 8/25/83 she was again treated at the Logan County Health Center for multiple contusions and abrasions. This pattern continued throughout their relationship. In 1990, while living with his mother, Mr. Wood and his brothers were told to tell their mother goodbye as Mr. Gross put a pistol to Ms. Wood's head.

According to Mr. Wood's juvenile records, this was a chaotic relationship as Mr. Gross was physically, sexually and verbally abusive to Ms. Wood. Juvenile records further reflected that the defendant's parents argued on a daily basis with physical fighting occurring on the average of every other day.

The defendant remains very bitter toward his father. He remembers Mr. Gross as physically abusive toward his mother, himself and his oldest brother. Mr. Wood recalls that his father "made us watch while he beat my mom's ass," and remembered occasions in which his father would drag his mother along the side of a moving vehicle. He also recalls his father pouring gasoline on his mother and beating her with guns. Mr. Wood stated that he and his siblings were forced to witness this abuse and recalled that if they refused to watch, his father would "beat our ass." He recalls Mr. Gross hitting him with boards, gun belts and his hands. He further recalls Mr. Gross pulling guns on him and snatching earrings out of his ear. Mr. Wood recalls one period when he stayed with his father and being told that his mother was dead. Mr. Gross demonstrated little interest in his son during his formative years other than using him as a tool to punish his mother. For example when Mr. Wood was referred for substance abuse counseling, Mr. Gross refused to participate in family counseling.

Mr. Wood reports that he was sexually abused by one of his father's friends. However he said his father and paternal grandmother refused to believe him when he reported the abuse. Mr. Wood's mother later attempted to have charges filed when she learned of the abuse. However Mr. Wood remembers that nothing was ever done. The man accused was later charged with sexual abuse of the children of a woman with whom he was involved romantically. Mr. Wood denies any relationship with his father at this time and refers to him as "Raymond" rather than "Dad" or "Father."

*Extended Family:* Mr. Wood denies contact with either his paternal or maternal grandparents. He reports his father's mother did not like him. Although he believes she liked his brothers better, he stated that none of them were treated equal to her other grandchildren. He believes this unequal treatment was due to the fact that they were half white. As a result, they were given less food, medication was withheld and new clothes provided by their mother were given to her other grandchildren. He

WOOD, Zjaiton Tyrone
Social History
3/17/04
Page 5

describes his mother's parents as prejudiced again blacks and as having no relationship with him or his brothers.

*Siblings:* Mr. Wood is close to his two brothers and protective of both of them. He describes being responsible for his younger brother and feelings of failure when his brother got in trouble or became involved in delinquent activities.

*Early Childhood/Adolescence:* Mr. Wood was abused throughout his childhood and early on, he learned to cope with this chaos by using drugs and alcohol. Mr. Wood recalls being around gang members since he was five or six and becoming involved in a gang at the age of 10 or 11. Mr. Wood identified the gang as his family and adopted the rules of the gang as his own. These were the only consistent rules present in his life and the only group with whom he felt totally accepted. The importance of this group is literally written all over Mr. Wood's face and body. His numerous tattoos include the gang's name and the names of gang members who have died. Over these formative years, Mr. Wood became increasingly violent as modeled in his home life and as required in his gang.

Mr. Wood's behaviors resulted in numerous placements in institutions beginning at the age of 12 and continuing throughout his life. A time line of these placements is included below.

| | |
|---|---|
| 1/11/91 | Admitted to Edmond Recovery Center for Substance Abuse - Referred by Youth Services in Stillwater, OK |
| 1/9/92 | Admitted to Edmond Regional Medical Center by mother (Mr. Wood's inappropriate behavior resulted in his being kicked out of the program. Prior to leaving, he admitted he didn't want to go home. His mother refused to pick him up stating she didn't have transportation. Eventually Ms. Wood arranged to pick him up but did not show up as scheduled. Mr. Wood was transported to the Youth Shelter by police on 2/5/92. |
| 4/16/92 | Mr. Wood was committed to DHS custody |
| 7/7/92 | Adjudicated Delinquent |
| 8/21/92 | Admitted to Central Oklahoma Juvenile Diagnostic and Evaluation Center (COJDEC) |
| 9/9/92 | Discharged from COJDEC |
| 9/25/92 | COJTC admission (D&A) |
| 12/24/92 | Discharged from COJTC (D&A) |
| 1/11/93 | Admitted to Speck Group Home |
| 3/9/93 | Discharged from Speck |
| 6/2/93 | Admitted to New Start at the Rader Children's Center |
| 8/17/93 | Discharged New Start |

WOOD, Zjaiton Tyrone
Social History
3/17/04
Page 6

| | |
|---|---|
| 8/17/93 | Admitted ROCMND Level E |
| 3/11/94 | Discharged ROCMND to mother's home. (Jake's mother moved back to Stillwater in December 1993 but did not inform center she returned) By July 1994, he had returned to live with his father. |
| 11/17/95 | Sentenced to Department of Corrections for 3 year term. He had been on probation prior to sentence but probation was revoked. |
| 3/31/97 | Discharged to street |
| 4/17/97 | Arrested in Payne County / Charges dismissed on 7/29/97 |
| 9/10/97 | Arrested in Payne County but once again charges dismissed on 12/15/97 |
| 4/13/98 | Arrested in Payne County – Received 4 years DOC |
| 10/12/01 | Discharged DOC sentence. |
| 01/08/02 | Arrested on current charges and remains incarcerated. |

*Substance Abuse History:*  Records show that Mr. Wood was admitted to the Edmond Regional Medical Center on 1/9/92 for treatment of a drug and alcohol problem. He recalls staying there for about two or three months and returning to drugs right after his release.

He reported that he first used alcohol at the age of 6 and began using it on a regular basis by the age of 10 (4 times a week). He further reported that he first used Marijuana at the age of 10 when he found some Marijuana in his Uncle's home. At the age of 12, he started using angel dust and heroin and admitted that alcohol had become a problem for him. At the age of 13, Mr. Wood reported using cocaine and "ice". He admitted to staff that he was using any drug that could be found on the street including heroin, speed, amphetamines, ice, cocaine, crack, PCP, marijuana and alcohol.

Records further show he was in the County jail for two months (October and November, 1991) for selling cocaine at school. An assessment completed in June 1992 at the Logan County Youth and Family Services described Mr. Wood as a chemical abuser, alcohol dependent, hallucinogen dependent, and inhalant dependent. In addition to substance abuse, Mr. Wood states that he often supported himself through the sale of drugs beginning at the age of 13. Mr. Wood acknowledges that substance abuse caused him numerous problems in school as he was less focused and had behavioral problems such as fighting and talking back to his teachers.

*Education:*  Mr. Wood reports quitting school in the ninth grade because he was arrested. He described his grades as "B's", "C's" and "D's" and acknowledges that he put forth little effort in school. He recalls numerous behavioral problems while in school including fights with both teachers and other students.

*Medical History:*  Most of Mr. Wood's medical problems have been as a result of fights.

WOOD, Zjaiton Tyrone
Social History
3/17/04
Page 7

On one occasion he was stabbed in the head and received five stitches. In total, he recalls being stabbed over 42 times while in prison. He reports one surgery at the age of 17 when his appendix was removed.

*Relationships:* Mr. Wood has never been married but has four children by two different women. It is interesting to note that although Mr. Wood identifies most closely with the black culture; his romantic relationships are with Caucasian women. Mr. Wood reports he has three children by Laura Sue Clark, Tevin, age 11, Angelica, age 7 and Bailey, age 5. He also describes a period when his two older children lived with him when they were babies because their mother "wasn't ready to be a mom". He continues to correspond with his older children and visits them when his mother is able to bring them to the jail. He is concerned over the welfare of his son as he is starting to get in trouble in the community. Mr. Wood states that it is painful for him to see his son getting into trouble and is frustrated that he cannot do anything to stop him. Mr. Wood's fourth child is also five years old and he reports no contact with either her or her mother.

Mr. Wood has a relationship with a woman by the name of Nancy Hipshire who he has known since they were 13 or 14 years old. Ms. Hipshire is a nurse at St. Anthony's adolescent psychiatric unit and expresses surprise over Mr. Wood's current charges. She states she met Mr. Wood at a time in their lives when they were both having problems at home. She claims they have maintained their relationship off and on throughout the years. At one point they had a romantic relationship and planned to get married but things didn't work out. She described Mr. Wood as protective of her and as always trying to shelter her from the violence and criminal activities of gang life. When they met, Ms. Hipshire ran with some of the same gang members but remained on the fringes of the group. Ms. Hipshire believes membership in a gang offered Jake a sense of belonging that he was unable to find anywhere else. She recalls Mr. Wood as a troubled adolescent who seemed angry at the world.

She further recalls Mr. Wood as protective of his family and as spending as much time as possible around them. She described Jake as only showing people what he wants them to see. She believes he protects himself by acting tough and like nothing bothers him. Ms. Hipshire states that if Jake cares about you, he really cares about you and protects those to whom he feels close. She further reported that Mr. Wood was never violent towards her.

*Employment:* Mr. Wood denies any employment history, stating he was supported by illegal means. Specifically he describes drug sales and robbery as his primary source of income.

*Mental Health History:* Records indicate that in 1987, Mr. Wood was placed in a class for emotionally disturbed children at Guthrie's Cottel School. However his father

WOOD, Zjaiton Tyrone
Social History
3/17/04
Page 8

removed him from the classes as he objected to him receiving counseling. Over the years Mr. Wood has had numerous evaluations with consistent findings of substance abuse problems and a conduct disorder. His chaotic and violent background were believed to be major contributing factors to these findings. Counselors consistently recommended a highly structured program with intense treatment. In a report submitted by Dr. Keith McKee dated 1/18/92 (consultant to the Edmond Regional Medical Center). Dr. McKee wrote:

"Present results would suggest that this is an adolescent who is in great need of long term inpatient and subsequent residential care. His whole life appears to be associated with trouble and his ability to break free from this troubled life style is unlikely unless he can remain in long term structured environment."

Dr. McKee recommended substance abuse treatment, group and individual therapy. Other therapists also recognized the need for long term treatment.

At the age of 15, a full evaluation was completed at the Central Oklahoma Juvenile Diagnostic and Evaluation Center (CODJEC). Psychological testing by Phillip Murphy, Ph.D. revealed no unusual psychiatric disorders other than "characterlogical ones". Specifically, he was diagnosed with a Conduct Disorder. Other diagnoses consistently included substance abuse problems and personality disorders but no major Axis I Disorders. In other words, he was not diagnosed with a major mental illness but did have a lifetime pattern of symptoms including antisocial acts which were believed the cause of his problem behaviors. He was assessed by Stephen Grissom, Ph.D. chief psychologist of the New Start Program at the Lloyd E. Rader Center in Sand Springs, Oklahoma. He also described Mr. Wood with a severe conduct disorder and cannabis abuse.

In 1998, Mr. Wood entered the adult system at the age of 20 and was referred for psychological services. On November 3, 1998, he reported he was hearing voices telling him to assault staff. He informed staff he had been hearing voices since the age of 13 telling him to "shoot the cops". He admitted he was using PCP at the time he heard the voices and was not hearing voices at the time of the interview. He discharged this sentence in 2001 with no further complaints of hearing voices.

Mr. Wood was incarcerated on his present charges on 1/8/02 and was screened by a jail nurse on 1/9/02 for physical and mental health needs. He reported he needed to be by himself so he didn't hurt anyone. He was placed on "mental health observation" with a referral made for a mental health evaluation. He was subsequently diagnosed with antisocial personality disorder with mood swings and placed on Elavil which is an antidepressant. Correctional Healthcare Management records indicate that on 5/9/92,

WOOD, Zjaiton Tyrone
Social History
3/17/04
Page 9

Mr. Wood made statements to Officer Borst that he wanted to be put on suicide watch before he hurt himself.  However when seen in the mental health unit, he denied being suicidal, stating he only wanted to get someone to listen to him.  He complained of being stressed because his mother had cancer.  Staff described his feelings as incongruent with his expressed discomfort and and believed he had initiated these complaints so that he could be placed on a unit closer to his brother.  Mr. Wood has continued to have problems during his incarceration.  He complains of being filled with rage and has been in frequent altercations.

On 12/25/02, the treating physician diagnosed Mr. Wood with Schizoaffective Disorder and Antisocial Personality Disorder.  He was placed on Thorazine 100 mg for 20 days which was to increase to 200 mg HS.  In addition he was placed on Tegretol 100 mg. at night.  On 9/4/03 both Thorazine and Prozac were discontinued and he was started on Haldol 5mg at night.

On 11/12/03 Mr. Wood was evaluated for effectiveness of medication.  He reported the Stellazine had stopped the hallucinations but he was having trouble with explosive behavior.  He informed the doctor that he had been taking Tegretol over the previous year but it was stopped and he was placed on Haldol which Mr. Wood claims was not helpful.  He was placed back on Tegretol 200mg twice a day and was continued on 2mg of Stellazine at night and Benedryl 800mg twice a day.  Mr. Wood reports he is also prescribed Trazadone (an antidepressant) but does not take it.

*Suicidal Ideation:*  Mr. Wood has expressed suicidal thoughts off and on since his incarceration on the current charges.  On 12/2/03 he informed the jail physician, Dr. Steadman that "he didn't know what was going to happen, but something bad was going to happen to him.  He told me about injuring himself somehow!"  Most of the time Mr. Wood reports he will not take his own life but would like to escape the pain of living through death."  He describes feeling very depressed about his brother's incarceration and his son's delinquent behavior.  He sees death as a way to escape the pain.

## MENTAL STATUS AND OBSERVATIONS

*Appearance:*  Mr. Wood is a well-developed 26 year old bi-racial male who appears his stated age.  He is approximately 6'2" tall and weighs about 190 pounds.  He comes to all interviews dressed in jail attire and is handcuffed to the wall by one hand.  His head is shaved and grooming and hygiene are good.  He has tattoos on his face; "West" above one eye and "Side" above the other eye.  He also has tattoos running down the side of his face below each of his eyes which identifies his gang membership in the 107 Hoover Crips.  In addition to tattoos on his face, he has numerous tattoos on his left forearm.  Although his movement is limited by restraints, he does not have signs of

WOOD, Zjaiton Tyrone
Social History
3/17/04
Page 10

increased or decreased psychomotor activity.  Mr. Wood answers all questions asked
by this examiner and appears invested in this evaluation.  His speech is of average rate
and volume.  He does not use neologisms (made-up words with no meaning to others)
or word salad (disorganized meaningless speech to others) and does not demonstrate
echolalia (senseless repetition of words or sounds.)

The defendant's mood (sustained emotion) appears euthymic (normal).  Affect
(immediately expressed or observed emotion) is somewhat constricted and is
appropriate to his expressed thoughts.  In other words he shows little emotion on any
topic of conversation.

Mr. Wood states the correct month, date, year and his location (Oklahoma County Jail).
He remembers the name of this examiner and others involved in his legal case.  He
demonstrates good attention and concentration through all three interviews.  He recalls
five numbers backwards and forwards despite loud voices and noises outside the
interview room.

Mr. Wood's intellectual functioning was measured using the WAIS-III.  He answers all
questions and results indicate he is functioning in the average range of intellectual
functioning.  These scores are higher than previous testing suggesting he did not put
forth his best effort in prior testing situations.

Mr. Wood's thinking is coherent, logical, and goal-directed without tangential or
circumstantial thought.  He has no loose associations, no blocking and no flight of
ideas.  Mr. Wood shows no disorder of perceptions such as hallucinations or delusions.
However, he reports that he occasionally hears voices telling him to hurt someone.  His
content of thought is focused on the questions asked of him regarding his social and
psychological history.  He denies being suicidal although admits to wanting to die.

**SUMMARY:**

The defendant is a 26 year old bi-racial male incarcerated in the Oklahoma County Jail
on charges of Murder I, Robbery With Firearms and Conspiracy to Commit a Felony.

Mr. Wood's social history reveals an extensive history of exposure to violence
beginning with his father's abuse toward both his wife and his sons.  Mr. Wood reports
being threatened with being shot by his father and on one occasion watched his father
place a gun against his mother's head telling him to say goodbye to her.  Mr. Wood
witnessed his mother being beaten and abused and remembers trying to intervene in
this cycle of abuse.  Although he reports being close to his mother, he admits that he
does not trust her.  Mr. Wood explains that he learned early on that she often did not do
what she said she would and abandoned him and his brothers on more than one

WOOD, Zjaiton Tyrone
Social History
3/17/04
Page 11

occasion. In fact, Mr. Wood states he does not trust anyone, including himself. Where some children find stability through relationships in the extended family, both the maternal and paternal grandparents rejected Mr. Wood and his brothers due to their own racial prejudices.

Mr. Wood's only stability was through membership in a gang which he joined at about the age of 10. His entire body speaks of the importance of this relationship as his tattoos have the name of his gang across his face and the names of deceased gang members on his arm. He has an extensive criminal history beginning at a young age and reflecting the gang's values. At the same time he learned the value of using violence to get what you want through the actions of his father and other gang members. In addition, Mr. Wood was sexually abused by a friend of his father and emotionally abused and neglected by his paternal grandmother.

Mr. Wood spent a good deal of his young life in state institutions based both on his delinquent behavior and neglect by his parents. Although extensive long term treatment was recommended on more than one occasion, it was never provided. At one point in Mr. Wood's institutional history, he asked not to be released and appeared to act out when release was near.

Based on this history, it is not surprising that Mr. Wood coped with his rage through criminal activity and violence. He was exposed to this behavior all his life. Although he does not have a history of violence toward self, he is currently expressing the desire to end his life as he sees no hope for the future. Mr. Wood expresses dismay over his brother's arrest and his son's delinquent behavior. In addition he expresses fear of his own behavior, stating he doesn't know what he will be like when he wakes up each morning.

Although limited in scope, Mr. Wood seems to have a sincere love and connection with his family. Both friends and relatives describe the defendant has very loyal and protective of those persons he cares about.

Submitted by,

Jeanne Russell, Ed.D.
Licensed Psychologist

# EXHIBIT 20

# EXHIBIT 20

**Autopsy & Forensic Services, Inc.**
2276 West Periwinkle Way
Chandler, AZ 85248
(480) 786-4256
Michael Iliescu, MD


June 24, 2011


Robin Konrad

**Re: Opinions regarding Ronnie Wipf's death and injuries**

Disclosure: Michael Iliescu, MD
Case State of Oklahoma vs. Termane Wood
Date of incident: January 1st, 2002

**Experts' Background:**

Michael Iliescu, M.D.

    Dr. Iliescu's professional background is in forensic pathology and pathology of trauma. His academic experience includes eight years of teaching in the area of forensic pathology and the pathology of trauma. He has performed more than 2,000 forensic autopsies throughout his eleven year career in forensic pathology and has testified in criminal cases in County, State and Federal courts in Arizona and Florida. Furthermore, he functioned as a full time medical examiner for approximately five years. Dr. Iliescu's curriculum vita is provided.


    In accordance with your request, I have prepared this preliminary report outlining my opinions in this matter. Dr. Iliescu's role has been to utilize the factual information at hand and the review of the autopsy report and pictures to determine the most probable mechanism of injuries sustained by Ronnie Wipf, with the focus on how the stab wound of the chest was documented by the medical examiner. Information on this case is limited and this expert understands that no other pictures of the injuries and no new medical records are available for review.

    The foregoing summary, opinions and conclusions are based on the information available to me at this time. I reserve the right to consider any information that may become available at a later date and if necessary author an additional supplemental report. This disclosure is preliminary, in that Dr. Iliescu has not received the jpg. files with the autopsy pictures, but only paper copies of the photographic images.

Dear Mrs. Konrad:

In accordance with your request, I have prepared this preliminary report outlining my opinions in this matter. My role has been to utilize the factual information at hand and a medical analysis to determine the most probable explanation for the incident of 01/01/2002 death of Mr. Ronnie Wipf.

The foregoing preliminary opinions and conclusions are based on the information which I received from your office. I reserve the right to consider any new information that may become available at a later date and if necessary author a supplemental report.

Dr. Michael Iliescu
Autopsy & Forensic Services, Inc.

**List of the materials reviewed:**

1. Autopsy Photos, Tremane Wood Bates, # 2927-2982
2. Crime Scene Photos, Tremane Wood, Bates # 2983-3053
3. Exhibits Introduced at Trial, Tremane Wood, Bates # 3054-3102
4. Autopsy Report, Tremane Wood, Bates # 3103-3111
5. Wood Trial Opening Statements, Tremane Wood, Bates # 3112-3125
6. Medical Examiner Testimony, Tremane Wood, Bates # 3126-3144
7. Wood Trial Closing Statements, Tremane Wood, Bates # 3145-3199
8. Wood Sentencing Opening Statements, Tremane Wood, Bates # 3200-3211
9. Wood Sentencing Closing Statements, Tremane Wood, Bates # 3212-3266

**CHRONOLOGY OF EVENTS SURROUNDING THE DEATH OF Ronnie Wipf**

Apparently, on the early hours of January 1st, 2002, brothers Tremane and Zjaiton Wood acted jointly with Brandy Warden and Lanita Bateman in the committing of an attempted robbery of Ronnie Wipf and Arnold Kleinsasser. One of the defendants, Zjaiton Wood allegedly fired a handgun during the altercation. The defendant Tremane Wood reportedly had in his possession a knife. A knife was used in the stabbing which mortally wounded Mr. Wipf. One of the victims, Arnold Kleinsasser managed to escape the motel room where the altercation took place.

## ANALYSIS OF THE AUTOPSY REPORT OF DR. LARRY BALDING, MD

### Injuries sustained by the deceased Ronnie Wipf

I.    **Stab wound**
There is a gaping stab wound of the right chest located at 20 inches below the top of the head and apparently 1 inch to the right of the **anterior** midline (Dr. Balding mentions 1 inch to the right of the **posterior** midline). The stab wound measures **1 3/8** inches in width (Dr. Balding mentions a width of **1.5** inch in his report). The injuries listed in the autopsy report are: penetration of the left lower lobe of the lung and penetration of the pericardium and of the left atrium, resulting in right hemothorax (1800 mL of blood).

**Issues arising from Dr. Balding's interpretation of the stab wound:**
- The documentation of the stab wound is made **after** the body was autopsied. This is against the common practice in forensic pathology of documenting the injuries before the autopsy examination is performed. Furthermore, the stab wound should have been documented by reapproximating of the edges of the wound (with the wound being closed), which was **not** done in this case. Such documentation of a stab wound with reapproximation of the edges is a basic procedure in the practice of forensic pathology. Gaping wounds must be reapproximated to determine whether the weapon was single- or double-edged. The characteristics of single-edged versus double-edged stab wound cannot be determined in this case because the reapproximation of the edges of the wound was not performed or documented.
It is possible that such documentation of the stab wound was made by Dr. Balding before the opening of the body of Mr. Wipf and that these photographs were never presented to the original defense attorney.
- I disagree with Dr. Balding in his determination of the depth of the stab wound being that of 5 inches. In the **Figure 1**, I scaled the stab wound picture and the picture of the knife to the same size. One can observe that by extrapolating the 1 3/8 inch stab wound width over the width of the blade, the corresponding 1 3/8 inch width of blade will be obtained around where the 3 inch mark is (on the scale placed just next to it). Furthermore, there are almost no blood stains on the blade of the knife below the 3.2" mark of the knife.



**Figure 1:** Comparison here of the width of the stab wound and width of the knife.

The medical examiner investigation and analysis failed to produce any pictures to document the stab wound's depth. This is usually performed with a ruler or a probe placed next to a ruler for proper documentation and

subsequent analysis. In addition, anatomically the right atrium of the heart is located just underneath the area where the stab wound of the chest was located, at a depth not exceeding 3.5 inches (see **figure 2** depicting the location of the stab wound in relation to the heart and the chest's rib cage). In conclusion, I believe, in my best professional opinion, that the stab wound depth was not greater than 3.2 inches.

- Dr. Balding also does not document any ribs or ribs' cartilage injuries of Mr. Wipf in relation to the stab wound of the chest. The ribs and ribs' cartilage injuries must have occurred when the sternum and ribs are stabbed, 1 inch laterally from the midline, in the intermammary line (the line between the nipples). **(see Figure 2).**



**Figure 2.** Location of the stab wound (in red circle on diagram), in relation to the ribs and the heart.

It is highly likely that the ribs or the ribs' cartilage will or would be injured during a stabbing of the chest located at 1 inch to the right of the anterior midline of the chest as described in the medical examiner's report.

- I do agree with Dr. Jordan's testimony that it is possible that the knife functioned as a "stopper" initially and that, once it was removed (apparently by Mr. Wipf), the bleeding was more prominent and profuse.

II.    **Incised wounds (cuts)**
   a.  There are 4 defense type incised wounds of the right hand which involve:
   - Right thumb.
   - Palmar aspect of the base of right ring finger. **Note: This injury is not documented in the autopsy report by Dr. Balding.**
   - 2 superficial cuts of the right ring finger. **Note: These injuries are not documented in the autopsy report and they were apparently added by Dr. Balding, on the body diagram on 01/03/2002, one day <u>after</u> the autopsy was performed (autopsy date is 01/02/2002).** In rare cases, the forensic pathologist makes entries in the body diagram after the autopsy was performed, but such changes need to **always** be accompanied by similar entries placed in the description of the injuries section of the autopsy report, which was not done in this case. This shows a superficial at best, improper documentation of the sharp force injuries by Dr. Balding.
   b.  There is an incised wound of the left chin.

III.   **Blunt force trauma**
   There are multiple abrasions and contusions as follows:
   - Contusion complex right forehead and bridge of nose and abrasion
   - Abrasion of the right and left neck
   - Abrasion of the right elbow
   - Abrasion below the left knee
   - Abrasion/ecchymosis on the left medial thigh

   **Role of Toxicology**

The toxicological analysis was performed and revealed the absence of alcohol in Ronnie Wipf's body at the time of his death. If Mr. Wipf consumed alcohol hours prior to his death, the blood analysis should have shown presence of alcohol in his system at the time of the autopsy.

**CONCLUSIONS:**

➢ Based on the analysis of the stab wound documentation, in my best professional opinion, the stab wound of the chest was <u>not</u> deeper than 3.2 inches.

➢ The documentation of the stab wound and incised wounds made by Dr. Balding is superficial and lacking necessary details. The body of Mr. Wipf was autopsied without photographing first the stab wound, inconsistent with the principles of forensic pathology practice. It is impossible to determine whether the stab wound of Ronnie Wipf is single- or double-edged, due to the fact that the edges of the wound were not reapproximated by

the medical examiner. This limits significantly our evaluation and interpretation of this injury as presented.

➢ The postmortem toxicological analysis should have shown presence of blood alcohol if the intake of alcohol by Mr. Wipf was documented/witnessed.

**Exhibit A:**
CV of Michael Iliescu, MD is attached.

# Autopsy & Forensic Services, Inc
# MICHAEL ILIESCU, MD

Curriculum Vitae
Licensed in Arizona and Washington State

## EDUCATION

| | |
|---|---|
| 1999-2000 | **Broward County Medical Examiner's Office**<br>Fellowship in Forensic Pathology |
| 1995-1999 | **Winthrop University Hospital, NY**<br>AP/CP resident |
| 1977-1983 | **Medical Institute of Timisoara, Romania**<br>Doctor of Medicine |

## HONORS AND AWARDS

1977-1983     **Timis Scholar-Tuition Scholarship**
Timis State Higher Education Coordinating Board.  Award recognizing academic
achievement and leadership activities of two university students per legislative district

## EMPLOYMENT HISTORY

2007-2008     **King County Medical Examiner's Office**
Assistant medical examiner
*-performed forensic autopsies*
*-participated in the development and implementation of new/improved forensic*
*protocols used during death investigation-presented at KCMEO conferences  -*
*coordinated with the Department of Health follow up investigation in infectious disease*
*related deaths-participated in the management of a mass fatality incident (Yakima*
*airplane accident)*

Page **2**

2006-Present     **US Department of Health and Human Services**
Training officer for NDMS-DMORT team 9
*-coordinated mass disaster management team on the federal level*
*-organized and supervised training exercise for a team of 93 members covering the*
  *states of  AZ, CA, NV and HI*
*-participated in development and implementation of standard morgue operating*
  *procedures for DMORT-9 team*

2005-Present   **Scottsdale Community College**
Adjunct faculty
*-Teaching two web-based forensic pathology classes*
*-Provide students with career advice and guidance*

2001-12/2003     **Coconino County Medical Examiner's Office**
Associate Medical Examiner
*-performed forensic autopsies*
*-participated in the development and implementation of new/improved forensic*
  *protocols used during death investigation*
*-presented and organized two Death Investigation seminars for local and federal law*
  *enforcement agencies*
*-participated at weekly management meetings with Department of Health division*
  *managers*
*-participated and supervised in two mass fatality incidents (airplane accidents)*
*-managed budget, personnel, supplies, contracts and supervised a staff of three and 3*
  *interns*

2000-01/2002     **Maricopa County Medical Examiner's Office**
Associate Medical Examiner
*-performed forensic autopsies*
*-participated in the development and implementation of new/improved forensic*
  *protocols used during death investigation*
*-coordinated with the Department of Health follow up investigation in infectious*
  *disease related deaths*
*-participated at weekly management meetings*

1983-1991     **Tomnatic Medical Clinic (Romania)**
Family Practitioner and clinic director
*-supervised the work of county staff paraprofessional staff for development and*

Page **3**

---

implementation of personal health services and programs such as: Immunizations,
Healthy Pregnancy, Family Planning and Healthy Infant programs
-managed budget, personnel, supplies, contracts and supervised a staff of seven
-coordinated with state and municipal health department planning for health services

December, 1989     **City of Timisoara Department of Health**
Department Head
-coordinated with municipal authorities health planning and implementation of
 personal health services for a population of 250,000
-managed budget, personnel, supplies, contracts and supervised a staff of 19

## TEACHING EXPERIENCE

2007-Present    **Advisory board member, forensic section**
-University of Washington Extension, Forensics program

2005-Present   **Adjunct Faculty**
Scottsdale Community College – Administration of Justice Department
-Teaching two web-based forensic pathology classes
-Provide students with career advice and guidance

2003-2004     **Adjunct Faculty**
Northern Arizona University – Administration of Justice Department
-Taught a Forensic Pathology class
-Provided students with career advice and guidance

2004        **Adjunct Faculty**
Coconino Community College – Administration of Justice Department
-Taught a Forensic Pathology class
-Provided students with career advice and guidance

1994-1995     **Instructor**
South Seattle Medical Assistant/Phlebotomist Academy
-Taught Anatomy and Physiology classes, including one anatomy lab
-Provided students with career advice and guidance

Page **4**

1990-1991    **Assistant Professor**
Medical University of Timisoara, Romania – Biochemistry Department
*-Taught Biochemistry classes and laboratory*
*-Provided students with career advice and guidance*

## PRESENTATIONS AND LECTURES

Michael Iliescu, MD and other speakers. "NTSB mass fatality incident management." Organized and presented at NDMS, DMORT-9 annual training, 2007

Mary Dudley, MD and Michael Iliescu, MD. "Forensic Medical Investigation, Comprehensive Review." Phoenix, Kansas City and Atlantic City, 2006 and 2007.

Michael Iliescu, MD. "Katrina Mission, how identification of the victims was made." Seminar organized and presented at Scottsdale Community College, 2006

Michael Iliescu, MD. "Biomechanics of motorcycle accidents." With Patrick Hannon "Brain Injuries" Southwestern Association of Traffic Accident Investigators Symposium, 2006

Michael Iliescu, MD. "Role of the medical examiner in death investigation." Chandler Citizens Police Academy, 2005 and 2006

Michael Iliescu, MD. "Death Investigation." Organized and presented for Arizona Funeral Home Directors Association, 2004 and 2005

Michael Iliescu, MD. "Role of the medical examiner in death investigation." Flagstaff Citizens Police Academy, 2002 and 2003

Michael Iliescu, MD. "Death Investigation Methodology." Seminar organized and presented for Coconino County Law Enforcement Agencies, Flagstaff, 2001

Michael Iliescu, MD. "Death Investigation Methodology." Seminar organized and presented for National Park Services and Coconino County Sherriff's Office, Tusayan, 2002

Michael Iliescu, MD. Firefighter autopsy protocol. The American Academy of Forensic Sciences Annual Meeting, Feb. 2001, Seattle

Page 5

## MEMBERSHIPS/LICENSES

| | |
|---|---|
| 2009 | **Academy of Criminal Justice Sciences** |
| 2006 | **Southwestern Association of Traffic Accident Investigators** |
| 2007 | **Medical license in Arizona and Washington states** |

# EXHIBIT 21

# EXHIBIT 21

01

HIGHWAY 33 AT ACADEMY ROAD  GUTHRIE, OKLAHOMA

| | |
|---|---|
| PATIENT NO. | 702523-1 |

| | | | | | |
|---|---|---|---|---|---|
| SOC. SEC. NO. | ▓▓7426 | MEDICARE NO. | | MARITAL STATUS CODE **M** | RACE **W** | SEX **F** | AGE **25** |
| NAME | GROSS, LINDA | | | S – M – D – W – SEP) | |
| ADDRESS | 221 WEST LINCOLN | | | BIRTHDATE ▓▓-57 | CITY | STATE |
| CITY | GUTHRIE | | | | |
| COUNTY | LOGAN, OKLA. 73044 | TEL. 282-5079 | | RELIGION UNKNOWN | |
| STATE | | | | | |

ROOM P
NUMBER/BED 138/01
RATE PER DAY

INSURANCE COMPANY AND ADDRESS

| | | | | | | |
|---|---|---|---|---|---|---|
| RESPONSIBLE PARTY | PREV. ADM. YR. | PAID | UNPAID | E.R. | NEVER HERE | OCCUPATION N/A | COMP. CASE? 0 |
| RELATION | HUSBAND | | | | |
| NAME | RAYMOND GROSS | | | | EMPLOYER |
| ADDRESS | 221 WEST LINCOLN | | | | ADDRESS |
| CITY | GUTHRIE | | | | CITY / STATE | N/A |
| STATE | OKLA. 73044 | TEL. 282-5079 | | | SUPERVISOR |
| OCCUPATION | | | 2215▓▓ | | |
| EMPLOYER | | TEL. | | | MAIDEN NAME UNKNOWN |
| EMP. ADDRESS | | TEL. | | | |

MEMBER OR POLICY HOLDER

BLUE CROSS HEADQUARTERS

TYPE        AGREEMENT / POLICY NO.

GROUP NO.        SERVICE DATE

| | | | |
|---|---|---|---|
| ADMITTED @2330 5-17-83 | DISCHARGED MAY 19 1983 | ATTENDING PHYSICIAN NO. 2 DR. DIXSON M.D. | TOT. DAYS MED |

ASSISTING AGENCY

| | |
|---|---|
| APPROVE ADMISSION NOTIFY TO NEWS MEDIA? | REMARKS. |

| | | | |
|---|---|---|---|
| BABY | NAME | M | F | WEIGHT | BIRTHDATE |
| SPOUSE | |
| EMPLOYER | |

| | | | |
|---|---|---|---|
| E. R. O N L Y | EVER TREATED HERE BEFORE? | PHYSICIAN NO. THIS EMERGENCY. | FAMILY / E R CALL |
| | ACCIDENT? | WHERE? | TIME |
| | POLICE NOTIFIED? | WHOM? | TIME |
| | AMBULANCE? WHOSE? | ADMITTED TO HOSPITAL? YES ☐ NO ☐ | D.O.A. ☐ CORONER D.I.E. ☐ |

NEAREST RELATIVE
● NOTIFY IN EVENT OF EMERGENCY ●
NAME  RAYMOND GROSS
ADDRESS 221 W. LINCOLN
CITY & STATE GUTHRIE, OKLA. 78844
RELATIONSHIP HUSBAND    TEL. 282-50
REMARKS

| | | | | |
|---|---|---|---|---|
| 180 ROOM CHARGE | 181 PHYSICIAN CHARGE | 182 MISC. $ | SPECIFY |

*Urgent!*   DETACH CHART COPY BEFORE PROCEEDING  ◄

PROVISIONAL DIAGNOSIS

FINAL DIAGNOSIS  *multiple colissa toxia*

CODE NO.
1.924.8

OPERATION/TREATMENT

COMPLICATIONS

CONSULTATION WITH  *Brown*

CAUSE OF DEATH

*C—5-25-83*

SUMMARY SHEET

02

LOGAN COUNTY HEALTH CENTER

DISCHARGE SUMMARY

PATIENT'S NAME:    GROSS, Linda
HOSPITAL NUMBER:   702523-I
ADMISSION DATE:    5/17/83
DISCHARGE DATE:    5/19/83
PHYSICIAN:         Jim Dixson, M.D.

HISTORY:
This 25 year old caucasian female was admitted from the Emergency Department after
being beaten by her husband.  She had multiple contusions and abrasions, and a broken
tooth, was very tense and anxious and she was admitted to the hospital for observation
and attempt at Social Service Consultation.

PHYSICAL EXAMINATION:
Pertinent physical examination revealed multiple contusions and abrasions about the
face and extremities.  She also had a broken tooth.

LABORATORY EVALUATION:
X-rays of the skull, facial bones, zygomatic arch, mandible and nasal bones but she
had no fractures.  Urinalysis revealed pyuria, TNTC per high power field.  The patient
did have no symptoms related to the urine, however.  Thoracic spine and elbow findings
were normal.

HOSPITAL COURSE:
The patient had a hospital course marked by improvement.  Dr. Brown saw her in consul-
tation in regards to her broken tooth and an attempt was made through the patient for
Social Services help, however, she declined this and made arrangements through her
family to return to California.  She was discharged home on Darvocet-N 100 1 every
4-6 for pain, and instructed to see her family physician in California if further prob-
lems developed, and to have definitive care for her tooth at that time.

FINAL DIAGNOSIS:
1) Multiple contusions and abrasions.

JD:bc
6/1/83
6/8/83                                          JIM DIXSON, M.D.

**03**

P.O. BOX 1017 · GUTHRIE, OKLAHOMA
(282-6709)

32/003

PATIENT DATA

| SOC. SEC. NO. | CHECK NO. | | | | | MARITAL STATUS (CODE S - M - (W - SEP)) | | RACE W | SEX F | AGE 25 |
|---|---|---|---|---|---|---|---|---|---|---|
| NAME | GROSS, LINDA | | | | | | | | | |
| ADDRESS | 221 WEST LINCOLN | | | | | BIRTHDATE -57 | | CITY | | STATE |
| CITY | GUTHRIE | | | | | | | | | |
| COUNTY | LOGAN | | | | | RELIGION | | | | |
| STATE | OKLA. 73044 TEL. 282-5079 | | | | | UNKNOWN | | | | |

COMPANY AND PLAN CODE

**PRIVATE PAY**

GROUP NO.    POLICY ID NO.

MEMBER OR POLICY HOLDER

| RESPONSIBLE PARTY | | PREV. ADM. YR. | PAID (N) | UNPAID (N) | B.D. (N) | REFER NONE | OCCUPATION | N/A | CODE, CODE? 0 |
|---|---|---|---|---|---|---|---|---|---|
| RELATION | HUSBAND | | | | | | | | |
| NAME | RAYMOND GROSS | | | | | EMPLOYER | | |
| ADDRESS | 221 WEST LINCOLN | | | | | ADDRESS | | |
| CITY | GUTHRIE | | | | | CITY / STATE | N/A | |
| STATE | OKLA. 73044 | | | | | SUPERVISOR | | |
| OCCUPATION | SECURITY GUARD TEL. 282-5079 | | | | | MAIDEN NAME | | |
| EMPLOYER | LANGSTON UNIVERSITY | | | | | UNKNOWN | | |
| EMP. ADDRESS | | | | | | ADDRESS | | |

INSURANCE CO. AND PLAN CODE

GROUP NO.    POLICY ID NO.

MEMBER OR POLICY HOLDER

ADDITIONAL INFORMATION

I GUARANTEE PAYMENT OF CHARGES

X _Raymond Gross_

| ARRIVED DATE 5-17-03 | DISCHARGED 5-17-03 | RELATIVE |
|---|---|---|
| TIME 2233 | TIME 2230 | PHONE |

| PRIVATE DOCTOR | TIMES/TIMES CALLED | TIME ARRIVED | CALL OR ER CAPTION _Child_ | TIME CALLED | TIME ARRIVED |
|---|---|---|---|---|---|
| CHECK AMBULANCE | IF ACCIDENT, WHERE HAPPENED | | REFERRED DOCTOR | TIME CALLED | TIME ARRIVED |

| CONDITION/ARRIVAL: GOOD FAIR POOR SHOCK HEMORRHAGE COMA | | PATIENT ARRIVAL WALKED W/C |
|---|---|---|
| CURRENT MEDICATIONS: | | AMBULANCE POLICE OTHER |
| CHIEF COMPLAINT: Beaten | | POLICE NOTIFIED YES NO TIME |

NURSES FINDINGS:

_(handwritten, illegible)_

POLICE ANSWER:

OFFICER'S NAME    BADGE NO.

MEDICAL EXAMINER: YES NO

NURSE'S SIGNATURE: _(handwritten)_

| VITAL SIGNS | | | PHYSICIANS REPORT |
|---|---|---|---|
| TIME | | | |
| TEMP. | 98 | | _(handwritten assessment)_ |
| PULSE | 100 | | |
| RESP. | 24 | | |
| B.P. | 130/70 | | |
| ALLERGIES | NKA | | |
| LAST TETANUS | N/A | | |
| MEDICATIONS GIVEN IN E.R. | | | |

PERSONAL BELONGINGS OF PT.

DIAGNOSIS: Multiple Contusion Abrasions

PHYSICIAN SIGNATURE:    CONDITION/DISCHARGE

DISPOSITION: HOME    AGM/ADM.    TRANSFER    OTHER

PATIENT INSTRUCTIONS: _Admitted 138_

I HAVE RECEIVED A COPY OF ABOVE INSTRUCTIONS: X

04

## AUTHORIZATION FOR EMERGENCY TREATMENT

The undersigned has been informed of the emergency treatment considered necessary for the patient whose name appears on the reverse hereof and that the treatment and procedures will be performed by physicians, members of the house staff and employees of the hospital. Authorization is hereby granted for such treatment and procedures.

The undersigned understands that a personal physician is to be selected by or on behalf of the patient within 24 hours if hospitalization or further treatment is required, or immediately if complications arise.

The undersigned has read the above authorization and understands that same and certifies that no guarantee or assurance has been made as to the results that may be obtained.

DATE _____ TIME _____ AM PM SIGNED _____

                                                                    Patient

WITNESS _____ OR _____

                                                              Authorized Person

                                    RELATIONSHIP TO PATIENT _____

BOTH AUTHORIZATIONS MUST BE SIGNED BY THE PATIENT, OR BY AN AUTHORIZED PERSON IN THE CASE OF A MINOR OR WHEN PATIENT IS PHYSICALLY OR MENTALLY INCOMPETENT.

## AUTHORIZATION FOR RELEASE OF INFORMATION

Authorization is hereby granted to release to the _____

                                          Name of Insurance Company or Companies

_____ such information as may be necessary for the completion of my hospitalization claims.

DATE _____ SIGNED _____

                                                                  Patient

                                    OR _____

                                                            Authorized Person

                                    RELATIONSHIP TO PATIENT _____

PATIENT'S NAME: GROSS, Brenda
HOSPITAL NUMBER: 702523-1
PHYSICIAN: JIM DIXSON, M.D.
DATE: 5/17/83



LOGAN COUNTY HEALTH CENTER

**HISTORY AND PHYSICAL**

| | |
|---|---|
| C.C. | Multiple contusions and abrasions. Musculoskeletal pain. |
| H.P.I. | This is the first recent LCHC admission for this 25 year old cauca |
| | female who was admitted from the E.R. after she was apparently bea |
| | by her husband. She was seen by Dr. Childs in the Emergency Depar |
| | ment and found to have multiple contusions about the face and neck |
| | She was very apprehensive about returning home and because of this |
| | fear and her pain was admitted to the hospital for further evaluat |
| | and treatment. |
| P.M.H. | Usual childhood diseases without sequelae. No significant medical |
| | illnesses in the past. No known drug allergies except to Penicill |
| F.H. | Noncontributory. |
| S.H. | The patient is married and has children in this area, who has been |
| | living with her husband. She has just recently been in Californi |
| | for the last several months. |
| R.O.S. | Negative except for that as listed above. |

PHYSICAL EXAMINATION:

| | |
|---|---|
| VITAL SIGNS: | Blood pressure 130/80, pulse 100 and regular, respirations 24, |
| | temperature 98. |
| GENERAL: | The patient is a well developed, well nourished white female who |
| | appears to have multiple contusions, abrasions, musculoskeletal |
| | pain and is very anxious and tense. |
| HEENT: | Unremarkable except for some very tender areas about the face and |
| | neck area. There is a front tooth displaced from trauma. Neck |
| | supple. |
| LUNGS: | Clear. |
| HEART: | Regular rhythm without murmur or gallop. |
| ABDOMEN: | Unremarkable. |

GROSS, Linda
702523-I
Adm: 5/17/83

PHYSICAL EXAMINATION CONTINUED:

EXTREMITIES:    No edema.  There is evidence of multiple contusions and abrasions.

NEUROLOGICAL:   The patient is alert and oriented.  Cranial nerves II-XII were
intact.  DTRs were hyporeflexic and symmetric.  There were no
pathologic reflexes.

IMPRESSION:     1) Multiple contusions and abrasions.

                2) Chipped tooth.

                3) Anxiety reaction.

JD:bc
6/1/83
6/8/83

JIM DAYSON, M.D.

07



LOGAN COUNTY HEALTH CENTER

**PROGRESS NOTES**

ADDRESSOGRAPH IMPRINT 61

5-18-83 — 120 pm- checks pt → Max left
Central avulsed from socket- got
Hx of Trauma - told pt we need to
See her in office as soon as
she is dismissed from hospital
                    S. Kelly Brown

---

GROSS, Linda
5/18/83 - 0730 - The patient's face is still full and very tender.  Trying to obtain Social
Services for this patient.

JD:bc  5/18/83                                    JIM DIXSON, M.D.

**PHYSICIAN'S ORDER SHEET**
**LOGAN COUNTY HEALTH CENTER**



L. Gross

**PHYSICIAN'S ORDER SHEET**
LOGAN COUNTY HEALTH CENTER

5-18-83  #2oo  1100

CBC O

Full liquid or tool.

UA

↑ Spine xray bn called

⊕ elbow x ray bn called

Vistaril 25mg im q̄ 4-6° prn N/V. Re

notify me if pt begins vomiting, if
so guiac emesis.

- CBC rpt not done EK.

Domler 5/18/83

1830                          S. Hamier, LPN
                                 5-18-83
                                 1330

5-18-83 - 1900 -

may go out on medical pass to Kelly Browns

office, to return to pod as soon as tooth

as corrected. V.O. _____ Dr. Dyson / S. Hamier

_____ 1925 - noted / S. Hamier, LPN

_____ 1/19/83  0300 =

5/19/83

_____                          S. Hamier, LPN  0800

_____ Doonough LPN  5/19/83  08

DO NOT WRITE IN THIS AREA

DO NOT WRITE IN THIS AREA

DO NOT WRITE IN THIS AREA

GROSS, LINDA
M7252S-2
W-F-25
Dr. DIXON
05-18-83-1

57
MED
ROOM 138



RADIOLOGY SHEET

GROSS, LINDA
#123523-1
W-C-25
D. JIXSON    MED    57
05-17-5    ROOM 138

Patient _____

_____ Doctor

| DATE | TIME | TEST ORDERED | MEDICATION | OBSERVATIONS |
|------|------|--------------|------------|--------------|
| 5/18/83 | 1230 | Rt Elbow, T-Spine | done | D. Lesler Rt. |

| | | DATE RENDERED 5-17-83 | ORDERED BY: | | STAT. | | ROUTING 11663 | |
|---|---|---|---|---|---|---|---|---|
| GROSS LINDA DR BHAKTA | | WALK | WC | CARRIER | | PORT. | MED. | |
| | | RACE | SEX | AGE | BIRTH DATE | | X | E.R. | TITLE 19 | |
| | | X-RAYED HERE BEFORE | | | | | O.P. | INS. | |
| | | YES | | | | | INV. # | F | |
| | | NO | | | | | | | |

| ESSENTIAL CLINICAL DATA | EXAMINATION ORDERED | | CHARGE |
|---|---|---|---|
| R/O FX  BEATEN | RT MANDIBLE ZYGOMA SKULL NASAL   FACIAL | | |
| | | | |
| | | | |
| | | | |
| | | | |

SKULL SERIES, FACIAL BONES, ZYGOMATIC ARCH, MANDIBLE AND NASAL BONES:
5-17-83

Question of some soft tissue swelling on the right aspect of the calvarium. There is some prominence of vascular shadows, definite fracture is not identified. There is some density in the nasal cavity consistent with blood. No definite fracture identified. Pineal is not adequately calcified for midline determination.

Sella turcica is unremarkable.

IMPRESSION:

1) Within normal limits, except for some soft tissue swelling.

| GROSS, LINDA | DATE WANTED 5-18-83 | ORDERED BY: | | STAT. | ROUTINE 11663 | | |
|---|---|---|---|---|---|---|---|
| DR. DIXSON | WALK | WC | CARRIER | PORT. | MOL. | | |
| | RACE W SEX F AGE 23 | BIRTHDATE 57 | | E.R. | TITLE 19 | | |
| | X-RAYED HERE BEFORE | | | O.P. | UNL. | | |
| | YES | | | RM.# 138 | P | | |
| | NO | | | | | | |

| ESSENTIAL CLINICAL DATA | EXAMINATION ORDERED | | | CHARGE |
|---|---|---|---|---|
| MULTIPLE ABRASIONS | T-SPINE, LT. ELBOW | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

THORACIC SPINE:  5-18-83

Film quality in the lateral view is somewhat dark, however no definite evidence of abnormality is identified.

IMPRESSION:

1)  Within normal limits.

LEFT ELBOW:  5-18-83

Within normal limits.

14

LOGAN COUNTY HEALTH CENTER

INTAKE AND OUTPUT

ROSS, LINDA
#792523-1
57
MED
138

| DATE | SHIFT | ORAL | I.V. | OTHER | 8 hr. INTAKE | URINE | GASTRIC | OTHER | 8 hr OUTPUT | NURSE |
|------|-------|------|------|-------|--------------|-------|---------|-------|-------------|-------|
| 5/18 | 6-2 | 300 | | | 300 | 500 | — | | 500 | |
| | 2-10 | 240 | | | 240 | 180 0 | | | 100 0 | EW |
| | 10-6 | 96 | | | 96 | 150 | | | 150 | |
| 24 Hour | | 636 | | | 636 | 750 | | | 750 | |
| 5/19 | 6-2 | 1590 | | | | 1975 | | | | |
| | 2-10 | | | | | | | | | |
| | 10-6 | | | | | | | | | |
| 24 Hour | | | | | | | | | | |
| | 6-2 | | | | | | | | | |
| | 2-10 | | | | | | | | | |
| | 10-6 | | | | | | | | | |
| 24 Hour | | | | | | | | | | |
| | 6-2 | | | | | | | | | |
| | 2-10 | | | | | | | | | |
| | 10-6 | | | | | | | | | |
| 24 Hour | | | | | | | | | | |
| | 6-2 | | | | | | | | | |
| | 2-10 | | | | | | | | | |
| | 10-6 | | | | | | | | | |
| 24 Hour | | | | | | | | | | |
| | 6-2 | | | | | | | | | |
| | 2-10 | | | | | | | | | |
| | 10-6 | | | | | | | | | |
| 24 Hour | | | | | | | | | | |

15



GROSS, LINDA
#772523-1
W-F-25 - -57
Dr. DIXON - MED
05-17-45 - ROOM 138

| DATE | | HOSP DAY | ADM | 5/17 | 5/18 | | 5/19 | | 5/20 | | 5/21 | | 5/22 | | 5/23 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| POST-OP. DAY | | | | | | | | 2 | | 3 | | 4 | | 5 | | 6 | |
| PULSE | F. | | 4 8 12 | 4 8 12 | 4 8 12 | 4 8 12 | 4 8 12 | 4 8 12 | 4 8 12 | 4 8 12 | 4 8 12 | 4 8 12 | 4 8 12 | 4 8 12 | 4 8 12 | 4 8 |
| 150 | 106° | | | | | | | | | | | | | | | | |
| 140 | 105° | | | | | | | | | | | | | | | | |
| 130 | 104° | | | | | | | | | | | | | | | | |
| 120 | 103° | | | | | | | | | | | | | | | | |
| 110 | 102° | | | | | | | | | | | | | | | | |
| 100 | 101° | | | | | | | | | | | | | | | | |
| 90 | 100° | | | | | | | | | | | | | | | | |
| 80 | 99° | | | | | | | | | | | | | | | | |
| 70 | 98° | | | | | | | | | | | | | | | | |
| 60 | 97° | | | | | | | | | | | | | | | | |
| 50 | 96° | | | | | | | | | | | | | | | | |
| 40 | 95° | | | | | | | | | | | | | | | | |

| | Resp. Rate | | | 16 | 20 | 19 | 16 | 18 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 7-3 | 3-11 | 11-7 | | | | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 | 11-7 | 7-3 | 3-11 |
| -Blood Pressure | | | 132/80 | 118/70 | 132/80 | 150/76 | 138/70 | | | | | | | | | | |
| SIDE RAILS UP | | | | ✓ | ✓ | ✓ | ✓ | | | | | | | | | | |
| Fluid Intake-Oral | | | | 300 | 240 | 240 | 510 | | | | | | | | | | |
| DIET | | | 7 12 5 9 | 7 12 5 9 | 7 12 5 9 | 7 12 5 9 | 7 12 5 9 | 7 12 5 9 | 7 12 5 9 | 7 12 5 9 | 7 12 5 9 | 7 12 5 9 | 7 12 5 | | | | |
| Parenteral | | | | | | | | | | | | | | | | | |
| Blood Transfusion | | | | | | | | | | | | | | | | | |
| 24-Hr. Intake Total | | | | | | | | | | | | | | | | | |
| Fluid Output-Urine | | | | 500 | 100 | 240 | | | | | | | | | | | |
| Gastric Suction | | | | | | | | | | | | | | | | | |
| Emesis | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | |
| 24-Hr. Output Total | | | | | | | | | | | | | | | | | |
| Stool | | | | 7D | 50 | 1x | | | | | | | | | | | |
| Height/Weight | | | 110 | | | | | | | | | | | | | | |

GROSS, LINDA
#792523-I
W-F-25                    57
Dx. 31x531      RED
          1037 138    PRN
05 - Scheduled Medications

DIAGNOSES: _Multiple (revisions)_

ALLERGIC TO: _Penicillin_    DIET: _Reg as tol_
(Record in Red)

| CH DATE INITIALS | EXP.DATE TIME | MEDICATION-DOSAGE-FREQUENCY-RT. OF ADM. | HR. | DATES GIVEN | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/14 | | Tylenol #X P.O. q | Date | 5/16 | | | | | | | | | | | | |
| | | 4-6 hrs PRN pain) | Time | 1100 | | | | | | | | | | | | |
| | | | Int | AB | | | | | | | | | | | | |
| 5/14 | | Tylenol #3 P.O. q3-4 | Date | 5/8 | 5/8 | | | | | | | | | | | |
| | | hrs PRN pain | Time | 0830 | 1300 | | | | | | | | | | | |
| | | | Int | A | AB | | | | | | | | | | | |
| 5/18 | | Vistaril 25 mg IM q | Date | | | | | | | | | | | | | |
| | | 4-6 PRN N/V | Time | | | | | | | | | | | | | |
| | | | Int | | | | | | | | | | | | | |

AGE _25_   RELIGION _____   DOCTOR _Dixon_   MILITARY _____   DATE/TIME ADMITTED _5/17/_
                                              AM

17

| OR DATE INITIALS | EXP-DATE TIME | MEDICATION-DOSAGE-FREQUENCY RT. OF ADM. | | DOSES GIVEN |
|---|---|---|---|---|
| | | | DATE | |
| | | | TIME | |
| | | | INIT | |
| | | | DATE | |
| | | | TIME | |
| | | | INIT | |
| | | | DATE | |
| | | | TIME | |
| | | | INIT | |
| | | | DATE | |
| | | | TIME | |
| | | | INIT | |
| | | | DATE | |
| | | | TIME | |
| | | | INIT | |
| | | | DATE | |
| | | | TIME | |
| | | | INIT | |
| | | | DATE | |
| | | | TIME | |
| | | | INIT | |

| Initials | Full Signature | Title | Initials | Full Signature | Title |
|---|---|---|---|---|---|
| EW | Pollew Walton | LPN | | | |

LOGAN COUNTY HEALTH CENTER          LINDA
PATIENT MEDICATION PROFILE            -57
                                    MED
                              ROOM 138

| ORDER DATE | DC DATE | ORDERED MEDICATIONS AND I.V. THERAPY |
|------------|---------|--------------------------------------|
| 5/18/83 | 1 | Tylenol X gr. P.O. q 4° 6° PRN pain |
| 5/18 | | Vistaril 25 mg i m q̄ 4-6° prn) pain |
| 5/18 | | Tylenol #3 P.O. q 3-4 His PRN pain |

*Gross*

## ADMISSION NOTES

```
GROSS, LINDA
#792523-1
W-F-25          -57
DR. DIXON   MED
05-17-43   ROOM 138
```
Addressograph

Date **5-12-83**  Room No. **138**

Time **1130**  Arrived per:  ambulatory
wheelchair
stretcher

Age **25**

Sex **F**  Admitted from: E.R. ✓
Dr's office
Home
Nursing Home

### DISPOSITION OF VALUABLES

| | With Pt. | Sent home |
|---|---|---|
| Dentures | ✓ | |
| Glasses/Contact Lens | no | |
| Hearing Aid | no | |
| Prosthesis | ✓ | |
| Money | ✓ | |
| Jewelry | no | |

Denture cup supplied: Yes  (NO)
Denture/Hearing aid instructions given:  Yes  (No)

List all clothing patient brought to the hospital:
*Blue jean shirt shoes watch*

Instructed on:
Use of call bell ✓  TV ✓
Policy requiring siderails to be up _____
Policy of no smoking in bed  ✓

### VITAL SIGNS

Temp **97.9**  Blood Pressure
Pulse **80**  Height **55½**
Respiration **36**  Scale Weight

Signature of Nurse Assistant

### ASSESSMENT

Chief Complaint **Beat up by husband**
Allergies (In Red) _Penicillin_
Ambulatory ✓ Bedfast ___ Wheelchair ___ Walker ___
Feeding: Self ✓ Assistance Needed ___
Respiration: Normal ✓ Labored ___ Shallow ___
Cough ___ Productive ___ Dry ___
Smoking History: Non ✓ Moderate ___ Heavy ___
Pulse: Reg ___ Irreg. ___ Strong ___ Weak ✓
History: COPD ___ Hypertension ___ Diabetes ___
Heart Problems _NONE_ Other ___
Social History: (M) S W D ___ Children **3**
Occupation **NONE**
List all medication patient is taking at home:
**NONE**

Disposition of medication brought to hospital:
Sent home with family _NO_ To Pharmacy ___
Physical Abnormalities: Obese ___
Emaciated ___ **NONE** Deaf ___
Emotional Assessment: Happy ___ Sad ___
Anxious ___ Other ___
Level of Consciousness: Alert ✓
Semi Alert ___ Non responsive ___
Elimination Pattern:
B.M. Functions: Reg ✓ Constipation ___
Loose Stools ___ Laxatives ___
Urination: Normal ✓ Burning ___
Nocturia ✓ Infection ___
Additional Note: _has not eaten
in three days - states no
appetite_

LOGAN COUNTY HEALTH CENTER

NURSES NOTES

CROSS, LINDA
#702525-1
W=F=25            57
D3. DIXSON    MED
RO ADDRESSOGRAPH

| TIME | TREATMENTS | NOTES |
|------|-----------|-------|
| 2330 | | Admitted via life flight — _illegible_ |
| | | Husband physically attacked her |
| | | Appears nervous, during the _illegible_ |
| | | from _illegible_ various arm bruises |
| | | _illegible_ lower extremities — talking _illegible_ |
| | | above — _illegible_ #3 — crying at |
| | | intervals — _illegible_ RN |
| 0110 | Tylenol #3 P.O. | per complaint of discomfort _illegible_ |
| 0815 | | Continues to complain of pain — lips |
| | | slightly swollen, _illegible_ discolored, right |
| | | side of face slightly swollen, area |
| | | of ecchymosis — _illegible_ has |
| | | _illegible_ Dr. Dixson notified of _illegible_ |
| | | continued complaints — orders noted _illegible_ |
| 2230 | Tylenol #3 | P.O. per discomfort, also ice pack to lips |
| | | per _illegible_ — _illegible_ RN |
| 0400 | | Appears to be asleep — _illegible_ RN |
| 0730 | | Awake, alert, skin warm & dry, much ecchymosis noted |
| | | to face & head, swelling noted, continues to be sore |
| | | in many places, refuses any meals, hasn't _illegible_ |
| | | x 4 days, is drinking some sprite, _illegible_ some nausea |
| | | offers no requests or no immediate distress noted |
| | | _illegible_ LP_ |
| 0930 | | trying to rest, husband @ side _illegible_ |
| | | personell making frequent _illegible_ to _illegible_ room, no |
| | | requests, no distress or significant change noted |

LOGAN COUNTY HEALTH CENTER
NURSES NOTES

GROSS, LINDA
#792523-I
W-F-29- [redacted] -57
D. DIXSON    MED
05-17-53    ADDRESSOGRAPH

Date 5-18

| TIME | TREATMENTS | NOTES |
|------|-----------|-------|
| 1223 | | To X ray _____ w/c - no distress noted upon leaving. _S. Hamier_ |
| 1235 | | Return from T-S spine & Elbow, no distress noted upon return. _S. Hamier_ |
| 1300 | Tylenol #3 | for ch. pain _S. Hamier_ |
| 1320 | | Dr. Kelly Brown here to see about teeth, instru on hygiene & how to take care of it. _S. Hamier_ |
| 1330 | | Ref. lunch, resting quietly, offers no further requests, fairly uneventful day, no immediate distress noted. _S. Hamier_ |
| 1425 | | Out on medical pass to Dentist, & french ____ signed, order written, fair to good condition upon departure. _S. Hamier Co_ |
| 1515 | | Remains out on pass _E. Walton Rey_ |
| 1705 | | Back to Rm _E. Walton Rey_ |
| 1730 | Reg. | Diet taken slowly - Husband in Rm _E. Walton Rey_ |
| 1800 | | BP 140/90  ← ERROR. EW _E. Walton Rey_ |
| 1800 | | Quiet - Face Remains Swollen - Sm amt of Bleeding From Dental Procedure - _E. Walton Rey_ |
| 2000 | | Remains Quiet - No Subjective Complaints _E. Walton Rey_ |
| 2200 | | Remains Quiet - Withdrawn _E. Walton Rey_ |

22

LOGAN COUNTY HEALTH CENTER

NURSES NOTES

GROSS, LINDA
#792523-1
W-F-25-          -57
DR. DIXSON    MED
05-17-43    ROOM 138
ADDRESSOGRAPH

| Date | | | |
|------|------|-----------|------|
| TIME | TREATMENTS | NOTES *Thursday 5/13/93* | |
| 0001 | | *Skin w/c color pale regard skin regular - up at lib w/ room - up doing at bedside w/ AD, voiced air G. Marquette* | |
| 0030 | | *Requested and given ice pack for face. depending from tooth extraction. J. Marquette* | |
| 0130 | | *Continues talking on phone - J. Marquette* | |
| 0230 | | *Appears to be sleeping - J. Marquette* | |
| 0400 | | *Continues sleeping - J. Marquette* | |
| 0600 | | *Rested well - J. Marquette* | |
| 0730 | | *Asleep, will arouse to verbal stimuli; x1 lib 1 front tooth removed; many contusions note around face; no requests or complaints of pain; has been discharged to home; no immediate distress note S. Homer LP* | |
| 0830 | | *Left via ambulatory, c friend; no distress note other than very sore; fair to good condition to leave SCHC - S. Homer LP* | |

23

**LOGAN COUNTY HEALTH CENTER**
Guthrie Okla

MEDICAL PASS

Patient's Name _Linda Gross_

Hospital Number _702523-I_

Doctor ordering pass: _Nixon_

Purpose and date (if medical appointment in Oklahoma City, give place, time etc.)

_for a dental appt. @ Dr. Kelly Browns_
_5-18-83_

Patient accompanied by: _Aretta Bohanan_

(Relationship) _friend AC_

The undersigned hereby accepts full responsibility for the above named patient to assist same in the purpose stated.

_Linda Wood_
_Arnetta Bohanan_

Date and time of departure _5-18-83 - 1925_

Condition of patient _good_

Date and time to return _5-18 - 1702_

Charted _____ RN

24

LOGAN COUNTY HEALTH CENTER

DISMISSAL NURSING OBSERVATION

USS, LINDA
~2523-1
W-F-25
DR. DIXSON    MED
05-17-33
ROOM 138
ADDRESSOGRAPH

DATE: 5-1983
TIME: 0830

ACCOMPANIED BY:
FAMILY:
FRIEND:
SELF:
AMBULANCE
ATTENDANTS:
                NAME

METHOD OF DEPARTURE:
WHEELCHAIR:
AMBULATORY:
STRETCHER:
VIA:
PRIVATE CAR
AMBULANCE

DESTINATION:
HOME:
NURSING HOME:
OTHER HOSPITAL:
OTHER:

REFERRAL:
PUBLIC HEALTH NURSE
SOCIAL SERVICE:
GUIDANCE CENTER:

SPECIAL EQUIPMENT:
BRACES:
CRUTCHES:
CATHETER:
DRAINS:
PACKS:
OTHERS:

CONDITION ON DISCHARGE: Skin warm
many contusions, no distress, able
to in good condition to leave
SCMC

PATIENT TEACHING DONE BY:
PHYSICIAN        NURSE

INSTRUCTIONS GIVEN TO:
PATIENT                FAMILY

INSTRUCTIONS GIVEN:
Norgesic forte -

OTHER:

WRITTEN INSTRUCTION SHEET WITH ABOVE INSTRUCTIONS GIVEN TO THE FAMILY _____
                                                    PATIENT _____

IS PATIENT AND FAMILY ABLE TO VERBALIZE UNDERSTANDING OF INSTRUCTIONS GIVEN: __

SIGNED BY Sandy Homer    TITLE LPN

**ALLERGIC:** PCN

# EXHIBIT 22

# EXHIBIT 22

01

P.O. BOX 101 GUTHRIE, OKLAHOMA
282-6700.

PATIENT NO. 322235-P

INSURANCE COMPANY AND PLAN CODE

**Private Pay**

| | |
|---|---|
| SOC. SEC. NO. | MEDICARE NO. 702523 |
| NAME: WOOD, LINDA | 001447 |
| ADDRESS: 221 W. Lincoln | |
| CITY: Guthrie, | |
| COUNTY: Logan | |
| Okla. 73044  TEL. 282-8166 | |

MARITAL STATUS: S-M-D-W-SEP.   RACE: W   SEX: F   AGE: 2

RESPONSIBLE PARTY
NAME: Self
ADDRESS: Linda Wood
CITY: 221 W. Lincoln
STATE: Guthrie,
OCCUPATION: Okla. 73044   TEL. 282-8166
EMPLOYER: n/a

ARRIVED DATE: 8-5-8  TIME: 1310   DISCHARGED: 8-5-8  TIME: 1400

VITAL SIGNS
TIME: 1310/1355
TEMP: 98
PULSE: 108
RESP: 28
B/P: 132/80 152/84
ALLERGIES: Penicillin
LAST TETANUS: 11/1
MEDICATIONS GIVEN IN E.R.: none

PHYSICIANS REPORT

DIAGNOSIS: Anterior chest wall trauma

PHYSICIAN SIGNATURE: [signature]

CONDITION/DISCHARGE: Good

DISPOSITION: HOME

PATIENT INSTRUCTIONS:
1) Return to emergency room if there is a sudden onset of severe abdominal pain or continued light headedness

I HAVE RECEIVED A COPY OF ABOVE INSTRUCTIONS: X

02



LABORATORY REPORTS

Wood, Linda
ER 322235
Hillshapes / Alp

INSTRUCTIONS: TO ATTACH REPORT, REMOVE
PROTECTIVE TAPE BACKING. ALIGN REPORT
AND PRESS DOWN FIRMLY, REPEAT PROCEDURE
FOR SUBSEQUENT REPORTS.

**03**

| DATE | | | | ORDERED BY: | | STAT. | | ROUTINE | X-RAY NO. |
|---|---|---|---|---|---|---|---|---|---|
| 8/5/83 | | | | | | | | | F-3003 |
| | WALK | | INC | | CARRIER | | PORT. | | MED. |
| RACE SEX AGE | | | | BIRTH DATE | | X | E.R. | | TITLE 19 |
| W F 25 | | | | 57 | | | O.P. | | INS. |
| X-RAYED HERE BEFORE | | | | | | | ICD. # | | P |
| | YES | | | | | | | | |
| | NO | | | | | | | | |

Wood, Linda
Dr. Dixson

| ESSENTIAL CLINICAL DATA | EXAMINATION ORDERED | | CHARGE |
|---|---|---|---|
| Asault— hit in abd / stomach | Chest | | |
| | | | |
| | | | |
| | | | |
| | | | |

CHEST: PA, lateral, 8-5-83

The heart, mediastinum, lungs, and bony structures are unremarkable.

IMPRESSION:

1) Negative chest, without change since 12-20-81.

# EXHIBIT 23

# EXHIBIT 23



# EXHIBIT 24

# EXHIBIT 24



# EXHIBIT 25

# EXHIBIT 25



# EXHIBIT 26

# EXHIBIT 26

1      IN THE DISTRICT COURT OF OKLAHOMA COUNTY

2                STATE OF OKLAHOMA

FILED IN THE DISTRICT COURT
OKLAHOMA COUNTY, OKLA.

JUN 11 2003

PATRICIA PRESLEY, COURT CLERK
By.............................
Deputy

3   STATE OF OKLAHOMA,           )

4            Plaintiff,          )

5   vs.                          )      Case No. CF-02-46

6   BRANDY LYNN WARDEN,          )

7            Defendant.          )

8               * * * * * * * * *

9      TRANSCRIPT OF PLEA OF GUILTY HAD ON THE 19th DAY OF

10        FEBRUARY, 2003 AND THE SENTENCING

11       HAD ON THE 18th DAY OF APRIL, 2003,

12                  BEFORE THE

13      HONORABLE RAY C. ELLIOTT, DISTRICT JUDGE

14              * * * * * * * * *

15  APPEARANCES:

16          Ms. Fern Smith and Mr. George Burnett, Assistant
    District Attorneys, Oklahoma County District Attorney's
17  Office, 320 Robert S. Kerr, Suite 505, Oklahoma City,
    Oklahoma, appearing on behalf of the state of Oklahoma.
18
            Ms. Janet Cox, Assistant Public Defender, Oklahoma
19  County Public Defender's Office, Oklahoma City, Oklahoma,
    appearing on behalf of the defendant, Brandy Warden.
20
    REPORTED BY:
21
    Barbara A. Ross, CSR, RPR
22  Official Court Reporter
    Oklahoma County Courthouse
23  Oklahoma City,  Oklahoma

24

25

COPY

1  assistance to the state as well.  And likewise may have to
2  testify in the trial in Cleveland County as a result of the
3  robbery.  She is well aware of her responsibility and wants
4  the Court to consider that and take that into consideration.
5  And she will try to do the best she can to turn her life
6  around.
7       She has three young children she has to raise and
8  wants to be around them to raise them.  We ask you take all
9  of that into consideration and allow her the opportunity to
10 get some type of opportunity to get out and to take care of
11 her children.
12      THE COURT:  Okay.  Ms. Warden, do you have
13 anything you wish to say?  You don't have to speak if you
14 don't want to.  I have read your letter that was presented
15 to me this morning.  But if you want to add anything you
16 may.
17      THE DEFENDANT:  My letter pretty much says it.
18      THE COURT:  Okay.  Anything else from the state?
19      MR. BURNETT:  Just to follow our agreement, your
20 Honor, is all we ask for.
21      THE COURT:  All right.  Well, as all the parties
22 are aware, including Ms. Warden, I presided over the trial
23 in which she gave testimony.  I am of the opinion it was
24 very powerful testimony.  It certainly appeared to the Court
25 it was very truthful testimony.  I think one might surmise

# EXHIBIT 27

# EXHIBIT 27

IN THE DISTRICT COURT OF OKLAHOMA COUNTY

STATE OF OKLAHOMA

FILED IN THE DISTRICT COURT
OKLAHOMA COUNTY, OKLA.

APR 1 1 2008

PATRICIA PRESLEY, COURT CLERK

By⸺⸺⸺⸺⸺⸺⸺⸺⸺
Deputy

JAMES T. FISHER,                    )
                                    )
            Appellant,              )
                                    )
vs.                                 )   CASE NO. CF-1983-137
                                    )              D-2005-460
THE STATE OF OKLAHOMA,              )
                                    )
            Appellee.               )


\* \* \* \* \* \*

TRANSCRIPT OF CONTINUATION OF EVIDENTIARY HEARING

PROCEEDINGS HAD ON THE **21ST** DAY

OF **MARCH, 2008,** BEFORE

THE HONORABLE KENNETH C. WATSON

\* \* \* \* \* \*


Reported by:

**Tara Nixon, RPR, CRR**
**321 Park Avenue**
**Oklahoma County Courthouse**
**Oklahoma City, Oklahoma**

COPY

DISTRICT COURT OF OKLAHOMA – OFFICIAL TRANSCRIPT

1      **THE COURT:**  Defendant's Exhibit 35 will be

2      admitted.  Call your next witness.

3          **MS. CHESLEY:**  Bryan Stevenson.

4                  BRYAN STEVENSON,

5      was called as a witness on behalf of the Appellant, and

6      having first been duly sworn, testified as follows:

7          **THE COURT:**  Take a seat, please.

8              DIRECT EXAMINATION

9      BY MS. CHESLEY:

10         **Q.**  Would you state your name for the record,

11     please?

12         **A.**  Yes, my name is Bryan Stevenson.

13         **Q.**  Would you give us an idea of your educational

14     background starting probably with college?

15         **A.**  Yes.  I have a bachelors degree in Philosophy

16     and Political Science.  I have a law degree from Harvard

17     Law School, masters degree in Public Policy from the

18     Harvard School of Government, that's my formal

19     educational background.

20         **Q.**  What is your current position?

21         **A.**  I currently direct a project called the Equal

22     Justice Initiative, it's a nonprofit law firm in

23     Montgomery, Alabama.  We provide legal representation to

24     capital defendants, to death row prisoners across the

25     deep south, and I'm also a professor of law at the New

1    York University School of Law in New York, City.

2        Q.   Have you had other teaching experience?

3        A.   Yes, I've taught at University of Michigan Law

4    School, Cumberland Law School, Yale Law School.  I've

5    been full-time, not full-time, I've been a... on the

6    faculty of NYU for the last ten years.

7        Q.   Do you sometimes give lectures and train other

8    lawyers?

9        A.   It's a big part of what I do.  I do a lot of

10   training for lawyers around the country on capital

11   litigation, national training programs, regional training

12   programs.  We also prepare materials for lawyers.  I've

13   written several trial manuals that are used widely across

14   the country; The Capital Defense Trial Manual, collateral

15   manuals.  Do a lot of training for advocates in various

16   phases of the capital litigation process and then we do

17   clinics and special programs for thinking through cases

18   for lawyers that are in active litigation.

19       Q.   Okay.  Now, have you actually tried capital

20   cases yourself?

21       A.   Oh, yes.  I've represented probably over a

22   hundred capital defendants or death row prisoners, it's a

23   big part of my practice.  I've been doing this for 20

24   some years now and the bulk of what I've done is

25   represent capital defendants, people on death row.  Our

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    project has a current docket of probably 60 cases right

2    now.

3        Q.  How many at the trial level have you done,

4    capital trials?

5        A.  We do a lot of work at the trial level in

6    various capacities.  I've probably been lead counsel in

7    12 to 20 cases, consulted in 50, 60 cases.  I've

8    testified as an expert several times as well.

9        Q.  So you have testified before as an expert

10   witness?

11       A.  Yes.  I frequently testify for courts on issues

12   related to indigent defense and some other aspects of the

13   criminal justice system.

14           MS. CHESLEY:  May I approach, Your Honor?

15           THE COURT:  Yes.

16       Q.  (By Ms. Chesley) I'm going to show you what's

17   been identified as Exhibit 31, and ask if you can

18   identify that document?

19       A.  Yes, this is my resume.

20       Q.  It basically goes through maybe in a little more

21   detail some of the things we have just discussed?

22       A.  That's correct.

23           MS. CHESLEY:  Your Honor, at this time we would

24       tender Mr. Stevenson as an expert in the area of

25       capital litigation.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1      **MS. BOX:**  No objection.

2      **THE COURT:**  That stipulation will be accepted.

3      **MS. CHESLEY:**  Thank you.

4      **Q.**   (By Ms. Chesley) Would you consider

5   representation of defendants charged with capital crimes

6   to be a specialized area of the law?

7      **A.**   Yeah, I don't think there's any question.

8   Capital cases are unique for a variety of reasons but the

9   most obvious one is that they have a special set of

10   procedures that the court has created in the mid 1970's;

11   bifurcating the trial process.  There are special laws

12   relating to aggravation, mitigation.  And the big

13   challenge in a death penalty case is unlike a lot of

14   other criminal cases, the depth of investigation is very

15   complicated from pretrial litigation where you have to

16   preserve issues because the law is constantly changing,

17   to voir dire we have to do things like life qualification

18   and death qualification, to the first phase where you

19   have to have a theory of the case that can be reconciled

20   with the potential penalty phase.  And then the special

21   penalty phase where the client's life is literally in

22   your hands, these cases are quite unique and very

23   challenging.

24      **Q.**   Is there a difference in how the lawyer should

25   prepare for the guilt phase of the trial and the penalty

DISTRICT COURT OF OKLAHOMA – OFFICIAL TRANSCRIPT

326

1  phase of the trial?

2      A.   Well, there's not a difference in the sense that

3  you have to do a lot of investigation and preparation,

4  but yes, there is a difference in terms of recognizing

5  that this is essentially two trials.  You've got to

6  establish that your client is not culpable for capital

7  murder, and at the same time be prepared to present a

8  case if the jury finds your client guilty of capital

9  murder, and that means you've got to do all of that in

10  advance; you've got to think that through, you've got to

11  have a theory of the case.  The ABA Guidelines which

12  would have been presented on this thing, on this issue,

13  have documented the particular need to have a lot of

14  planning and a team to help you organize and prepare.

15      It's my view that it's impossible for one lawyer

16  working alone to adequately represent capital defendants

17  without a lot of time and a lot of resources, and that's

18  why the guidelines are so dependent on teams and experts

19  and specialists because of the complexity of these cases.

20      Q.   And what kind of team is it that you're supposed

21  to have?

22      A.   Well, you're going to have to investigate the

23  case thoroughly.  Unlike other criminal cases where you

24  can sometimes do some things in the courtroom, a capital

25  case because the client's life is at risk requires a full

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    first phase investigation, that's particularly true in

2    retrial cases.  A lot of the cases that I have done are

3    cases where the client have been previously convicted and

4    sentenced to death, those cases present special

5    challenges because usually there's a time and there are

6    these other, kind of appearance problems, but you've got

7    some opportunities as well in the investigation of what's

8    been laid out before is among the top of those things,

9    but yes, in talking to every witness; investigating

10   what's in the police reports; exploring with your client

11   theories of the crime; self-defense, alibi, whatever it

12   is, investigating those.

13        In capital cases in particular because the

14   stakes are so high many people accused of crimes will

15   become quite desperate and they'll say this happened and

16   that happened and this happened.  And in a capital case

17   you really have to investigate those things, go back to

18   the client and say, you know, I can't prove that because

19   the people said this to me.  And it's only through that

20   process that you actually get to the point where you're

21   having good conversations with the client about how to

22   prepare the case.  And so unlike a lot of other cases

23   that kind of investigation has to happen far in advance

24   of the trial, then you develop a theory of the case of

25   the first phase, and you start trying to reconcile that

1    with the penalty phase.  In every death penalty case

2    you're going to have to do a complete life history.

3    You're going to have to understand who this person is, if

4    they're presenting problems and difficulties you're going

5    to have to understand why; you're going to have to

6    document them objectively with records, school records,

7    employment records.  Military records are really

8    important sources, but you're also going to have to

9    animate them with testimony, with witnesses.  It's the

10    client's life and no one is going to presume that that

11    life has value or meaning unless you present that, and

12    that's an incredibly challenging responsibility but

13    absolutely critical in death penalty cases.

14          We know from the work we do and jurors tell us

15    this all the time, if they get a sense of the person, if

16    they understand who the person is, if they have some

17    context for evaluating the person's crime the chance of

18    succeeding in preventing a death sentence goes way up, in

19    the absence of that a death sentence becomes very, very

20    likely.

21      Q.   Is there a difference in the standard for

22    constitutionally acceptable conduct of an attorney in

23    Oklahoma as opposed to Alabama where you are, or New

24    York, or any other state?

25      A.   No.  The United States Supreme Court has

1    established the standards that govern this kind of

2    litigation and they are the same nationwide.  People in

3    Oklahoma are not entitled to less effective

4    representation than people in New York or California or

5    Alabama and vice versa.  So the standards are fairly well

6    established.

7         They have been codified in a variety of

8    publications, the ABA Guidelines being the most well

9    known.  And the effort, the intent is to kind of deal

10   with the problem we've been having in getting adequate

11   services to people in capital trials that the court has

12   recognized.  So standardizing some of this has become a

13   real norm, nationwide norm, it's also why there is so

14   much training.  There's lots and lots of training

15   programs available to kind of help get lawyers up to

16   these standards.

17        Q.  And there are training --

18        A.  I --

19        Q.  How often a year do you think there would be

20   training for a capital defendant, defender?

21        A.  Well I probably -- yeah, I probably lecture 20,

22   25 times a year at training programs around the country

23   and, obviously, I'm not at every one.  And so there's,

24   you know, the National Legal Aid and Defender Association

25   conducts them, the National Criminal Defense College

1    conducts them, the American Bar Association conducts

2    them.   There are law schools and universities that have

3    special programs conducting them, the Bureau of Justice

4    is now funded training programs that are being conducted.

5    There are a range of specialized practitioners who are

6    conducting them, so they're pretty available all across

7    the country with an emphasis on training people from

8    different states and different regions.

9        Q.   So there's a recognition that such training is

10   really necessary to do a capital case?

11       A.   Absolutely.   I think it's -- the law and the

12   science surrounding this is evolving in such a way that

13   without access to experts who are talking about the

14   latest developments, without training on how to put

15   together a mitigation case for somebody who has sexual

16   abuse in their history or physical abuse, or someone who

17   is difficult or someone who is mentally ill or someone

18   who is reluctant to talk about these things, or someone

19   who doesn't want mitigation, these are all familiar

20   problems that the trainings are designed to help lawyers

21   who wouldn't ordinarily have any experience with these

22   issues, confront and overcome.

23       Q.   So it's not necessarily unusual for a capital

24   defendant to be upset with his lawyer or be --

25       A.   In all of my cases -- I mean, when the State

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    threatens to kill you it's pretty unnerving and for many

2    people who get into these situations where they're on

3    trial for their life, they come with poor deficits and

4    reasoning, emotional problems, mental health problems.

5    Most of the clients I've represented have come with a lot

6    of problems that had to be managed, challenged,

7    confronted, overcome, it's just the norm, particularly

8    with young... my clients have gotten younger and younger

9    in the last 20 years, and I found particularly with

10   younger clients, people under the age of 21, 25, there's

11   always a set of issues that you have to kind of work

12   through.  It's why we say that the attorney-client

13   relationship is perhaps the most critical component to

14   effective representation.  You absolutely will not

15   succeed unless you get your client to trust you at a

16   level where you can do your job.  And so you spend a lot

17   of time on that, you invest a lot of energy in that if

18   you're going to try to do effective work.

19       Q.   Now, the question that we're actually addressing

20   today is whether this defendant, James Fisher, received

21   constitutionally effective assistance of counsel at his

22   trial.  Have you reviewed materials related to

23   Mr. Fisher's 2005 trial?

24       A.   Yes, I have.

25       Q.   What kind of information did you review?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

332

A.   I reviewed the trial transcript from his 2005
case.   I reviewed pretrial pleadings, competency
hearings, *Faretta* hearings, all of the pleadings that
were transcribed leading up to his trial transcript.
I've reviewed the appellate pleadings, I've reviewed
affidavits that are presented in this court, reviewed
essentially all of the documents that I could identify
relating to his prosecution for the 2005 case.

Beyond that, I also had previously reviewed
Mr. Fisher's original 1983 trial because I testified as
an expert in that case as well, so I reviewed those
pleadings and the materials that were presented and
gathered in challenging his original conviction.

Q.   I know you weren't able to be here yesterday,
but have you received a summary of the testimony that's
been presented in this proceeding, in this evidentiary
hearing?

A.   Yes, I did receive a summary of evidence that
was presented and the evidence that supported that at
yesterday's hearings.

Q.   And all of that together is what has formed your
opinion?

A.   Yes, my opinion is based on all of the documents
that I have reviewed that relate to Mr. Fisher; his
history and the trial of this case.

DISTRICT COURT OF OKLAHOMA – OFFICIAL TRANSCRIPT

1        **Q.**  A lot of the testimony has been about how

2   Mr. Fisher and Mr. Albert had a very difficult

3   relationship.  What effect does that relationship between

4   Mr. Fisher and Mr. Albert have on the case?

5        **A.**  Well, again, I think effective communication

6   between the attorney and the client is absolutely

7   essential because you can't get to the things that are

8   absolutely critical to do effective work without that.  I

9   think, my opinion, that the representation in this case

10  was objectively unreasonable and ineffective is primarily

11  situated, at least first situated on the poor

12  attorney-client relationship.

13              **THE COURT:**  Let me ask you a question.  Have you

14          spoken -- have you ever spoken to Johnny Albert

15          about this case?

16              **THE WITNESS:**  No, I have not, Your Honor.

17              **THE COURT:**  All right.

18       **Q.**  (By Ms. Chesley) Is there anything in particular

19  about Mr. Fisher's background that might make it

20  difficult for him to have a relationship with his

21  attorney?

22       **A.**  Well, I think all capital defendants have reason

23  to be fearful and to be distrusting because the process

24  is a pretty intimidating one.  Mr. Fisher had some

25  particular reasons to be fearful and distrustful largely

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

334

1    owing to his experience with his original counsel in this

2    case that was also very contentious and difficult, and

3    that lawyer admitted to a real animosity toward

4    Mr. Fisher because of his perceived sexual orientation.

5    He admitted to a lot of animosity toward Mr. Fisher on

6    other grounds as well and that creates a very difficult

7    framework and foundation on which to build an

8    attorney-client relationship.  So there were particular

9    problems that made Mr. Fisher especially needy, and he's

10   got a long history of emotional and mental health

11   problems that you would factor in.  But in my view the

12   biggest problem in this case is that Mr. Albert engaged

13   in what I would characterize as unquestionably

14   unreasonable conduct shortly after he began

15   representation of Mr. Fisher, when he threatened him in

16   court and basically promised to hurt him.

17        The incident where he reacted to perceived

18   threats by Mr. Fisher against him and his family and

19   called Mr. Fisher names, asked the bailiff to take the

20   handcuffs off of him so he could fight him, so he could

21   whip him, in front of other people, in my view, was

22   objectively unreasonable conduct that was so

23   unprofessional and so unethical that it became a very

24   serious obstacle to expect any client to get past.  In a

25   death penalty case you can't take the role of helping the

335

1  client when their life is on the line and then promise to

2  hurt them prior to doing that.  It's just hard to expect

3  anybody to get past that, it's especially hard to expect

4  Mr. Fisher to get past that.

5      In my own view is that creates the kind of

6  breakdown in the attorney-client relationship that

7  requires change, that requires some new response.  You're

8  not likely going to recover from that.  It's also the

9  kind of objectively unreasonable behavior that makes me

10  question the fitness of the advocate.  As frustrated as

11  I've gotten with clients, with people, with prosecutors,

12  with judges, with everybody, I know that my obligation is

13  to interact professionally with all of those folks, once

14  I can't do that I can't be an effective advocate.  And

15  calling Mr. Fisher, as the affidavits that were presented

16  to me report, "a little bitch" threatening to "whip his

17  ass," threatening to have the handcuffs removed so he

18  could hurt him is way outside the norms of professional

19  conduct and I think creates a kind of conflict in

20  developing a loyal trusting relationship that aren't

21  likely to be overcome.  It would take a lot of skills, a

22  lot of time, a lot of effort to get past something like

23  that and there was no evidence of that in this case.

24      Q.  What duty does a lawyer have in a capital case

25  to investigate the case and to prepare the case for

336

1    trial?

2        A.   It's the lawyer's first duty.  What we've

3    recognized in capital cases, that investigation

4    preparation is the absolute core of effective assistance.

5    And I guess the second thing that I would characterize as

6    objectively unreasonable in a way that is pretty stunning

7    is Mr. Albert's failure to carefully and thoroughly

8    examine the records that had been developed leading up to

9    this trial.  There were mental health reports and

10   assessments by experts who could have helped Mr. Albert

11   understand who Mr. Fisher is, how to approach him, how to

12   think about him.  Lawyers had successfully worked with

13   Mr. Fisher, engaged, reviewing their records and notes

14   was absolutely critical, in my judgment.  And then there

15   was the State's case which had been laid out in a prior

16   trial that I believe you have to review, and there's no

17   evidence that Mr. Albert did any of that in this case,

18   and in a death penalty case I would characterize that as

19   just objectively unreasonable.

20       Q.   Is that something that the ABA Guidelines

21   address on what sort of investigation should be done?

22       A.   Yes, the ABA Guidelines make it clear that

23   review of all documents, all materials that are related

24   to the case have to be thoroughly examined, thoroughly

25   reviewed, and thoroughly evaluated and to be adequately

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    prepared for capital litigation.

2        Q.    And that's not just going to the prosecutor but

3    looking at other things as well?

4        A.    That's right; crime witnesses, police reports,

5    witnesses provided by the client, medical records, school

6    records, employment records, all of those records.    In

7    this case there was a wealth of evidence about

8    Mr. Fisher, in particular social history, family history,

9    mental health history, but there were also a great deal

10   of evidence about the crime that would, obviously,

11   warrant close attention; evidence relating to Mr. Neal's

12   prior behavior, to witnesses who saw these men on the

13   street, to police accounts that were supportive of a

14   theory that helps Mr. Fisher.

15       Q.    We've talked a lot about the boxes of material

16   that were delivered to Mr. Albert, what would be the

17   importance of going through those?

18       A.    Well, again, to understand what the State's

19   case -- I mean, I've done... I've been in that situation.

20   It's the one upside to these retrials, you get to see the

21   entire case, unlike a lot of trials where you come in

22   with no clear understanding of what the State is going to

23   do.   You have that here so you always want to access

24   that, but beyond that every witness that you're going to

25   be facing or most of those witnesses have previously

338

1  testified.  It's just the first thing you would do is to

2  get their prior testimony to be prepared to cross-examine

3  to impeach them, to evaluate how that testimony holds up

4  in comparison to their current testimony.  Without that

5  you're just giving up a very powerful tool to help you in

6  challenging the case.

7        In this case what was also really important is

8  that there was a very powerful mitigation case.

9  Witnesses from Mr. Fisher's family had previously

10  testified.  You didn't have to guess what they could say

11  and how they would perform in court.  You didn't have to

12  speculate about what you could do to make a very

13  persuasive mitigation case, it was all laid out there for

14  you, you just have to review it and then take advantage

15  of that.  And all of that work, these mental health

16  histories, these evaluations were simply ignored in ways

17  that I think greatly prejudiced Mr. Fisher at his trial.

18      Q.  Even in a case that was 20 years old would it be

19  important to look at the physical evidence that was

20  involved in that case?

21      A.  No question.  Because the way the case is being

22  presented to the jury is back in 1983.  The presentation

23  of the evidence isn't 20 years old in the sense that

24  you're talking about what the witnesses see at the time,

25  what did the medical report show, what does this forensic

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    evidence establish, and you're getting into the mind of

2    those witnesses at that time and so you have to review

3    those records, obviously, to be effectively prepared for

4    that.

5        Q.  Is it something where you'd actually want to go

6    down to the police department or wherever they're stored

7    and see the actual physical evidence that exist --

8        A.  Oh, at a minimum.

9        Q.  -- in the case?

10        A.  Oh, at a minimum you would get all of those

11    files, but beyond that you'd go talk to the witnesses.  I

12    mean, obviously, any good defense lawyer knows that you

13    don't rely on the police account of what a witness says

14    to inform you what that witness can say.  And you can't

15    get to that unless you go talk to that witness.  For

16    example, there were lots of people identified who were on

17    the street that night that had a different account than

18    the account given by Mr. Johnson about what happened,

19    very powerful stuff, really important stuff.  Same is

20    true for the history of the decedent and his prior

21    interactions with people and his propensity for violence,

22    all of that very critical that you'd have to go explore,

23    but you're not going to get to that unless you go through

24    those boxes and look at those records.

25        Q.  How about, how important is it to have an

1    investigator on your case?

2        A.  I can't imagine in a case like this trying to do

3    it without an investigator.  I mean, in part because you

4    do have some time problems, so there are dozens of

5    witnesses in this case that have to be, you know,

6    interviewed.  And most experienced lawyers are going to

7    need the help of an investigator to help prepare those

8    interviews, to help do the initial interviews.  A lot of

9    these people are going to have to be interviewed more

10   than once.  Prior witness was talking about the need for

11   building trust with the client, that's absolutely true,

12   but you also have to build trust with the client's family

13   members.  In our country, in our culture it's very hard

14   to talk about things like physical abuse, sexual abuse,

15   domestic violence, abandonment, neglect to the first

16   stranger who comes into the door.  And so that requires

17   multiple interviews, it requires a lot of time and that's

18   why the ABA Guidelines insist that there be mitigation

19   specialists, investigators who can help with that.

20           You've got four investigations going on in this

21   case.  You've got an investigation into what happened on

22   the street that night between Mr. Johnson, Mr. Fisher,

23   Mr. Neal and all of the witnesses connected to that;

24   you've got an investigation into how likely it is that

25   Mr. Neal did something that would have made the act of

341

1    the accused in this case not called capital murder, not

2    murder at all but something less than that; manslaughter,

3    self-defense, whatever, and that's a separate

4    investigation into the likelihood that Mr. Neal did

5    something based on prior conduct that would make

6    provocation, self-defense, et cetera, a reasonable

7    theory.

8         Then you've got an investigation going on into

9    the circumstances following that incident.  Mr. Johnson

10   was initially charged with murder and then the murder

11   charges dismissed, that's a very powerful fact you want

12   to develop.  Mr. Johnson flees the jurisdiction as soon

13   as he is released from the, by the police department.

14   That evidence of flight, that flight is very important

15   suggesting that he's not a credible witness.  Mr. Johnson

16   gets to a juvenile facility and physically assaults a

17   guard, that history of violence is important to an

18   investigation that looks at the behavior of these

19   witnesses, these people post incident is important

20   because it help shape who do you believe; Mr. Johnson or

21   Mr. Fisher; what's reasonable?  And that kind of

22   presentation, again, is going to require a lot of

23   investigation.

24        And then finally, the fourth area is this

25   incredibly difficult mitigation investigation, because

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    Mr. Fisher is not from Oklahoma City he's got history,

2    family history, personal history in several states;

3    Pennsylvania, New York, in multiple communities, that's

4    going to require a lot of time.  But you're going to have

5    to get to Buffalo, you're going to have to get to

6    Harrisburg, you're going to have to get to places where

7    he's lived to document the steps in his life to

8    understand how he was out on the streets roaming around

9    at the time this incident took place, at a very young

10   age.  And because he's younger you've got to rely on a

11   lot of other people to help put that together.

12        So all of those things, in my judgment,

13   absolutely require a lot of investigative assistance.  I

14   just don't know how you could reasonably engage in

15   accomplishing all of that.  Even if you were working on

16   the case full-time by yourself for a year it would be

17   very difficult.

18        Q.  Well, we're talking about a very complicated

19   kind of process, is it something that you could

20   accomplish if you had a substance abuse problem?

21        A.  Well, I guess that's the third thing I found

22   just really hard to reconcile --

23        MS. BOX:  Judge, I object.  That's speculative.

24        THE COURT:  It is speculative.  I'm going to

25   sustain it.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    MS. CHESLEY:  I think that he can talk about the

2    thought processes that are required.

3    THE COURT:  I think we have beat that horse, and

4    through -- I'm going to sustain the objection.

5    MS. CHESLEY:  Thank you.

6    THE COURT:  And I'm sustaining it because I've

7    heard from Mr. Albert.  I've got a clear view of how

8    it affected his... so to compound it from the

9    horse's mouth really doesn't add anymore fuel to it.

10   Mr. Albert has already said, he's talked about it in

11   detail and I, you know --

12   MS. CHESLEY:  Well, Mr. Albert and --

13   THE COURT:  And I recognize his expertise and I

14   know exactly what he's going to say, and I agree

15   with him that, you know, it has, just by

16   Mr. Albert's own words and then my 30 plus years of

17   practicing law I know that.  So just, we can move

18   on.  We've beaten Mr. Albert up enough in here.

19   MS. CHESLEY:  Well, I do understand.  And I

20   don't want to beat Mr. Albert.

21   THE COURT:  I know.

22   MS. CHESLEY:  But I think that Mr. Albert to

23   some degree and certainly Mr. Palumbo seem to think

24   that even when he's drinking he can go in

25   on-the-fly, he's such a good trial attorney he can

344

1    get past that.

2        MS. BOX:  Your Honor, I object to her telling

3    what other people think.  She has no more ability to

4    do that than he --

5        MS. CHESLEY:  I believe that's what they

6    testified to yesterday.

7        MS. BOX:  No, you were talking about what you

8    think they meant, not what he said.

9        THE COURT:  That's sustained.

10       MS. CHESLEY:  All right.  We'll move on.

11       THE COURT:  Thank you.

12   Q.  (By Ms. Chesley) So what is the importance of

13   going through all these police records and the physical

14   evidence even in a case that's more than 20 years old?

15   A.  Well, to get to a theory of the defense you have

16   to understand what all the information is.  You can't

17   make informed decisions about how to present the case,

18   what witnesses to call, how to shape the voir dire

19   process, the pretrial motions, the arguments until you

20   have all that information in front of you and you, you

21   know, you think through it.  I guess what's very

22   troubling in this case is that the work was made a lot

23   easier by the 12 volumes of work that had been done

24   previously and Mr. Albert simply did not access or take

25   advantage of that information.

1    **Q.** Now, you talked a little bit about Fadjo

2 Johnson, the other young boy that was involved with this.

3 Now, Mr. Fisher was a young man at the time that this

4 happened as well, wasn't he?

5    **A.** Yes, that's right. I mean, you're talking about

6 two teenagers involved in this incident.

7    **Q.** What would be the importance of looking into

8 that background of Fadjo Johnson?

9    **MS. BOX:** Objection, Your Honor. This is

10 repetitious. We've already gone through all of

11 this.

12    **THE COURT:** It is. It really is, but I'm going

13 to overrule it and I'm going to allow it.

14    **THE WITNESS:** Well, I'll just try to be quick.

15 My review of the record makes it clear to me that

16 the evidence pointing to Mr. Fisher's culpability

17 for capital murder largely came down to the

18 testimony of Fadjo Johnson, he is the critical

19 witness. And so you want to access and avail

20 yourself of all information that might make a jury

21 believe that his testimony on that issue is

22 unreliable, and so that would be the importance of

23 it, and there was a lot out there that would have

24 allowed Mr. Albert to do that, in part Mr. Johnson's

25 own vulnerability on these charges and that would be

DISTRICT COURT OF OKLAHOMA – OFFICIAL TRANSCRIPT

346

1          the traditional and the critical component of

2          impeaching that evidence.

3          Q.  (By Ms. Chesley) Mr. Fisher was not present at

4     his trial, how do you think that affected the case?  And

5     it was Mr. Fisher's choice not to be there.  How would

6     Mr. Albert, how should he have handled that?

7          A.  Well, it's an incredibly unusual circumstance.

8     In all of my years of looking at lots and lots of these

9     cases I don't remember ever seeing a case where a client

10    was absent during an entire trial where the client had

11    not done something in the trial process itself that

12    created an absolute security risk.  To me, you completely

13    undermine the ability to get an adequate verdict where

14    you have the unexplained absence of a client in a capital

15    trial.  It just creates this presumption that the client

16    is either too dangerous, too indifferent, or too guilty

17    to matter to the process, and so you have one of two

18    options.

19          You require the client to be there and that's a

20    challenging... but something that lawyers sometimes have

21    to confront or you explain it.  And what I guess I found

22    so troubling is that there's a really compelling

23    explanation.  This is somebody with serious mental health

24    problems, with a long history of behavioral problems that

25    you could present.  I mean, it would be an opportunity to

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1 call Dr. O'Carroll, to call the competency doctors, to

2 call these people to explain why is it that you don't see

3 Mr. Fisher in the courtroom; cause he's schizophrenic,

4 because he has these problems.  And those problems mean

5 that he can't protect himself in this process and so,

6 ladies and gentlemen of the jury, we're going to ask you

7 to protect his rights even if he's not there.

8    But to have it presented in the absence of any

9 explanation I find objectively unreasonable.  It's asking

10 a lot for a juror to presume the innocence of someone

11 they never see, to presume and to find the humanity of

12 someone they never encounter and to hear nothing about

13 that that is explanatory.  You can go either way if any

14 court or lawyer chooses to kind of do it this way, fine,

15 but then the lawyer has an obligation to advocate, to

16 make up for that, and that just didn't happen here.  And

17 I think it really rendered a fair verdict, very, very

18 difficult.  Very, very difficult.

19    You know, there are other concerns because

20 Mr. Fisher is the person who is advocating for himself in

21 this capacity, which is another problem, it's objectively

22 unreasonable to ask a client with his history to prove to

23 the Court he can or cannot be in court, and that's the

24 lawyer's job.  The lawyer is supposed to be advocating

25 for Mr. Fisher in that capacity.  And again, there was

348

1   none of that.  The transcripts on that part of the trial

2   I found especially sad because Mr. Fisher desperately

3   needed an advocate.  He needed someone to help present

4   who he is and explain him to these proceedings and there

5   was no evidence of that.

6       Q.   Did you review the voir dire process in this

7   case?

8       A.   Voir dire in a capital case is really important

9   because of the complexities of life and death

10  qualification.  I think it was unreasonable for

11  Mr. Albert to not do something to create some foundation.

12  His voir dire was very short.  There were very few

13  pretrial motions.  We think of pretrial motions as in a

14  critical part in the death penalty process because you do

15  have to begin to advocate for your client to create an

16  environment where your client has a fair trial, I think

17  that was deficient.  The cross-examination of witnesses,

18  there was so much that could have been done with the

19  medical experts about critical components.

20       State introduces a witness who testifies that

21  Mr. Fisher allegedly claimed to have raped the man in

22  this case.  Well, there is physical evidence, medical

23  evidence that absolutely would have disputed that, that's

24  not developed.  The prior history of the decedent, none

25  of that comes out during cross-examination.  So at every

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

349

1   critical stage, it's my opinion, that there was deficient

2   performance; pretrial motions, voir dire,

3   cross-examination, advocacy for the client at the first

4   phase, and then certainly advocacy for the client at the

5   penalty phase.

6       Q.   What about the requesting instructions and --

7       A.   Again, there were no written instructions

8   prepared by Mr. Albert.  In a death penalty case we train

9   lawyers that's absolutely critical, one because the law

10  in these cases is a little more complicated and judges

11  need that assistance, but two, your ability to get those

12  instructions is going to require some notice, some

13  planning and some thinking, so if you want a manslaughter

14  instruction or you want an accomplice instruction or you

15  want some lesser you've got to build that into the

16  presentation, and you need to know that, obviously,

17  before the trial begins, which is why we always ask that

18  those instructions be written, prepared, presented to the

19  Court, so you know before you're going into it whether

20  you have the opportunity to develop those defenses.

21      Q.   Did Mr. Albert request, file any written

22  proposed instructions in this case?

23      A.   None.

24      Q.   Are you aware of whether there was an accomplice

25  instruction given?

1      **A.**   There was not.

2      **Q.**   And would Fadjo Johnson have been considered an

3   accomplice in this case?

4      **A.**   Oh absolutely.  I mean, anyone who is indicted

5   for murder and then admits to being present under these

6   circumstances is someone around whom you want to at least

7   create the consciousness that they are an accomplice and

8   there are a lot of ways of characterizing him as a

9   potential suspect.

10     **Q.**   What about this pre-mortem photograph of the

11  victim in this case?

12     **A.**   There was a lot of evidence introduced that we

13  would certainly instruct lawyers to challenge.  You know,

14  the trial is about whether Mr. Fisher is guilty or not

15  guilty, is he culpable or not culpable, not do we feel

16  empathy for this person, that person, et cetera.  And so

17  anything that distracts the jury from that is going to be

18  something that is objectionable.  And so not objecting to

19  that, not objecting to a lot of the instructions and a

20  lot of the argument, all of those things will be part of

21  a calculus that evaluates the performance of counsel.

22     **Q.**   On painting the picture of Fadjo Johnson as a

23  baby face kid, is --

24     **A.**   You would, obviously, want to challenge that,

25  that he's innocuous, that he's unbiased if he is also a

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    victim and that's why his assaults of guards, his flight

2    from the community, his initial indictment and charge on

3    murder would all be relevant.  I mean, he was more

4    actively engaged in prostitution on the streets than

5    Mr. Fisher was, according to the evidence available to

6    Mr. Albert.

7        Q.  Does the fact that a state court may have, you

8    know, ruled on whether a state statute is constitutional

9    mean that counsel should just give up the challenge to

10   that?

11       A.  No.  Unfortunately, in death penalty cases the

12   law changes quite a bit.  You know, initially there was

13   no requirement that there be voir dire of life

14   qualification, that is you could ask about automatic

15   death penalty jurors.  Then the court says that there is

16   that requirement but you only get the benefit of that if

17   you've been objecting, the same is true for certain kinds

18   of instructions.  And so in these areas, until the U.S.

19   Supreme Court says yes this is permissible conduct you

20   have to keep making those objections.  All of the federal

21   circuits in this country are active on these issues and

22   are constantly passing judgments; the Tenth Circuit, the

23   Eleventh Circuit, the Fifth Circuit.  And so you have to

24   kind of preserve those issues for that purpose.  But also

25   the U.S. Supreme Court, this is the most active area of

1    the U.S. Supreme Court's docket, capital cases, they do

2    eight, nine a year.

3         Q.  In fact, there was one that came out this week?

4         A.  Constantly coming out.  Another one just came

5    out this week on *Batson*.  They've got several up there on

6    a range of issues related to capital litigation, and

7    lawyers have to know about them to know that they have to

8    be making these objections, because people like

9    Mr. Fisher are absolutely prejudiced if they don't do

10   that and the law evolves.

11        Q.  How do you feel Mr. Fisher was prejudiced by

12   these failures that we've talked about?

13        A.  It's clear that the jury was given nothing at

14   either phase.  At the first phase, you know, this is not

15   a strong, in my judgment, case for capital murder.  The

16   circumstances of the crime are very, very murky.  It's

17   largely circumstantial and so a theory, I think, would

18   have absolutely created a reasonable probability of a

19   different outcome.  It's not that it's impossible or

20   unlikely, it's quite likely that a reasonable juror would

21   conclude that this is not first degree murder.  I mean,

22   Mr. Fisher was not, according to the evidence, out

23   prowling for someone to intentionally kill.  He was

24   invited into the victim's home.  There was clearly

25   evidence of solicitous behavior.  There are circumstances

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    that really raised questions about who initiated what.

2    It's very, very, to me, it's a very triable case, it's a

3    very winnable case on the question of culpability at the

4    first stage.  And then obviously --

5         Q.  And that's actually from the worst case

6    scenario.  The best case scenario with the two witnesses

7    who indicate that it might be Fadjo Johnson that went off

8    with the victim --

9         A.  Absolutely, you could, as the Tenth Circuit has

10   pointed out, absolutely flip the testimony and the

11   testifying witnesses in this case and get the same

12   outcome for Mr. Fisher that Mr. Johnson got, vice versa.

13   At the penalty phase I think it's even more dramatic, but

14   there's a very compelling history.

15        Mr. Fisher has had a very tragic life that's

16   been characterized by a lot of abandonment, a lot of

17   abuse, a lot of neglect.  He's developed mental and

18   emotional problems that have been well documented, that

19   are tragic and have some disturbing features that,

20   obviously, when you present them to a sentencer who is

21   thinking about the laws that applies to these issues

22   creates a reasonable outcome that they could consider and

23   impose a sentence less than death.

24        In my view it's a very strong mitigation case

25   the problem is it just wasn't presented at Mr. Fisher's

354

1    trial.

2        Q.   Well, there were a number of witnesses who were

3    presented against him.

4        A.   No question.  I mean, one of the things that

5    happens, and I've had to deal with this myself, is when

6    you have a client who's been on death row for many years

7    they're developing an institutional history and

8    frequently that institutional history can become an

9    aggravating factor.  In all of those cases you've got to

10   be prepared for that and to contextualize that

11   institutional behavior.  It goes both ways.  There's a

12   case, Skipper vs. South Carolina, that says when clients

13   do well that can be mitigating evidence, when clients do

14   poorly it can be aggravating, it was used as aggravating

15   in this case.  So putting on the context of that is

16   really important.

17           Mr. Fisher is someone who has always struggled

18   with people who are disrespectful, people who he sees as

19   threatening, people who are menacing, circumstances and

20   conditions that are difficult and dehumanizing, and

21   that's been his story and his history for the last 23

22   years.  So it's absolutely important that you

23   contextualize this.

24           The account of these guards is not a neutral

25   account.  These are very difficult, violent, disruptive

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

conditions and until you contextualize that you're not
going to be able to do much.  But even if that's not
something you can do a lot with it just increases the
need for mitigation and for compelling mitigation for
bringing in a lot of family members, a lot of people who
can speak to this; mental health people, experts, et
cetera, and unfortunately none of that was done.

    Q.  Would you say even an expert on that
institutional behavior would be important?

    A.  Standard operating procedure when you've got
somebody who's been on the row for these years is to have
an expert who will talk about the institutional
experience of the client.

    Q.  And when you know that those witnesses are going
to be presented it's not a surprise, you've been informed
that they're going to be presented, is that --

    A.  Absolutely.  Yeah, you're on good notice that
you're going to need that.

        THE COURT:  Are you close to a place where we
        can take a break?

        MS. CHESLEY:  I am.  Yes, I believe we can.

        THE COURT:  Why don't we break for about 10
        minutes, 10 or 15 minutes.  Then I'll entertain your
        objection, Ms. Box.

        (A recess was here had at 11:28 a.m.)

```
 1                      AFTER RECESS
 2           (Whereupon, the following transpired at
             11:36 a.m.)
 3
 4           THE COURT:  Are we ready to resume?
 5           MS. CHESLEY:  We don't have James.
 6           (An off the record discussion was here had.)
 7           THE COURT:  Ms. Box, you had an objection?
 8           MS. BOX:  Yes, sir.  Just that I think, again,
 9      it's ground we've been over.
10           THE COURT:  I'm going to overrule it, but we --
11           MS. CHESLEY:  Your Honor, I'm really going to
12      cut to the chase right now.
13           THE COURT:  Okay.
14                CONTINUING DIRECT EXAMINATION
15      BY MS. CHESLEY:
16        Q.  Based on all the information that you've been
17      provided in your review of that record and the summary of
18      the testimony presented in this trial that you have
19      looked at, have you reached conclusions regarding this
20      case?
21        A.  Yes, I have.
22        Q.  And what are those?
23        A.  That Mr. Albert's conduct was objectively
24      unreasonable, that his performance was deficient at the
25      first phase of the trial and prejudicial and that his
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    performance at the penalty phase was also deficient and

2    prejudicial and that constitutes ineffective assistance

3    under the Sixth Amendment.

4        Q.   How was it prejudicial?

5        A.   The prejudice at the first phase was by not

6    developing the kind of attorney-client relationship that

7    you need to develop evidence.   He was not able to develop

8    the kind of evidence that was required.   He couldn't

9    present a defense for Mr. Fisher based on fact and

10   witnesses because communication was so limited and

11   constrained.   It was also deficient because he didn't

12   develop reliable evidence, available evidence to help

13   explain Mr. Fisher's absence from experts who testified

14   at the competency hearing, experts who had previously

15   evaluated Mr. Fisher, experts who could have again

16   contextualized his absence.   It was prejudicial in the

17   sense that he did not create a meaningful option for the

18   jury of a verdict other than first degree murder.   They

19   were forced to choose between first degree murder and

20   acquittal, and in a case like this where there is very

21   compelling evidence to support lessers that required

22   written instructions, that required evidence and

23   witnesses who were available and had been identified, I

24   think that was deficient performance and highly

25   prejudicial.